# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JASON MCLEAN and<br>BRIAN COLEMAN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No.: 06-617-SLR |
| | ) | |
| COMMUNICATIONS<br>CONSTRUCTION GROUP, LLC., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' OPENING BRIEF IN SUPPORT OF ITS
## MOTION FOR PARTIAL SUMMARY JUDGMENT

**YOUNG, MALMBERG & HOWARD, P.A.**

/s/ Ronald G. Poliquin
Ronald G. Poliquin, Esquire
I.D. No. 4447
30 The Green
Dover, DE  19901
(302) 672-5600
*Attorney for Plaintiffs*

DATED:  November 28, 2007

## TABLE OF CONTENTS

                                                                    Page

TABLE OF AUTHORITIES............................................................ii

NATURE AND STAGE OF PROCEEDINGS.................................................1

SUMMARY OF ARGUMENT............................................................2

STATEMENT OF FACTS...........................................................3-7

ARGUMENT...................................................................8-11

    I.     PLAINTIFF IS ENTITLED TO JUDGMENT IN ITS FAVOR THAT
         FOREMAN BRADLEY DODSON TELLING SEVERAL CCG
         EMPLOYEES THAT MCLEAN AND COLEMAN WERE "TWO LAZY
         DUMB NIGGERS" CONSTITUTES RACIAL HARASSMENT.........8-10

    II.    PLAINTIFF IS ENTITLED TO JUDGMENT IN ITS FAVOR THAT
         BRADLEY DODSON WAS BRIAN COLEMAN AND JASON MCLEAN'S
         IMMEDIATE SUPERVISOR....................................................11

CONCLUSION....................................................................12

## **TABLE OF AUTHORITIES**

Page

CASES

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986)……………………………….8

*Burkhart v. Davies,* 602 A.2d 56, 59 (Del.1991)…………………………………………8

*Burlington Industries, Inc. v. Ellerth,* 118 S. Ct. 2257 (1998)……………………...11

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)…………………………………………8

*Faragher v. City of Boca Raton.* 524 U.S. 775 (1998)……………………...Passim

*Moore v. City of Philadelphia* 461 F.3d 331 C.A.3 (Pa.), 2006 ………………………8-9

STATUTES

Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a)……………………………………………………………………………………...9

## NATURE AND STAGE OF PROCEEDINGS

Brian Coleman and Jason McLean ("plaintiffs") commenced this Title VII action on October 2, 2006 contending that they were the subject of racial harassment and retaliation. Defendant Communications Construction Group, LLC ("defendant CCG") answered the complaint on October 24, 2006. On November 28, 2007, plaintiffs filed this partial motion for summary judgment and this accompanying opening brief in support thereof.

## **SUMMARY OF THE ARGUMENT**

I.    Foreman Brad Dodson telling two CCG employees that McLean and Coleman were "two dumb lazy niggers" constitutes harassment under Title VII.

II.    As crew foreman and Brian Coleman and Jason McLean's direct boss, having impact on their promotions and raises, Bradley Dodson was their supervisor as defined under Title VII.

**STATEMENT OF FACTS**

Around May 27, 2005, Communications Construction Group, LLC ("CCG")

foreman Bradley Dodson was speaking with two co-workers at a job site and stated, "At

least you don't have to work with two dumb niggers!". (Robert Koch Deposition at 11,

15-22, McLean Ex.1)

Dodson made the statement to Robert Koch. Koch was a member of a different

crew. The statement was also made in front of another employee Joseph Tatsch. (Joseph

Tatsch Deposition at 13, 1-8, McLean Ex.2) This type of statement is fairly common

between CCG employees. (Robert Koch Deposition at 15, 9-25, McLean Ex.3)

A few days later, on May 31, 2005, Robert Koch informed plaintiffs of the

statement.  Right afterwards, plaintiffs Coleman and McLean asked Dodson if he made

the remark. Plaintiffs were the first employees to alert human resources of the incident

(Michael B. Fender Deposition at 18, 1-8, McLean Ex.4 ) When asked by plaintiffs about

the remark, Bradley Dodson jumped off a machine and continually pointed his finger in

McLean's chest.  (Michael B. Fender Deposition at 42, 1-7 McLean Ex.5, ) The project

supervisor of the jobsite was David Dodson, Bradley Dodson's brother. (Robert Koch

Deposition at 14, 5-13 McLean Ex.6) After the confrontation, Bradley Dodson called

David Dodson. (David E. Dodson Deposition at 23, 10-13, McLean Ex.7) David Dodson

was Bradley Dodson's boss at the time. (Michael B. Fender Deposition at 32, 5-8,

McLean Ex.8) Employees Robert Koch and Joseph Tatsch confirmed that Dodson made

the racial slur about defendants. At the time, Bradley Dodson was poking Jason McLean

in the chest, he said, "My brother is the supervisor" or something to that nature. (Jason

McLean Deposition at 63, 1-5, McLean Ex.9) Michael B. Fender was the field supervisor

3

at the jobsite. (Michael B. Fender Deposition at 31, 5-12, McLean Ex.10) Upon arriving

at the incident, Fender had a fifteen-minute conversation with Jason McLean and Brian

Coleman.  (Michael B. Fender Deposition at 25, 17-23, McLean Ex.11) Robert Koch told

Fender that he heard Bradley Dodson call McLean and Coleman "two dumb niggers".

(Michael B. Fender Deposition at 27, 16-19, McLean Ex.12) After the incident, the police

arrested Bradley Dodson. (David E. Dodson Deposition at 28, 17-20, McLean Ex.13)

Later, the plaintiffs were reassigned to a different crew. (Robert Koch Deposition at 26,

1-17, McLean Ex.14 )

Bradley Dodson was a foreman with CCG. (Robert Koch Deposition at 13, 10-11,

McLean Ex.15) A foreman is a boss of a crew who supervises anywhere from four to six

employees. (Robert Koch Deposition at 13, 17-22, McLean Ex.15) Bradley Dodson was

the plaintiffs' direct boss. (Michael B. Fender Deposition at 32, 17-20, McLean Ex.16)

Coleman and McLean were the only members of his crew. A foreman would be given

work by a project supervisor and decide how to go about doing the work. (David E.

Dodson Deposition at 13, 1-14, McLean Ex.17) A foreman would give feedback to the

project supervisor concerning members of his crew. (David E. Dodson Deposition at 13,

12-20, McLean Ex.17) CCG conducted regular evaluations of employees that impacted

promotions and pay. (David E. Dodson Deposition at 19, 1-16, McLean Ex.18)  A

foreman's input was sought for evaluations of crew members. (David E. Dodson

Deposition at 18, 1-24, McLean Ex.19 )   The Human Resource Manager stated that

Bradley Dodson was "in supervision". (Lisa Clements Deposition at 29, 13-19, McLean

Ex.20)

CCG is a limited liability company organized and existing under the laws of Delaware. *Answer by Defendant* ¶2. CCG has operations in Delaware, New Jersey, and Delaware and currently has 70 employees. *Answer by Defendant* ¶2

Plaintiff Brian Coleman was a good employee. (Michael B. Fender Deposition at 40, 3-4, McLean Ex.21) He was dependable and came to work everyday. (David E. Dodson Deposition at 38, 1-7, McLean Ex.22) At the time of the incident, there were no problems with plaintiff Jason McLean's work. (David E. Dodson Deposition at 38, 1-7, McLean Ex.22)

CCG's reporting system on harassment allows a crew member to report racial harassment to a foreman. (David E. Dodson Deposition at 21, 21-24 and at 22, 1-11, McLean Ex.23) (CCG Harassment and Reporting Policy, McLean Ex.24). Dodson's actions were in violation of CCG's policy against racial harassment. (David E. Dodson Deposition at 35, 6-24, McLean Ex.25) (Lisa Clements Deposition at 17, 21-23, McLean Ex.26)

At the time of the incident, Lisa Clements was the manager of Human Resources and conducted an investigation. Clements never received any training on harassment or discrimination during her employment with CCG. (Lisa Clements Deposition at 16, 15-17, McLean Ex.27) Clements never conducted or participated in an investigation into racial harassment prior to the incident. (Lisa Clements Deposition at 18, 22 to 19, 1-11, McLean Ex.28) After the incident, Robert Koch and Joseph Tatsch reported what they heard to Clements and CEO Jonathan Gates. (Robert Koch Deposition at 21, 1-25, McLean Ex.29) Tatsch was told by all of the other employees to "keep his mouth shut" and "not say anything." (Joseph Tatsch Deposition at 22 and 23, McLean Ex.30) No

employee told Clements that Bradley Dodson did not make the statement. (Lisa Clements Deposition at 22, 13-16, McLean Ex.31)  Although, two employees told Clements that Bradley Dodson called the plaintiffs "two dumb niggers", Clements stated that there was no concrete evidence that the statement was made. (Lisa Clements Deposition at 25, 8-9, McLean Ex.32) Employees also told Clements that Bradley Dodson had poked Brian Coleman in the chest during the incident. (Lisa Clements Deposition at 27, 14-22, McLean Ex.33) Bradley Dodson's sole punishment was a written warning. (Lisa Clements Deposition at 28, 1-17, McLean Ex.34)

Ultimately, Clements both "believed and didn't believe" that Bradley Dodson called the plaintiffs "two dumb niggers" (Lisa Clements Deposition at 32 at 6-24 and at 33, 1-23, McLean Ex.35) Even after the incident, Clements did not believe that Bradley Dodson did not get along with the plaintiffs. (Lisa Clements Deposition at 16, 14-22, McLean Ex.36) Clements never followed up as to the outcome of Bradley Dodson's arrest. (Lisa Clements Deposition at 40, 17-19, McLean Ex.37) Clements gave Bradley Dodson the same punishment of the plaintiffs- written warnings. (Lisa Clements Deposition at 28, 14-17, McLean Ex.38) After the investigation, David Dodson and Jonathan Gates decided where the plaintiffs would be transferred and subsequently laid off. (Lisa Clements Deposition at 42, 4-10, McLean Ex.39) Even though she had more knowledge concerning the events that transpired, she was not consulted as to the plaintiffs' future at CCG. (Lisa Clements Deposition at 43, 1-14, McLean Ex.40) Fender did not believe that Coleman and McLean should receive the same punishment as Bradley Dodson. (Michael B. Fender Deposition at 44, 11-12, McLean Ex.41) Prior to making the comment about Coleman and McLean, Bradley Dodson complained about the

6

plaintiffs to his brother David Dodson. (*David E. Dodson Dep*. at 33, 1-16 McLean Ex.42).

## ARGUMENT I

**I. PLAINTIFF IS ENTITLED TO JUDGMENT IN ITS FAVOR AS FOREMAN BRAD DODSON TOLD SEVERAL CCG EMPLOYEES THAT MCLEAN AND COLEMAN WERE "TWO LAZY DUMB NIGGERS".**

A. Standard of Review

Federal Rule of Civil Procedure 56 states that summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The plain language of Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986)); *see also Burkhart v. Davies,* 602 A.2d 56, 59 (Del.1991).

An employer is subject to vicarious liability for an actionable hostile environment created by a supervisor with immediate or successively higher authority over employee. *Faragher v. City of Boca Raton.* 524 U.S. 775 (1998). For purposes of an employer's liability under Title VII, when co-workers are the perpetrators of the harassment, the plaintiff must prove employer liability using traditional agency principles; there is such a basis for liability where supervisors knew or should have known about the co-worker harassment, but failed to take prompt and adequate remedial action to stop the abuse. *Moore v. City of Philadelphia* 461 F.3d 331 C.A.3 (Pa.), 2006 citing Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

8

Simply because the comment was made out of earshot of the plaintiffs does not make it not actionable under Title VII. See *Moore*. In *Moore*, the court stated, "If a white supervisor told white employees that he fired someone because he was black or harasser someone because she was female, it would not matter that this comment was made outside of earshot of the victim or that the employee did not actually witness the firing or the harassment."

Bradley Dodson calling the plaintiffs "two dumb lazy niggers" to two other co-workers and then physically attacking Jason McLean qualifies as racial harassment under Title VII. See *Moore*. It is undisputed that foreman Bradley Dodson told co-workers Robert Koch and and Joseph Tatsch "at least you don't have two dumb niggers working with you" referencing the plaintiffs. (McLean Ex.1). Joseph Tatsch testified that Bradley Dodson call the plaintiffs "two fucking dumb lazy niggers". (McLean Ex.2)

At the time, Dodson was the foreman or "boss of the crew" who plaintiffs Jason McLean and Brian Coleman were the only members. (McLean Ex.8). David Dodson, Brad Dodson's brother was responsible for all of the crews working in the area. (McLean Ex.6) Bradley Dodson and other CCG employees have a history of making these same type of statements. (McLean Ex.3) CCG employees would make racial comments when they stayed at motels off the worksite. (McLean Ex.3) Robert Koch reported what Brad Dodson said to Lisa Clements and Jonathan Gates.( McLean Ex.29). Tatsch also reported what he heard to Lisa Clements. (McLean Ex.30) Tatsch was told by other employees to "shut his mouth and not say anything". (McLean Ex.30) Later, David Dodson participated in the decision to transfer the plaintiffs and subsequent termination from the company.

Brad Dodson's actions violated CCG's own policy against harassment. (McLean Ex.25). Lisa Clements testified that calling the Plaintiffs "two dumb niggers" and then physically assaulting another employee violates CCG's harassment policy. (McLean Ex.26)

## **ARGUMENT II**

## **I. PLAINTIFF IS ENTITLED TO JUDGMENT IN ITS FAVOR AS BRAD DODSON WAS BRIAN COLEMAN AND JASON MCLEAN'S IMMEDIATE SUPERVISOR.**

A supervisor is a person who can directly or indirectly affect a tangible employment action. *See Faragher*; *Burlington Industries, Inc. v. Ellerth*, 118 S. Ct. 2257 (1998). A "tangible employment action" consists of a significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities or a decision causing a significant change in benefits.

When the alleged harasser is a supervisor, Defendant employer is presumed to be absolutely liable for harassment under Title VII. See *Faragher*. An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. See *Burlington Industries, Inc*.

Here, Bradley Dodson was plaintiffs' immediate supervisor. Dodson was in charge of McLean and Coleman on a daily basis. (McLean Ex.16 ). As foreman, Bradley Dodson gave feedback to higher ups on how crewmembers were doing. (McLean Ex.17). Foremen help evaluate crewmembers which directly impacts a crewmember's wages and promotions. (McLean Ex.18) Prior to making the statement, Brad Dodson told his brother and superior David Dodson that McLean and Coleman had work problems. (McLean Ex.42).

CCG should be held liable for the acts of Bradley Dodson since he was the plaintiffs' supervisor.

11

## CONCLUSION

Based on the foregoing reasons, Plaintiffs Jason McLean and Brian Coleman respectfully request that this Court enter an order declaring that foreman Bradley Dodson calling the plaintiffs "two dumb lazy niggers" to two other co-workers and then physically attacking Jason McLean qualifies as racial harassment under Title VII and that CCG should be held vicariously liable for the acts of Bradley Dodson since he was the plaintiffs' supervisor.

**YOUNG, MALMBERG & HOWARD, P.A.**

/s/ Ronald G. Poliquin
Ronald G. Poliquin, Esquire
I.D. No. 4447
30 The Green
Dover, DE 19901
(302) 672-5600
*Attorney for Plaintiffs*

12

# McLean Exhibit 1

1      Q      Who is Brad Dodson?

2      A      He was an employee.

3      Q      Where was the conversation that you had

4  with him?

5      A      On one of the job sites.

6      Q      It was out on a job site?

7      A      Yeah.

8      Q      Was there anyone else present for this

9  conversation?

10     A      When he said it, yeah.

11     Q      Who else was present?

12     A      Joe Tatsch.

13     Q      And what was the -- how did this

14  conversation come about?

15     A      We were -- I think it was on a Friday,

16  Thursday, Friday.  I think it was a Friday because we

17  were leaving, and we parked equipment up past him.

18  And we were walking on down by, and he said to us it

19  because we were leaving.

20            He said, it must be nice to leave.  I said,

21  well, you get work done -- that what he said, he said,

22  you don't have the two dumb niggers working with you.

23     Q      So you were just going past him at that

24  point.  It wasn't an ongoing conversation about

25  anything?

# McLean Exhibit 2

1  was talking to Bobby Koch --

2          If you want to know what he heard, I'll

3  tell you what he said.  He ended up -- apparently, him

4  and them other two that you're talking about they

5  weren't getting along too good, so Brad Dodson ended

6  up called them stupid Fing --

7      Q      Please, you know --

8      A      -- niggers.

9          So then I never said anything because I

10  just kept walking down the road.  I didn't want to

11  cause no trouble with anybody, but I got drug back

12  into it.

13          I went up the road.  And, apparently, one

14  of the other guys had told them what Brad Dodson

15  said.

16          Now, Brad Dodson did not say this to their

17  face.  You know, he said it to this other guy; and,

18  apparently, he told him what the other one said.

19          Then it started a big dispute, and I didn't

20  want tied up in any of it because it comes to this,

21  and I did not want to be anywhere near a courthouse or

22  anything.  I would rather stay up in my mountain and

23  be left alone.

24      Q      Who was present when you and -- do you know

25  when the first comment that you referenced was made?

# McLean Exhibit 3

```
 1   would be acceptable under that policy?

 2        A     No.

 3        Q     You don't know or it would not be?

 4        A     No, it wouldn't be acceptable.

 5        Q     Given that, is there any particular reason

 6   that you didn't tell anyone that this statement had

 7   been made?

 8        A     No.

 9        Q     Had you ever heard Brad Dodson make such a

10   statement on a previous occasion?

11        A     Yeah.

12        Q     In what context?

13        A     It's always -- comes out whenever you're

14   around motels, you know, work comes up.

15        Q     From him?  From other people?

16        A     Everybody.

17        Q     Other than Mr. Miller's crew and

18   Mr. Dodson's crew, were there any other crews doing

19   underground work in Delaware at that time?

20        A     Yeah, there was other crews around.

21        Q     When you said it comes up around the motel,

22   can you explain what you're referring to by the motel?

23        A     Everybody sitting around drinking, talking

24   about work and stuff, talking about things, anything

25   in general, you know, drinking and just talking, it
```

# McLean Exhibit 4

Michael B. Fender

18

1   Q.   At some point in time do you remember Jason

2   McLean or Brian Coleman calling human resources?

3   A.   Yes.

4   Q.   Who do you remember them calling in human

5   resources?

6   A.   Can you repeat that?

7   Q.   Which one, Jason McLean or Brian Coleman?

8   A.   I don't recall.

9           MR. POLIQUIN:  I'm going to mark this as an

10  exhibit.

11          (Fender Deposition Exhibit No. 1 was marked

12  for identification.)

13  BY MR. POLIQUIN:

14  Q.   Mr. Fender, I'm showing you a letter from CCG's

15  attorneys to Novella West of the EEOC concerning this

16  incident.  If you look on the bottom of the Page 13

17  there it's represented by Ben Huggett that, "As noted

18  before neither Mr. McLean nor Mr. Coleman contacted

19  HR.  HR contacted them because the incident was

20  reported by management."  Do you read that?

21  A.   Yes, I read that.

22  Q.   And that's contrary to what you testified to

23  here today that, in fact, Jason McLean or Brian

24  Coleman had, in fact, contacted HR on the date of the

# McLean Exhibit 5

42

1  Brad Dodson was poking his finger in Brian Coleman's

2  chest?

3   A.   Can you repeat that one more time?

4   Q.   Were you made aware on May 31st, 2005 Brad

5  Dodson was poking his finger into Brian Coleman's

6  chest?

7   A.   Yes.

8   Q.   How did you feel about that?

9   A.   Concerned.

10   Q.   And why were you concerned?

11   A.   Because of physical contact.

12   Q.   And should that behavior be tolerated at CCG?

13   A.   By "tolerated," what do you mean by tolerated?

14   Q.   Do you know what the term "tolerated" means?

15   A.   Yes.

16   Q.   Do you think CCG should tolerate that behavior

17  if it was true that Brad Dodson had poked Brian

18  Coleman in the chest?

19   A.   By not tolerating it are you saying be fired?

20   Q.   I'm not saying be fired.

21   A.   I don't know what you mean.

22   Q.   What do you think would be the appropriate

23  punishment for Brad Dodson poking Brian Coleman in the

24  chest?

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

# McLean Exhibit 6

1   Dave Miller.

2       Q     Who else was on your crew?

3       A     Joe, Don -- I can't remember Don's last

4   name -- and me.  There was five of us.

5       Q     Who was the CCG management responsible for

6   the crews working in this area?

7       A     You mean over all the crews?

8       Q     Yes.

9       A     Dave Dodson.

10      Q     Who is Dave Dodson, do you know?

11      A     Who is Dave Dodson?  Another Dodson, Brad's

12  brother or something.

13      Q     Okay.

14      A     Somehow him and Brad's related?

15      Q     Did you consider reporting to Dave the

16  statement that you heard?

17      A     No.

18      Q     Did you consider reporting it to CCG human

19  resources?

20      A     No, I didn't report it to them.

21      Q     Do you remember receiving a copy of the

22  harassment policy from CCG during the course of your

23  employment?

24      A     Yeah, I got one.

25      Q     And do you know whether such a statement

# McLean Exhibit 7

David E. Dodson

23

1   Dodson?

2           MR. HUGGETT:   Objection.   Just to clarify

3   you are asking him what he was involved in?

4   BY MR. POLIQUIN:

5     Q.    I'm asking if you can describe the events that

6   happened that day.

7     A.    That was the first day, that was the day that

8   the allegations took place?

9     Q.    Correct.

10    A.    The first I heard about it Brad called me, told

11  me that Brian, Brian and Jason, came up to him -- up

12  to Frank and was yelling and screaming and he told me

13  I needed to get out there right away.

14    Q.    And he called you on -- what did he call you

15  on?

16    A.    I believe it was Nextel, which is a two-way.

17    Q.    On that date what was your position with the

18  company?

19    A.    Job supervisor.

20    Q.    And were you the supervisor for that particular

21  job?

22    A.    For?

23    Q.    The job that Bradley Dodson, Jason McLean and

24  Brian Coleman were doing.



# McLean Exhibit 8

Michael B. Fender

32

1   A.    Project supervisor.

2   Q.    And what is his relation to Brad Dodson?

3   A.    What is his relation?

4   Q.    Yes.

5   A.    You mean as far as work or as far as personal

6   life?

7   Q.    Work.

8   A.    I guess technically he would be Brad's boss.

9   Q.    Would he be pretty much everybody's boss on a

10  job site?

11  A.    By "he" you mean Dave Dodson?

12  Q.    Dave Dodson, yes.

13  A.    Yes.

14  Q.    Would he be Brian Coleman's and Jason McLean's

15  boss?

16  A.    Not directly.

17  Q.    Who would be their direct boss?

18  A.    The direct boss would be Brad Dodson.

19  Q.    As direct boss what were his duties and

20  responsibilities?

21  A.    As "he" being Brad Dodson's duties?

22  Q.    Yes.

23  A.    To maintain a proper and safe work site.

24  Q.    Anything else?

# McLean Exhibit 9

McLean and Coleman v. Communications Construction Group, LLC
Jason McLean

60

ied calling
gers?
lenied it

ice report to

; him a
ted as

g the statement

eport, did
t at all to the

Go ahead and

id, so --
xcuse me, did
Brad Dodson on May

odson had started

61

on changed you

laid off,
able to provide
arrying and my
e to the fact that I
r the both of them,
nded up -- I have
osed to have my
irs went by
nded up getting
. I actually
for it

---

**62**

1    A. All the time.
2        MR. HUGGETT: Objection.
3    Q. And when do you think about that?
4    A. Whenever I think about what life would have
5    been like if he had never made that statement.
6    Q. Do you know if Brad Dodson continued to work
7    after you were laid off from CCG?
8    A. Yeah. Because the day I was laid off, that was
9    the day they transferred him and another guy named Chris
10   to an aerial construction team up in New York, I believe.
11   Q. Do you know, did Brad Dodson make any
12   statements concerning his relationship with, the fact
13   that he was related to David Dodson, during the
14   confrontation with Brian Coleman?
15   A. Yeah. He did spout off a couple times that,
16   you know -- just pretty much they were arguing. Nobody
17   knew where the situation was going to go at that time.
18   So he did make a couple of statements about his brother,
19   yeah.
20   Q. What statements were those?
21   A. I can't remember exactly the exact statements.
22   Q. Can you recall in general what type of
23   statements they were?
24   A. When he was poking him in his chest, he was

---

**63**

1    saying, "What do you think you're doing here?" He's like
2    "My brother is the supervisor." Or something to that
3    nature. Just pretty much trying to make it like there
4    was nothing we could do. He was going to win, if we
5    tried to do anything, pretty much.
6    Q. Does the Dodson name mean anything within the
7    CCG company?
8    A. It means a lot, just like the Millers. The
9    Dodsons are some of the -- I believe they were some of
10   the founders of the company. His dad, their dad works
11   there, the brother works there, cousins work there. And
12   like I said, I met a cousin of the Dodsons in Ocean City
13   this year. It's a big family company, pretty much.
14   Q. After you were transferred from the New Castle
15   site, do you know how much you were making per square

---

**64**

1    Q. Now, you heard the question referenced by
2    defense counsel that you were actually making more after
3    you were transferred.
4    A. You make more on the books, but I mean at the
5    end of the week, after you deduct everything you have to
6    spend to make the money, you don't make more, working two
7    hours away from home, than you do when you work 30
8    minutes from home. Working for half the -- less than
9    half the pay, doing more work on a daily basis, just to
10   make that dollar.
11   Q. So, do you know if you were working more days
12   after your transfer?
13   A. Yeah. We worked four-day weeks in Angola and
14   New Castle, and in Westchester, we worked up to six days,
15   sometimes come in on the weekends and even work just to
16   make enough money.
17   Q. And who decided how many days a week you were
18   to work? How was that decided?
19   A. You were mandatory to work five days, but I
20   mean if you didn't make it, they had no problem with you
21   working more days, as much overtime as you want, because
22   the company made a lot more than we did, so they wouldn't
23   have a problem with it. There's always an abundance of
24   work, so --

---

1    Q. Do you know if anyone informed
2    that Brad Dodson, in fact, did not call yc
3    niggers?
4    A. If anybody informed her that he d
5    Q. Yes.
6    A. I don't know. I don't think so.
7    Q. And when Robert Koch had told j
8    conversation, it was in the context of how
9    they were making?
10   A. Yeah.
11   Q. And Robert Koch informed you of
12   that Brad Dodson made, was it a reference
13   were the reason that they were not making
14   A. Exactly, yes.
15   Q. And how do you know that?

# McLean Exhibit 10

Michael B. Fender

31

1    Q.   Were you friends with Brad Dodson?

2    A.   No.

3    Q.   Did you ever hang out socially outside of work?

4    A.   No.

5    Q.   What was your position on May 31st, 2005 with

6    CCG?

7    A.   My work position?

8    Q.   Correct.

9    A.   Field supervisor.

10   Q.   And what is a field supervisor?

11   A.   Field supervisor oversees duties that go on in

12   field work.

13   Q.   What are those duties and responsibilities?

14   A.   Various different duties.

15   Q.   Can you describe those various duties and

16   responsibilities?

17   A.   Maintaining a job site, dealing with customers,

18   homeowners, permit and county meetings, state highway

19   meetings, utility meetings, dealing with underground

20   infrastructure existing in certain counties and towns.

21   Q.   Who was your supervisor at the time on May

22   31st, 2005?

23   A.   Dave Dodson.

24   Q.   What was his position?

# McLean Exhibit 11

Michael B. Fender

25

1   A.   No.

2   Q.   Do you remember if your interview with Lisa

3  Clements was either tape-recorded or video-recorded?

4   A.   I don't remember.

5   Q.   Do you recall telling Lisa Clements -- well, in

6  this Incident Information Report, investigation form,

7  it doesn't say anything about being fearful of Jason

8  McLean or Brian Coleman, does it?

9   A.   You are speaking of these two investigation

10  forms?

11   Q.   Yes.

12   A.   No, it does not.

13   Q.   And it doesn't mention anything about Brian

14  Coleman and Jason McLean screaming expletives, does

15  it?

16   A.   No, it does not.

17   Q.   It does make reference to that you spoke with

18  Jason and Brian for 15 minutes regarding the

19  allegations?

20   A.   Yes, it does.

21   Q.   Do you know what was said during those 15

22  minutes?

23   A.   I don't remember.

24   Q.   It said, "The police asked Mike to get Bob so

# McLean Exhibit 12

Michael B. Fender

27

1    A.    I don't remember having a conversation with him

2    prior to being interviewed by the police.

3    Q.    Do you remember Bob Koch telling you that he

4    had, in fact, heard Brad Dodson call Brian Coleman and

5    Jason McLean two dumb niggers?

6    Q.    Can you repeat that question, please?

7    Q.    Do you remember Bob Koch telling you that he

8    had heard Brad Dodson call Jason McLean and Brian

9    Coleman two dumb niggers?

10    A.    Are you just speaking of prior to going --

11    Q.    No, at any point in time.

12    A.    I remember him telling me something that was in

13    that ballpark, but not worded the way you spoke.

14    Q.    Did he use the term "niggers"?

15    A.    Yes, he did.

16    Q.    Bob Koch had affirmatively told you that he had

17    heard Brad Dodson call Brian Coleman and Jason McLean

18    niggers?

19    A.    Yes.

20    Q.    Do you have any reason why Bob Koch would lie

21    about something like that?

22    A.    No.

23    Q.    Did you believe Bob Koch when he told you that?

24    A.    I wasn't sure.

# McLean Exhibit 13

David E. Dodson

28

```
 1    Q.    Why weren't you worried?

 2    A.    What do you mean?  I guess I should say what do

 3   you mean by worried?

 4    Q.    Were you concerned that your brother was

 5   arrested that day?

 6    A.    He wasn't arrested that day.

 7    Q.    Was he taken away by the police in handcuffs?

 8    A.    No, not at that day.

 9    Q.    When was he taken away by the police?

10    A.    Probably I think it was two weeks later.

11    Q.    Did you make a statement to the police?

12    A.    No.

13    Q.    Are you sure you didn't make a statement to the

14   police?

15    A.    I'm fairly certain, yes.  I don't remember

16   making a statement to the police.

17    Q.    When was your brother, Bradley Dodson, arrested

18   by the police?

19    A.    It was approximately two weeks after the

20   incident occurred.

21    Q.    Did your brother have any problems with any

22   other individuals at that time on the work site?

23    A.    Not that I'm aware of.

24    Q.    Did he have any problems with the Miller crew?
```

# McLean Exhibit 14

1   Then we went back to work, and then they split up them

2   two guys and put them on our crew.  Jason and Brian,

3   they worked with us for a while.

4        Q      How long did they work with you?

5        A      I don't know how long they were there.

6        Q      Were they there at the time you left in

7   July to take the other job?

8        A      Working with us, no.

9        Q      Do you remember that it was after these

10  interviews and they joined your crew that you went

11  down to the southern part of Delaware for the work?

12       A      Yeah, I think it was.

13       Q      Do you recall whether or not they were on

14  your crew at that point in time?

15       A      When we left?

16       Q      Yes.

17       A      No, they weren't with us when we left.

18       Q      When they joined your crew, did you have

19  any further discussions about these events with either

20  Brian Coleman or Jason McLean?

21       A      No.

22       Q      Any reason that you didn't?

23       A      We were told not to.  We weren't allowed to

24  discuss it.

25       Q      Who told you not to discuss it?

# McLean Exhibit 15

```
 1       A      No.

 2       Q      Did he identify by name who he was

 3  referring to?

 4       A      No.  He didn't say no names, no.

 5       Q      Did you know who he was referring to?

 6       A      He said you don't have two working for you,

 7  and he only had those other two guys working for him.

 8       Q      When you say "working for him," what do you

 9  mean?

10       A      He was more or less the boss of the crew,

11  and he had three guys working under him.

12       Q      What is the boss of the crew?  Is that

13  referred to as the foreman?

14       A      Right.

15       Q      And is that a management employee or just

16  the head of the particular crew?

17       A      It's just more or less the head of the crew.

18       Q      How many employees are generally in a crew

19  working on the underground work?

20       A      They ranged anywhere from four to six.

21  Some had more.  It all depended on what they were

22  doing and how many guys they had to have.

23       Q      Whose crew were you working on at that

24  point in time?

25       A      I was working with Bob Miller and
```

# McLean Exhibit 16

Michael B. Fender

32

1

2

3

1    A.    Project supervisor.

2    Q.    And what is his relation to Brad Dodson?

3    A.    What is his relation?

4    Q.    Yes.

5    A.    You mean as far as work or as far as personal

6    life?

7    Q.    Work.

8    A.    I guess technically he would be Brad's boss.

9    Q.    Would he be pretty much everybody's boss on a

10   job site?

11   A.    By "he" you mean Dave Dodson?

12   Q.    Dave Dodson, yes.

13   A.    Yes.

14   Q.    Would he be Brian Coleman's and Jason McLean's

15   boss?

16   A.    Not directly.

17   Q.    Who would be their direct boss?

18   A.    The direct boss would be Brad Dodson.

19   Q.    As direct boss what were his duties and

20   responsibilities?

21   A.    As "he" being Brad Dodson's duties?

22   Q.    Yes.

23   A.    To maintain a proper and safe work site.

24   Q.    Anything else?

# McLean Exhibit 17

1   they normally do.  I don't know his exact job duties,

2   but it would be running a crew of I don't know how

3   many guys right now.  Easy three to six guys.

4   Q.   You say "running a crew," is that usually what

5   a foreman does is run a crew?

6   A.   Correct.

7   Q.   What other job duties generally does a foreman

8   have?

9   A.   They basically decide -- like I would give them

10  the work and they decide where they're starting and

11  what they're going to do on that day, stuff like that.

12  Q.   Would they give you feedback as to --

13  A.   They give us a daily as to what they completed

14  that day.

15  Q.   And would they give you feedback on members of

16  their crew and how they were doing?

17  A.   Yes.

18  Q.   And would they tell you if a crew member was

19  not working out or was doing well?

20  A.   Usually, yeah, they would.

21  Q.   What does David Dodson, Senior do?

22  A.   Mechanic.

23  Q.   How is he related to you?

24  A.   Father.



# McLean Exhibit 18

David E. Dodson

19

1    doing?

2       A.    Correct.

3       Q.    And after the evaluation would there be a

4    recommendation for a raise or promotion perhaps?  What

5    was the purpose of that evaluation?

6       A.    What is that?

7       Q.    What was the purpose of that?

8       A.    It's usually they're yearly evaluations.  It's

9    just to gauge where they're at and it would be -- you

10   could suggest if they should be increased, stay the

11   same, as far as wages.  Yeah, you didn't have final

12   decision or anything on that, but basically yearly

13   evaluation to gauge where they're at.

14      Q.    Sometimes would there be a recommendation that

15   this person, individual, get a raise?

16      A.    Yes.

17      Q.    Can you describe was Brad Dodson a good

18   employee with CCG?

19      A.    Yes.

20      Q.    And what is your basis for that statement?

21      A.    As far as workload and stuff like that he

22   carried a good workload and was able to get things

23   done in a timely basis with minimal supervision.

24   Basically dependable as far as being on time to work,

# McLean Exhibit 19

David E. Dodson

18

1   You just evaluate different areas on where they're at

2   on the scale and there is a place for comments and

3   stuff like that.

4       Q.    And in what capacity did you participate in

5   evaluations, at your current position or previous

6   position?

7       A.    No, my current position.

8       Q.    How would you go ahead and evaluate a member of

9   a crew?

10      A.    As far as?

11      Q.    How would you decide how to put which numbers

12  to it?

13      A.    Just go by what they were asked and like -- and

14  just use the knowledge I had.  If it's vague, like

15  another supervisor knew more about them, I might

16  consult them and see what their thoughts were on it.

17      Q.    Would you consult with a supervisor that had

18  the most direct contact with that employee usually?

19      A.    Correct, correct.

20      Q.    And did you ever consult with a foreman?

21      A.    Yes, if it was a ground hand or somebody below

22  the foreman that I was evaluating.

23      Q.    And that would be something that you would talk

24  to a foreman about about how this crew member was

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

# McLean Exhibit 20

29

BY MR. POLIQUIN:

Q.    I'm showing to you what has been provided to
the plaintiffs as I believe notes took during your
investigation.

A.    Okay.

Q.    If you can review those and confirm that.

A.    (Witness complies.)  Okay.

Q.    Now, on Clements-2 the first page on what has
been Bates stamped DO429.  There is a part cut off
there, I believe it says Brad Dodson.  Can you confirm
that?

A.    Yes, that's Brad Dodson.

Q.    The reason why you have Brad Dodson there is
that a summary of your discussion with Brad Dodson?

A.    Yes, these are my notes after the warnings are
given to the plaintiffs and defendants.

Q.    And under 2 it says, "Should know how to handle
employees, being supervision."

A.    Correct.

Q.    Is that because you viewed that Brad Dodson was
in a supervisor position at the time this happened?

A.    He is a foreman.  He is not a supervisor, two
different levels.

Q.    Why would you write "Should know how to handle

# McLean Exhibit 21

Michael B. Fender

40

1    to that point in time?

2    A.    No.

3    Q.    Was he a good employee?

4    A.    I would say he was good.

5    Q.    Why was he good?

6              MS. WIRTH:  Objection.  Are we talking

7    about -- who are we talking about?

8              MR. POLIQUIN:  Brian Coleman.

9    A.    I would say because that crew was good and he

10   was part of that crew.

11   Q.    Outside of being part of that crew did you know

12   him as an employee individually?

13   A.    No.

14   Q.    Have you ever reviewed any of his employment

15   evaluations?

16   A.    No.

17   Q.    Who reviews those evaluations?

18   A.    I do not know.

19   Q.    Have you ever seen those evaluations in your

20   current position as a project supervisor?

21   A.    For Brian Coleman?

22   Q.    For any employee.

23   A.    No.

24   Q.    Have you ever seen any employee's evaluation in

# McLean Exhibit 22

David E. Dodson

38

1    A.    As much as I can remember him, I mean, he

2    worked every day, dependable that way.  I really don't

3    -- I really don't know.

4    Q.    You never had any problems with Brian Coleman?

5    A.    No.

6    Q.    Did you have any problems with Jason McLean?

7    A.    No.

8    Q.    Did you have a chance to ever review your

9    brother Bradley Dodson's employment file?

10   A.    No.

11   Q.    Were you aware previously that your brother had

12   been terminated by the company?

13   A.    Not that I remember.

14          MR. POLIQUIN:  Can I mark this, please.

15          (Dodson Deposition Exhibit No. 4 was marked

16   for identification.)

17   BY MR. POLIQUIN:

18   Q.    I'm going to show you what we have marked as

19   Dodson-4, Employee Warning Report, it's from January

20   18, 1990.

21   A.    Okay.

22   Q.    It appears that your brother -- it was decided

23   at one point in time your brother would be terminated

24   by the company.  You have never seen that report

# McLean Exhibit 23

David E. Dodson

21

1   for identification.)

2   BY MR. POLIQUIN:

3     Q.   I'm going to show you what has been marked

4   Exhibit Dodson-1.  Can you tell me what that document

5   is?

6     A.   It's CCG harassment policy.

7     Q.   And have you read over that document prior to

8   this?

9     A.   Yes, but I don't remember anything that is on

10  it.  It has been a while.

11    Q.   Do you know if CCG's policy prohibits racial

12  harassment or racial discrimination?

13    A.   I'm sure it does.  I mean --

14    Q.   How many classes have you taken concerning

15  sexual harassment or racial harassment or racial

16  discrimination?  Have you taken any classes?

17    A.   Yeah, one that I can recall.

18    Q.   Do you know when that was?

19    A.   I don't know the exact date.  It was years ago,

20  though.

21    Q.   In your understanding of CCG's policy if

22  someone was a subject of racial harassment or racial

23  discrimination, would it be appropriate for that

24  person to report it to their supervisor?

David E. Dodson

22

A.    Correct.

Q.    Would it be appropriate for a crew member to report it to a foreman as their supervisor?

A.    They could tell the foreman and the foreman would let the supervisor know.

Q.    As of May 31, 2005 Bradley Dodson was the foreman in charge of Jason McLean and Brian Coleman?

A.    Correct.

Q.    And you used the term "crew," they were on essentially his crew, is that correct?

A.    Yes.

Q.    And what were his job duties and responsi-bilities at that time?

A.    Whose?

Q.    I'm referring to Bradley Dodson.

A.    He was the foreman of the drill crew, directional drill crew.

Q.    And what was the job of the drill crew?

A.    They would -- we were doing FTTP work for Verizon and basically what that entailed was putting in two-inch pipe and setting some bolts for splice points.

Q.    Can you describe what happened on May 31, 2005 between Brian Coleman, Jason McLean and Bradley

# McLean Exhibit 24



DEPOSITION
EXHIBIT
PENGAD 800-631-6989
DODSON -1
9/14/07-CMV

**Communications Construction Group, LLC**          **Harassment Policy**

## Harassment/Sexual Harassment

CCG seeks to provide a work environment that is free from intimidation, hostility, or other offenses which might interfere with work performance. Harassment of any sort including verbal, physical, or visual will not be tolerated.

## What is Harassment?

Harassment deals with both verbal and physical conduct. It may be but is not limited to words, signs, horseplay, jokes, pranks, intimidation, physical conduct, or violence. Below are some examples of behavior that will not be tolerated:

**Verbal Harassment-** Verbal threats towards persons or property; the use of vulgar, profane, or discriminatory language towards others. Disparaging or derogatory comments, slurs, offensive sexual flirtation or propositions, verbal intimidation, exaggerated criticism, and name calling.

**Physical Harassment-** Any physical assault such as uninvited touching, hitting, pushing, kicking, holding, impeding or blocking the movement of another person.

**Visual Harassment-** Derogatory or offensive posters, cartoons, publications, drawings, or clothing.

**Prohibited Items on Company Property-** Under no circumstances are the following items permitted on company property, including parking areas: all types of firearms, switch blade knives or knives with blades longer than 4", dangerous chemicals, explosives including blasting caps, chains, or any contraband or illegal object carried for the purpose of injuring or intimidating.

**Sexual Harassment-** While the above items pertain to all types of harassment, we want to emphasize the seriousness of sexual harassment. Sexual harassment itself may include unwelcome sexual advances, requests for sexual favors, other verbal or physical conduct of sexual nature when such conduct creates an intimidating, hostile or offensive environment, interferes with work performance, or when performing such actions is made a term or condition of employment either explicitly or implicitly.

## Harassment/ Sexual Harassment (cont) Reporting

If you believe that you have experienced harassment, report the incident immediately to your Jobsite Supervisor, any other Supervisor with whom you feel comfortable, or to the Human Resource Manager. All reports will be promptly investigated with regard for the privacy of all parties involved, but complete confidentiality cannot be guaranteed. Any employee found to have harassed a fellow employee or subordinate will be subject to severe disciplinary action including possible termination. CCG will not retaliate against any employee who makes a good faith report of possible harassment, even if the employee was wrong. Intentionally falsifying any such harassment is a serious offense, and will be cause for severe disciplinary action, including possible termination.

- 1 -

D0433

**Responsibility**

Every CCG employee is responsible for keeping his or her work environment free of harassment. Any employee who becomes aware of an incident of harassment, whether by witnessing the incident or being credibly informed about it, must report it to a Supervisor or the Human Resource Manager. When CCG becomes aware of alleged harassment, we will investigate. Following the investigation, we will take prompt and appropriate action, whether or not the employee wants the company to do so.

If an employee suffers harassment from a supervisor or any employee, customer, or vendor and is not able to report such harassment, or is not comfortable reporting such harassment to an immediate supervisor or manager, or if a complaint concerning another employee, customer, or vendor is not handled satisfactorily, immediately contact Human Resources at (610) 696-1800.

Any person utilizing this complaint resolution procedure will be treated courteously, and the problem will be handled swiftly and as confidentially as feasible in light of the circumstances, with appropriate corrective action. The registering of a complaint will in no way be used against an employee or have an adverse impact on the individual's employment status. A record of the complaint and subsequent findings will become a part of the complaint investigation record, and a file will be maintained separately from the employee's personnel file.

*Harassment is virtually impossible to detect unless a complaint is appropriately reported. Do not assume that the Company is aware of your problem! It is your responsibility to report this information to the appropriate person so the issue can be promptly investigated and resolved.*

**I understand that my signature below indicates that I have read and understand the above statements and I have received a copy of the CCG Harassment Policy.**


_____                    _____
Employee's Printed Name                                          Date


_____
Employee's Signature

- 2 -

D0434

# McLean Exhibit 25

David E. Dodson

35

1   information that it was Brad Dodson that called Brian

2   Coleman a dumb nigger?

3      A.   I didn't hear dumb or anything like that, but I

4   heard -- yeah, yeah, I mean, that come out in the

5   wash, yes.

6      Q.   So, the accusation was that Bradley Dodson had

7   called Jason McLean and Brian Coleman two dumb

8   niggers?

9      A.   Something to that effect.

10      Q.   Based on your understanding of CCG's policy

11   against harassment if Bradley Dodson did, in fact, say

12   that, would that be a violation of CCG's harassment

13   policy?

14      A.   It would be a violation.

15      Q.   Did you learn that other employees confirmed

16   that Bradley Dodson had called Jason McLean and Brian

17   Coleman two dumb niggers?

18      A.   I believe there was another person that said

19   that, yes.

20      Q.   Did you learn that Joseph Tatsch had confirmed

21   that Bradley Dodson had called Brian Coleman and Jason

22   McLean two dumb niggers?

23      A.   Yes.

24      Q.   Did you learn that Bob Koch had confirmed that

# McLean Exhibit 26

17

1    Q.    Who gives that training?

2    A.    It's usually an outside vendor.

3    Q.    And do you know how often that occurs?

4    A.    Once every two or three years.

5    Q.    Would they have certificates showing that they

6    attended that training?

7    A.    I don't believe so.

8    Q.    Do you know what the subject matter of the

9    training would be?

10   A.    I don't recall.

11   Q.    Does the instructor give examples of what kind

12   of conduct would constitute racial harassment?

13   A.    Yes.

14   Q.    Under CCG's policy what type of conduct would

15   constitute racial harassment?

16   A.    It could be verbal, it could be visual.

17   Q.    Can you give examples?

18   A.    Visual would be, you know, a picture, a

19   cartoon, a comic and then verbal would be, you know, a

20   word or a phrase.

21   Q.    Would calling employees niggers constitute

22   racial harassment under CCG's policy?

23   A.    Yes, it would.

24   Q.    Would that constitute -- would calling

# McLean Exhibit 27

Lisa Clements

16

1    Q.    Does the company have a -- is that the

2    progressive discipline policy of the company you just

3    talked about?

4    A.    Yes.

5    Q.    Does the CCG have a policy concerning promoting

6    employees?

7    A.    No, we do not.

8    Q.    Does the company have a policy concerning

9    raises or increases in salary?

10    A.    No, not specific to that, no.

11    Q.    CCG has a policy against racial harassment and

12    discrimination, is that correct?

13    A.    CCG has a policy against all types of

14    harassment.

15    Q.    Have you ever received any harassment or

16    discrimination training during your employment at CCG?

17    A.    Training I haven't received it, no.

18    Q.    Do any employees receive any harassment or

19    discrimination training during their employment?

20    A.    Yes, our supervisors.

21    Q.    When you say "supervisors," can you name

22    specific positions?

23    A.    Project supervisors, field supervisors,

24    managers.

# McLean Exhibit 28

Lisa Clements

18

1    employees niggers constitute racial harassment whether

2    it was said directly to them or to other employees?

3       A.    It would.

4       Q.    Why would calling employees niggers to other

5    employees constitute racial harassment under CCG's

6    policy?

7       A.    Because it's a derogatory word.

8       Q.    During your time at CCG you haven't attended

9    any classes or seminars concerning racial harassment

10   related to human resources?

11      A.    I've attended numerous seminars, but I don't

12   recall what the material was off the top of my head.

13      Q.    Do you know if it involved racial harassment?

14      A.    It may have, but I'm not entirely sure.

15      Q.    Are you a member of any professional

16   associations concerning human resources?

17      A.    Yes, I'm a member of SHRM and I'm also a member

18   of the Chester County Human Resource Association.

19      Q.    SHRM being the Society For Human Resource

20   Management?

21      A.    Correct.

22      Q.    Prior to May 31, 2005 have you ever personally

23   conducted any type of investigation concerning

24   harassment or discrimination?

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Lisa Clements

19

1    A.   Not that I recall.

2    Q.   Would there be a reason that you wouldn't

3  remember that?

4    A.   It has been many years so, no, I don't

5  remember.

6    Q.   Did you work at any other companies prior to

7  working for CCG?

8    A.   Yes.

9    Q.   Did you ever personally conduct any

10  investigations concerning harassment?

11    A.   No.

12    Q.   Prior to May 31, 2005 did you ever personally

13  conduct any investigations concerning harassment?

14    A.   I've done investigations, but I don't recall if

15  it was more harassment or not.

16    Q.   Have you ever assisted anyone in conducting a

17  harassment investigation?

18    A.   No.

19    Q.   Now, when did you first learn about the

20  incident between Jason McLean, Brian Coleman and Brad

21  Dodson that involves the facts in this lawsuit?

22    A.   Once I received a phone call from Jason McLean.

23    Q.   When did that occur?

24    A.   The day of the incident.

# McLean Exhibit 29

1      A      What's her name?  I don't remember.  Human

2  resource.

3      Q      CCG human resources?

4      A      Yeah.

5      Q      Lisa Clements?

6      A      Is that who it is?  That might have been

7  it.

8      Q      She's the human resource manager for CCG

9  and was at that time.

10     A      Then that was probably her.

11     Q      What was the meeting with human resources?

12     A      They were questioned -- asking questions

13  all about it.

14     Q      Who was present for that?

15     A      What do you mean who was present?  Like --

16     Q      Did you speak directly with the person from

17  human resources?

18     A      Yes.  I spoke to Lisa.

19     Q      Was anyone else present when you spoke to

20  Lisa?

21     A      Yeah, Gates.

22     Q      John Gates?

23     A      Yeah.

24     Q      Do you recall his title?

25     A      I don't know what he was.

# McLean Exhibit 30

1    Q    Let's break it into two parts.

2         The first part is it refers to Friday?

3    A    I see that.

4    Q    It relates what you were doing, walking by,

5    and what you heard.

6         That's correct, right?

7    A    Yeah.

8    Q    You weren't involved in the conversation.

9         And then it says Monday or Tuesday?

10   A    It might have been.  I don't know.  I

11   thought it was the same day they came.

12   Q    So you at this point in time, you think it

13   was one day, but you don't really recall?

14   A    Yeah.  I thought they came the same day,

15   but they might have showed up Monday or Tuesday.

16   Q    It says, working with Bobby Koch and Pap?

17   A    That's the one I told you I think his

18   name's John or something like that, but everybody

19   called him Pap.

20   Q    So other than your not being sure on the

21   different dates, this is correct?

22   A    As far as I know of, yeah.

23   Q    After talking with human resources, did you

24   talk with anyone else about this matter?

25   A    No.  Everybody told me I should have just

```
 1  kept my mouth shut and not said anything, which is

 2  true, but then when you're working with people and

 3  that and you -- I don't like the slare word any ways.

 4  Everybody's out to make a living, and that shouldn't

 5  have been said.

 6        Q     And it's your understanding --

 7        A     But I heard it, so I felt it's my right,

 8  you know, to say what I heard, so that's all I can

 9  really tell you about it.

10        Q     Okay.

11              And human resources asked you exactly what

12  you heard --

13        A     And I told them what I heard.

14        Q     -- and took it down in their notes,

15  correct?

16        A     Yeah.

17        Q     And you understood that was against the

18  company's policy in the harassment policy?

19        A     Well, you mean for them for him to say

20  something like that?

21        Q     Correct.

22        A     Yeah.  Well, it's in anybody's policy more

23  than likely.

24        Q     Do you know what discipline was issued as a

25  result of this?
```

# McLean Exhibit 31

1    A.    No.

2    Q.    Another employee, Joseph Tatsch, also confirmed

3  he heard Brad Dodson make that statement calling Jason

4  McLean and Brian Coleman two dumb niggers, is that

5  correct?

6    A.    That is correct.

7    Q.    Other than Brad Dodson did any employee make a

8  statement to you in your investigation that Brad

9  Dodson did, in fact, not make that statement?

10            MR. WIRTH:  Objection, that was really

11  confusing.  Can you restate that?

12  BY MR. POLIQUIN:

13    Q.    Did any employee tell you that Brad Dodson

14  didn't call Brian Coleman and Jason McLean two dumb

15  niggers?

16    A.    No.

17    Q.    Brian Coleman also represented to you that

18  Robert Koch had told him that Brad Dodson had called

19  him and Mr. McLean two dumb niggers, is that correct?

20    A.    Correct.

21    Q.    Now, Jason McLean had contacted you on the date

22  the incident happened?

23    A.    Correct.

24    Q.    Did anyone else contact you on the date the

# McLean Exhibit 32

25

1   that correct?

2      A.   That's correct.

3      Q.   And would it change your investigation at all

4   if Brad Dodson pled guilty to one of the charges he

5   was arrested for?

6      A.   No.

7      Q.   Why not?

8      A.   Because there was no concrete evidence

9   regarding the racial remark that was made.

10     Q.   What do you consider concrete evidence?

11     A.   Concrete evidence would have been if Jason

12  McLean and Brian Coleman had heard the comment

13  themselves.

14     Q.   But Joseph Tatsch and Robert Koch affirmatively

15  stated that they heard the comment?

16     A.   I was not there.  I didn't hear the comment and

17  Jason and Brian Coleman did not hear the comment as

18  well.

19     Q.   You wouldn't have been there if Jason McLean or

20  Brian Coleman would have heard the comment either,

21  though?

22            MR. WIRTH:  Objection.  Is that a question?

23            MR. POLIQUIN:  Yes.

24     A.   Correct.



WILCOX & FETZER LTD.
Registered Professional Reporters

# McLean Exhibit 33

27

1   Coleman two dumb niggers to another group of

2   employees, isn't that true?

3   A.    I'm sorry, can you ask that again?

4   Q.    There is at least two employees that

5   represented to you they heard Brad Dodson state that

6   Jason McLean and Brian Coleman were two dumb niggers,

7   isn't that correct?

8   A.    That is correct.

9   Q.    Did they also represent that Brad Dodson was

10  poking Brian Coleman in the chest that day?

11          MR. WIRTH:  Objection, vague.  Can you

12  clarify what you are talking about?

13  BY MR. POLIQUIN:

14  Q.    Did anyone during your investigation state to

15  you that they saw Brad Dodson poke Brian Coleman in

16  the chest that date?

17  A.    Yes.

18  Q.    And is that a violation of CCG's harassment

19  policy?

20  A.    It's a violation of a CCG policy, but not

21  particularly the harassment policy.  Can I rephrase

22  that?  It is a violation of physical harassment.

23  Q.    Based on these findings you gave Brian Coleman

24  and Jason McLean the same type of violation as Brad

# McLean Exhibit 34

28

Dodson?

A.  I don't believe that's correct.

Q.  What punishment did Brad Dodson receive after your investigation?

A.  He received a written warning.

Q.  What punishment did Brian Coleman receive after your investigation?

A.  A written warning.

Q.  What punishment did Jason McLean receive after your investigation?

A.  A written warning.

Q.  So, they received the same type of punishment, a written warning?

A.  They received -- they all receive written warnings, however, the individual that was on the written warning is different.  They were written up for different things.

Q.  Other than the actual way the warning was written was there any other punishment to Brad Dodson?

A.  No.

MR. POLIQUIN:  If I could have this marked.

(Clements Deposition Exhibit No. 2 was marked for identification.)

# McLean Exhibit 35

Lisa Clements

31

32

1    A.    Again, if Jason and Brian had actually heard

2 the statement and if Brad had admitted that he made

3 the statement.

4    Q.    Why does that matter?

5    A.    Why does what matter?

6    Q.    Why does it matter that Jason McLean and Brian

7 Coleman did not hear the statement since it's a

8 violation of your harassment policy to call two

9 employees two dumb niggers in front of another group

10 of employees?

11    A.    No one knows that the statement was made.  Brad

12 denies that he made the statement and Jason and Brian

13 are basing their information off of two other

14 individuals that state that they heard the statement,

15 the comment.

16    Q.    Did you not believe Bob Koch and Joseph Tatsch?

17    A.    No, I didn't believe anything because -- and an

18 investigation hadn't been done yet.

19    Q.    But you conducted an investigation?

20    A.    Yes, I did.

21    Q.    So, at some point in time you have to make a

22 determination after interviewing all the witnesses, is

23 that correct?

24    A.    Correct.



1    Q.   At the end of the day when you came up with

2    your conclusions did you not believe Bob Koch and

3    Joseph Tatsch?

4    A.   I still didn't -- can you rephrase that

5    question?

6    Q.   Did you not believe Joseph Tatsch and Bob Koch

7    when they told you they heard Brad Dodson refer to

8    Jason McLean and Brian Coleman as two dumb niggers?

9    A.   I did and I didn't because of -- I did and I

10   didn't believe them.

11   Q.   What was the purpose of your investigation?

12   A.   The purpose of my investigation was to find out

13   what actually had happened.

14   Q.   And would that include finding out whether, in

15   fact, Brad Dodson made the statement?

16   A.   Yes.

17   Q.   And your conclusion was that he did not make

18   the statement?

19   A.   My conclusion was that according to Brad he did

20   not make the statement.

21   Q.   And that was after listening to both Bob Koch

22   and Joseph Tatsch?

23   A.   Correct.

24   Q.   What was your basis for giving Jason McLean and

# McLean Exhibit 36

Lisa Clements

15                                                                          16

1    Q.    Does the company have a -- is that the

2  progressive discipline policy of the company you just

3  talked about?

4    A.    Yes.

5    Q.    Does the CCG have a policy concerning promoting

6  employees?

7    A.    No, we do not.

8    Q.    Does the company have a policy concerning

9  raises or increases in salary?

10    A.    No, not specific to that, no.

11    Q.    CCG has a policy against racial harassment and

12  discrimination, is that correct?

13    A.    CCG has a policy against all types of

14  harassment.

15    Q.    Have you ever received any harassment or

16  discrimination training during your employment at CCG?

17    A.    Training I haven't received it, no.

18    Q.    Do any employees receive any harassment or

19  discrimination training during their employment?

20    A.    Yes, our supervisors.

# McLean Exhibit 37

40

1  had seven warnings during his employment with CCG?

2              MR. WIRTH:  Did you say Brian Coleman?

3              MR. POLIQUIN:  Excuse me, Brad Dodson.

4    A.    If that's what is on his file, yes.  I don't

5  know off the top of my head how many it was.

6    Q.    Did you know Brad Dodson was terminated for a

7  violation on January 18, 1990?

8    A.    Just based on what I would have seen in the

9  file.

10   Q.    Based on what you saw in the file did that

11 impact your punishment at all?

12   A.    No.

13   Q.    If you had learned that Brad Dodson did not

14 deny making a statement to the police, would that have

15 changed the findings of your investigation?

16   A.    Yes, it would have.

17   Q.    But you never followed up on what Brad Dodson

18 represented to the police?

19   A.    No, I did not.

20   Q.    And why not?

21   A.    I don't believe it was actually available, the

22 police report, at the time of my investigation.

23   Q.    Did you call the police officer that was

24 conducting the investigation?

# McLean Exhibit 38

Lisa Clements

27

28

1    Dodson?

2    A.    I don't believe that's correct.

3    Q.    What punishment did Brad Dodson receive after

4    your investigation?

5    A.    He received a written warning.

6    Q.    What punishment did Brian Coleman receive after

7    your investigation?

8    A.    A written warning.

9    Q.    What punishment did Jason McLean receive after

10   your investigation?

11   A.    A written warning.

12   Q.    So, they received the same type of punishment,

13   a written warning?

14   A.    They received -- they all receive written

15   warnings, however, the individual that was on the

16   written warning is different.  They were written up

17   for different things.

18   Q.    Other than the actual way the warning was

19   written was there any other punishment to Brad Dodson?

20   A.    No.

21        MR. POLIQUIN:  If I could have this marked.

22        (Clements Deposition Exhibit No. 2 was

23   marked for identification.)

24

at

rs,

is

to

in

it

ase

leman

rad



WILCOX & FETZER LTD.
Registered Professional Reporters

# McLean Exhibit 39

42

1  decision-making to transfer Brad Dodson, Brian Coleman

2  or Jason McLean?

3      A.   No, I was not.

4      Q.   Who decided where those employees would be

5  transferred?

6      A.   The regional manager, John Gates, and the

7  project supervisor, Dave Dodson, Junior.

8      Q.   Dave Dodson is brothers with Brad Dodson, is

9  that correct?

10     A.   That is correct.

11     Q.   And you didn't feel it was inappropriate for

12 Dave Dodson to be part of those decisions since he was

13 closely related to Brad Dodson?

14     A.   No, because Dave Dodson is our project

15 supervisor and he maintains that position whether it's

16 his brother or not.

17     Q.   As somebody with a degree in HR management you

18 don't see any conflict of interest in having Dave

19 Dodson participate in this decision?

20     A.   I didn't even know the decision was being made.

21     Q.   So, no one asked you?

22     A.   No.

23     Q.   Do you think you should have been consulted on

24 a decision like this?

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

# McLean Exhibit 40

Michael B. Fender

44

1    concerning this incident?

2      A.    Can you ask that again, please.

3              MR. POLIQUIN:    Can you repeat my last

4    question.

5              (The last question was read back by the

6    court reporter.)

7      A.    Hypothetically speaking are you asking?

8      Q.    Yes.

9      A.    No.

10     Q.    Why do you say that?

11     A.    Hypothetically I don't see where McLean and

12   Coleman should be punished.

13     Q.    Were you ever made aware of Brian Coleman or

14   Jason McLean being written up for poor work quality?

15             MS. WIRTH:    Objection, it's compound.

16   BY MR. POLIQUIN:

17     Q.    Were you ever made aware that Brian Coleman was

18   ever written up for poor work quality?

19     A.    Not in my time at CCG, no.

20     Q.    Have you ever been made aware that Jason McLean

21   was written up for poor work quality?

22     A.    Not in my time at CCG, no.

23     Q.    And as field supervisor if they were working on

24   the project you were the field supervisor on, would

# McLean Exhibit 41

44

1    concerning this incident?

2    A.    Can you ask that again, please.

3          MR. POLIQUIN:    Can you repeat my last

4    question.

5          (The last question was read back by the

6    court reporter.)

7    A.    Hypothetically speaking are you asking?

8    Q.    Yes.

9    A.    No.

10    Q.    Why do you say that?

11    A.    Hypothetically I don't see where McLean and

12    Coleman should be punished.

13    Q.    Were you ever made aware of Brian Coleman or

14    Jason McLean being written up for poor work quality?

15          MS. WIRTH:    Objection, it's compound.

16    BY MR. POLIQUIN:

17    Q.    Were you ever made aware that Brian Coleman was

18    ever written up for poor work quality?

19    A.    Not in my time at CCG, no.

20    Q.    Have you ever been made aware that Jason McLean

21    was written up for poor work quality?

22    A.    Not in my time at CCG, no.

# McLean Exhibit 42

David E. Dodson

33

1    Q.    Prior to this incident did you ever have any

2    problems with Jason McLean and Brian Coleman?

3    A.    No.

4    Q.    Did you have any complaints about their work?

5    A.    Very vague.  I mean, nothing that was real

6    concerning.  Brad did tell me that they were -- he

7    thought they would be working faster and stuff like

8    that.

9    Q.    So, Brad Dodson had informed you that he

10   thought Jason McLean and Brian Coleman could be

11   working faster?

12   A.    Right.  I don't know if it was that exactly,

13   but something to that.

14   Q.    And the speed of their work would that involve

15   how much money the crew made?

16   A.    Correct.

17   Q.    Prior to this incident other than what you

18   talked about did Bradley Dodson have any other

19   problems with Jason McLean and Brian Coleman?

20   A.    Not that I was aware of.

21   Q.    Did you have any problems concerning Jason

22   McLean and Brian Coleman's work prior to this?

23   A.    No.

24   Q.    Do you know why Brian Coleman approached

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JASON MCLEAN and | ) | |
| BRIAN COLEMAN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No.: 06-617-SLR |
| | ) | |
| COMMUNICATIONS | ) | JURY TRIAL DEMANDED |
| CONSTRUCTION GROUP, LLC., | ) | |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

I certify that on this 28th day of November, 2007, I served electronically the

attached Plaintiffs' Opening Brief in Support of Its Motion for Partial Summary

Judgment on the following parties:

Michael B. Kelly, Esquire
Daniel M. Silver, Esquire
McCarter & English, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801

Thomas Benjamin Huggett, Esquire
Courtney A. Wirth, Esquire
Morgan, Lewis & Bockius, LLP
1701 Market Street
Philadelphia, PA 19103

**YOUNG, MALMBERG & HOWARD, P.A.**

/s/ Ronald G. Poliquin
Ronald G. Poliquin, Esquire
I.D. No. 4447
30 The Green
Dover, DE 19901
(302) 672-5600
*Attorney for Plaintiffs*