# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JASON MCLEAN and
BRIAN COLEMAN,

                **Plaintiffs,**

v.

COMMUNICATIONS CONSTRUCTION
GROUP, LLC,

                **Defendant.**

CIVIL ACTION NO. 06-617 (SLR)

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT COMMUNICATIONS CONSTRUCTION GROUP, LLC'S MOTION FOR SUMMARY JUDGMENT

---

Respectfully submitted,

/s/ Daniel M. Silver
Michael P. Kelly (DE Bar ID # 2295)
Daniel M. Silver (DE Bar ID # 4758)
McCarter & English LLP
Renaissance Centre
405 N. King St., 8th Floor
Wilmington, DE 19801
302.984.6301
302.984.2493 (fax)
mkelly@mccarter.com
dsilver@mccarter.com

Thomas Benjamin Huggett *(admitted pro hac vice)*
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
215.963.5191
215.963.5001 (fax)
tbhuggett@morganlewis.com

Dated: November 28, 2007

*Attorneys for Defendant*
*Communications Construction Group, LLC*

# **TABLE OF CONTENTS**

I.  NATURE AND STAGE OF THE PROCEEDING........................................................... 1

II.  SUMMARY OF ARGUMENT ...................................................................................... 1

III.  STATEMENT OF UNDISPUTED FACTS ................................................................... 2

 A.  CCG's Operations ........................................................................................... 2

 B.  The Alleged Racial Statement ......................................................................... 3

 C.  The Investigation ............................................................................................. 5

 D.  The Transfer to Philadelphia............................................................................ 6

 E.  Use of the Company Truck ............................................................................... 6

 F.  Lay Off Due to Lack of Work.......................................................................... 6

IV.  ARGUMENT .............................................................................................................. 7

 A.  Standard Of Review ........................................................................................ 7

 B.  The Court Should Grant CCG Summary Judgment With Respect to
  Plaintiffs' Racial Discrimination Claim........................................................... 8

  1.  Plaintiffs Cannot Establish A Prima Facie Case of Racial
   Discrimination.................................................................................... 8

  2.  Plaintiffs Cannot Establish that CCG's Stated Reasons for
   its Decisions are Pretextual ............................................................... 9

 C.  The Court Should Grant CCG Summary Judgment With Respect to
  Plaintiffs' Racial Harassment Claim.............................................................. 12

  1.  Plaintiffs Cannot Establish a Prima Facie Case of Racial
   Harassment...................................................................................... 12

 D.  The Court Should Grant Summary Judgment With Respect to
  Plaintiffs' Retaliation Claim .......................................................................... 15

  1.  Plaintiffs Cannot Establish a Prima Facie Case of
   Retaliation ....................................................................................... 15

  2.  Plaintiffs Cannot Establish that CCG's Stated Reasons for
   its Decisions are Pretextual ............................................................. 17

V.  CONCLUSION.......................................................................................................... 18

MEI 6947943v.1

# TABLE OF AUTHORITIES

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986)..................................................................................................7

Andrews v. City of Phila.,
    895 F.2d 1469 (3d Cir. 1990)..................................................................................12

Bell v. Waste Management, Inc.,
    Civ. A. No. 03-992, 2004 WL 2451416 (D. Del. Oct. 29, 2004) ......................................13

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986)..................................................................................................7

Charlton v. Paramus Bd. of Educ.,
    25 F.3d 194 (3d Cir. 1994)..................................................................................8

Daso v. Grafton Sch.,
    181 F. Supp. 2d 485 (D. Md. 2002) ..................................................................13, 14

Ezold v. Wolf, Block, Schorr and Solis-Cohen,
    983 F.2d 509 (3d Cir. 1992)..................................................................................10

Farrell v. Planters Lifesavers Co.,
    206 F.3d 271 (3d Cir. 2000)..................................................................................15, 16

Fuentes v. Perskie,
    32 F.3d 759 (3d Cir. 1994)..................................................................................10, 11, 17

Goosby v. Johnson & Johnson Med., Inc.,
    228 F.3d 313 (3d Cir. 2000)..................................................................................9

Harris v. Forklift Sys., Inc.,
    510 U.S. 17 (1993)..................................................................................................12, 13

Kautz v. Met-Pro Corp.,
    412 F.3d 463 (3d Cir. 2005)..................................................................................8, 10

King v. City of Philadelphia,
    66 F. App'x 300 (3d Cir. 2003)..................................................................................13

Lawrence v. Nat'l Westminster Bank N.J.,
    98 F.3d 61 (3d Cir. 1996)..................................................................................7

ME1 6947943v.1

McDonnell Douglas Corp. v. Green,
    411 U.S. 792 (1973)................................................................8, 15

Mroczek v. Bethlehem Steel Corp.,
    126 F. Supp. 2d 379 (E.D. Pa. 2001) ................................15

Oncale v. Sundowner Offshore Servs., Inc.,
    523 U.S. 75 (1998)................................................................13

Pritchett v. Imperial Metal and Chemical Co.,
    Civ. A. No. 96-0342, 1997 WL 570929, 4 (E.D. Pa. Sept. 8, 1997) ................................16

Schoch v. First Fid. Bancorporation,
    912 F.2d 654 (3d Cir. 1990)................................................8

Smith v. Univ. of Pa.,
    No. CIV.A.05-525, 2006 WL 2645143 (E.D. Pa. Sept. 15, 2006) ......................9

Storti v. First Fid. Bank,
    No. CIV.A.97-5283, 1998 WL 404814 (E.D. Pa. July 16, 1998)......................10

Valenti v. Brownlee,
    No. 04-5369, 2005 WL 1655887 (E.D. Pa. July 13, 2005) ................................10

Walker v. Pepsi-Cola Bottling Co.,
    Civ. A. No. 99-748, 2000 WL 1251906 (D. Del. Aug. 10, 2000) ......................13

Walls v. Turano Baking Co.,
    No. 01 C 3577, 2002 WL 31236406 (N.D. Ill. Oct. 1, 2002)............................14

Weston v. Pennsylvania,
    251 F.3d 420 (3d Cir. 2001)................................................15, 16

Woods v. Bentsen,
    889 F. Supp. 179 (E.D. Pa. 1995) ................................13

Zappan v. Pennsylvania Board of Probation and Parole,
    Civ. A. No. 00-1049, 2002 WL 32174230 (E.D. Pa. Nov. 25, 2002)................................15

## FEDERAL STATUTES

42 U.S.C. § 2000e-3(a) ................................................................1

iv

## I.    NATURE AND STAGE OF THE PROCEEDING

On October 3, 2006, Plaintiff Jason McLean ("Mr. McLean") and Plaintiff Brian

Coleman ("Mr. Coleman") (collectively "Plaintiffs") filed the instant Complaint against

Defendants Communications Construction Group, LLC ("CCG"), Brad Dodson, Jonathan Gates,

and Mike Fender (the "Individual Defendants"), asserting racial harassment and discrimination

in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII")

("Count I"), retaliation in violation of Title VII ("Count II"), as well as an Equal Protection

Clause claim ("Count III"), a breach implied covenant of good faith and fair dealing claim

("Count IV"), and an assault and battery claim ("Count V").  On October 24, 2006, Defendants

filed a motion for partial dismissal to dismiss Counts III-V of the Complaint as well as all claims

against the Individual Defendants.  On January 30, 2007, the parties filed a joint stipulation for

dismissal with regards to Defendants motion which the Court granted on February 1, 2007.

Therefore, all that remains in this action is a racial harassment and discrimination claim, Count I,

and a retaliation claim, Count II, against CCG.  Discovery is closed.  CCG now moves for

summary judgment because there are no genuine issues of material fact and CCG is entitled to

judgment as a matter of law.

## II.    SUMMARY OF ARGUMENT

1.      In this matter, Plaintiffs assert three Title VII claims against CCG for

discrimination, harassment, and retaliation.  This Court should grant summary judgment with

respect to all three of Plaintiffs' claims.

2.      Plaintiffs' discrimination claim cannot survive summary judgment because

Plaintiffs cannot establish a prima facie case of discrimination under Title VII and cannot

establish that CCG's legitimate non-discriminatory reasons for its actions are pretextual.

1

Specifically, Plaintiffs cannot show that their transfer and lay off occurred under circumstances giving rise to an inference of racial discrimination.

      3.      Plaintiffs' harassment claim cannot survive summary judgment because Plaintiffs cannot establish a prima facie case of racial harassment under Title VII. Specifically, Plaintiffs cannot show that they were subject to harassment that was "pervasive and regular." They heard second hand only one alleged comment.

      4.      Plaintiffs' retaliation claim cannot survive summary judgment because Plaintiffs cannot establish a prima facie case of retaliation under Title VII and cannot establish that CCG's legitimate non-discriminatory reasons for its actions are pretextual. Specifically, Plaintiffs cannot establish a causal connection between their protected activity and any adverse employment action and they cannot show that their transfer and termination occurred under circumstances giving rise to an inference of discrimination.

      5.      Therefore, as explained in more detail below, Plaintiffs' claims are entirely without merit and Defendant is entitled to summary judgment.

## III.    STATEMENT OF UNDISPUTED FACTS[1]

### A.    CCG's Operations

    CCG is a construction services company that provides services to the cable television and telephone industries. As CCG contracts with different cable and telephone providers to perform work at many different locations, CCG employees generally work at multiple job sites. (Complaint/Answer ¶2; Exhibit 1 [Koch Dep.] at 31:11-13). Once CCG employees complete the work at one job site, it is typical for them to relocate to the next job site. (Exhibit 1 [Koch Dep.]

---

[1]    CCG accepts the following recitation of facts as undisputed for the purposes of this Motion only. CCG reserves the right to dispute any or all of the facts presented here at trial, should this Motion be denied.

at 31:14-22). Mr. Coleman himself admitted that CCG is a traveling company:

> A:      I mean it was a traveling company. That's what the
> company did. They had job sites all across the United States.
> Wherever they want to send you, that's where you have to go, if
> you want the job.
>
> Q:      And that's in the nature of the contracts and work that they
> do?
>
> A:      Yeah.

(Exhibit 2 [Coleman Dep.] at 8:21-9:3).

In May 2005, CCG was performing work for Verizon in New Castle, Delaware which consisted of the installation of underground lines in residential neighborhoods. (Exhibit 3 [McLean Dep.] at 36:11-14). At that time, both Plaintiffs Coleman and McLean worked for CCG at the New Castle, Delaware site. Mr. McLean and Mr. Coleman worked on a crew with Brad Dodson, who was the crew foreman. Plaintiffs' crew reported to Mike Fender ("Mr. Fender"), who had the job title field supervisor. (D.I. 3 ¶3; Exhibit 4 [Dodson Dep.] at 24:1-6). Mr. Fender reported to Dave Dodson, who worked as the job supervisor for the New Castle Delaware jobsite. (Exhibit 4 [Dodson Dep.] at 23:17-24:2). Jonathan Gates was the regional supervisor. (D.I. 3 ¶5; Exhibit 3 [McLean Dep.] at 44:3-7).

**B.**    **The Alleged Racial Statement**

On May 31, 2005, Mr. McLean and Mr. Coleman were working for CCG out of its New Castle, Delaware site. The work consisted of digging holes to put in underground vaults and running for conduit lines between the vaults. (D.I. 1 ¶¶10 and 11; Exhibit 3 [McLean Dep.] at 11:20-23). Another CCG employee, Robert Koch ("Mr. Koch"), began a conversation with Plaintiffs about making money. (Exhibit 3 [McLean Dep.] at 10:6-14; Exhibit 2 [Coleman Dep.] at 11:11-17). At that time, Mr. Koch told Plaintiffs that during the prior week, he heard Brad

3

Dodson make a comment allegedly referring to Mr. McLean and Mr. Coleman as "niggers."[2]
(D.I. 3 ¶14; Exhibit 3 [McLean Dep.] at 10: 8-19; Exhibit 2 [Coleman Dep.] at 11:14-23; Exhibit
1 [Koch Dep.] at 10:18-11:22, 13:2-7). Joseph Tatsch ("Mr. Tatsch"), another CCG employee,
was walking by Brad Dodson and Mr. Koch and he also heard Brad Dodson make the remark.
(Exhibit 1 [Koch Dep.] at 10:23-11:22, Exhibit 5 [Tatsch Dep.] at 14:19-15:14). It is undisputed
that Mr. McLean and Mr. Coleman were not present during this conversation and neither
Plaintiff actually heard Brad Dodson make the alleged statement. (Exhibit 3 [McLean Dep.] at
13:17-19; Exhibit 2 [Coleman Dep.] at 11:24-12:3, 17:1-14). Rather, Mr. McLean and Mr.
Coleman only heard the statement second hand from Mr. Koch who repeated it to them.

After Mr. Koch told Plaintiffs about the racial slur, Mr. McLean and Mr. Coleman left
the spot where they were working and went to confront Brad Dodson. (Exhibit 3 [McLean Dep.]
at 10:8-11:5). Brad Dodson, at that time, was working around the corner from where Plaintiffs
were located and was drilling underneath the street. (Exhibit 3 [McLean Dep.] at 10:20-11:2).
Mr. Coleman and Brad Dodson got into a verbal altercation and Brad Dodson apparently poked
Mr. Coleman in the chest. (D.I. 3 ¶16; Exhibit 3 [McLean Dep.] at 10:23-11:5; Exhibit 2
[Coleman Dep.] at 23:1-24:2). Only at that time, did Mr. McLean call Lisa Clements ("Ms.
Clements"), CCG's Human Resources Manager and Mr. Coleman called the police. (Exhibit 3
[McLean Dep.] at 11:6-13). Brad Dodson called Dave Dodson to report the incident and Dave
Dodson called Mr. Fender and told him to get to the jobsite. (Exhibit 4 [Dodson Dep.] at 23:10-
13, 24:7-12). Mr. Fender arrived at the scene and tried to defuse the situation. The police also
arrived and took statements from everyone involved.

---

[2]    Although he denied making the statement during CCG's contemporaneous internal
investigation, CCG will assume that Brad Dodson did make this remark for the purposes of
this motion only.

4

It is undisputed that aside from the May 31, 2005, neither Mr. McLean nor Mr. Coleman has identified any other instances of racial slurs made by CCG employees. (Exhibit 3 [McLean Dep.] at 10:2-5; Exhibit 2 [Coleman Dep.] at 11:1-10). Moreover, both Mr. McLean and Mr. Coleman were promoted to foreman after the incident on May 31, 2005 and after their complaints about the discriminatory statement. (Exhibit 3 [McLean Dep.] at 9:8-13, 31:22-32:1; Exhibit 2 [Coleman Dep.] at 9:4-23).

C.    **The Investigation**

Ms. Clements, on behalf of CCG, investigated the incident. In conducting her investigation, Ms. Clements interviewed all of the individuals involved. (Exhibit 6 [Clements Dep.] at 23:22-24:1). Brad Dodson denied making the racial statement. (Exhibit 6 [Clements Dep.] at 33:33:11-20). As a result of Ms. Clements' investigation, Ms. Clements gave written warnings to Brad Dodson, Mr. Koch, Mr. McLean and Mr. Coleman. Brad Dodson received a written warning for engaging in the physical altercation. (Exhibit 7 [D0491]). Mr. Koch was written up for failing to report the alleged racial statement as required by company policy and for inciting other employees by repeating the statement. (Exhibit 8 [D0486]). Mr. McLean and Mr. Coleman each received a warning for failing to use CCG's Complaint Procedure as stated in the Harassment Policy and for leaving their work area to engage in a physical confrontation with Mr. Dodson. (Exhibit 9 [D0476]; Exhibit 10 [D0481]). Both Mr. McLean and Mr. Coleman had received CCG's Employee Manual and had signed verifications that they had read and understood all of CCG's policies prior to the incident. (Exhibit 3 [McLean Dep.] at 14:2-23; Exhibits 11 [D0018] and Exhibit 12 [D0504]). Plaintiffs were immediately removed from Brad Dodson's crew and did not work on the same crew as him for the remainder of their employment with CCG.

5

### D.    The Transfer to Philadelphia

On July 6, 2005 – more than a month after the confrontation incident – Mr. McLean and

Mr. Coleman were transferred to a job site in West Chester, Pennsylvania.  The reason for the

transfer was that the work for Verizon in New Castle was being cut and more work was available

in West Chester for another Verizon contract.  (Exhibit 13 [Clements Decl.] at ¶ 2).  Mr. McLean

and Mr. Coleman were not the only CCG employees transferred to the West Chester site.

(Exhibit 3 [McLean Dep.] at 37:22-38:5).  Their entire crew, including foreman Harry Ortiz

(Hispanic), was also transferred to West Chester along with a 120 man Sub Crew.  (Exhibit 13

[Clements Decl.] at ¶ 2).

### E.    Use of the Company Truck

For the West Chester job, Mr. Coleman was assigned the use of a company truck for

taking equipment from the warehouse to the job site.  Unbeknownst to their new General Forman

– Bill Grover – Mr. Coleman drove the company truck home to Delaware.  One morning while

driving up the highway to work Mr. Grover saw Mr. Coleman and Mr. McLean driving to work

in the company truck.  Mr. Grover reviewed the issue with Mr. Gates who confirmed that only

specifically approved supervisory personnel were authorized to take company vehicles home.

(Exhibit 14 [Gates Decl.] at ¶ 3-4).  Any foremen who were permitted to take company vehicles

home had been grandfathered in under an old policy, which did not apply to Plaintiffs.  (Id. At ¶

5-6).  Mr. Coleman was directed to stop taking the company truck home.  Id.  He continued to

use it at work and to take Mr. McLean to the job site from the warehouse where they reported

each morning.  Id.

### F.    Lay Off Due to Lack of Work

Mr. McLean and Mr. Coleman were eventually laid off due to lack of work.  This

6

occurred on October 6, 2005, more than four months after the incident with Dave Dodson.

However, Plaintiffs were not the only CCG employees in their work group laid off due to lack of

work. (Exhibit 3 [McLean Dep.] at 38:10-19). In fact, Plaintiffs were among seven employees

who were all laid off on October 6, 2005 due to lack of work. (Exhibit 15 [D0574-D580];

Exhibit 13 [Clements Decl.] at ¶ 3). Four out of the seven laid off employees were outside of

Plaintiffs protected class. (Exhibit 13 [Clements Decl.] at ¶ 3).

## IV.     ARGUMENT

### A.     Standard Of Review

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of judgment against a

party who fails to offer admissible evidence sufficient to establish the existence of every element

essential to that party's case and on which that party bears the burden of proof. See Celotex

Corp. v. Catrett, 477 U.S. 317, 322, 327 (1986). Although a defendant bears the initial

responsibility of asserting the basis for its motion, the defendant is not required to negate the

plaintiff's claim. Rather, the defendant must only point out that there is an absence of evidence

to support the plaintiff's case or, alternatively, offer affirmative evidence which demonstrates

that the plaintiff cannot prove his case. Lawrence v. Nat'l Westminster Bank N.J., 98 F.3d 61,

69 (3d Cir. 1996).

After the defendant demonstrates a lack of evidence to support the non-moving party's

claims, the plaintiff must present competent evidence designating "specific facts showing that

there is a genuine issue for trial." Celotex, 477 U.S. at 324 (citation omitted). Although the

court is to view all evidence in a light favorable to the plaintiff, the mere existence of some

alleged factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Rather, a dispute must exist over a <u>material</u> fact. <u>Id.</u>; <u>Charlton v. Paramus Bd. Of Educ.</u>, 25 F.3d 194, 197 (3d Cir. 1994). To survive a motion for summary judgment, therefore, the non-moving party must come forward with specific, admissible and credible evidence supporting each element essential to that party's case; mere conclusory allegations or denials are not enough. <u>Schoch v. First Fid. Bancorporation</u>, 912 F.2d 654, 657 (3d Cir. 1990). Applying this standard, the undisputed facts establish that Plaintiffs' claims fail as a matter of law.

**B.     The Court Should Grant CCG Summary Judgment With Respect to Plaintiffs' Racial Discrimination Claim**

Plaintiffs claim that they were subject to discrimination because of their race (African-American). Specifically, Plaintiffs allege that CCG discriminated against them on the basis of their race by transferring their employment, limiting their use of a company truck, and eventually terminating their employment. The Court should grant CCG summary judgment with respect to Plaintiffs' racial discrimination claim because there is absolutely no evidence of racial discrimination in this matter.

**1.     Plaintiffs Cannot Establish A Prima Facie Case of Racial Discrimination**

Plaintiffs' Title VII race discrimination claims are subject to the familiar burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Under this framework, "[a] plaintiff must first produce evidence sufficient to convince a reasonable factfinder as to all of the elements of a prima facie case of discrimination." <u>Kautz v. Met-Pro Corp.</u>, 412 F.3d 463, 465 (3d Cir. 2005) (granting summary judgment). A plaintiff must first establish a <u>prima facie</u> case by showing by a preponderance of evidence that: (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) employees outside of the protected class were treated more

8

favorably or the circumstances of the adverse employment action otherwise give rise to an

inference of unlawful discrimination. See Smith v. Univ. of Pa., No. CIV.A.05-525, 2006 WL

2645143, *7 (E.D. Pa. Sept. 15, 2006) (citing Goosby v. Johnson & Johnson Med., Inc., 228 F.3d

313, 318-19 (3d Cir. 2000)).

Plaintiffs cannot establish a prima facie case of racial discrimination under the fourth

prong of the prima facie case because they cannot show that their transfer and termination

occurred under circumstances giving rise to an inference of discrimination. Plaintiffs have

provided absolutely no evidence of racial animus by CCG. John Gates, Regional Manager, made

the decision to transfer Plaintiffs. Plaintiffs have adduced no evidence he acted with any racial

motivation whatsoever. Moreover, the fact that both Plaintiffs were promoted to foreman after

the May 31, 2005 incident directly refutes their discrimination claim(Exhibit 3 [McLean Dep.] at

9:8-13, 31:22-32:1; Exhibit 2 [Coleman Dep.] at 9:4-23). Additionally, CCG treated Plaintiffs'

transfer and termination in the same manner as other similarly situated non-African American

employees. For example, Harry Ortiz (Hispanic), who worked on Mr. McLean and Mr.

Coleman's crew, was also transferred and then laid off due to lack of work at the same time as

Plaintiffs. (Exhibit 13 [Clements Decl.] at ¶ 2). Plaintiffs' only evidence of any racial issue was

the statement attributed to foreman Brad Dodson. As Dodson was not involved in any

subsequent part of their employment, this is in no way evidence of race discrimination.

Accordingly, Plaintiffs cannot establish a prima facie case of race discrimination and their claim

fails under Title VII.

### 2. Plaintiffs Cannot Establish that CCG's Stated Reasons for its Decisions are Pretextual

Assuming Plaintiffs can meet their prima facie burden (which they cannot), the Court

should grant summary judgment for CCG because Plaintiffs cannot prove that CCG's stated

9

reasons for its decisions are pretextual. If a plaintiff satisfies this prima facie burden, the employer must then meet its "relatively light burden" of providing a legitimate, nondiscriminatory reason for its employment action. See Valenti v. Brownlee, No. 04-5369, 2005 WL 1655887, at *3 (E.D. Pa. July 13, 2005) (granting summary judgment) (quoting Fuentes v. Perskie, 32 F.3d 759, 804 (3d Cir. 1994)). At this stage, a defendant has no duty to prove that its "proffered reasons actually motivated [its] employment decision." Kautz, 412 F.3d at 465. Rather, it simply must articulate and support the existence of those legitimate reasons. See id.; Fuentes, 32 F.3d at 763. Significantly, a defendant need not prove that its stated reason was a good reason, wise reason, fair reason, or even justifiable reason. See Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 527 (3d Cir. 1992) ("While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination.") (citation omitted); Storti v. First Fid. Bank, No. CIV.A.97-5283, 1998 WL 404814, at *8 (E.D. Pa. July 16, 1998) (observing that a court does not sit as a "super human resources office" when reviewing management decisions) (citations omitted). Once a defendant meets its minimal burden of production, the burden shifts back to a plaintiff to meet his or her final burden to demonstrate that the defendant's stated reason was mere pretext for discrimination. A plaintiff faces a "difficult burden" if he is to avoid summary judgment. Kautz, 412 F.3d at 467 (quoting Fuentes, 32 F.3d at 765).

Even assuming arguendo, that Plaintiffs can establish a prima facie case, there is no evidence that CCG's legitimate, non-discriminatory reasons for their decisions are pretextual or that CCG was otherwise motivated by anti-African American animus. Plaintiffs cannot create a triable issue of pretext merely by showing that the "employer's decision was wrong or mistaken,

10

since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." <u>Fuentes</u>, 32 F.3d at 765. Rather, Plaintiffs must adduce admissible evidence demonstrating such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them 'unworthy of credence.'" <u>Id.</u> In this case, there is not a shred of evidence that CCG's stated reasons for their decisions are pretextual.

Here, Plaintiffs were transferred from New Castle to West Chester for a legitimate, non-discriminatory reason – because the work Plaintiffs were performing for Verizon in New Castle was ending and more work was available in West Chester on another Verizon contract. (Exhibit 13 [Clements Decl.] at ¶ 2). There is absolutely no evidence that this transfer was somehow motivated by anti-African American animus – only Plaintiffs' bold-faced assertion. Moreover, as Mr. Coleman himself admitted, it was the nature of the work at CCG that employees would be transferred from one job site to another. (Exhibit 2 [Coleman Dep.] at 8:13-9:3).

While it is true that Plaintiffs were told that they could not drive the company truck home, while other supervisory employees could, this was because only specifically approved supervisory personnel were authorized to take company vehicles home. (Exhibit 14 [Gates Decl.] at ¶ 3-4). Foremen who were permitted to take company vehicles home had been grandfathered in under an old policy. (<u>Id.</u> At ¶ 5-6).

There is also no evidence that Plaintiffs' eventual layoff for lack of work was somehow motivated because of their race. Plaintiffs were not the only CCG employees laid off due to lack of work. (Exhibit 3 [McLean Dep.] at 38:10-19). In fact, Plaintiffs were among seven employees who were all laid off on October 6, 2005 due to lack of work. (Exhibit 15 [D0574-

11

D780]; Exhibit 13 [Clements Decl.] at ¶ 3). Four out of the seven employees were outside of

Plaintiffs protected class. (Exhibit 13 [Clements Decl.] at ¶ 3). Plaintiffs may subjectively

believe that their transfer to West Chester, inability to drive the company truck home, and

subsequent termination were wrong or unfair, but that is irrelevant in a discrimination case and

legally insufficient to defeat CCG's motion for summary judgment. There is simply no evidence

that any of these actions were for anything other than legitimate non-discriminatory reasons.

> ### C.     The Court Should Grant CCG Summary Judgment With Respect to Plaintiffs' Racial Harassment Claim

Plaintiffs also claim that they were subject to racial harassment. The crux of Plaintiffs'

claim is that Brad Dodson, the foreman of Plaintiffs' crew, referred to Plaintiffs on one occasion

as "niggers." Plaintiffs did not hear Brad Dodson make this alleged racial slur, but were told of

it by another coworker. The Court should grant CCG summary judgment with respect to

Plaintiffs' racial harassment claim.

> #### 1.      Plaintiffs Cannot Establish a Prima Facie Case of Racial Harassment

To establish a Title VII hostile work environment claim, Plaintiffs must establish, under

the totality of the circumstances, that: (1) they suffered intentional discrimination because of

their race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally

affected them; (4) the discrimination would have detrimentally affected a reasonable person of

the same race in the same position; and (5) that respondeat superior liability exists. See Andrews

v. City of Phila., 895 F.2d 1469, 1482 (3d Cir. 1990). Thus, to prevail on a claim for racial

harassment, a plaintiff must show that his workplace was "permeated with discriminatory

intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions

of [his] employment and create an abusive working environment." Harris v. Forklift Sys., Inc.,

510 U.S. 17, 21 (1993) (cites and quotes omitted). It is not enough for a plaintiff to show that he,

12

subjectively, believed his work environment to be hostile.  Rather, he must show that a

reasonable person would have found it so.  Id.  The plaintiff also cannot simply show that his

work environment was hostile in general.  Rather, he must show that her work environment was

hostile because of his race.  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998).

　　　In analyzing hostile work environment claims, federal courts will look to all of the

circumstances including the "frequency of the discriminatory conduct; its severity; whether it is

physically threatening or humiliating, *or a mere offensive utterance*; and whether it unreasonably

interferes with an employee's work performance."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23

(1993) (emphasis added).  In Harris, the Supreme Court held that the "mere utterance of an . . .

epithet which engenders offensive feelings in an employee does not sufficiently affect the

conditions of employment to implicate Title VII."  Id. At 21.  The principle that the mere

utterance of a racial epithet is insufficient to support a Title VII harassment claim because such

conduct is not "pervasive and regular" has been widely accepted among the courts of the Third

Circuit.  See King v. City of Philadelphia, 66 F. App'x 300, 305 (3d Cir. 2003) (affirming

summary judgment in favor of defendant and finding that a single racial epithet and physical

altercation were isolated and sporadic incidents that did not demonstrate a pervasive atmosphere

of harassment); Bell v. Waste Management, Inc., Civ. A. No. 03-992, 2004 WL 2451416, * 7 (D.

Del. Oct. 29, 2004) (granting summary judgment for a defendant where plaintiff could only point

to a single circumstance where he was subjected to a racial epithet); Walker v. Pepsi-Cola

Bottling Co., Civ. A. No. 99-748, 2000 WL 1251906, *16 (D. Del. Aug. 10, 2000) (granting

summary judgment for defendant because "[o]ne-time utterances of racial epithets simply do not

rise to the level of racial harassment); Woods v. Bentsen, 889 F. Supp. 179, 187 (E.D. Pa. 1995)

(one racial epithet insufficient as a matter of law to create hostile work environment).  See also

13

Daso v. Grafton Sch., 181 F. Supp. 2d 485, 493 (D. Md. 2002) (single incident in which

supervisor yelled at the plaintiff, "Next time you all niggers lock the door, I'm going to write you

up," was insufficient to create hostile work environment under Title VII); Walls v. Turano

Baking Co., No. 01 C 3577, 2002 WL 31236406, at *3 (N.D. Ill. Oct. 1, 2002) (supervisor's

reference to plaintiff as "nigger" insufficient to create hostile work environment under Title VII).

Judged against these standards, the undisputed record evidence firmly establishes that

Plaintiffs' harassment claim fails as a matter of law because Plaintiffs cannot establish the

second prong of their prima facie case, which requires them to prove that they were subject to

harassment which was pervasive and regular. Here, Mr. Koch told Plaintiffs that on one

occasion he heard Brad Dodson make a comment allegedly referring to Mr. McLean and Mr.

Coleman as "niggers." (Exhibit 3 [McLean Dep.] at 10: 8-19; Exhibit 2 [Coleman Dep.] at

11:14-23; Exhibit 1 [Koch Dep.] at 10:23-11:22, 13:2-7). It is undisputed that Mr. McLean and

Mr. Coleman were not present during this conversation and neither Plaintiff actually heard Brad

Dodson make the alleged statement. (Exhibit 3 [McLean Dep.] at 13:17-19; Exhibit 2 [Coleman

Dep.] at 11:24-12:3, 17:1-14). It is also undisputed that aside from the incident on May 31,

2005, neither Mr. McLean nor Mr. Coleman have identified any other instances of alleged racial

discrimination, nor did the report any other such incident to CCG during their employment.

(Exhibit 3 [McLean Dep.] at 10:2-5; Exhibit 2 [Coleman Dep.] at 11:1-10). This one incident is

simply insufficient to prove that Plaintiffs were subject to harassment which was pervasive and

regular. Even granting Plaintiffs every benefit of the doubt, their harassment claim is vastly

deficient, and therefore this Court should enter summary judgment on this claim.

14

**D.     The Court Should Grant Summary Judgment With Respect to Plaintiffs'
Retaliation Claim**

Plaintiffs also claim that CCG transferred them and terminated their employment in

retaliation for their alleged complaints about Brad Dodson's remark in violation of Title VII.

The court should grant CCG summary judgment on Plaintiffs' retaliation claim because Plaintiffs

cannot establish a causal connection between their protected activity and any adverse

employment action.

### 1.     Plaintiffs Cannot Establish a Prima Facie Case of Retaliation

Plaintiffs' retaliation claims are also subject to the McDonnell Douglas burden-shifting

framework. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 278 (3d Cir. 2000). To make out a

prima facie case of retaliation under Title VII, Plaintiff must show:  (1) participation in a

protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff;

and (3) a causal connection between the protected activity and the adverse employment action.

Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001); 42 U.S.C. § 2000e-3(a).  If the

elements of a prima facie case are met, the defendant must then proffer a legitimate, non-

retaliatory reason for the adverse action. Mroczek v. Bethlehem Steel Corp., 126 F. Supp. 2d

379, 388 (E.D. Pa. 2001). The plaintiff must then point to evidence that this reason is actually a

pretext for unlawful retaliation. Id. At 389.

There is absolutely no evidence to suggest that Plaintiffs' transfer and eventual layoff

were causally connected to their complaint about Brad Dodson's racial comment.  To determine

whether there is a causal connection between a protected activity and an adverse employment

action, courts focus on two main factors:  timing and circumstantial evidence of ongoing

antagonism. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000). With respect

to Plaintiffs termination, this is not a case where the temporal proximity between the protected

activity and the adverse action is "unusually suggestive." Id. In order to prove causation by temporal proximity, the retaliatory conduct usually must occur within a relatively short time period of the protected conduct. See Zappan v. Pennsylvania Board of Probation and Parole, Civ. A. No. 00-1049, 2002 WL 32174230, *10 (E.D. Pa. Nov. 25, 2002) (finding that a two month separation between the protected activity and the adverse employment action is "not unusually suggestive enough to establish causation"); Pritchett v. Imperial Metal and Chemical Co., Civ. A. No. 96-0342, 1997 WL 570929, 4 (E.D. Pa. Sept. 8, 1997) (same). Here, Plaintiffs were laid off more than four months after they complained about Brad Dodson's remark.

Moreover, Plaintiffs cannot point to any circumstantial evidence sufficient to raise the inference that their protected activity was likely the reason for any adverse action. Weston, 251 F.3d at 430. As mentioned above, Plaintiffs were transferred from New Castle to West Chester because the work Plaintiffs were performing for Verizon in New Castle was ending and more work was available in West Chester for another Verizon contract. (Exhibit 13 [Clements Decl.] at ¶ 2). Far from an adverse action, this was continuation of their employment. There is simply no evidence that this transfer was somehow motivated by anti-African American animus. Moreover, as Mr. Coleman himself admitted, it was the nature of the work at CCG that employees would be transferred from one job site to another. (Exhibit 2 [Coleman Dep.] at 8:13-9:3).

While it is true that Plaintiffs were told that they could not drive the company truck home, while other supervisory employees could, this was because only specifically approved supervisory personnel were authorized to take company vehicles home. (Exhibit 14 [Gates Decl.] at ¶ 3-4). Foremen who were permitted to take company vehicles home had been grandfathered in under an old policy. (Id. At ¶ 5-6).

16

Finally, there is no evidence that Plaintiffs' eventual layoff for lack of work was somehow motivated because of their race. Plaintiffs were not the only CCG employees laid off due to lack of work. (Exhibit 3 [McLean Dep.] at 38:10-19). In fact, Plaintiffs were among seven employees who were all laid off on October 6, 2005 due to lack of work. (Exhibit 15 [D0574-D780]; Exhibit 13 [Clements Decl.] at ¶ 3). Four out of the seven employees were outside of Plaintiffs protected class. (Exhibit 13 [Clements Decl.] at ¶ 3).

> ## 2.    Plaintiffs Cannot Establish that CCG's Stated Reasons for its Decisions are Pretextual

Even assuming arguendo that Plaintiffs can establish a prima facie case of retaliation, they can point to no evidence that the stated reasons for their transfer or layoff were pretextual. To survive summary judgment, a plaintiff must adduce sufficient evidence which discredits the employer's reasons for taking the adverse actions, or which shows that retaliation was more likely than not a motivating and determinative factor in that decision. Fuentes, 32 F.3d at 764. To establish pretext, a plaintiff must do more than simply argue that a factfinder should not believe the employer's reason for taking the adverse actions. Fuentes, 32 F.3d at 765. Plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them 'unworthy of credence,' and hence infer that the employer did not act for the asserted non-discriminatory reasons." Id. (citations omitted). For the same reasons stated in Section IV.B.2 above, there is simply no evidence from which a factfinder could reasonably infer that CCG's legitimate reasons for its employment actions were pretext for unlawful retaliation.

17

V.    **CONCLUSION**

For the reasons set forth above, there are no genuine disputes of material fact and the

Court should grant summary judgment.

Respectfully submitted,

/s/ Daniel M. Silver_____
Michael P. Kelly (DE Bar ID # 2295)
Daniel M. Silver (DE Bar ID # 4758)
McCarter & English LLP
Renaissance Centre
405 N. King St., 8th Floor
Wilmington, DE  19801
302.984.6301
302.984.2493 (fax)
mkelly@mccarter.com
dsilver@mccarter.com

Thomas Benjamin Huggett *(admitted pro hac vice)*
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103-2921
215.963.5191
215.963.5001 (fax)
tbhuggett@morganlewis.com

Dated:  November 28, 2007          *Attorneys for Defendant*
                                   *Communications Construction Group, LLC*

18

# EXHIBIT 1

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 3                          -  -  -

 4   McLEAN, et al.,                    )
                                        )
 5              Plaintiffs,             )
                                        ) Action
 6        vs.                           ) No. 06-617-SLR
                                        )
 7   COMMUNICATIONS CONSTRUCTION        )
     GROUP, LLC,                        )
 8                                      )
                Defendant.              )
 9
                            -  -  -
10
                 Deposition of ROBERT KOCH
11
                 Monday, November 5, 2007
12
                            -  -  -
13
          The deposition of ROBERT KOCH, called as a
14   witness by the Defendant, pursuant to notice and the
     Federal Rules of Civil Procedure pertaining to the
15   taking of depositions, taken before me, the
     undersigned, Melissa L. Fenster, a Notary Public in
16   and for the Commonwealth of Pennsylvania, at the
     offices of Morgan, Lewis & Bockius, LLP, One Oxford
17   Centre, 32nd Floor, Pittsburgh, Pennsylvania  15219,
     commencing at 9:00 o'clock a.m., the day and date
18   above set forth.

19                          -  -  -

20           COMPUTER-AIDED TRANSCRIPTION BY
                MORSE, GANTVERG & HODGE, INC.
21               PITTSBURGH, PENNSYLVANIA
                      412-281-0189
22
23   ORIGINAL                -  -  -

24

25
```

```
 1  APPEARANCES:

 2        On behalf of the Plaintiffs:

 3           (No appearance.)

 4        On behalf of the Defendant:

 5           Morgan, Lewis & Bockius, LLP:
              Thomas B. Huggett, Esquire
 6           1701 Market Street
              Philadelphia, Pennsylvania  19103-2921
 7
                      - - -
 8                     INDEX

 9  EXAMINATION:                              PAGE:

10  BY MR. HUGGETT                              3

11  KOCH DEPOSITION EXHIBITS:                 PAGE:

12  1    Letter with subpoena                   22

13  2    Harassment policy acknowledgment       22

14  3    Incident Investigation Form            22

15  4    Disciplinary notice                    27

16                    - - -

17

18

19

20

21

22

23

24

25
```

1                              ROBERT KOCH

2   called as a witness by the Defendant, having been

3   first duly sworn, as hereinafter certified, was

4   deposed and said as follows:

5                      DIRECT EXAMINATION

6   BY MR. HUGGETT:

7        Q     Mr. Koch, would you state your full name

8   for the record.

9        A     Robert James Koch, Jr.

10       Q     What is your present home address?

11       A     RR 2 Box 361, Portage, Pennsylvania, 15946.

12       Q     What's your phone number?

13       A     814-695-9020.

14       Q     Have you ever been deposed before,

15  Mr. Koch?

16       A     No.

17       Q     A deposition is the process during the

18  course of a lawsuit in which the parties to the

19  lawsuit are entitled to ask questions of witnesses.

20  And the purpose of that is for the parties to learn

21  the facts about the case before proceeding to a

22  trial.

23            So the purpose here today is to ask

24  questions of you related to a lawsuit brought by

25  Brian Coleman and Jason McLean against Communications

1              It would have been in July.

2      Q      You're looking at something.

3              What is that?

4      A      Reference from New Enterprise.

5      Q      Do you mind if I --

6              So this is your certification of road test

7  for your new company?

8      A      Yeah.

9      Q      New Enterprise?

10     A      Correct.

11     Q      And it states that the road test was

12  14 July 2005?

13     A      Correct, so it was in July whenever I left

14  CCG.

15     Q      We were talking earlier about the issues

16  that brought about this lawsuit.  You identified a

17  statement.

18              Can you in your own description tell me

19  what you remember about that event when it first

20  occurred, when you first heard such a statement?

21     A      I don't know when it occurred.

22     Q      Okay.

23              This was a conversation that you had with

24  Brad Dodson, correct?

25     A      Yeah, it was Brad Dodson.

1    Q    Who is Brad Dodson?

2    A    He was an employee.

3    Q    Where was the conversation that you had

4  with him?

5    A    On one of the job sites.

6    Q    It was out on a job site?

7    A    Yeah.

8    Q    Was there anyone else present for this

9  conversation?

10    A    When he said it, yeah.

11    Q    Who else was present?

12    A    Joe Tatsch.

13    Q    And what was the -- how did this

14  conversation come about?

15    A    We were -- I think it was on a Friday,

16  Thursday, Friday.  I think it was a Friday because we

17  were leaving, and we parked equipment up past him.

18  And we were walking on down by, and he said to us it

19  because we were leaving.

20        He said, it must be nice to leave.  I said,

21  well, you get work done -- that what he said, he said,

22  you don't have the two dumb niggers working with you.

23    Q    So you were just going past him at that

24  point.  It wasn't an ongoing conversation about

25  anything?

1    A    No, no.  We stopped for maybe a minute or

2    two, and then we left.

3    Q    What did you say to him in response to that

4    comment?

5    A    Nothing, just left.

6    Q    Was Mr. Tatsch standing there?

7    A    Yeah.  Joe and I were both standing there.

8    Q    Did he say anything?

9    A    No.

10    Q    Did anybody say anything after --

11    A    No.

12    Q    -- he said -- made that statement?

13    A    No.  We just looked at him and left.

14    Q    Did you report that to anyone at that point

15    in time?

16    A    No.  We left right from there and went

17    straight home.  We didn't go to the shop or nothing.

18    Q    Is it correct that was Memorial Day

19    Weekend?

20    A    It could have been.  I'm not going to say

21    that it is or it isn't.  I'm not sure.

22    Q    So that was all that happened on that day.

23         Nothing else that you can recall --

24    A    No.

25    Q    -- occurring on that particular day?

1      A      No.

2      Q      Did he identify by name who he was

3   referring to?

4      A      No.  He didn't say no names, no.

5      Q      Did you know who he was referring to?

6      A      He said you don't have two working for you,

7   and he only had those other two guys working for him.

8      Q      When you say "working for him," what do you

9   mean?

10     A      He was more or less the boss of the crew,

11   and he had three guys working under him.

12     Q      What is the boss of the crew?  Is that

13   referred to as the foreman?

14     A      Right.

15     Q      And is that a management employee or just

16   the head of the particular crew?

17     A      It's just more or less the head of the crew.

18     Q      How many employees are generally in a crew

19   working on the underground work?

20     A      They ranged anywhere from four to six.

21   Some had more.  It all depended on what they were

22   doing and how many guys they had to have.

23     Q      Whose crew were you working on at that

24   point in time?

25     A      I was working with Bob Miller and

1      Q      Correct?

2      A      I guess, yeah.  As far as I can remember,

3  yes, just them two and me.

4      Q      Were you present for any conversation

5  between Brian Coleman and Jason McLean about that

6  statement?

7      A      No.

8      Q      Were you present when they spoke to

9  Brad Dodson?

10     A      No.

11            Are you talking about Jason and them?

12     Q      Yes.

13     A      No.

14     Q      You've testified that pursuant to the

15  direction from human resources not to discuss the

16  matter after you were interviewed by them, you didn't

17  have any further discussions about this?

18     A      No.

19     Q      Did you hear anyone else have any

20  discussions about it?

21     A      No.

22     Q      You said that Brian and Jason joined your

23  crew after that event?

24     A      Yes.

25     Q      Do you know approximately how long they

1    were on your crew after that?

2        A      No.

3        Q      Do you know -- I may have asked you this,

4    but do you know whether they were still working for

5    CCG at the time you left in July?

6        A      I don't know if they were or not whenever I

7    left because they weren't -- they weren't with us, and

8    we were down at, you know, another site, different

9    places, so I couldn't tell you if they were still

10   working or not.

11       Q      Working at different sites was common at

12   CCG?

13       A      Yes.

14       Q      You finish in one area and you move to the

15   next?

16       A      Move to the next area, finish there and go

17   to the next area.  You might only be in there a day

18   one area and go to another area the same day.

19       Q      It's a part of -- simply a part of what

20   they do?

21       A      Right.  They bounce around different

22   areas.

23       Q      At the time you left in or about July of

24   2005, what was the state of the work available at CCG,

25   if you know?

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


JASON McLEAN and                    )
BRIAN COLEMAN,                      )
                                    )   C.A. No. 06-617 SLR
                    Plaintiffs,)
                                    )
  -vs-                              )
                                    )
COMMUNICATIONS CONSTRUCTION         )
GROUP, LLC,                         )
                                    )
                    Defendant. )



          Deposition of BRIAN COLEMAN taken pursuant
to notice at the law offices of Young, Malmberg &
Howard, 30 The Green, Dover, Delaware, beginning at 1:00
p.m. on September 13, 2007, before Julianne LaBadia,
Registered Diplomate Reporter and Notary Public.


APPEARANCES:

          RONALD POLIQUIN, ESQ.
          YOUNG, MALMBERG & HOWARD
            30 The Green
            Dover, Delaware  19901
            For the Plaintiff


          THOMAS BENJAMIN HUGGETT, ESQ.
          MORGAN, LEWIS & BROCKIUS, LLP
            1701 Market Street
            Philadelphia, Pennsylvania  19103
            For the Defendant

          WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
          (302) 655-0477
          www.wilfet.com



Brian Coleman

2

1                          BRIAN COLEMAN

2              The deponent herein, having first been

3              duly sworn on oath, was examined and

4              testified as follows:

5                       DIRECT EXAMINATION

6    BY MR. HUGGETT:

7         Q.    Would you state your name for the record?

8         A.    Brian T. Coleman.

9         Q.    Mr. Coleman, by whom are you presently

10   employed?

11        A.    Myself.

12        Q.    And what do you do?

13        A.    The same thing that I used to do there.

14        Q.    When you say "there," you're referring to

15   Communication Construction Group?

16        A.    Yes, sir.

17        Q.    Have you worked for any other company since you

18   worked for CCG?

19        A.    Yeah.  I mean I work for myself, but I still

20   sub work out.  I get it from somebody else.

21        Q.    Who do you get work for?

22        A.    JT Enterprises, now it's S&M, out of Richmond,

23   Virginia, or Ashland, Virginia.

24        Q.    And do you get a paycheck from them?  Or how

Brian Coleman

3

1    does that work for you?

2          A.    Yeah.  A paycheck.

3          Q.    And what do you presently make?

4          A.    What do you mean?  As far as what?

5          Q.    On an average week.

6          A.    I haven't got a paycheck yet.  I just started

7    back working.

8          Q.    You just started working?

9          A.    Yeah.  Three weeks out.  I been working for

10   three weeks.  Now I'll just get a paycheck this Friday.

11   It's production pay, the same type pay that I was making

12   there.

13         Q.    Same type of rates?  Higher rates?

14         A.    No.  Lower rates.

15         Q.    You said you've only been working for them for

16   three weeks?

17         A.    Three weeks.

18         Q.    And when were you working before that?

19         A.    Probably like four months before that.

20   Approximately.  Give or take.

21         Q.    How long have you worked for JT Enterprises?

22         A.    Oh, about a year, I guess, a little over a

23   year.

24         Q.    So, did you work for anyone else?

Brian Coleman

8

1    A.   I'm not sure.

2    Q.   And when did that move to New Castle?

3    A.   I have no idea.  You asking me stuff that was

4 like a couple years back.  I can't remember.  CCG should

5 have that information.

6    Q.   Okay.  Well, at this point, I am just exploring

7 what you recall, and, yeah, we'll -- your attorney has

8 the right to ask questions of our employees, as well.

9    A.   That's fine.

10   Q.   And we can go through all that.  Do you know

11 why the work moved from Westchester down to New Castle?

12   A.   No.

13   Q.   And at some point, the work moved back from New

14 Castle back up to Westchester, correct?

15   A.   From where?

16   Q.   From New Castle, Delaware, back up to

17 Westchester?

18   A.   Yeah.

19   Q.   Did it go back and forth over a period of

20 years, or just --

21   A.   I mean it was a traveling company.  That's what

22 the company did.  They had job sites all across the

23 United States.  Wherever they want to send you, that's

24 where you have to go, if you want the job.

Brian Coleman

9

1      Q.    And that's in the nature of the contracts and

2   work that they do?

3      A.    Yeah.

4      Q.    What was the last position that you held with

5   CCG?

6      A.    I was a foreman.

7      Q.    When did you become a foreman?

8      A.    Well, I was a foreman when I was doing the

9   underground FIOS work, before that Verizon work started.

10  After that incident happened with Mr. Dodson, Mr. Gates,

11  I asked him if I could run my own crew, he told me he

12  didn't know if I was capable of doing that, and that's

13  when he tried -- gave me a crew and gave me a truck and

14  took the truck away.  After that incident happened, after

15  I got back off vacation from California.

16      Q.    The incident that you're referring to is the

17  May 31 conversation, Mr. Robert Koch told you about a

18  comment that was allegedly made by Brad Dodson; is that

19  correct?

20      A.    I guess that was May 31st.  Yeah.  I mean if

21  that was the right day.  That was a long time ago.  But

22  it wasn't just Robert Koch.  It was a couple other guys,

23  as well.

24      Q.    We'll get back to that.  And it was after that

Brian Coleman

11

1       Q.    2005.   Now, you had worked for CCG for a number

2   of years prior to May 31st, 2005?

3       A.   Yes.

4       Q.    Were there any events that occurred prior to

5   that date, in your employment --

6       A.   With me?

7       Q.   With you.

8       A.   No, sir.

9       Q.   Didn't have any problems --

10      A.   No problem at all.

11      Q.    -- with the company or working?  Okay.  In your

12  own words, if you would, tell me what happened on May

13  31st, what the conversation was with Mr. Koch.

14      A.    Well, it was me and Jason McLean, saw Mr. Koch,

15  I guess, and asked him if they were making any money.  It

16  was like -- some weeks you do good and some weeks you do

17  bad.  This was one of those bad spells.  And he had told

18  us what Mr. Dodson said, about "We weren't making any

19  money, but at least you don't have to work with two dumb

20  niggers."

21      Q.    And when you said Mr. Dodson, you're referring

22  to Brad Dodson?

23      A.    Brad Dodson.  He was my foreman.

24      Q.    You weren't present for this conversation

Brian Coleman

12

1    between Mr. Dodson when he allegedly made this statement

2    to Mr. Koch?

3        A.    No.  I wasn't.

4        Q.    Do you know when that happened?

5        A.    It was a Friday before that weekend, or -- we

6    had a weekend off or something, a holiday or something.

7    A couple days that went past, and that Monday, I think,

8    they told us.

9        Q.    What did you say to Mr. Koch after he gave you

10   this alleged statement?

11       A.    Well, you keep saying Mr. Koch.  It wasn't just

12   Mr. Koch who was telling me.

13       Q.    Okay.  Who else -- where did that conversation

14   take place?

15       A.    Right in the neighborhood where we were working

16   at.

17       Q.    Okay.  And was Mr. Koch working with you?

18       A.    No.  Mr. Koch wasn't working with us.

19       Q.    Okay.

20       A.    We all worked -- there was a street here, a

21   street here.  Everybody -- the neighborhood was broken up

22   into sections.  This crew had this section, this crew had

23   this section.  We had to go around the corner on the

24   backhoe to get stone.  We were getting boxes.  And we

Brian Coleman

17

1     A.    It says me, the big boss -- he called me a dumb

2  nigger before the police came.

3     Q.    Okay.  You didn't tell the police that he

4  called you a dumb nigger at that point in time?

5     A.    Yes, I did.  Yes, I did.

6     Q.    Did he call you that, on May 31st?

7     A.    He called me that before May 31st.

8     Q.    You heard that he called you that?

9     A.    Yeah.

10    Q.    You never heard that directly from him, did

11 you?

12    A.    From a couple guys.

13    Q.    You never heard that --

14    A.    No.  I didn't hear that directly from him.

15    Q.    Okay.

16    A.    Okay.

17    Q.    So, did you mean to tell the police that you

18 heard it directly from him?

19    A.    I never told the police that I heard it

20 directly from him.

21    Q.    If you look at the --

22    A.    When the police came there, they took my

23 statement.  They said that there was more than one party

24 who heard him say it, so that was admissible in court, it

Brian Coleman

23

1      Q.    How did you approach him?

2      A.    I didn't go up there yelling at him.  He jumps

3  off the machine yelling at me, getting in my face.

4  Talking about "I don't know what you're trying to do.  I

5  don't know what you're trying to prove.  I'm a Dodson."

6  That's when he was poking me in my chest.

7      Q.    You said you didn't yell at him.

8      A.    No, I didn't yell at him.

9      Q.    What was the first thing that you said to him?

10     A.    I said, "Man, what's going on?  I'm over here

11  busting my rump for you, how you going to call me a dumb

12  nigger?"  Or something to that effect.

13     Q.    What was his first response?

14     A.    I don't exactly remember what his first

15  response was.  He was on the machine.  I don't think he

16  even quite heard me when I first said that.  So he jumped

17  off the machine, you know what I mean, and I was like,

18  "Yo, what's up?"  You know what I mean.  And I asked him

19  about the dumb nigger incident or remark.  And that's

20  what he said, "I don't know what you trying to start.  I

21  don't know what you're trying to prove or whatever."  And

22  that's when the poking started.

23            And that I should get the hell away from

24  there.  Never once did I put my hands back on him, so I

Brian Coleman

24

1   don't know what you're trying to get at, or what you're

2   trying to ask me.

3        Q.   I'm just trying to figure out exactly what

4   happened.  So it's your testimony you did not touch him?

5        A.   No.  I did not touch him.

6        Q.   Didn't poke him in the chest with your finger

7   back?

8        A.   No, I did not.  If I would have poked him in

9   the chest I would have been arrested, too, right?  Let me

10  ask you a question.

11            MR. POLIQUIN:  You're only supposed to

12  answer questions.

13       Q.   You called the police.

14       A.   Yes, I did.

15       Q.   And they came out?

16       A.   I don't think it was that day.  I think it was

17  when I got back off of my vacation.

18       Q.   You don't recall them being there on May 31st?

19       A.   If May 31st was when I got back from my

20  vacation, that's when they was there.  If the incident

21  happened before May 31st -- they didn't come that first

22  day when the incident happened.  They came out there

23  after.  Well, as a matter of fact, they did come out

24  there the 31st, and what happened was, they told me I had

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


JASON McLEAN and )
BRIAN COLEMAN, )
                        ) C.A. No. 06-617 SLR
            Plaintiffs,)
                        )
 -vs- )
                        )
COMMUNICATIONS CONSTRUCTION )
GROUP, LLC, )
                        )
            Defendant. )


        Deposition of JASON McLEAN taken pursuant
to notice at the law offices of Young, Malmlberg &
Howard, 30 The Green, Dover, Delaware, beginning at 9:13
a.m. on September 13, 2007, before Julianne LaBadia,
Registered Diplomate Reporter and Notary Public.


APPEARANCES:

        RONALD POLIQUIN, ESQ.
        YOUNG, MALMBERG & HOWARD
          30 The Green
          Dover, Delaware  19901
          For the Plaintiff


        THOMAS BENJAMIN HUGGETT, ESQ.
        MORGAN, LEWIS & BROCKIUS, LLP
          1701 Market Street
          Philadelphia, Pennsylvania  19103
          For the Defendant

          WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
          (302) 655-0477
          www.wilfet.com



**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters
**ORIGINAL**

Jason McLean

2

1                    JASON MCLEAN

2           The deponent herein, having first been

3           duly sworn on oath, was examined and

4           testified as follows:

5                    DIRECT EXAMINATION

6   BY MR. HUGGETT:

7        Q.   Would you state your name for the record,

8   please.

9        A.   Jason A. McLean.

10       Q.   And where do you reside, Mr. McLean?

11       A.   In Dover.

12       Q.   And what address?

13       A.   324 East Broad Stairs, Dover, Delaware 19904.

14       Q.   How long have you lived at that address?

15       A.   About six months.

16       Q.   Where did you reside prior to that?

17       A.   1266 South Farmview Drive, Dover, Delaware

18   19904.

19       Q.   And how long did you reside there?

20       A.   22 years.

21       Q.   I would take that it's your parents' house?

22       A.   Exactly.

23       Q.   We are here today to take your deposition.

24   Have you ever been deposed before?

Jason McLean

8

1    A.   Construction.  Roads.

2    Q.   How long were you with EPB?

3    A.   I can't recall.  Maybe six, seven months.

4    Q.   Where did you work prior to that?

5    A.   Carmike Cinemas.

6    Q.   Is that a movie theater?

7    A.   Yeah.

8    Q.   How long did you work there?

9    A.   About six years.

10    Q.   Is that while you were in school?

11    A.   Yes.

12    Q.   Were you still in school at the time that you

13 worked for EPB?

14    A.   No.

15    Q.   What were you doing when you were first hired

16 by CCG?

17    A.   Laborer, digging holes.

18    Q.   And how long did you work as a laborer?

19    A.   Maybe four months.

20    Q.   What did you do after you worked as a laborer

21 for CCG?

22    A.   Operator.

23    Q.   And how long were you an operator for CCG?

24    A.   Maybe two, three months.

Jason McLean

9

1      Q.   Did you hold any position after you were an

2  operator?

3      A.   Foreman position.

4      Q.   And how long did you hold that position?

5      A.   The remainder of the time.

6      Q.   That would be about five months?

7      A.   Sure, yeah.

8      Q.   Do you recall specifically when you were

9  promoted to foreman?

10     A.   Not the exact date, no.

11     Q.   Do you recall if that was after you made the

12 complaint of discrimination that's at issue in this case?

13     A.   Yes.

14     Q.   Is it correct that the issues that you're

15 bringing in this case begin on May 31 of 2005, when Brad

16 Koch told you about a comment supposedly made by Brad

17 Dodson -- or I'm sorry.  Robert Koch told you about a

18 comment supposedly made by a Brad Dodson?

19     A.   Can you repeat the whole question one more

20 time?

21          (Question read)

22     A.   Yes.

23     Q.   And that comment was allegedly a racial

24 comment?

**W&F**

Jason McLean

10

1    A.    Yes.

2    Q.    Had anything occurred prior to May 31 of 2005,

3  in your employment with CCG, that you think is of any

4  significance to this matter?

5    A.    No.

6    Q.    All right.  In your own words, if you would,

7  can you tell me what happened on May 31 of 2005.

8    A.    I was digging a hole in the neighborhood that

9  we were working in, and Robert Koch rode by on a -- on a

10  machine, and he stopped.  We had a conversation.

11         The conversation consisted of we were

12  talking about how nobody was making any money.  He stated

13  that, "You wouldn't believe what Brad said about you last

14  week."

15         Then I asked him what he said.  He said --

16  "We were talking that -- we were having the same

17  conversation.  At that time, he said, 'yeah, nobody is

18  making any money, but at least you don't have to work

19  with two dumb niggers,'" quote, unquote.

20         At that time we approached Mr. Dodson.  He

21  was drilling --

22    Q.    When you said "we," who are you referring to?

23    A.    Brian Coleman and I approached Mr. Dodson, who

24  was drilling underneath the street, around the corner

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Jason McLean

11

1    from where we were.  We asked him if he made the

2    statement.  He jumped off his machine, furious, started

3    waving his finger in my face, and then Brian's face, and

4    then him and Brian got into a verbal altercation, and he

5    started poking Brian in his chest.

6            At that time, I called Lisa Clemens, the HR

7    representative, the only phone number of anybody I had

8    from the company, other than Brad.  I explained to her

9    what was going on at the present time.  After that

10    confrontation, Brian called the police.  After I got off

11    the phone with Lisa, Brad's brother Dave, the site

12    supervisor, and Mike Fender arrived on scene.  That was

13    my first time meeting Mike Fender.

14            They tried to resolve the situation by

15    having us shake hands and go back to work.  I stated that

16    that wouldn't work, because there's been some wrong

17    doings done.  The police then arrived and took statements

18    from everybody involved, and then the day was over and we

19    went home.

20       Q.    Okay.  Let me go back through, get a little

21    more detail on some of that.  You said you were digging a

22    hole.  What were you digging a hole for?

23       A.    Put in an underground vault.

24       Q.    And is that the normal work that you were doing

Jason McLean

12

1  at that time for CCG?

2      A.   Yes.

3      Q.   Yes?

4      A.   Yes, sir.

5      Q.   And Mr. Koch came by at that point, and you

6  were having a conversation about not making money.  What

7  does that mean, not making money?

8      A.    In that business, most people in the company

9  were making an excessive amount of money, anywhere from

10  $2,000 to $3,000 a week.  So anything less than that, for

11  them is, quote, unquote, not making any money.

12      Q.   You never made 2,000 to $3,000 a week with CCG?

13      A.   Never.

14      Q.   And did you ever see anyone else's paycheck to

15  know exactly what they made?

16      A.   Yeah.  Yeah.

17      Q.   Whose paycheck did you see?

18      A.   Buddies like Josh.  Brian.  Previous -- before

19  I started working for CCG, I've known them before then.

20      Q.   Were they doing the same kinds of installation

21  work that you were doing at that point in time?

22      A.   No.

23      Q.   What kind of work were they doing at that time?

24      A.   Aerial.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Jason McLean

13

1      Q.    So, depending on the type of work that's being

2   done by the company, different amounts of money can be

3   made by employees?

4      A.    Yes.

5      Q.    Can you tell me to the best of your

6   recollection exactly what Mr. Koch said, after that,

7   about Mr. Dodson?

8      A.    Exactly what I said.

9      Q.    How did he make the transition from talking

10  about not making money to repeating this alleged

11  statement?

12     A.    There was no transition.  He just came right

13  out and said it.

14     Q.    Why did he do that?

15     A.    He's one of our friends.  I would consider him

16  a friend.

17     Q.    You weren't present for this comment allegedly

18  made by Brad Dodson?

19     A.    No.

20     Q.    This was the first time that you had heard

21  about it?

22     A.    Yes.

23     Q.    You didn't know whether, in fact, Mr. Dodson

24  had said this?

Jason McLean

14

1       A.   No.

2       Q.   When you were hired, you received the CCG

3   employee manual, correct?

4       A.   Yes.

5       Q.   Did you read that?

6       A.   Partially.

7       Q.   Okay.  Do you recall signing a statement that

8   you had read and understood the policies?

9       A.   Yes.

10      Q.   Did you understand that that manual had a

11  harassment policy in it?

12      A.   If I signed, yes.

13           (McLean Exhibit 1 marked)

14           MR. HUGGETT:  I introduce as Exhibit 1

15  the employee policy manual that has been previously

16  produced here, and the signed acknowledgment of

17  Mr. McLean.

18  BY MR. HUGGETT:

19      Q.   On this document that we've marked as Exhibit

20  1, is that your signature?

21      A.   Yes, sir.

22      Q.   On January 10, 2005?

23      A.   Yes, sir.

24      Q.   When you were hired by CCG?

Jason McLean

31

1       Q.    Do you recall seeing the rate schedules?

2       A.    Yes.

3             (McLean Exhibits 3 and 4 marked)

4    BY MR. HUGGETT:

5       Q.    I've marked as Exhibit 3 the rate schedule for

6    Delaware FIOS work.  Is that the rate schedule that you

7    have previously seen?

8       A.    No.  Never seen this piece of paper before.

9       Q.    Okay.  Can you describe what you've seen?

10      A.    I seen a copy of just a brief rundown on the

11   back of my paycheck of what you get paid per foot.

12      Q.    Is that this document?

13      A.    It might be.  It looks like a copy.  I don't

14   remember seeing anything like this, but it was similar.

15      Q.    Exhibit 4 is marked the southeast PA FIOS drops

16   for Pennsylvania rate schedule.  Have you ever seen that

17   rate schedule?

18      A.    No.  They never provided us anything like this.

19      Q.    Did you ever ask for a copy of the rate

20   schedule?

21      A.    No.

22      Q.    When were you promoted to the position of

23   foreman?

24      A.    I don't recall the exact date.  Take a stab,

Jason McLean

32

1   maybe a month before I was laid off.

2        Q.   And that was while you were working in

3   Westchester?

4        A.   No.  We were actually transferred up to Oaks,

5   Pennsylvania, at that time.

6        Q.   Why did you go up to Oaks, Pennsylvania?

7        A.   Because I was told to.

8        Q.   Why did the company go up there?

9        A.   I don't know.

10       Q.   What kind of work was being done in Oaks,

11  Pennsylvania?

12       A.   Same work.

13       Q.   And just so we're clear, can you describe, when

14  you say same work, what was the work that was being done?

15       A.   Underground utilities.

16       Q.   When you were working in Angola, how did you

17  get to Angola?

18       A.   Drove my car.

19       Q.   Prior to working in Angola, had you always

20  driven your car to get to work?

21       A.   Yes.

22       Q.   And did you drive your car to get to work in

23  Westchester?

24       A.   Partially.



Jason McLean

35

1    before it was filed?

2        A.    Yes.

3        Q.    Did you sign a verification that it was

4    accurate?

5        A.    I believe so.

6              MR. HUGGETT:  I would make a request

7    for a copy of that if it exists.  I don't have any

8    such -- I have a verification from Mr. Coleman,

9    but --

10       Q.    In the Complaint, paragraph 28, it says "The

11   plaintiffs made $1.20 per square foot, compared to $2.80

12   per foot at the New Castle plant."  Do you recall that

13   allegation?

14       A.    Yeah.

15       Q.    Okay.  Upon what do you base the allegation

16   that you were paid $1.20 per square foot?

17       A.    Should have been $1.20 per foot.

18       Q.    Rates are based on linear feet of installation?

19       A.    Whatever linear means.  What do you mean by

20   linear?

21       Q.    Distance from one point to another in a

22   straight line.

23       A.    Okay.  Yeah.

24       Q.    And in fact, the rates that you were paid for

Jason McLean

36

1    out of New Castle, it wasn't just one $1.20 rate, was

2    there?

3        A.   No.

4        Q.   There were multiple rates depending on what

5    work you were doing?

6        A.   Yes.

7        Q.   So when you referred to the $1.20, what are you

8    referring to?

9        A.   The main course of action.  Just the burying of

10   the pipe.

11       Q.   When you were working in New Castle, you were

12   burying the main trunk line through the neighborhood,

13   correct?

14       A.   Yes.

15       Q.   When you were working out of Westchester, you

16   were burying lines from that main trunk directly to a

17   house, a drop?

18       A.   Yes.

19       Q.   And that's different work with different rates?

20       A.   Same principle, different rates.

21       Q.   At paragraph 27, it says, "The transfer

22   resulted in a substantial reduction in salary."  Do you

23   recall that allegation?

24       A.   Yes.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Jason McLean

37

1    Q.    Upon what is that based?

2    A.    Deductions at the end of the day.

3    Q.    And what are deductions?

4    A.    Gas, food, room and board.

5    Q.    Well, you were traveling back and forth daily

6    between home, so you didn't have room and board, did you?

7    A.    Depending on what time we got off work.  If we

8    got off work at 9:00 at night, we would just get a hotel.

9    No point in driving home.

10   Q.    Why would food costs increase because you were

11   in Westchester as opposed to anywhere else?  You have to

12   eat all the time, right?

13   A.    We worked longer hours, so you ended up in the

14   field longer, so you got to spend more money on food.

15   Q.    And if you're driving the company truck, who

16   pays for gas?

17   A.    The company.

18   Q.    In fact, in direct salary from the company, you

19   made more working at Westchester than you did in New

20   Castle?

21   A.    In direct salary, yes.

22   Q.    And you and Mr. Coleman weren't the only

23   employees transferred from New Castle to Westchester,

24   were you?



Jason McLean

38

1  A. Yes, that day -- well, that week.

2  Q. Over time, all the employees were transferred

3 to Westchester, weren't they?

4  A. Just Brad and Frank, afterwards.  I think they

5 were the only ones left.

6  Q. The rest were, in fact, laid off?

7  A. Quit.

8  Q. Didn't work for the company at all anymore?

9  A. Exactly.

10  Q. You were ultimately laid off of work from CCG?

11  A. Yes.

12  Q. Along with seven other employees?

13  A. I don't know how many.

14  Q. You weren't the only one laid off?

15  A. No.

16  Q. Mr. Coleman wasn't the only one laid off?

17  A. No.

18  Q. There were more than the two of you?

19  A. To my understanding.

20  Q. And you understood that you were being laid off

21 because the work had come to an end?

22  A. I didn't know why I was being laid off.  There

23 was still work.

24  Q. No one told you why you were being laid off?

Jason McLean

44

1    disciplined at all or not?

2        A.    I have no idea.

3        Q.    Do you know who Jonathan Gates is?

4        A.    Yes.

5        Q.    Who is Mr. Gates?

6        A.    I believe his title is the regional supervisor

7    for CCG.

8        Q.    And does he have any information relevant to

9    this matter?

10       A.    He should have all of it.

11       Q.    And why do you say that?

12       A.    Because he's the regional supervisor for CCG.

13       Q.    Was he a witness to any of the events?

14       A.    No.

15       Q.    Was he involved in any of the events?

16       A.    No.   Other than the revoking of our truck

17   privilege.  According to my supervisor Bill, John said

18   you cannot drive the truck home anymore.

19       Q.    Did you ever speak to Mr. Gates about that?

20       A.    I called him and left him a message.  Never

21   called me back.

22       Q.    Wasn't your supervisor Brian Coleman?

23       A.    My supervisor?  No.

24       Q.    He was your foreman?

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


JASON McLEAN and BRIAN COLEMAN,   )
                              )
        Plaintiffs,     )
                              )   Civil Action
v.                          )   No. 06-617-SLR
                              )
COMMUNICATIONS CONSTRUCTION GROUP,)
LLC.,                        )
                              )
        Defendant.     )


         Deposition of DAVID E. DODSON taken
pursuant to notice at the law offices of Young &
Malmberg, P.A., 30 The Green, Dover, Delaware,
beginning at 1:00 p.m. on Friday, September 14, 2007,
before Christina M. Vitale, Certified Shorthand
Reporter and Notary Public.

APPEARANCES:

     RONALD G. POLIQUIN, ESQUIRE
     YOUNG MALMBERG & HOWARD, P.A.
      30 The Green
      Dover, Delaware  19901
      For the Plaintiffs

     THOMAS BENJAMIN HUGGETT, ESQUIRE
     MORGAN LEWIS & BOCKIUS LLP
      1701 Market Street
      Philadelphia, Pennsylvania   19103-2921
      for the Defendant


        WILCOX & FETZER

  1330 King Street -  Wilmington, Delaware 19801

         (302) 655-0477

        www.wilfet.com




David E. Dodson

2

1      DAVID E. DODSON, the deponent herein,

2  having first been duly sworn on oath, was examined and

3  testified as follows:

4  BY MR. POLIQUIN:

5    Q.    Good morning, Mr. Dodson, my name is Ron

6  Poliquin and I'll be taking your deposition today.

7  Have you ever had a deposition taken previous to this

8  deposition?

9    A.    No.

10    Q.    Do you understand the procedures for taking

11  your deposition?

12    A.    Not really.

13    Q.    Do you understand that you have been placed

14  under oath and you have an obligation to testify

15  truthfully?

16    A.    Yes.

17    Q.    Do you understand that even though we are in an

18  informal conference room your testimony here has the

19  same effect as if you were testifying in front of a

20  judge or a jury?

21    A.    Yes.

22    Q.    Do you understand that the court reporter will

23  take down everything that is said during the

24  deposition and that testimony will be transcribed into

David E. Dodson

23

1    Dodson?

2            MR. HUGGETT:   Objection.   Just to clarify

3    you are asking him what he was involved in?

4    BY MR. POLIQUIN:

5        Q.    I'm asking if you can describe the events that

6    happened that day.

7        A.    That was the first day, that was the day that

8    the allegations took place?

9        Q.    Correct.

10       A.    The first I heard about it Brad called me, told

11   me that Brian, Brian and Jason, came up to him -- up

12   to Frank and was yelling and screaming and he told me

13   I needed to get out there right away.

14       Q.    And he called you on -- what did he call you

15   on?

16       A.    I believe it was Nextel, which is a two-way.

17       Q.    On that date what was your position with the

18   company?

19       A.    Job supervisor.

20       Q.    And were you the supervisor for that particular

21   job?

22       A.    For?

23       Q.    The job that Bradley Dodson, Jason McLean and

24   Brian Coleman were doing.



David E. Dodson

24

1    A.    With my duties I'm the supervisor over all the

2    jobs.  I do have a field supervisor, which is under

3    me.

4    Q.    Who is the field supervisor?

5    A.    The one that would have been with those -- in

6    charge of those guys would have been Mike Fender.

7    Q.    And did Bradley Dodson say anything else to you

8    over the telephone?

9    A.    Not that I can recall.

10    Q.    Did you ask him any questions?

11    A.    No.  I got off the phone and I called Mike

12    Fender to go out there.

13    Q.    And how long between the phone call that you

14    received from Bradley Dodson and the time that you

15    eventually came to the incident that happened?

16    A.    I don't recall 100 percent, but I would say it

17    was within an hour.

18    Q.    Where were you at the time you received the

19    phone call?

20    A.    At our field office.

21    Q.    Where is the field office at?

22    A.    It was in New Castle, Delaware.

23    Q.    And where was Bradley Dodson at?

24    A.    I don't recall the address.  I would have to --

# EXHIBIT 5

```
 1            IN THE UNITED STATES DISTRICT COURT

 2         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 3                         - - -

 4   McLEAN, et al.,                    )
                                        )
 5              Plaintiffs,             )
                                        ) Action
 6         vs.                          ) No. 06-617-SLR
                                        )
 7   COMMUNICATIONS CONSTRUCTION        )
     GROUP, LLC,                        )
 8                                      )
                Defendant.              )
 9
                                 - - -

10

              Deposition of JOSEPH TATSCH
11
              Monday, November 5, 2007
12
                                 - - -

13
         The deposition of JOSEPH TATSCH, called as a
14   witness by the Defendant, pursuant to notice and the
     Federal Rules of Civil Procedure pertaining to the
15   taking of depositions, taken before me, the
     undersigned, Melissa L. Fenster, a Notary Public in
16   and for the Commonwealth of Pennsylvania, at the
     offices of Morgan, Lewis & Bockius, LLP, One Oxford
17   Centre, 32nd Floor, Pittsburgh, Pennsylvania  15219,
     commencing at 11:51 o'clock a.m., the day and date
18   above set forth.

19                               - - -

20         COMPUTER-AIDED TRANSCRIPTION BY
            MORSE, GANTVERG & HODGE, INC.
21             PITTSBURGH, PENNSYLVANIA
                   412-281-0189
22
                                 - - -
23
     ORIGINAL

24

25
```

2

1  APPEARANCES:

2       On behalf of the Plaintiffs:

3         (No appearance.)

4       On behalf of the Defendant:

5         Morgan, Lewis & Bockius, LLP:
          Thomas B. Huggett, Esquire
6         1701 Market Street
          Philadelphia, Pennsylvania  19103-2921
7
                     - - -
8                    INDEX

9  EXAMINATION:                                    PAGE:

10  BY MR. HUGGETT                                    3

11  TATSCH DEPOSITION EXHIBITS:                     PAGE:

12  1    Letter with subpoena                         4

13  2    Harassment policy acknowledgment            20

14  3    Incident Investigation Form                 21

15                   - - -

16

17

18

19

20

21

22

23

24

25

3

```
1                    JOSEPH TATSCH

2  called as a witness by the Defendant, having been

3  first duly sworn, as hereinafter certified, was

4  deposed and said as follows:

5                    DIRECT EXAMINATION

6  BY MR. HUGGETT:

7       Q       Would you state your full name for the

8  record.

9       A       Joseph G. Tatsch.

10      Q       Would you state your address?

11      A       It's used to be HC 1 Box 70A, Madera,

12  Pennsylvania, but I think it's 348, something like

13  that now.  They switched addresses up there for

14  emergency things.

15              My wife has it.  I didn't even bother

16  looking at.  I ain't much on paperwork.  I stay away

17  from it.

18      Q       You are here today pursuant to a subpoena

19  that my office sent to you, correct?

20      A       Yes.

21              MR. HUGGETT:  We'll mark that as Exhibit 1.

22              (Thereupon, Tatsch Deposition Exhibit No. 1

23      was marked for identification.)

24      Q       I've given you a document that we've marked

25  as Exhibit 1.
```

1    A    Like I said, I was walking down the road,

2    and he called Bobby Koch over.

3    Q    Do you know what month or what day that

4    was?

5    A    I couldn't tell you.  I don't remember

6    dates too good.  I go from day to day and I don't even

7    bother looking at a calendar.

8    Q    Do you remember anything about what day of

9    the week it was?

10    A    The only thing I can tell you is it might

11    have been a Wednesday or a Thursday or something like

12    that.

13    Q    If I told you it was from the information

14    we have either May 26th or May 27th of 2005, would you

15    have any reason to disagree with that?

16    A    No, because like I said I don't follow

17    along with dates.  I just go from day to day.  I don't

18    even pay attention to a calendar.

19    Q    As I understand it, you and Bobby Koch were

20    walking down the road?

21    A    Yeah.

22    Q    From where?

23    A    From up the road.  We was getting pipe.  We

24    was getting pipe or something.  I forget what it was,

25    but we were walking down.

1          He called Bobby Koch down, and I still kept

2     walking.  As I kept walking, I ended up I heard him

3     say to Bobby Koch or that -- because I guess them two

4     that you're talking about, that whatever his name is,

5     the two black guys --

6          Q     Mr. Coleman and Mr. McLean?

7          A     Yeah.  He ended up I guess they were having

8     a dispute or something like that, and then he ended up

9     telling Bobby Koch -- like I said, he called them dumb

10    Fing niggers.  That's all I can tell you.

11          I kept walking by.  I didn't say nothing to

12    nobody because I know what it causes, so I stayed away

13    from it.  I walked up onto the area where I was

14    working.

15          And, apparently -- I don't know if it was

16    Bobby Koch ended up talking to them two and saying

17    what Brad Dodson said or somehow they found out about

18    it some other way, but then there was a big dispute.

19          I guess they called the cops or that, and

20    they had the cops there to take testimony, and then

21    the next thing I know I got drug down into it.

22          Q     When Brad Dodson was speaking to

23    Bobby Koch, there was no one else present?

24          A     No, no one else.

25          Q     And you were walking down the road?

# EXHIBIT 6

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


JASON McCLEAN and BRIAN COLEMAN,     )
                                     )
          Plaintiffs,                )
                                     )   Civil Action
v.                                   )   No. 06-617-SLR
                                     )
COMMUNICATIONS CONTRUCTION GROUP,    )
LLC,                                 )
                                     )
          Defendant.                 )


          Deposition of LISA CLEMENTS taken
pursuant to notice at the law offices of Morgan, Lewis
& Bockius, LLP, 1701 Market Street, Philadelphia,
Pennsylvania,  beginning at 1:06 P.m. on Wednesday,
September 19, 2007, before Christina M. Vitale,
Certified Shorthand Reporter and Notary Public.

APPEARANCES:

          RONALD G. POLIQUIN, ESQUIRE
          YOUNG MALMBERG & HOWARD, P.A.
            30 The Green
            Dover, Delaware  19901
            For the Plaintiffs

          COURTNEY A. WIRTH, ESQUIRE
          MORGAN LEWIS & BOCKIUS, LLP
            1701 Market Street
            Philadelphia, Pennsylvania  19103
            For the Defendant



          WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801

            (302) 655-0477

          www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters



Lisa Clements

2

1       LISA CLEMENTS, the deponent herein, having

2   first been duly sworn on oath, was examined and

3   testified as follows:

4   BY MR. POLIQUIN:

5    Q.   Ms. Clements, have you spoken with your

6   attorney regarding the procedures for a deposition?

7    A.   Yes.

8    Q.   Do you understand you are under oath and you

9   are obligated to testify truthfully?

10    A.   Yes.

11    Q.   Even though we are sitting here in a conference

12   room your testimony has the same force and effect as

13   if you were testifying in a court of law.

14    A.   Yes.

15    Q.   Do you understand that the court reporter will

16   take down everything you say during the deposition and

17   that that testimony will be transcribed into a booklet

18   form?

19    A.   Yes.

20    Q.   And please understand that because everything

21   is verbal answer all your questions verbally meaning

22   no nods with the head, no shaking, everything has to

23   be communicated verbally.

24    A.   Yes.

Lisa Clements

23

1   incident happened?

2   A.    No, I believe it was just Jason.

3   Q.    Were you told anything about how you should go

4   about conducting the investigation into this complaint

5   of racial harassment?

6   A.    No.

7   Q.    Were there any restrictions placed on your

8   investigation?

9   A.    No.

10  Q.    And you could have interviewed anyone you

11  wanted to in connection with the investigation, is

12  that correct?

13  A.    Yes.

14  Q.    And you could look at any documents you wanted

15  to in connection with the investigation, is that

16  correct?

17  A.    Yes.

18  Q.    Were there any time limits placed on your

19  investigation?

20  A.    Just my own to make sure that it was done

21  sooner than later.

22  Q.    What steps did you take, if any, prior to

23  meeting with Jason McLean and Brian Coleman?

24  A.    I conducted phone interviews with all

Lisa Clements

24

1  individuals involved.

2    Q.    Did you review Brian Coleman's personnel file?

3    A.    No, that was not done until after my

4  investigation face-to-face with the plaintiffs.

5    Q.    Did you review Jason McLean's personnel file?

6    A.    Again, it was done after the investigation

7  on-site.

8    Q.    You had became aware that Brad Dodson was

9  arrested concerning events that happened on May 31st,

10  2005?

11    A.    I was aware of that, yes.

12    Q.    Are you aware that Brad Dodson did not

13  represent to the police that he didn't make the

14  statement that Brian Coleman and Jason McLean were two

15  dumb niggers?

16    A.    I'm not aware of anything regarding that.

17    Q.    Did you follow-up with the police, what the

18  result of the police arrest of Brad Dodson was?

19    A.    No.

20    Q.    Why not?

21    A.    Because it was regarding Brad individually.  It

22  wasn't against the company.

23    Q.    But it involved the incident that we are

24  talking about that is the basis of this lawsuit, is

Lisa Clements

33

1    Q.    At the end of the day when you came up with

2    your conclusions did you not believe Bob Koch and

3    Joseph Tatsch?

4    A.    I still didn't -- can you rephrase that

5    question?

6    Q.    Did you not believe Joseph Tatsch and Bob Koch

7    when they told you they heard Brad Dodson refer to

8    Jason McLean and Brian Coleman as two dumb niggers?

9    A.    I did and I didn't because of -- I did and I

10   didn't believe them.

11   Q.    What was the purpose of your investigation?

12   A.    The purpose of my investigation was to find out

13   what actually had happened.

14   Q.    And would that include finding out whether, in

15   fact, Brad Dodson made the statement?

16   A.    Yes.

17   Q.    And your conclusion was that he did not make

18   the statement?

19   A.    My conclusion was that according to Brad he did

20   not make the statement.

21   Q.    And that was after listening to both Bob Koch

22   and Joseph Tatsch?

23   A.    Correct.

24   Q.    What was your basis for giving Jason McLean and

# EXHIBIT 7

# Communications Construction Group, LLC.
## *Employee Warning Report*

Employee's Name  **Brad Dodson**          Date of Warning  6/20/05      Job #  5007

## Type of Violation

☐ Attendance        ☐ Safety Violation        ☐ Work Quality        ✸ Insubordination

☐ Lateness/Leave Early      ✸ Violation of Policy        ☐ Other _____

## Warning Information

Violation Date  5/31/05      Violation Time    Mid-Day    Location of Violation    New Castle, DE

| Company Explanation of Incident | Employee Statement |
|---|---|
| An allegation was made that Brad used a racially derogatory remark. Brad denies making the statement he was accused of making. Additionally, during a heated conversation with Brian Coleman, Brad used physical contact in an inappropriate manner. | ☒ I agree with the company's statement<br><br>☐ I disagree with the company's statement; <u>Explanation</u> |

*★ If necessary, use the back of the form to complete your explanation ★*

## Action Taken As Result Of Warning

Brad violated CCG's Harassment policy by engaging in inappropriate physical contact with an employee. To the extent any statement Brad made was either racially derogatory or racially insensitive, that would constitue a further violation of CCG Policy. A copy of CCG's Harassment Policy is being reissued. If he should violate any CCG policy again, he will be subject to further discipline, up to and including termination.

## *MUST BE COMPLETED*

I have read and understand this warning and decision, and have had the opportunity to express my viewpoint.

Employee's Signature: *Brad Dodson*          Date: 6/21/05

Signature of Person Preparing Warning *Lisa Clements*      Date 6/17/05

Supervisor's Signature (if different): *John Haley*      Date: 6-21-05

D0491

# EXHIBIT 8

# Communications Construction Group, LLC.
## *Employee Warning Report*

Employee's Name     Bob Koch          Date of Warning    6/20/05          Job #     5007

## Type of Violation

☐ Attendance        ☐ Safety Violation        ☐ Work Quality        ☐ Insubordination

☐ Lateness/Leave Early        ☒ Violation of Policy        ☐ Other _____

## Warning Information

Violation Date    5/31/05          Violation Time          Morning        Location of Violation    New Castle, DE

| Company Explanation of Incident | Employee Statement |
|---|---|
| During a conversation between Bob Koch and Brad Dodson which took place on 5/27/05, Bob has made<br><br>a claim that he heard Brad Dodson make a racially derogative comment about two other employees from #5007. Rather than following the Company procedure and reporting the alleged racially derogatory remark to the Project Supervisor and/or HR, on 5/31/05, Bob told Jason McLean and Brian Coleman about the comment and that it<br><br>was said by Brad Dodson. | ☐ I agree with the company's statement<br><br>☐ I disagree with the company's statement; Explanation |

★ *If necessary, use the back of the form to complete your explanation* ★

## Action Taken As Result Of Warning

Bob violated CCG's Harassment Policy by not following the Complaint Procedure and by spreading rumors at work. A copy of CCG's Harassment Policy and Complaint Procedure are being reissued. If any company violation should occur again, Bob will be subject to further disciplinary action, up to and including termination.

### *MUST BE COMPLETED*

I have read and understand this warning and decision, and have had the opportunity to express my viewpoint.

Employee's Signature: _(signature)_          Date: 6-21-05

Signature of Person Preparing Warning: _Lisa Clements_          Date: 6/17/05

Supervisor's Signature (if different): _John Bates_          Date: 6-21-05

D0486

# EXHIBIT 9

# Communications Construction Group, LLC.
## *Employee Warning Report*

Employee's Name    Jason McLean                    Date of Warning    6/20/05        Job #    5007

## Type of Violation

☐ Attendance        ☐ Safety Violation        ☐ Work Quality        ☐ Insubordination

☐ Lateness/Leave Early        ✶ Violation of Policy        ☐ Other _____

## Warning Information

Violation Date    5/31/05        Violation Time    Mid-Day        Location of Violation    New Castle, DE

| Company Explanation of Incident | Employee Statement |
|---|---|
| Jason was involved in a conversation with Brian Coleman and Bob Koch during which he claims to have been told by Bob Koch that a racially derogative comment about Jason McLean and Brian Coleman was made by Brad Dodson. Rather than following company procedure and reporting the issue to the Project Supervisor and/or HR, Jason left his job site during work hours and approached Brad Dodson to confront him about the comment. | ☐ I agree with the company's statement<br><br>☑ I disagree with the company's statement;<br>Explanation<br>I never left my job site. We all were working in the same area. |

★ *If necessary, use the back of the form to complete your explanation* ★

## Action Taken As Result Of Warning

Jason violated CCG's Harassment Policy by not following the Complaint Procedures. He also violated Company policy by leaving his job site during work hours. A copy of the Company's Harassment Policy and Complaint Procedures are being reissued. If this type of violation occurs again, Jason will be subject to further disciplinary action.

### *MUST BE COMPLETED*

I have read and understand this warning and decision, and have had the opportunity to express my viewpoint.

Employee's Signature: *Jason McLean*                    Date: 6·21·05

Signature of Person Preparing Warning: *Lisa Clements*            Date: 10/17/05

Supervisor's Signature (if different): *John Doty*        Date: 6-21-05

D0476

# EXHIBIT 10

# Communications Construction Group, LLC.

## Employee Warning Report

Employee's Name   Brian Coleman                Date of Warning   6/20/05        Job #   5007

### Type of Violation

☐ Attendance          ☐ Safety Violation        ☐ Work Quality        ✳ Insubordination

☐ Lateness/Leave Early      ✳ Violation of Policy      ☐ Other _____

### Warning Information

Violation Date   5/31/05        Violation Time   Mid-Day    Location of Violation   New Castle, DE

| Company Explanation of Incident | Employee Statement |
|---|---|
| Brian was told by Bob Koch that Brad Dodson had made a racially derogative remark and it was directed towards Jason McLean and Brian Coleman. Upon hearing this, rather than following company policy and raising the issue with the Project Supervisor and/or HR, Brian left his job site and confronted Brad to question him about the comment.<br><br>While doing so, Brian waved his finger at Brad's face in a menacing manner. | ☐ I agree with the company's statement<br><br>☐ I disagree with the company's statement; Explanation |

★ *If necessary, use the back of the form to complete your explanation* ★

### Action Taken As Result Of Warning

Brian violated CCG's Harassment Policy by not following the Complaint Procedure and by engaging in inappropriate physical interaction with another employee. A copy of CCG's Harassment Policy and Complaint Procedure are being reissued. Brian also violated CCG's policy by leaving his job site during working hours. If this type of violation occurs again, Brian will be subject to further discipline, up to and including termination.

### MUST BE COMPLETED

I have read and understand this warning and decision, and have had the opportunity to express my viewpoint.

Employee's Signature: _____        Date: 6/21/05

Signature of Person Preparing Warning: _Lisa Clements_        Date: 6/17/05

Supervisor's Signature (if different): _John Astle_        Date: 6-21-05

D0481

# EXHIBIT 11

# Receipt and Acknowledgment of
# Communications Construction Group Inc.
# Employee Policy Manual

This Employee Policy Manual is an important document intended to help you become familiar with CCG, and our policies. This Policy Manual will serve as a guide; it is not the final word in all cases. Individual circumstances may call for individual attention. Because company and economic conditions are always changing, the contents of this Policy Manual may be altered at any time at the will of the company without prior notice.

Please read the following statements and sign below to indicate your receipt and acknowledgment of the Communications Construction Group Employee Policy Manual.

- ♦ I have received and read a copy of CCG's's Employee Policy Manual. I understand that the policies, rules, and benefits described in it are subject to change or elimination at the sole will of the company at any time.
- ♦ I further understand that my employment may be terminated at any time, either by myself or by CCG, regardless of the length of employment or the granting of benefits of any kind, including but not limited to benefits which provide for vesting based on the length of my employment.
- ♦ I understand that no contract of employment other than "at will" has been expressed or implied, and that no circumstances arising out of my employment will alter my "at will" employment relationship unless expressed in writing, with the understanding specifically set forth and signed by myself and the President of CCG.
- ♦ I understand that I may be transferred to a different job site, which may be in a different location or state, and by refusing to do so I will have voluntarily resigned.
- ♦ I understand and agree to abide by all guidelines and testing requirements outlined in the Substance Abuse Prevention and Detection Program.

**I understand that my signature below indicates that I have read and understand the above statements and I have received a copy of the CCG Employee Policy Manual.**

Jason McLean
Employee's Printed Name

1-10-05
Date

Employee's Signature

# EXHIBIT 12

# Communications Construction Group Inc.
## Employee Policy Manual

This Employee Policy Manual is an important document intended to help you become familiar with CCG, and our policies. This Policy Manual will serve as a guide; it is not the final word in all cases. Individual circumstances may call for individual attention. Because company and economic conditions are always changing, the contents of this Policy Manual may be altered at any time at the will of the company without prior notice.

Please read the following statements and sign below to indicate your receipt and acknowledgment of the Communications Construction Group Employee Policy Manual.

- I have received and read a copy of CCG's's Employee Policy Manual. I understand that the policies, rules, and benefits described in it are subject to change or elimination at the sole will of the company at any time.
- I further understand that my employment may be terminated at any time, either by myself or by CCG, regardless of the length of employment or the granting of benefits of any kind, including but not limited to benefits which provide for vesting based on the length of my employment.
- I understand that no contract of employment other than "at will" has been expressed or implied, and that no circumstances arising out of my employment will alter my "at will" employment relationship unless expressed in writing, with the understanding specifically set forth and signed by myself and the President of CCG.
- I understand that I may be transferred to a different job site, which may be in a different location or state, and by refusing to do so I will have voluntarily resigned.
- I understand and agree to abide by all guidelines and testing requirements outlined in the Substance Abuse Prevention and Detection Program.

I understand that my signature below indicates that I have read and understand the above statements and I have received a copy of the CCG Employee Policy Manual.

Brian Coleman
Employee's Printed Name

1-29-01
Date

Employee's Signature

© CCG, August 1997, All Rights Reserved

# EXHIBIT 13

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

**JASON MCLEAN and**
**BRIAN COLEMAN,**

            **Plaintiffs,**          **CIVIL ACTION NO. 06-617 (SLR)**

**v.**

**COMMUNICATIONS CONSTRUCTION**
**GROUP, LLC,**

            **Defendant.**

## DECLARATION OF LISA CLEMENTS

I, Lisa Clements, depose and state as follows:

    1.      I am a currently employed as the Human Resources Manager for Communications Construction Group, LLC ("CCG"). I have held this position since approximately August of 2005. Prior to August of 2005 I was employed as the Human Resource/Benefits Administrator.

    2.      On or about July 6, 2005 Brian McLean and Jason Coleman were transferred from CCG's Newcastle Delaware, worksite to its West Chester, Pennsylvania worksite. They were transferred because work on the Verizon contract in Delaware was ending and other work was available in Pennsylvania. After they were notified of the transfer by their supervisor, and before the transfer occurred, pursuant to a request from Mr. Coleman on or about July 5 I prepared a letter explaining the basis for the transfer for Mr. Coleman. A true and accurate copy of the letter is attached as Exhibit 1 hereto.

    3.      On October 6, 2005 several CCG employees who were working on Job No. 5008 were laid off due to lack of work. The names and races of these employees are as follows:

        a.  Marco Blancas (Hispanic)

b.  Alberto Carmona (Hispanic)

c.  Brian Coleman (African-American)

d.  Joel Diaz Guaddarama (Hispanic)

e.  Jason McLean (African-American)

f.  John Morris (African-American)

g.  Harry Ortiz (Hispanic)


I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing information is true and correct, based upon my knowledge, information and belief.

DATED:  November 27, 2007

LISA CLEMENTS

Exhibit
1

July 5, 2005


Mr. Brian Coleman
20 Tarpon Court
Willingboro, NJ 08046

Re: Employee Transfer

Attn: Brian

Due to the recent cut back in the amount of work given to Communications Construction Group, LLC in New Castle, DE (Job #5007) we will need to transfer you to Devault, PA (Job #5008). John Gates - Regional Manager – received notification from Job #5007 customer that the work was being cut in half. At the same time the work on Job #5008 is being increased.

Jason McLean, Harry Ortiz and you are all being transferred to the Devault, PA job. A 120 man Sub Crew is also being transferred to Devault, PA. Currently there are two underground crews working in New Castle, DE. The other crew uses a drill that is too large to be used on the Devault, PA job and the New Castle, DE job must have a drill on site; therefore this crew must stay at the New Castle, DE job.

As a reminder, I have enclosed a copy of the signed *Receipt & Acknowledgement* form. As stated in the company's Employee Policy Manual, "All employees should be advised that CCG may require that you transfer to another job site, which could be in a different location or state."

If you have any questions, please feel free to call me at (610) 696-1800 x588.

Thank you,



Lisa Clements
Human Resource/Benefits Administrator



*encl*

# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JASON MCLEAN and
BRIAN COLEMAN,

                Plaintiffs,

v.

COMMUNICATIONS CONSTRUCTION
GROUP, LLC,

                Defendant.

CIVIL ACTION NO. 06-617 (SLR)

## DECLARATION OF JOHN GATES

I, John Gates, depose and state as follows:

1.      I am a currently employed as the Regional Supervisor for Communications Construction Group, LLC ("CCG"). I have held this position since 2000.

2.      In my capacity as Regional Supervisor, I have personal knowledge of CCG policies and procedures, including use of company provided vehicles.

3.      In 2005, it was brought to my attention by Bill Grover that Brian Coleman and Jason McLean were driving a company truck home from work.

4.      According to CCG policy at that time, only specifically approved supervisory personnel were authorized to take company vehicles home.

5.      The only foremen who were authorized to take company vehicles to and from their homes had been grandfathered in under an old policy where they had been personally assigned a company truck for their company and individual use. Those foremen who had previously worked on aerial installation of fiber optic cable across the state of Pennsylvania. At that time, CCG provided company trucks to foreman and allowed their use for travel home on

weekends because the job sites were extremely remote. Aerial cable installation work by CCG ended in late 2004 and early 2005 and company trucks were not provided to any foremen after that time. This practice was discontinued in part as a cost savings measure for the company.

6.    Because neither Mr. Coleman nor Mr. McLean had ever performed aerial installation, and because neither had been personally assigned a company truck, it was against company policy for them to use a company truck to get to and from the company warehouse. Therefore, I instructed Mr. Grover to tell Mr. McLean and Mr. Coleman to stop driving the company truck home. Mr. Coleman and Mr. McLean were still permitted to use the truck for travel from the warehouse to the job site.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing information is true and correct, based upon my knowledge, information and belief.

DATED: November 27, 2007            JOHN GATES

# EXHIBIT 15

P.02
RECEIVED FROM:12152697568
15:08    06-10-05

1-800-822-3345

# Communications Construction Group, LLC.
## *Record of Employment Separation*

**Employee's Name**    Marco Blancas                **Employee #**    11993

(print name)

**Last Day Worked**    10-6-05                **Job #**    5008

### Reason For Separation (check one)

| Voluntary Resignation | | Discharge | |
|---|---|---|---|
| Job Abandonment | ☐ | | ☐ Absenteeism |
| Job Relocation Refused | ☐ | | ☐ Lateness |
| Dissatisfied with Job | ☐ | | ☐ Not Qualified |
| Other Employment | ☐ | Violation of Company Policy | ☐ |
| Personal or Domestic | X | | ☐ Lack of Work |
| Continuing Education | ☐ | Gross Insubordination | ☐ |
| Other _____ | | Other _____ | |

### Items Returned to CCG (check all that apply)

☐ Cell Phone    ☐ Computer/Laptop    ☒ Company Truck/ Keys    ☐ Building Keys    ☐ CCG ID Cards    ☐ Other _____

### Explanation of Final Incident
Include all relevant dates and previous infractions. Continue on back of page if necessary.

_____

---

### MUST BE COMPLETED

**Employee's Signature**    Marco Antonio Blancas          **Date**    10/06/05

**Supervisor (signature)**    William J Growe Jr          **Date**    10-6-05

**Supervisor (print name)**    William J Growe Jr

**Witness Signature** _____    **Date** _____

---

### Office Use Only    fd w/cu 10.13.05 cm

☐ **If checked, the company chooses not to challenge claimant's eligibility to receive benefits.**

| | | |
|---|---|---|
| Health Insurance    NA | Stock    NA | Tool amount owed _____ |
| H.I. Reimbursement    NA | Garnishment _____ | Vacation    3½ days pc |
| 401(k)    NA | Direct Deposit _____ | Computer/Network Access    See attached |
| ING    NA | Vehicle Allowance _____ | Advances    NA |
| Pre-Paid Legal    NA | Cell Phone    NA | |

PC 10/5 ✓ Human Resources
10.10.05 Payroll cm

CCG: Emp separation frm(4-05)

610-380-3569 Call Back #

D0574

RECEIVED FROM:12152697568                15:09    06-10-05

1-800-822-3-45

# Communications Construction Group, LLC.
## *Record of Employment Separation*

| | | | |
|---|---|---|---|
| **Employee's Name** | Alberto Carmona | **Employee #** | 11976 |
| | (print name) | | |
| **Last Day Worked** | 10-6-05 | **Job #** | 5008 |

### Reason For Separation (check one)

| Voluntary Resignation | | Discharge | |
|---|---|---|---|
| ☐ | Job Abandonment | ☐ | Absenteeism |
| ☐ | Job Relocation Refused | ☐ | Lateness |
| ☐ | Dissatisfied with Job | ☐ | Not Qualified |
| ☐ | Other Employment | ☐ | Violation of Company Policy |
| ☐ | Personal or Domestic | X | Lack of Work |
| ☐ | Continuing Education | ☐ | Gross Insubordination |
| ☐ | Other | ☐ | Other |

### Items Returned to CCG (check all that apply)

☐ Cell Phone    ☐ Computer/Laptop    ☒ Company Truck/ Keys    ☐ Building Keys    ☐ CCG ID Cards    ☐ Other

### Explanation of Final Incident
Include all relevant dates and previous infractions. Continue on back of page if necessary.

---

| **MUST BE COMPLETED** | | |
|---|---|---|
| **Employee's Signature** Alberto Carmona | **Date** | 10-6-06 |
| **Supervisor (signature)** Will J.J. | **Date** | 10-6-05 |
| **Supervisor (print name)** William J Grover Jr | | |
| **Witness Signature** | **Date** | |

---

### Office Use Only    Pd w/ck 10-13-05 KW

__ **If checked, the company chooses not to challenge claimant's eligibility to receive benefits.**

| | | |
|---|---|---|
| Health Insurance NA | Stock NA | Tool amount owed |
| H.I. Reimbursement NA | Garnishment | Vacation 3½ days PC |
| 401(k) NA | Direct Deposit | Computer/Network Access See attached |
| ING NA | Vehicle Allowance | Advances NA |
| Pre-Paid Legal NA | Cell Phone NA | |

PC 10/5 ✓ Human Resources
10-10-05 Payroll KW

CCG/ Emp separation fim(4-05)

D0575

P.05        RECEIVED FROM:12152697568        15:00    06-01-06

1-800-822-3345

# Communications Construction Group, LLC.
## *Record of Employment Separation*

**Employee's Name**   Brian Coleman          **Employee #**   11563
                      (print name)

**Last Day Worked**   10-6-05               **Job #**   5008

## Reason For Separation (check one)

| Voluntary Resignation | | Discharge | |
|---|---|---|---|
| ☐ | Job Abandonment | ☐ | Absenteeism |
| ☐ | Job Relocation Refused | ☐ | Lateness |
| ☐ | Dissatisfied with Job | ☐ | Not Qualified |
| ☐ | Other Employment | ☐ | Violation of Company Policy |
| ☐ | Personal or Domestic | X | Lack of Work |
| ☐ | Continuing Education | ☐ | Gross Insubordination |
| ☐ | Other _____ | | Other _____ |

## Items Returned to CCG (check all that apply)

☒ Cell Phone   ☐ Computer/Laptop   ☒ Company Truck/ Keys   ☐ Building Keys   ☐ CCG ID Cards   ☐ Other

## Explanation of Final Incident
Include all relevant dates and previous infractions. Continue on back of page if necessary.

_____

**MUST BE COMPLETED**

**Employee's Signature**   B      C              **Date**   10-6-05

**Supervisor (signature)**   Will $.L.f.        **Date**   10-6-05

**Supervisor (print name)**   William J Grover Jr

**Witness Signature** _____   **Date** _____

---

## Office Use Only

___ If checked, the company chooses not to challenge claimant's eligibility to receive benefits.

Pd w/cc  10.13.05 KM

**Health Insurance**  term $\ell^L$          **Stock**  NA          Tool amount owed _____

**H.I. Reimbursement**  term $\ell^L$         **Garnishment** _____   **Vacation**  1/2 day XC

**401(k)**  N/A , XV       **Direct Deposit**  off       **Computer/Network Access**  See attached

**ING**  NA               **Vehicle Allowance** _____   **Advances**  NA

**Pre-Paid Legal**  NA    **Cell Phone**  returned

XC 10/5 ✓  Human Resources
10.13.05  Payroll KM

→ Medical KM
   Dental KM

CCG Emp separation frm (4-05)

Call Back # 302-241-1139

D0576

RECEIVED FROM:12152697568

13:16  06-10-05

# Communications Construction Group, LLC.
## *Record of Employment Separation*

| | | | |
|---|---|---|---|
| **Employee's Name** | Joel Diaz Guaddarama | **Employee #** | 12036 |
| | **(print name)** | | |
| **Last Day Worked** | 10-6-05 | **Job #** | 5008 |

### Reason For Separation (check one)

| Voluntary Resignation | | Discharge | |
|---|---|---|---|
| ☐ | Job Abandonment | ☐ | Absenteeism |
| ☐ | Job Relocation Refused | ☐ | Lateness |
| ☐ | Dissatisfied with Job | ☐ | Not Qualified |
| ☐ | Other Employment | ☐ | Violation of Company Policy |
| ☐ | Personal or Domestic | X | Lack of Work |
| ☐ | Continuing Education | ☐ | Gross Insubordination |
| ☐ | Other ___ | ☐ | Other ___ |

### Items Returned to CCG (check all that apply)

☐ Cell Phone   ☐ Computer/Laptop   ☒ Company Truck/ Keys   ☐ Building Keys   ☐ CCG ID Cards   ☐ Other ___

### Explanation of Final Incident
Include all relevant dates and previous infractions. Continue on back of page if necessary.

_____

**MUST BE COMPLETED**

| | | |
|---|---|---|
| **Employee's Signature** | Joel Diazleal Guadarama | **Date** 10-6-05 |
| **Supervisor (signature)** | Will ƎЯK | **Date** 10-6-05 |
| **Supervisor (print name)** | William J Grover Jr | |
| **Witness Signature** | _____ | **Date** _____ |

### Office Use Only    Pd w/ck 10·13·05

☐ **If checked, the company chooses not to challenge claimant's eligibility to receive benefits.**

| | | |
|---|---|---|
| Health Insurance *NA* | Stock *NA* | Tool amount owed ___ |
| H.I. Reimbursement *NA* | Garnishment ___ | Vacation 2 days fc |
| 401(k) *NA* | Direct Deposit N A | Computer/Network Access *See Attached* |
| ING *NA* | Vehicle Allowance ___ | Advances *NA* |
| Pre-Paid Legal *NA* | Cell Phone ___ | |

| | |
|---|---|
| fc 10/5 | Human Resources |
| 10·7·05 | Payroll ★w |

CCG Emp separation frm/(4-05)

D0577

# Communications Construction Group, LLC.
## *Record of Employment Separation*

**Employee's Name**   Jason McLean                 **Employee #**   11951
                      **(print name)**

**Last Day Worked**   10-6-05                      **Job #**   5008

### Reason For Separation (check one)

| Voluntary Resignation | | Discharge | |
|---|---|---|---|
| ☐ | Job Abandonment | ☐ | Absenteeism |
| ☐ | Job Relocation Refused | ☐ | Lateness |
| ☐ | Dissatisfied with Job | ☐ | Not Qualified |
| ☐ | Other Employment | ☐ | Violation of Company Policy |
| ☐ | Personal or Domestic | X | Lack of Work |
| ☐ | Continuing Education | ☐ | Gross Insubordination |
| ☐ | Other | ☐ | Other |

### Items Returned to CCG (check all that apply)
X Cell Phone   ☐ Computer/Laptop   X Company Truck/ Keys   ☐ Building Keys   ☐ CCG ID Cards   ☐ Other

### Explanation of Final Incident
Include all relevant dates and previous infractions. Continue on back of page if necessary.

---

### MUST BE COMPLETED

**Employee's Signature**   *Jason McLean*              Date   10-6-05

**Supervisor (signature)**   *Will fl*                 Date   10-6-05

**Supervisor (print name)**   William J Grover Jr

**Witness Signature**   *Rhyle*                        Date   10/6/05

---

### Office Use Only                    Pd w/CK 10.13.05 KM

☐ If checked, the company chooses not to challenge claimant's eligibility to receive benefits.

Health Insurance   term JC          Stock   NA          Tool amount owed   _____

H.I. Reimbursement   NA             Garnishment  _____   Vacation   2 days JC

401(k)   NA                         Direct Deposit   off    Computer/Network Access   See attached

ING   NA                            Vehicle Allowance  _____

Pre-Paid Legal   NA                 Cell Phone   returned   Advances   NA

                                    | JC/015 | Human Resources |
                                    | 10.7.05 | Payroll KM |

medical KM
Dental KM
Vision KM
CCG Emp separation frm (4-05)                                              D0578

Call back # 3026785725

RECEIVED FROM:12152697568                                    06-10-05    15:09    P.04

1-800-822-33 5

# Communications Construction Group, LLC.
## *Record of Employment Separation*

| Employee's Name | John Morris | Employee # | 12001 |
|---|---|---|---|
| | **(print name)** | | |
| Last Day Worked | 10-6-05 | Job # | 5008 |

## Reason For Separation (check one)

| Voluntary Resignation | | Discharge | |
|---|---|---|---|
| ☐ | Job Abandonment | ☐ | Absenteeism |
| ☐ | Job Relocation Refused | ☐ | Lateness |
| ☐ | Dissatisfied with Job | ☐ | Not Qualified |
| ☐ | Other Employment | ☐ | Violation of Company Policy |
| ☐ | Personal or Domestic | X | Lack of Work |
| ☐ | Continuing Education | ☐ | Gross Insubordination |
| ☐ | Other _____ | ☐ | Other _____ |

## Items Returned to CCG (check all that apply)

☒ Cell Phone  ☐ Computer/Laptop  ☐ Company Truck/ Keys  ☐ Building Keys  ☐ CCG ID Cards  ☐ Other _____

## Explanation of Final Incident
Include all relevant dates and previous infractions. Continue on back of page if necessary.

_____

_____

---

**MUST BE COMPLETED**

| Employee's Signature | _(signature)_ | Date | 10·6·05 |
|---|---|---|---|
| Supervisor (signature) | _(signature)_ | Date | 10-6-05 |
| Supervisor (print name) | William J Grover Jr | | |
| Witness Signature | _____ | Date | _____ |

---

## Office Use Only

Pd w/ck  10·13·05 kw.

☐ If checked, the company chooses not to challenge claimant's eligibility to receive benefits.

| Health Insurance | term RV | Stock | NA | Tool amount owed | _____ |
|---|---|---|---|---|---|
| H.I. Reimbursement | NA | Garnishment | | Vacation | 3 days kc |
| 401(k) | NA | Direct Deposit | Off | Computer/Network Access | See attached |
| ING | NA | Vehicle Allowance | | Advances | NA |
| Pre-Paid Legal | NA | Cell Phone | returned | | |

→ medical kw
    Dental kw.

| KC 10/5 | Human Resources |
| 10/13/05 | Payroll kw. |

CCG Emp separation frm/(4-05)

215-535-2355                                    D0579

RECEIVED FROM:12152697568    P.03    06-10-05  13:17

# Communications Construction Group, LLC.
## *Record of Employment Separation*

| | | | |
|---|---|---|---|
| **Employee's Name** | Harry Ortiz | **Employee #** | 11959 |
| | (print name) | | |
| **Last Day Worked** | 10-6-05 | **Job #** | 5008 |

### Reason For Separation (check one)

| Voluntary Resignation | | Discharge | |
|---|---|---|---|
| ☐ | Job Abandonment | ☐ | Absenteeism |
| ☐ | Job Relocation Refused | ☐ | Lateness |
| ☐ | Dissatisfied with Job | ☐ | Not Qualified |
| ☐ | Other Employment | ☐ | Violation of Company Policy |
| ☐ | Personal or Domestic | X | Lack of Work |
| ☐ | Continuing Education | ☐ | Gross Insubordination |
| ☐ | Other _____ | ☐ | Other _____ |

### Items Returned to CCG (check all that apply)

X Cell Phone  ☐ Computer/Laptop  ☑ Company Truck/ Keys  ☐ Building Keys  ☐ CCG ID Cards  ☐ Other _____

### Explanation of Final Incident
Include all relevant dates and previous infractions. Continue on back of page if necessary.

_____

_____

---

**MUST BE COMPLETED**

| | | | |
|---|---|---|---|
| **Employee's Signature** | _Harry Ortiz_ | **Date** | _____ |
| **Supervisor (signature)** | _Will Grover_ | **Date** | 10-6-05 |
| **Supervisor (print name)** | William J Grover JR | | |
| **Witness Signature** | _____ | **Date** | 10/6/-05 |

---

**Office Use Only**          pd w/ck 10·13·05  Khu.

☐ **If checked, the company chooses not to challenge claimant's eligibility to receive benefits.**

| | | |
|---|---|---|
| Health Insurance  term FC | Stock  NA | Tool amount owed _____ |
| H.I. Reimbursement  NA | Garnishment _____ | Vacation  3½ days ot |
| 401(k)  NA | Direct Deposit  Off | Computer/Network Access  See attached |
| ING  NA | Vehicle Allowance _____ | Advances  NA |
| Pre-Paid Legal  NA | Cell Phone  returned | |

Medical
Dental
Vision

| | |
|---|---|
| pd 10/5 | Human Resources |
| 10·7·05 | Payroll  Khu. |

CCG Emp separation frm (4-05)

610-563-8474

D0580

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JASON MCLEAN and
BRIAN COLEMAN,

                    Plaintiffs,                    CIVIL ACTION NO. 06-617 (SLR)

v.

COMMUNICATIONS CONSTRUCTION
GROUP, LLC,

                    Defendant.

## ORDER

Now, this _____ day of _____, 2007, having considered Defendant

Communication Construction Group, LLC's Motion for Summary Judgment and any opposition

thereto, it is hereby **ORDERED** that the Motion is **GRANTED**.  It is further **ORDERED** that

Plaintiffs' Complaint is **DISMISSED WITH PREJUDICE**.

SO ORDERED BY THE COURT:

_____
Robinson, U.S.D.J.

## **CERTIFICATE OF SERVICE**

I, Daniel M. Silver, hereby certify that a true and correct copy of the foregoing Defendant

Communications Construction Group, LLC's Motion for Summary Judgment, accompanying

Memorandum of Law, and all Exhibits thereto has been served via CM/ECF this 28th day of

November, 2007 upon the following:

        Ronald G. Poliquin
        Young, Malmberg & Howard, P.A.
        30 The Green
        Dover, DE 19901
        (302) 672-5600
        DEL. I.D. No. 4447

        Attorney for Plaintiffs

                  /s/ Daniel M. Silver
                  Daniel M. Silver (DE Bar ID # 4758)