IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JASON MCLEAN and          )
BRIAN COLEMAN,            )
                          )
        Plaintiffs,       )
                          )
v.                        )        Civ. No.: 06-617-SLR
                          )
COMMUNICATIONS            )
CONSTRUCTION GROUP, LLC., )
                          )
        Defendant.        )

**PLAINTIFFS' ANSWERING MEMORANDUM IN SUPPORT OF DENYING
DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**YOUNG, MALMBERG & HOWARD, P.A.**

/s/ Ronald G. Poliquin
Ronald G. Poliquin, Esquire
I.D. No. 4447
30 The Green
Dover, DE  19901
(302) 672-5600
*Attorney for Plaintiffs*

DATED:  December 17, 2007

**TABLE OF CONTENTS**

                                                                    Page

TABLE OF AUTHORITIES............................................................ii

NATURE AND STAGE OF PROCEEDINGS...............................................1

SUMMARY OF ARGUMENT..........................................................2

STATEMENT OF FACTS...........................................................3-5

ARGUMENT......................................................................6

    I.    THE COURT SHOULD NOT GRANT CCG SUMMARY JUDGMENT
        WITH RESPECT TO PLAINTIFF'S RACIAL DISCRIMINATION,
        RACIAL HARASSMENT, AND RETALIATION CLAIM

CONCLUSION....................................................................10

## **TABLE OF AUTHORITIES**

Page

CASES

Cole v. Delaware Technical and Community College 459 F.Supp.2d 296 D.Del., 2006...7


STATUTES

Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1)…………………....6-8

## **NATURE AND STAGE OF PROCEEDINGS**

Brian Coleman and Jason McLean ("plaintiffs") commenced this Title VII action on October 2, 2006 contending that they were the subject of racial harassment and retaliation. Defendant Communications Construction Group, LLC ("defendant CCG") answered the complaint on October 24, 2006. On November 28, 2007, both plaintiffs and defendant filed motions for summary judgment. This is plaintiffs' answering brief in opposition of defendant's motion for summary judgment.

## SUMMARY OF THE ARGUMENT

I.    Foreman Brad Dodson telling two CCG employees that McLean and Coleman
      were "two dumb lazy niggers" constitutes harassment under Title VII. (See
      plaintiff's opening brief in support of motion for summary judgment)

II.   As crew foreman and Brian Coleman and Jason McLean's direct boss, having
      impact on their promotions and raises, Bradley Dodson was their supervisor as
      defined under Title VII. (See plaintiff's opening brief in support of motion for
      summary judgment)

III.  Here, the plaintiffs are African American and thus a member of a protected
      class. Secondly, plaintiffs suffered an adverse employment action when they
      were transferred and subsequently terminated. Lastly, similarly situated
      members of the class were treated more favorably as the harasser- Bradley
      Dodson stayed with the company at the more desirable work location and
      continued to work after plaintiffs were laid off.

IV.   Temporal proximity of the events demonstrate that as a result of the incident
      with Brad Dodson, both plaintiffs were transferred to inferior working
      conditions in West Chester and then Oaks and then terminated.

V.    Genuine issues of material facts, as to pretextual nature of defendant's
      proffered legitimate, nondiscriminatory reason

## STATEMENT OF FACTS

Plaintiff reiterates the statement of facts submitted in plaintiff's opening brief in support of its motion for partial summary judgment. In addition, plaintiff adds the following facts:

More than just two other employees were aware of Brad Dodson calling the two plaintiffs "two dumb niggers". (Brian Coleman Deposition at 13, 3-11, McLean Ex.1). Bradley Dodson made clear that being a "Dodson" gave him superior standing within the company. (McLean Ex. 1) Brad Dodson had control over plaintiffs' job even helping determining their pay rate. (Jason McLean Deposition at 53, 13-24, McLean Ex.2) Bradley Dodson would often call the plaintiffs "yahoos" while criticizing their work. (Brian Coleman Deposition at 50, 2-23, McLean Ex.3) Brad Dodson constantly reminded McLean and Coleman on a daily basis that he could fire them. (Jason McLean Deposition at 15, 12-24, McLean Ex.4) After the confrontation between the plaintiffs and Dodson, CCG supervisors tried to dissuade the plaintiffs from pursuing the matter with Human Resources. (Brian Coleman Deposition at 18, 16-19, McLean Ex.5) Dodson was about 150 feet away when plaintiffs confronted him. (Jason McLean Deposition at 17, 10-11, McLean Ex.6) McLean and Coleman never left their job site to confront Brad Dodson. (Jason McLean Deposition at 43, 11-14, McLean Ex.7)

The incident included more than just a verbal altercation. Upon confronting Brad Dodson about the incident, Dodson immediately starts striking Coleman in the chest with his finger. (Brian Coleman Deposition at 23, 1-6, McLean Ex.8)

After reporting the incident, Coleman left for a pre-planned vacation. Immediately after the incident and during Coleman's vacation, McLean was relegated to sweeping

3

sidewalks and cleaning dirt out of people's yards. (Jason McLean Deposition at 24, 1-7, McLean Ex.9) The position paid McLean half as much as his former position. (Jason McLean Deposition at 54, 1-9, McLean Ex.10) Upon returning to the company, he was transferred to another worksite in Angola, Delaware. (Brian Coleman Deposition at 28, 1-7, McLean Ex.11) Coleman and McLean worked there for three days. (McLean Ex.12). Then Coleman and McLean were transferred to West Chester and then Oaks, Pennsylvania. (McLean Ex. 12). The rate schedule was different in New Castle then in Angola and West Chester. (Jason McLean Deposition at 30, 15-24, McLean Ex.13)

Originally, Coleman and McLean were allowed a truck to travel to their worksite (Brian Coleman Deposition at 29, 1-24, McLean Ex.14) However; CCG's CEO Jonathan Gates quickly took the truck away. (Brian Coleman Deposition at 30, 7-14, McLean Ex.15) All other foremen had company trucks. (Jason McLean Deposition at 34, 13-17, McLean Ex.16)

The work in West Chester was inferior to the New Castle worksite. (Brian Coleman Deposition at 31, 10-15, McLean Ex.17) The transfer resulted in a substantial loss of salary. (Jason McLean Deposition at 36, 1-24, McLean Ex.18) Plaintiffs were making less money for the same work in West Chester. (Jason McLean Deposition at 63, 17-24, McLean Ex.19) The transfer also resulted in longer hours, higher costs for room and board, and higher food costs. (Jason McLean Deposition at 37, 1-17, McLean Ex.20) Plaintiffs worked four-day weeks in New Castle and six day weeks in West Chester. (Jason McLean Deposition at 64, 13-24, McLean Ex.21) McLean requested an explanation from HR concerning his transfer, but was never given one. (Jason McLean Deposition at 58, 3-10, McLean Ex.22) The pay was inferior at the West Chester

4

worksite. (Brian Coleman Deposition at 32, 3-17, McLean Ex.23) The travel time was much longer for both McLean and Coleman at West Chester (Brian Coleman Deposition at 33, 16-24, McLean Ex.24) The pay was similar at the Oak worksite. (Brian Coleman Deposition at 35, 19-21, McLean Ex.25)

Despite five years of employment, Gates made vague threats as to Coleman's future with the company. (Brian Coleman Deposition at 37, 16-24, McLean Ex.26) Prior to this incident, Coleman had no negative reviews in his file with CCG. (Brian Coleman Deposition at 49, 3-21, McLean Ex.27) McLean started working with CCG in January 2005. (Jason McLean Deposition at 7, 15-19 McLean Ex.28)

There was still work at CCG after plaintiffs were laid off. (Jason McLean Deposition at 38, 22-23, McLean Ex.29) The incident was widely known in the company. (Jason McLean Deposition at 47, 2-5, McLean Ex.30) Bradley Dodson continued to work after Coleman and McLean were laid off. (Brian Coleman Deposition at 51, 1-8, McLean Ex.31)

## ARGUMENT

## I. THE COURT SHOULD NOT GRANT CCG SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFF'S RACIAL DISCRIMINATION, RACIAL HARASSMENT, AND RETALIATION CLAIM

With respect to summary judgment in employment discrimination cases, the court's role is to determine whether, upon reviewing all the facts and inferences to be drawn there from in a light most favorable to plaintiff, whether there exists sufficient evidence to create a genuine issue of material fact as to whether an employer intentionally discriminated against the plaintiff. Fed.Rules Civ.Proc.Rule 56.

Under the *McDonnell Douglas* burden-shifting framework, employees establish prima facie case of employment discrimination based on race by showing that (1) they are members of a protected class, (2) they are qualified for position, (3) they suffered an adverse employment action, and (4) the action occurred under circumstances that give rise to an inference of unlawful discrimination, such as might occur when a similarly situated person not of the protected class is treated differently. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1). Here, the plaintiffs are African American and thus a member of a protected class. Secondly, plaintiffs suffered an adverse employment action when they were transferred and subsequently terminated. Lastly, similarly situated members of the class were treated more favorably as the harasser- Bradley Dodson stayed with the company at the more desirable work location and continued to work after plaintiffs were laid off.

## A. The discrimination against Plaintiffs involved both verbal and physical harassment

Here, plaintiffs were called "two dumb lazy niggers" by a supervisor who had control over plaintiffs' job even helping determine their pay rate. (Jason McLean

Deposition at 53, 13-24, McLean Ex.2). Bradley Dodson often called the plaintiffs

"yahoos" while criticizing their work. (Brian Coleman Deposition at 50, 2-23, McLean

Ex.3) Brad Dodson constantly reminded McLean and Coleman on a daily basis that he

could fire them. (Jason McLean Deposition at 15, 12-24, McLean Ex.4) Not only did

Brad Dodson call the plaintiffs "two dumb lazy niggers", he also physically poked his

finger in plaintiff Coleman's chest several times after confronted with the question as to

whether he made the statement. The incident was widely known to other employees in

the company. (Jason McLean Deposition at 47, 2-5, McLean Ex.30)

**B. Plaintiffs were transferred to worse positions and eventually laid off after reporting the incident**

The Court has previously decided that genuine issues of material fact, as to

whether relocation of four employees to single office at technical and community college

constituted an "adverse employment action," precluded summary judgment for the

college on employees' claim of race-based disparate treatment. Cole v. Delaware

Technical and Community College 459 F.Supp.2d 296 D.Del., 2006. Civil Rights Act of

1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

Substantial interference with work facilities that are important to the performance

of an employee's job can constitute a material change in the terms and conditions of

employment and thereby qualify as an "adverse employment action." Id.

As a result of the incident with Brad Dodson, both plaintiffs were transferred to

inferior working conditions in West Chester and then Oaks and subsequently terminated.

McLean was relegated to sweeping sidewalks and cleaning dirt out of people's yards.

(Jason McLean Deposition at 24, 1-7, McLean Ex.9) The position paid McLean half as

much as his former position. (Jason McLean Deposition at 54, 1-9, McLean Ex.10)

The work in West Chester was inferior to the New Castle worksite. (Brian Coleman Deposition at 31, 10-15, McLean Ex.17) The transfer resulted in a substantial loss of salary. (Jason McLean Deposition at 36, 1-24, McLean Ex.18) Plaintiffs were making less money for the same work in West Chester. (Jason McLean Deposition at 63, 17-24, McLean Ex.19) The transfer also resulted in longer hours, higher costs for room and board, and higher food costs. (Jason McLean Deposition at 37, 1-17, McLean Ex.20) Plaintiffs worked four-day weeks in New Castle and six day weeks in West Chester. (Jason McLean Deposition at 64, 13-24, McLean Ex.21) McLean requested an explanation from HR concerning his transfer, but was never given one. (Jason McLean Deposition at 58, 3-10, McLean Ex.22) The pay was inferior at the West Chester worksite. (Brian Coleman Deposition at 32, 3-17, McLean Ex.23) The travel time was much longer for both McLean and Coleman to West Chester (Brian Coleman Deposition at 33, 16-24, McLean Ex.24) The inferior pay was similar at the Oak worksite. (Brian Coleman Deposition at 35, 19-21, McLean Ex.25)

### C.  Defendant's actions demonstrate that their reasons for Plaintiffs' transfer and termination were pretextual

In Cole, the Court decided that genuine issues of material facts, as to pretextual nature of technical and community college's proffered legitimate, nondiscriminatory reason for office relocations of African-American employees of educational opportunity outreach program, that it was part of larger plan to locate members of each of three such federally-funded programs in single designated area, precluded summary judgment for college on employees' claim of race-based disparate treatment under Title VII. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

8

Here, CCG asserts that plaintiffs were transferred and laid off as part of a larger business plan. That type of assertion without substantive evidence is a disputed material fact in the case. See <u>Cole</u>.

Despite five years with the company, plaintiff Coleman (after the incident with Dodson) received veiled threats that his future with the company was in question. (Brian Coleman Deposition at 37, 16-24, McLean Ex.26) Prior to this incident, Coleman had no negative reviews in his file with CCG. (Brian Coleman Deposition at 49, 3-21, McLean Ex.27) McLean started working with CCG in January 2005. (Jason McLean Deposition at 7, 15-19 McLean Ex.28) In addition, after the confrontation, CCG supervisors tried to dissuade the plaintiffs from pursuing the matter with Human Resources. (Brian Coleman Deposition at 18, 16-19, McLean Ex.5)

Originally, Coleman and McLean were allowed a truck to travel to their worksite (Brian Coleman Deposition at 29, 1-24, McLean Ex.14) However; CCG's CEO Jonathan Gates quickly took the truck away. (Brian Coleman Deposition at 30, 7-14, McLean Ex.15) All other foremen had company trucks. (Jason McLean Deposition at 34, 13-17, McLean Ex.16)

There was still work at CCG after plaintiffs were laid off. (Jason McLean Deposition at 38, 22-23, McLean Ex.29) The incident was widely known in the company. (Jason McLean Deposition at 47, 2-5, McLean Ex.30) Bradley Dodson continued to work after Coleman and McLean were laid off. (Brian Coleman Deposition at 51, 1-8, McLean Ex.31). In addition, Bradley Dodson's brother, David Dodson participated in the decision to transfer and subsequent terminate the plaintiffs. (Lisa Clements Deposition at 42, 4-10, McLean Ex.39 in plaintiffs' opening brief in support for partial summary judgment).

9

**CONCLUSION**

The Court should deny defendant's motion for summary judgment as issues of material fact are in dispute that need to be decided at trial.

Respectfully submitted,

/s/ Ronald G. Poliquin
Ronald G. Poliquin, Esquire
I.D. No. 4447
30 The Green
Dover, DE 19901
302-672-5600
*Attorney for Plaintiffs*

Dated: December 17, 2007

10

# MCLEAN EXHIBIT 1

McLean and Coleman v. Communications Construction Group, LLC
Brian Coleman

---

**10**

1  point in time that Mr. Gates made you a foreman?
2  A. For the Verizon, yes. After that.
3  Q. We've said that May 31st is the day, and I use
4  that date because it's the date that is in the Complaint
5  that was filed in this action. Did you review the
6  Complaint prior to its filing?
7  A. Yes.
8  Q. And did you verify the facts in that Complaint?
9  A. Somewhat.
10  Q. What do you mean by "somewhat"?
11  A. I mean some of the stuff is wrong that's in
12  there.
13  Q. What do you think is wrong in there?
14  A. The stuff that CCG told, it didn't happen that
15  way. Some of it.
16  Q. Now, I'm talking about what's in your
17  Complaint.
18  A. Oh, my Complaint?
19  Q. To begin this litigation.
20  A. My Complaint is pretty accurate. I mean what
21  wasn't accurate, I pointed out to my lawyer.
22  Q. So you don't have any reason to challenge this
23  date that's been put out of May 31st?
24  A. Nope.

**11**

1  Q. 2005. Now, you had worked for CCG for a number
2  of years prior to May 31st, 2005?
3  A. Yes.
4  Q. Were there any events that occurred prior to
5  that date, in your employment --
6  A. With me?
7  Q. With you.
8  A. No, sir.
9  Q. Didn't have any problems --
10  A. No problem at all.
11  Q. -- with the company or working? Okay. In your
12  own words, if you would, tell me what happened on May
13  31st, what the conversation was with Mr. Koch.
14  A. Well, it was me and Jason McLean, saw Mr. Koch,
15  I guess, and asked him if they were making any money. It
16  was like -- some weeks you do good and some weeks you do
17  bad. This was one of those bad spells. And he had told
18  us what Mr. Dodson said, about "We weren't making any
19  money, but at least you don't have to work with two dumb
20  niggers."
21  Q. And when you said Mr. Dodson, you're referring
22  to Brad Dodson?
23  A. Brad Dodson. He was my foreman.
24  Q. You weren't present for this conversation

**12**

1  between Mr. Dodson when he allegedly made this statement
2  to Mr. Koch?
3  A. No. I wasn't.
4  Q. Do you know when that happened?
5  A. It was a Friday before that weekend, or -- we
6  had a weekend off or something, a holiday or something.
7  A couple days that went past, and that Monday, I think,
8  they told us.
9  Q. What did you say to Mr. Koch after he gave you
10  this alleged statement?
11  A. Well, you keep saying Mr. Koch. It wasn't just
12  Mr. Koch who was telling me.
13  Q. Okay. Who else -- where did that conversation
14  take place?
15  A. Right in the neighborhood where we were working
16  at.
17  Q. Okay. And was Mr. Koch working with you?
18  A. No. Mr. Koch wasn't working with us.
19  Q. Okay.
20  A. We all worked -- there was a street here, a
21  street here. Everybody -- the neighborhood was broken up
22  into sections. This crew had this section, this crew had
23  this section. We had to go around the corner on the
24  backhoe to get stone. We were getting boxes. And we

**13**

1  always stopped and just shoot the shit with the guys, you
2  know what I mean? We all worked together. Same company.
3  So when we stopped, he told us what was
4  said. Davey Miller told us what was said. There was a
5  couple of them told us what was said. So when he told us
6  what was said, I mean I go -- I bust my butt for this
7  guy, Dave Dodson -- I mean, yeah, Brad Dodson. If I
8  don't dig my holes, he can't use that machine to shoot
9  that footage there where he is taking the biggest chunk
10  of the money. So I went around there, and I confronted
11  him. I asked him --
12  Q. Okay.
13  A. -- why would you say something like that, you
14  know what I mean?
15  Q. And what was his response?
16  A. He got in my face. "I'm a Dodson." I said I
17  don't care who you are. I'm a man just like you are.
18  From there, that's when the confrontation started.
19  Q. Okay. You and Jason were going to get stone,
20  you said, when this conversation took place.
21  A. Yeah.
22  Q. Who was present at that point in time?
23  A. When we were going to get stone?
24  Q. Yeah.

4 (Pages 10 to 13)

# MCLEAN EXHIBIT 2

McLean and Coleman v. Communications Construction Group, LLC
Jason McLean

| 50 | 52 |
|---|---|
| 1    A.   A written statement? No. | 1    with the Equal Employment Opportunity Commission? |
| 2    Q.   Have you gotten a written statement from anyone | 2    A.   Yes. |
| 3    else who was a witness to this matter? | 3    Q.   And do you recall that they ended up dismissing |
| 4    A.   No. Nothing written. | 4    the charge? |
| 5    Q.   Other than your attorney, Mr. Brad Dodson's | 5    MR. POLIQUIN:  Objection. You can |
| 6    cousin, and Mr. Coleman, have you spoken with anyone else | 6    answer. You can answer the question. |
| 7    about these events since your termination from CCG? | 7    A.   I don't think they dismissed it. I think they |
| 8    A.   Yes. | 8    didn't find any outcome, and they ended up giving us the |
| 9    Q.   Who else have you spoken to? | 9    right to sue. |
| 10    A.   Lots of people. | 10    Q.   Let me give you a document that's marked |
| 11    Q.   Okay. Anyone with any direct knowledge of | 11    Exhibit 6, entitled dismissal and notice of rights. Do |
| 12    these events? | 12    you recall receiving that document from them? |
| 13    A.   No. | 13    A.   Yes. |
| 14    Q.   Did you keep any notes during the course of | 14    Q.   And that's dated June 29th? |
| 15    your employment with CCG? | 15    A.   Uh-huh. |
| 16    A.   Other than stuff pertaining to work. Did I | 16    Q.   Okay. Do you know when you received that? |
| 17    keep any to this day? No. | 17    A.   Probably sometime thereafter. |
| 18    Q.   And what do you keep pertaining to work? | 18    Q.   Any idea when? |
| 19    A.   Maybe stuff that I might need for the | 19    A.   Maybe a week. |
| 20    day-to-day work, you know, like where I'm going to be | 20    Q.   Okay. |
| 21    working, the map grid, length of the job. | 21    MR. HUGGETT:  That's all that I have. |
| 22    Q.   Are those documents that you would still have | 22    MR. POLIQUIN:  Just a few questions. |
| 23    today? | 23    If you don't mind. |
| 24    A.   No. | 24    CROSS-EXAMINATION |

| 51 | 53 |
|---|---|
| 1    Q.   When would you have gotten rid of those | 1    BY MR. POLIQUIN: |
| 2    documents? | 2    Q.   You had stated that Brad Dodson was your |
| 3    A.   Probably until they got thrown out of my truck. | 3    supervisor as of May 31, 2005? |
| 4    Q.   Do you keep a journal or a diary? | 4    A.   Uh-huh. |
| 5    A.   No. | 5    Q.   What was Brad Dodson's position on May 31, |
| 6    Q.   Did you file an income tax return in 2005? | 6    2005? |
| 7    A.   Yeah. | 7    A.   It was foreman, boss, manager. Whatever you |
| 8    Q.   In 2006? | 8    would like to call it. |
| 9    A.   Yeah. | 9    Q.   And what was your interaction with Brad Dodson, |
| 10    Q.   And you testified that one was filed on behalf | 10    as of May 31, 2005? Excuse me. When you say he was your |
| 11    of McLean Enterprises? | 11    boss, can you describe your working relationship with |
| 12    A.   Yeah. | 12    Brad Dodson? |
| 13    MR. HUGGETT:  I would like to | 13    A.   Pretty much I take all my orders from him, tell |
| 14    reiterate the document request for all damages and | 14    us what to do, where to go, when to do it. He decides my |
| 15    mitigation and get those tax returns, as well as any | 15    pay. So -- the only person like if I had complained, |
| 16    other information on the business of McLean | 16    he's the only person that I could really complain to. |
| 17    Enterprises. | 17    Didn't have anybody else's phone number to call or |
| 18    I think that's all that I have. Let | 18    anything like that, at that point in time. |
| 19    me take about five minutes. | 19    Q.   You said he decided your pay. When you say he |
| 20    MR. POLIQUIN:  That's fine. | 20    decided your pay, what do you mean by that? |
| 21    (Brief recess held) | 21    A.   Okay. He had all control over percentages the |
| 22    (McLean Exhibit 6 marked) | 22    crew had -- everybody gets a percentage out of the entire |
| 23    BY MR. HUGGETT: | 23    crew's performance. So, if he felt as though you weren't |
| 24    Q.   Do you recall filing a charge of discrimination | 24    pulling your weight, he could cut your percentage down. |

14  (Pages 50 to 53)

# MCLEAN EXHIBIT 3

McLean and Coleman v. Communications Construction Group, LLC
Brian Coleman

---

**50**

1    A. No.

2    Q. Prior to this incident, did Bradley Dodson ever

3 refer to you or Jason McLean by a certain -- by any other

4 names?

5    A. Yeah. He used to call us yahoos.

6    Q. And did he call anyone else yahoos, or yahoos?

7    A. I never heard him say that to anyone else.

8    Q. And in what context did he tell you yayhoos or

9 yahoos?

10    A. "You yayhoos, come on. You can't get that

11 right." I never heard the word or expression before. I

12 didn't know what it meant.

13    Q. Who else was on your team at that time?

14    A. Bradley and Frank.

15    Q. Did he ever refer to Frank as a yayhoo?

16    A. Huh-uh.

17    Q. You had worked for this company for four or

18 five years?

19    A. Yes, sir.

20    Q. And were you ever laid off during that period

21 of time?

22    A. No, sir. Not that I remember.

23    Q. And do you know what discipline Bradley Dodson

24 received has a result of the Lisa Clemens investigation?

---

**51**

1    A. None. A warning like we did. Which I don't

2 see how --

3    Q. And do you know if Bradley Dodson continued to

4 work after you were laid off?

5    A. Yes, he did.

6    Q. Now, whatever happened to Bradley Dodson's

7 criminal charges that were filed against him?

8    A. He pled out. Probation before judgment.

9    MR. POLIQUIN: I have no further

10 questions.

11    REDIRECT EXAMINATION

12 BY MR. HUGGETT:

13    Q. Brad Dodson's title was foreman?

14    A. Yes.

15    Q. Okay. And in Exhibit 2, the policies you

16 looked at, nowhere in there did it use the word foreman

17 in terms of making a complaint, did it?

18    A. I correct you, foreman or supervisor.

19 Foreman/supervisor. He had the power to fire me. He

20 told me what I did, he had control over me, so yeah.

21 Foreman, supervisor. He was my supervisor. You try and

22 reword it, but I mean that's -- that's what he was, my

23 supervisor.

24    Q. That's what you believe he was. Jason McLean

---

**52**

1 called human resources after the confrontation between

2 you and Mr. Dodson, correct?

3    A. Correct.

4    Q. Did you ever complain to anyone that Brad

5 Dodson referred to you as a yahoo?

6    A. I didn't pay it no mind, until after that other

7 comment was said. But I heard him say that directly to

8 me.

9    MR. HUGGETT: That's all.

10    MR. POLIQUIN: I have nothing else.

11 you can either waive signature or you can review it

12 before you sign it. What would you want to do?

13    THE WITNESS: I want to review it.

14    (Deposition concluded at 2:22 p.m.)

---

**53**

1            I N D E X

2 DEPONENT: BRIAN COLEMAN      PAGE

3 Examination by Mr. Huggett    2

   Examination by Mr. Poliquin    42

4 Examination by Mr. Huggett    51

5           E X H I B I T S

6 DEFENDANT'S DEPOSITION EXHIBITS    MARKED

7 1. Complaint and Warrant    16

8 2. Employee Policy Manual    22

9 3. Employee vacation form, 5/10/05    25

10 4. Employee warning report, 6/20/06    36

11 ERRATA SHEET/DEPONENT'S SIGNATURE    54

12 CERTIFICATE OF REPORTER    55

---

14 (Pages 50 to 53)

# MCLEAN EXHIBIT 4

Case 1:06-cv-00617-SLR    Document 45-5    Filed 12/17/2007    Page 2 of 2
McLean and Coleman v. Communications Construction Group, LLC
Jason McLean

14

1     A.  No.
2     Q.  When you were hired, you received the CCG
3   employee manual, correct?
4     A.  Yes.
5     Q.  Did you read that?
6     A.  Partially.
7     Q.  Okay.  Do you recall signing a statement that
8   you had read and understood the policies?
9     A.  Yes.
10    Q.  Did you understand that that manual had a
11  harassment policy in it?
12    A.  If I signed, yes.
13        (McLean Exhibit 1 marked)
14        MR. HUGGETT:  I introduce as Exhibit 1
15  the employee policy manual that has been previously
16  produced here, and the signed acknowledgment of
17  Mr. McLean.
18  BY MR. HUGGETT:
19    Q.  On this document that we've marked as Exhibit
20  1, is that your signature?
21    A.  Yes, sir.
22    Q.  On January 10, 2005?
23    A.  Yes, sir.
24    Q.  When you were hired by CCG?

15

1     A.  Yes, sir.
2     Q.  Okay.  And page 8 of that document has a
3   harassment provision, does it not?
4     A.  Yes, sir.
5     Q.  After Mr. Koch told you about this alleged
6   comment by Mr. Dodson, why didn't you call Lisa Clemens
7   at that point in time?
8     A.  I didn't see it fit.
9     Q.  And why is that?
10    A.  Because I felt as though I should have
11  contacted my supervisor.
12    Q.  And who was your supervisor at that point in
13  time?
14    A.  Brad Dodson.
15    Q.  Mr. Dodson was a foreman, correct?
16    A.  Yes.
17    Q.  He did not have the power to hire and fire you,
18  did he?
19    A.  He could fire me, yes.
20    Q.  How do you know that he could fire you?
21    A.  He made it very clear, every day.
22    Q.  Did anyone else tell you that he had the
23  authority to fire you?
24    A.  No.

16

1     Q.  Where were you at the time that you had this
2   conversation with Mr. Koch?
3     A.  On the work site.
4     Q.  How far away from where Mr. Dodson was working?
5     A.  Maybe 150 feet.
6         (McLean Exhibit 2 marked)
7   BY MR. HUGGETT:
8     Q.  I've marked as Exhibit 2 what is a map of the
9   neighborhood where the employees were working, previously
10  produced.  Do you recognize that as a map of the
11  neighborhood where you were working on May 31, 2005?
12    A.  It could possibly be one.  I've seen thousands
13  of these.
14    Q.  Okay.  On the second page of that document,
15  there is a handwritten notation in the top left corner
16  that says "Brian and Jason."  Do you see that?
17    A.  Right here?
18    Q.  Yes.
19    A.  Okay.
20    Q.  Is that the location where you were working on
21  May 31?
22    A.  Yeah.  That's it.  That's it.
23    Q.  And that's on Cunane Court?
24    A.  Uh-huh.

17

1     Q.  And on the first page of that document, there
2   is a notation on the bottom left side that says Brad and
3   Frank.  Do you see that?
4     A.  Yes.
5     Q.  And is that where Mr. Dodson was working on May
6   31?
7     A.  Possibly, yeah.
8     Q.  And that's around the corner from Cunane Street
9   on Entre Lane, correct?
10    A.  It was right across the property.  Yeah.  About
11  150 feet away.
12    Q.  So you left where you were and went over to
13  where Mr. Dodson was working?
14    A.  Yes.
15    Q.  Did you talk to Mr. Dodson or to the other
16  gentleman that was there, Frank?  What's Frank's last
17  name?
18    A.  Neither.  I didn't have a conversation with
19  either.
20    Q.  Okay.  Did Mr. Coleman have a conversation with
21  either?
22    A.  Yes.
23    Q.  Who did Mr. Coleman speak to first?
24    A.  He spoke to Brad.

5  (Pages 14 to 17)

# MCLEAN EXHIBIT 5

Case 1:06-cv-00617-SLR   Document 45-6   Filed 12/17/2007   Page 2 of 2
McLean and Coleman v. Communications Construction Group, LLC
Brian Coleman

18

1   wasn't hearsay.
2       Q.  If you look at the fourth page of this
3   document, the handwritten portion.  That's the fourth
4   page.
5       A.  Okay.
6       Q.  The middle entry, there is a narrative
7   paragraph.  Is that your handwriting?
8       A.  Yup.  Yes.  That's right.
9       Q.  Okay.  And that's exactly what's typed on this
10  first page, isn't it?
11      A.  Well, it's right, then.  That's correct.
12      Q.  You just said it was wrong.
13      A.  Well, I misunderstood what I was reading there.
14  That's exactly how it happened.  Dodson came out there,
15  his brother came.  He didn't want to get involved with
16  it.  That's when Mike Fender arrived.  Mike Fender tried
17  to tell us don't call human resources, don't call the
18  police.  Let's shake hands and be men about this and go
19  back to work.
20      Q.  Okay.  This statement says, Bradley Dodson
21  jabbed me with a finger in the chest.  Correct?
22      A.  Repeatedly.
23      Q.  It doesn't say that.
24      A.  Well, okay.

19

1       Q.  "I asked him to stop.  He kept going."
2       A.  Correct.
3       Q.  "Then he pushed me."
4       A.  Correct.
5       Q.  "Big boss come on the scene."  Who is that?
6       A.  That would be his brother, Dave Dodson.
7       Q.  And how did he come to be there?
8       A.  I think Brad must have called him, or Frank
9   called him.
10      Q.  Who is Frank?
11      A.  Frank was the guy that worked with Brad
12  after -- he was working with Brad before me and Jason
13  started working with him.  I don't know his last name.  I
14  have no idea.
15      Q.  He was a member of your crew?
16      A.  Yeah.
17      Q.  And was Mr. Dodson there when you called the
18  police or did you call the police before?  Mr. Dave
19  Dodson?
20      A.  I believe it was after.  Because they
21  weren't -- the only thing is they were telling us, "Go
22  back to work, go back to work.  We'll handle it.  Go back
23  to work."
24      Q.  Okay.  This then says, "He called me dumb

20

1   nigger."  Does this in any way tell the police that you
2   didn't actually hear him say that to you?
3       A.  I believe it's in the police report, that they
4   know what happened, that it was told to me.
5       Q.  Okay.  This document that you signed --
6       A.  Well, that's wrong, then, huh?  That's wrong.
7   Okay.
8       Q.  You said Dave Dodson didn't want to get
9   involved.  What did he say?
10      A.  He didn't say too much of anything, that I
11  remember.
12      Q.  Okay.
13      A.  He was standing off like to the side.  Fender
14  was the one doing all the talking.
15      Q.  Okay.  When did Mr. Fender get there?
16      A.  Right after the whole altercation happened.
17      Q.  Who was Mr. Fender, to your knowledge?
18      A.  Mike Fender.  He was like the supervisor, I
19  guess.
20      Q.  How long had he been on the job?
21      A.  He just started working for the company.
22      Q.  And if you remember, what happened when he
23  showed up?
24      A.  He was just trying to resolve the problem, I

21

1   guess.  He was trying to sweep it under the rug.  He
2   wasn't -- I mean I just got assaulted, what are you going
3   to do?  If I would have assaulted somebody, they would
4   have fired me probably.  He wasn't trying to do anything
5   to him.  Just trying to tell us shake hands and going
6   back to work.  No, I'm not shaking hands and going back
7   to work.  That's why I called the police.  Jason called
8   human resources.  Mrs. Clemens.
9       Q.  Had you had any dealings with Ms. Clemens
10  before that?
11      A.  No.
12      Q.  When you were originally talking to this group
13  that included Bobby Koch, and he relayed this statement
14  to you, where was that in relation to where Mr. Dodson
15  was working?
16      A.  Maybe right around the corner.
17      Q.  It wasn't right in the same spot?  You had to
18  go to where Mr. Dodson --
19      A.  We had to pass him to go to where we had to go
20  to get to Mr. Dodson.
21      Q.  When you heard the statement, why didn't you
22  call human resources at that time?
23      A.  I don't know.  I haven't the foggiest idea.
24      Q.  You knew that the company had a harassment

6 (Pages 18 to 21)

# MCLEAN EXHIBIT 6

McLean and Coleman v. Communications Construction Group, LLC
Jason McLean

| | 14 |
|---|---|
| 1 | A. No. |
| 2 | Q. When you were hired, you received the CCG |
| 3 | employee manual, correct? |
| 4 | A. Yes. |
| 5 | Q. Did you read that? |
| 6 | A. Partially. |
| 7 | Q. Okay. Do you recall signing a statement that |
| 8 | you had read and understood the policies? |
| 9 | A. Yes. |
| 10 | Q. Did you understand that that manual had a |
| 11 | harassment policy in it? |
| 12 | A. If I signed, yes. |
| 13 | (McLean Exhibit 1 marked) |
| 14 | MR. HUGGETT: I introduce as Exhibit 1 |
| 15 | the employee policy manual that has been previously |
| 16 | produced here, and the signed acknowledgment of |
| 17 | Mr. McLean. |
| 18 | BY MR. HUGGETT: |
| 19 | Q. On this document that we've marked as Exhibit |
| 20 | 1, is that your signature? |
| 21 | A. Yes, sir. |
| 22 | Q. On January 10, 2005? |
| 23 | A. Yes, sir. |
| 24 | Q. When you were hired by CCG? |

| | 16 |
|---|---|
| 1 | Q. Where were you at the time that you had this |
| 2 | conversation with Mr. Koch? |
| 3 | A. On the work site. |
| 4 | Q. How far away from where Mr. Dodson was working? |
| 5 | A. Maybe 150 feet. |
| 6 | (McLean Exhibit 2 marked) |
| 7 | BY MR. HUGGETT: |
| 8 | Q. I've marked as Exhibit 2 what is a map of the |
| 9 | neighborhood where the employees were working, previously |
| 10 | produced. Do you recognize that as a map of the |
| 11 | neighborhood where you were working on May 31, 2005? |
| 12 | A. It could possibly be one. I've seen thousands |
| 13 | of these. |
| 14 | Q. Okay. On the second page of that document, |
| 15 | there is a handwritten notation in the top left corner |
| 16 | that says "Brian and Jason." Do you see that? |
| 17 | A. Right here? |
| 18 | Q. Yes. |
| 19 | A. Okay. |
| 20 | Q. Is that the location where you were working on |
| 21 | May 31? |
| 22 | A. Yeah. That's it. That's it. |
| 23 | Q. And that's on Cunane Court? |
| 24 | A. Uh-huh. |

| | 15 |
|---|---|
| 1 | A. Yes, sir. |
| 2 | Q. Okay. And page 8 of that document has a |
| 3 | harassment provision, does it not? |
| 4 | A. Yes, sir. |
| 5 | Q. After Mr. Koch told you about this alleged |
| 6 | comment by Mr. Dodson, why didn't you call Lisa Clemens |
| 7 | at that point in time? |
| 8 | A. I didn't see it fit. |
| 9 | Q. And why is that? |
| 10 | A. Because I felt as though I should have |
| 11 | contacted my supervisor. |
| 12 | Q. And who was your supervisor at that point in |
| 13 | time? |
| 14 | A. Brad Dodson. |
| 15 | Q. Mr. Dodson was a foreman, correct? |
| 16 | A. Yes. |
| 17 | Q. He did not have the power to hire and fire you, |
| 18 | did he? |
| 19 | A. He could fire me, yes. |
| 20 | Q. How do you know that he could fire you? |
| 21 | A. He made it very clear, every day. |
| 22 | Q. Did anyone else tell you that he had the |
| 23 | authority to fire you? |
| 24 | A. No. |

| | 17 |
|---|---|
| 1 | Q. And on the first page of that document, there |
| 2 | is a notation on the bottom left side that says Brad and |
| 3 | Frank. Do you see that? |
| 4 | A. Yes. |
| 5 | Q. And is that where Mr. Dodson was working on May |
| 6 | 31? |
| 7 | A. Possibly, yeah. |
| 8 | Q. And that's around the corner from Cunane Street |
| 9 | on Entre Lane, correct? |
| 10 | A. It was right across the property. Yeah. About |
| 11 | 150 feet away. |
| 12 | Q. So you left where you were and went over to |
| 13 | where Mr. Dodson was working? |
| 14 | A. Yes. |
| 15 | Q. Did you talk to Mr. Dodson or to the other |
| 16 | gentleman that was there, Frank? What's Frank's last |
| 17 | name? |
| 18 | A. Neither. I didn't have a conversation with |
| 19 | either. |
| 20 | Q. Okay. Did Mr. Coleman have a conversation with |
| 21 | either? |
| 22 | A. Yes. |
| 23 | Q. Who did Mr. Coleman speak to first? |
| 24 | A. He spoke to Brad. |

5 (Pages 14 to 17)

# MCLEAN EXHIBIT 7

Case 1:06-cv-00617-SLR    Document 45-8    Filed 12/17/2007    Page 2 of 2
McLean and Coleman v. Communications Construction Group, LLC
Jason McLean

### 42

1  said they didn't want to get themselves involved.
2  Q. And did they tell you that?
3  A. Yeah.
4  Q. Did they tell you whether they actually heard
5  this comment or not?
6  A. They said quote, unquote, "I don't want to get
7  involved."
8  Q. So they never told you that they heard this
9  comment?
10  A. Davey Miller and the other guy, no.
11  Q. Anyone else that you believe Ms. Clemens should
12  have spoken to?
13  A. No.
14  (McLean Exhibit 5 marked)
15  BY MR. HUGGETT:
16  Q. Let me hand you a document we've marked as
17  Exhibit 5, an employee warning statement. Take a look at
18  that and tell me if you've seen that document before.
19  A. Yes.
20  Q. Is that your signature at the bottom of that
21  document?
22  A. Yes.
23  Q. And is this the document that you told me that
24  you disagreed with?

### 43

1  A. Yes.
2  Q. And you, indeed, checked the box that says I
3  disagree with the company's statement?
4  A. Yes.
5  Q. And is that your handwriting there that's under
6  that checked box?
7  A. Yes.
8  Q. And what does that say?
9  A. "I never left my job site. We were all working
10  in the same area."
11  Q. You told me earlier, in looking at Exhibit 2,
12  the map of the neighborhood, that in fact, you went from
13  where you were working to where Mr. Dodson was working?
14  A. Same area. Same neighborhood.
15  Q. At least 150 feet away?
16  A. Yes. Same area.
17  Q. And that was the reason that you disagreed with
18  this, is that you didn't leave the job site?
19  A. Yes.
20  Q. Do you know whether anyone else received any
21  discipline as a result of this incident?
22  A. I think Brian was written up for the exact same
23  thing, I believe. I'm not positive, though.
24  Q. You don't know whether Mr. Dodson was

### 44

1  disciplined at all or not?
2  A. I have no idea.
3  Q. Do you know who Jonathan Gates is?
4  A. Yes.
5  Q. Who is Mr. Gates?
6  A. I believe his title is the regional supervisor
7  for CCG.
8  Q. And does he have any information relevant to
9  this matter?
10  A. He should have all of it.
11  Q. And why do you say that?
12  A. Because he's the regional supervisor for CCG.
13  Q. Was he a witness to any of the events?
14  A. No.
15  Q. Was he involved in any of the events?
16  A. No. Other than the revoking of our truck
17  privilege. According to supervisor Bill, John said
18  you cannot drive the truck home anymore.
19  Q. Did you ever speak to Mr. Gates about that?
20  A. I called him and left him a message. Never
21  called me back.
22  Q. Wasn't your supervisor Brian Coleman?
23  A. My supervisor? No.
24  Q. He was your foreman?

### 45

1  A. At one point in time.
2  Q. At the time of the allegation involving the
3  truck?
4  A. Uh-huh.
5  Q. And what did your supervisor tell you regarding
6  the truck?
7  A. That John Gates said you cannot drive the truck
8  home.
9  Q. And was an explanation for that given?
10  A. No.
11  Q. Who is Robert Cole?
12  A. I don't know. Robert Koch? I know Robert
13  Koch.
14  Q. Did you look at the initial disclosures that
15  were filed in this matter?
16  A. Yeah.
17  Q. Listed is a witness Robert Cole, also listed
18  separately is a Michael B. Koch?
19  A. Typos.
20  Q. Do you believe that those are, in fact, one and
21  the same person?
22  A. Yeah. Robert Koch.
23  Q. He's known as Bobby?
24  A. Yeah.

# MCLEAN EXHIBIT 8

Case 1:06-cv-00617-SLR    Document 45-9    Filed 12/17/2007    Page 2 of 2
McLean and Coleman v. Communications Construction Group, LLC
Brian Coleman

## 22

1  policy, didn't you?

2      A.  A harassment policy?  Yeah.

3      Q.  Okay.  You had gotten the employee policy

4  manual, and had signed for that on a couple of occasions

5  as it had been revised?

6      A.  Yes.

7          (Coleman Exhibit 2 marked)

8  BY MR. HUGGETT:

9      Q.  We'll mark this as Exhibit 2.  The employee

10  policy manual, is that your signature on that document?

11      A.  Yes.

12      Q.  And there's a couple of pages after that that

13  there were additional signatures that from time to time

14  it would be revised, and you would get a revised copy?

15      A.  Uh-huh.

16      Q.  And I'm sorry.  Did you say you just didn't

17  think to call human resources?

18      A.  I mean why would I get the man in trouble?  I

19  want to go see if he said it first and see if he is a man

20  to admit what he said.  Well, allegedly said.  What was

21  told to me that he said.  When I went up there, it was

22  obvious that he did say it, because of the way he acted.

23      Q.  How did he act?

24      A.  He reacted.

## 23

1      Q.  How did you approach him?

2      A.  I didn't go up there yelling at him.  He jumps

3  off the machine yelling at me, getting in my face.

4  Talking about "I don't know what you're trying to do.  I

5  don't know what you're trying to prove.  I'm a Dodson."

6  That's when he was poking me in my chest.

7      Q.  You said you didn't yell at him.

8      A.  No, I didn't yell at him.

9      Q.  What was the first thing that you said to him?

10      A.  I said, "Man, what's going on?  I'm over here

11  busting my rump for you, how you going to call me a dumb

12  nigger?"  Or something to that effect.

13      Q.  What was his first response?

14      A.  I don't exactly remember what his first

15  response was.  He was on the machine.  I don't think he

16  even quite heard me when I first said that.  So he jumped

17  off the machine, you know what I mean, and I was like,

18  "Yo, what's up?"  You know what I mean.  And I asked him

19  about the dumb nigger incident or remark.  And that's

20  what he said, "I don't know what you trying to start.  I

21  don't know what you're trying to prove or whatever."  And

22  that's when the poking started.

23          And that I should get the hell away from

24  there.  Never once did I put my hands back on him, so I

## 24

1  don't know what you're trying to get at, or what you're

2  trying to ask me.

3      Q.  I'm just trying to figure out exactly what

4  happened.  So it's your testimony you did not touch him?

5      A.  No.  I did not touch him.

6      Q.  Didn't poke him in the chest with your finger

7  back?

8      A.  No, I did not.  If I would have poked him in

9  the chest I would have been arrested, too, right?  Let me

10  ask you a question.

11          MR. POLIQUIN:  You're only supposed to

12  answer questions.

13      Q.  You called the police.

14      A.  Yes, I did.

15      Q.  And they came out?

16      A.  I don't think it was that day.  I think it was

17  when I got back off of my vacation.

18      Q.  You don't recall them being there on May 31st?

19      A.  If May 31st was when I got back from my

20  vacation, that's when they was there.  If the incident

21  happened before May 31st -- they didn't come that first

22  day when the incident happened.  They came out there

23  after.  Well, as a matter of fact, they did come out

24  there the 31st, and what happened was, they told me I had

## 25

1  to go to court -- some court up there in New Castle,

2  go fill out a -- a paper, and the cop gave me the card.

3  I still got the card at home.  I had to take that up

4  there, and they signed a warrant out for his arrest and

5  all that stuff.  The.

6          (Coleman Exhibit 3 marked)

7  BY MR. HUGGETT:

8      Q.  I'm going to hand you what we've marked as

9  Exhibit 3 to your deposition.  It's a vacation time off

10  request form, that identifies vacation for June 1 through

11  10th for you.  So would that be the vacation to which

12  you're referring?

13      A.  I'm sure it was.  But actually, it went longer

14  than that, because I called and I stayed longer.

15      Q.  Okay.  So you do recall the police coming out

16  to the area where everyone was working on the 31st?

17      A.  Yes.

18      Q.  And what did they do?

19      A.  Took everybody's statement.

20      Q.  And by "everyone," who are you referring to?

21      A.  Everybody that was in the thing.  Dave Dodson,

22  Brad Dodson, Brian Coleman, Jason McLean, Bobby Koch,

23  Frank Workowski, or whatever his name is.  David Miller,

24  I guess.

# MCLEAN EXHIBIT 9

McLean and Coleman v. Communications Construction Group, LLC
Brian Coleman

22

1  policy, didn't you?
2      A.  A harassment policy?  Yeah.
3      Q.  Okay.  You had gotten the employee policy
4  manual, and had signed for that on a couple of occasions
5  as it had been revised?
6      A.  Yes.
7          (Coleman Exhibit 2 marked)
8  BY MR. HUGGETT:
9      Q.  We'll mark this as Exhibit 2.  The employee
10 policy manual, is that your signature on that document?
11     A.  Yes.
12     Q.  And there's a couple of pages after that that
13 there were additional signatures that from time to time
14 it would be revised, and you would get a revised copy?
15     A.  Uh-huh.
16     Q.  And I'm sorry.  Did you say you just didn't
17 think to call human resources?
18     A.  I mean why would I get the man in trouble?  I
19 want to go see if he said it first and see if he is a man
20 to admit what he said.  Well, allegedly said.  What was
21 told to me that he said.  When I went up there, it was
22 obvious that he did say it, because of the way he acted.
23     Q.  How did he act?
24     A.  He reacted.

23

1      Q.  How did you approach him?
2      A.  I didn't go up there yelling at him.  He jumps
3  off the machine yelling at me, getting in my face.
4  Talking about "I don't know what you're trying to do.  I
5  don't know what you're trying to prove.  I'm a Dodson."
6  That's when he was poking me in my chest.
7      Q.  You said you didn't yell at him.
8      A.  No, I didn't yell at him.
9      Q.  What was the first thing that you said to him?
10     A.  I said, "Man, what's going on?  I'm over here
11 busting my rump for you, how you going to call me a dumb
12 nigger?"  Or something to that effect.
13     Q.  What was his first response?
14     A.  I don't exactly remember what his first
15 response was.  He was on the machine.  I don't think he
16 even quite heard me when I first said that.  So he jumped
17 off the machine, you know what I mean, and I was like,
18 "Yo, what's up?"  You know what I mean.  And I asked him
19 about the dumb nigger incident or remark.  And that's
20 what he said, "I don't know what you trying to start.  I
21 don't know what you're trying to prove or whatever."  And
22 that's when the poking started.
23         And that I should get the hell away from
24 there.  Never once did I put my hands back on him, so I

24

1  don't know what you're trying to get at, or what you're
2  trying to ask me.
3      Q.  I'm just trying to figure out exactly what
4  happened.  So it's your testimony you did not touch him?
5      A.  No.  I did not touch him.
6      Q.  Didn't poke him in the chest with your finger
7  back?
8      A.  No, I did not.  If I would have poked him in
9  the chest I would have been arrested, too, right?  Let me
10 ask you a question.
11         MR. POLIQUIN:  You're only supposed to
12 answer questions.
13     Q.  You called the police.
14     A.  Yes, I did.
15     Q.  And they came out?
16     A.  I don't think it was that day.  I think it was
17 when I got back off of my vacation.
18     Q.  You don't recall them being there on May 31st?
19     A.  If May 31st was when I got back from my
20 vacation, that's when they was there.  If the incident
21 happened before May 31st -- they didn't come that first
22 day when the incident happened.  They came out there
23 after.  Well, as a matter of fact, they did come out
24 there the 31st, and what happened was, they told me I had

25

1  to go to court -- some court up there in New Castle, and
2  go fill out a -- a paper, and the cop gave me the card.
3  I still got the card at home.  I had to take that up
4  there, and they signed a warrant out for his arrest and
5  all that stuff.  The.
6          (Coleman Exhibit 3 marked)
7  BY MR. HUGGETT:
8      Q.  I'm going to hand you what we've marked as
9  Exhibit 3 to your deposition.  It's a vacation time off
10 request form, that identifies vacation for June 1 through
11 10th for you.  So would that be the vacation to which
12 you're referring?
13     A.  I'm sure it was.  But actually, it went longer
14 than that, because I called and I stayed longer.
15     Q.  Okay.  So you do recall the police coming out
16 to the area where everyone was working on the 31st?
17     A.  Yes.
18     Q.  And what did they do?
19     A.  Took everybody's statement.
20     Q.  And by "everyone," who are you referring to?
21     A.  Everybody that was in the thing.  Dave Dodson,
22 Brad Dodson, Brian Coleman, Jason McLean, Bobby Koch,
23 Frank Workowski, or whatever his name is.  David Miller,
24 I guess.

7  (Pages 22 to 25)

# MCLEAN EXHIBIT 10

McLean and Coleman v. Communications Construction Group, LLC
Jason McLean

---

**54**

1    Q.   You stated that after May 31, 2005, you were
2    assigned to cleanup work?
3    A.   Uh-huh.
4    Q.   And what was the pay rate for that cleanup
5    work?
6    A.   $11 an hour.
7    Q.   And do you know how that compared to other work
8    that you would be doing, you could be doing?
9    A.   Probably about half the pay.
10   Q.   On May 31, 2005, after you had reported the
11   incident that you and Brian Coleman had with Brad Dodson
12   to Lisa Clemens.
13   A.   Uh-huh.
14   Q.   And how did you report that incident?
15   A.   I called 411, and got the number for CCG, and
16   then asked for HR.  And talked -- that's the first time I
17   ever talked to her, when I told her what was going on,
18   and she thanked me, and -- then I got wrote up for it.
19   Q.   Now, what was Dave Dodson's position on May 31,
20   2005, with CCG?
21   A.   He was the site supervisor, I believe, that's
22   what they called him.  Basically he was the supervisor of
23   all the foremen in that area.
24   Q.   And do you know what his relationship was with

---

**55**

1    Brad Dodson?
2    A.   Brother.
3    Q.   Did the situation on May 31, 2005, between Brad
4    Dodson, Brian Coleman, and yourself, become physical at
5    some point in time?
6    A.   Yeah.  When Brad hopped off the machine and
7    started poking Brian in the chest, it seemed like he was
8    trying to start something, yeah.
9    Q.   And how long did Brad Dodson poke Brian Coleman
10   in the chest for?
11   A.   Oh, it was about four or five, six pokes.
12   Probably a couple seconds over a period of their little
13   conversation they were having.
14   Q.   And what was Brian Coleman's response?
15   A.   He took two steps backwards, and pulled his
16   phone out and dialed 911.
17   Q.   Now, you were informed by Robert Koch that Brad
18   Dodson had referred to you as "two dumb niggers"?
19   A.   Yes.
20   Q.   And how did that make you feel?
21   A.   Upset.
22   Q.   And why?
23   A.   Because it's -- it was kind of disparaging that
24   the person that you work for, and sweat for every day,

---

**56**

1    would talk to you like that.  And then just a couple
2    weeks ago he was telling the regional supervisor that we
3    were some of the best guys he's ever worked with, and
4    that we smile in his face and he smiles in our face every
5    day, to find out that he's saying something that terrible
6    behind our backs kind of hurts.
7    Q.   And he didn't say this directly to you, he said
8    it to other employees?
9    A.   Yes.  Which kind of makes it worse.
10   Q.   And Brad Dodson stated to you on May 31, 2005,
11   that he, in fact, did not make the statement?
12   A.   Yes.
13   Q.   Did any other employee tell you that Brad
14   Dodson, in fact, did not make that statement?
15   A.   That he did not make it?
16   Q.   Yes.
17   A.   No.  Nobody ever said he didn't.
18   Q.   Did any other employees tell you that he did
19   make the statement?
20   A.   Nobody came -- other than Robert Koch and
21   Joseph Tatsch, nobody came straight forward and said that
22   he made the statement, but --
23   Q.   But Robert Koch and Joseph Tatsch did say
24   affirmatively that he made the statement?

---

**57**

1    A.   Yes.  But from what I could read -- it really
2    doesn't count for anything, but what I can read from
3    Davey Miller, the way he said, "I'm not getting
4    involved," was kind of his admission that, yeah, I heard
5    it but I'm not going to put my career on the line for
6    something like that.
7    Q.   And in fact, Brad Dodson was charged with
8    criminal offenses concerning what happened on May 31,
9    2005?
10   A.   Yeah.  I went to court that day and he ended up
11   getting found guilty.
12   Q.   And do you know if the company took any action
13   after he had pled guilty?
14   A.   No.  Because to my knowledge, he kept working
15   for them after we were laid off, he was transferred to an
16   aerial construction site, along with a couple other guys,
17   and after that, I don't know what happened.  I don't know
18   what happened to him.
19   Q.   When you were transferred from the New Castle
20   site, did you ask anyone, ask any of your supervisors why
21   you were transferred?
22   A.   Yeah.
23   Q.   And who did you ask?
24   A.   I asked Mike Fender.

---

15  (Pages 54 to 57)

# MCLEAN EXHIBIT 11

Case 1:06-cv-00617-SLR    Document 45-12    Filed 12/17/2007    Page 2 of 2
McLean and Coleman v. Communications Construction Group, LLC
Brian Coleman

**26**

1    Q. And the police told you that you needed to file
2 a further report?
3    A. They told me I needed to?
4    Q. Is that --
5    A. No.
6    Q. Okay. What did they do?
7    A. They told me it was up to me what I wanted to
8 do. But they had two or more people who heard him say
9 this, and I could -- they were going to give me the card
10 where I can go down to the court and have him arrested if
11 I wanted to, and I chose to.
12    Q. Did anyone tell you that you couldn't do that?
13    A. Not that I know of.
14    Q. And that document that we've looked at as
15 Exhibit Number 1 was dated June 17th. Was that as soon
16 as you got back from vacation, or --
17    A. I don't remember.
18    Q. Okay.
19      MR. POLIQUIN: Can we take a quick
20 break for a second?
21      (Brief recess held)
22 BY MR. HUGGETT:
23    Q. What happened when you returned from your
24 vacation?

**27**

1    A. A whole bunch. I don't -- we got transferred,
2 they had told us they didn't know what they was going to
3 do with us. They had me laying pipe for a little bit up
4 in -- I believe it was Hockessin, Delaware, up by the
5 beach, for like three days. Snatched us off that, and
6 that's when we went to Westchester.
7    Q. When you came back, were you on Brad Dodson's
8 crew?
9    A. No.
10    Q. Whose crew were you on?
11    A. I guess you could call it my own for three
12 days.
13    Q. And when you say your own, you would have been
14 a foreman for that crew?
15    A. Yeah.
16    Q. Who else was on the crew?
17    A. I believe it was Jason McLean, and Harry Ortiz.
18    Q. Previously, that crew, Mark Lynch was the
19 foreman, correct?
20    A. Mark Lynch.
21    Q. Worked with Harry Ortiz?
22    A. I don't remember. I don't even remember a Mark
23 Lynch.
24    Q. Did you do any work down in Angola?

**28**

1    A. That was the place. Angola, Delaware.
2    Q. So, not Hockessin or --
3    A. Not Hockessin.
4    Q. Or in addition to Hockessin?
5    A. No. It was Angola.
6    Q. How long did you work in Angola?
7    A. That was that three days I told you.
8    Q. And you went straight from Angola to
9 Westchester?
10    A. Yeah. Westchester and Oaks, Pennsylvania,
11 which is even farther than Westchester.
12    Q. So you don't recall being in Angola for several
13 weeks?
14    A. No. I don't remember. It seemed like it was
15 only like three days, four days. Not even a week. Not
16 no several weeks. I don't know. Could have been, I
17 don't remember.
18    Q. How did you get down to Angola?
19    A. What did you mean how did I get down there?
20    Q. Did you take a company vehicle or did you take
21 your own vehicle?
22    A. Yeah, right. Took our own vehicle.
23    Q. In fact, that was always how you got to work,
24 correct?

**29**

1    A. Until we got to Westchester. We had a truck, I
2 had a truck like all the rest of the foremen.
3    Q. Well, you said you were previously a foreman
4 for cable TV work and you didn't have a truck then, did
5 you?
6    A. They didn't give trucks then, because you were
7 doing cable TV. They had a van. There was vans.
8 Whatever job sites you were in, because most of the time
9 you were working out of town, you would drive that van to
10 that shop and get in your car and go home or to the
11 motel.
12    Q. How did you get the truck in Westchester?
13    A. Oh, what's his name? I don't remember the
14 supervisor's name. Billy Grover, I think it is. Bill
15 Grover.
16    Q. Did he assign you the vehicle for work
17 purposes?
18    A. I had a brand new truck, it was Jason's truck
19 that he was using during the day, he told us we could run
20 back and forth with the old one. Everybody else had a
21 truck, why shouldn't we have a truck is what he told us.
22    Q. When did he make that statement?
23    A. I don't know. Sometime during the time we were
24 working up there.

# MCLEAN EXHIBIT 12

McLean and Coleman v. Communications Construction Group, LLC
Brian Coleman

---

26

1    Q.  And the police told you that you needed to file
2  a further report?
3    A.  They told me I needed to?
4    Q.  Is that --
5    A.  No.
6    Q.  Okay.  What did they do?
7    A.  They told me it was up to me what I wanted to
8  do.  But they had two or more people who heard him say
9  this, and I could -- they was going to give me the card
10  where I can go down to the court and have him arrested if
11  I wanted to, and I chose to.
12    Q.  Did anyone tell you that you couldn't do that?
13    A.  Not that I know of.
14    Q.  And that document that we've looked at as
15  Exhibit Number 1 was dated June 17th.  Was that as soon
16  as you got back from vacation, or --
17    A.  I don't remember.
18    Q.  Okay.
19      MR. POLIQUIN:  Can we take a quick
20  break for a second?
21      (Brief recess held)
22  BY MR. HUGGETT:
23    Q.  What happened when you returned from your
24  vacation?

---

27

1    A.  A whole bunch.  I don't -- we got transferred,
2  they had told us they didn't know what they was going to
3  do with us.  They had me laying pipe for a little bit up
4  in -- I believe it was Hockessin, Delaware, up by the
5  beach, for like three days.  Snatched us off that, and
6  that's when we went to Westchester.
7    Q.  When you came back, were you on Brad Dodson's
8  crew?
9    A.  No.
10    Q.  Whose crew were you on?
11    A.  I guess you could call it my own for three
12  days.
13    Q.  And when you say your own, you would have been
14  a foreman for that crew?
15    A.  Yeah.
16    Q.  Who else was on the crew?
17    A.  I believe it was Jason McLean, and Harry Ortiz.
18    Q.  Previously, that crew, Mark Lynch was the
19  foreman, correct?
20    A.  Mark Lynch.
21    Q.  Worked with Harry Ortiz?
22    A.  I don't remember.  I don't even remember a Mark
23  Lynch.
24    Q.  Did you do any work down in Angola?

---

28

1    A.  That was the place.  Angola, Delaware.
2    Q.  So, not Hockessin or --
3    A.  Not Hockessin.
4    Q.  Or in addition to Hockessin?
5    A.  No.  It was Angola.
6    Q.  How long did you work in Angola?
7    A.  That was that three days I told you.
8    Q.  And you went straight from Angola to
9  Westchester?
10    A.  Yeah.  Westchester and Oaks, Pennsylvania,
11  which is even farther than Westchester.
12    Q.  So you don't recall being in Angola for several
13  weeks?
14    A.  No.  I don't remember.  It seemed like it was
15  only like three days, four days.  Not even a week.  Not
16  no several weeks.  I don't know.  Could have been, I
17  don't remember.
18    Q.  How did you get down to Angola?
19    A.  What did you mean how did I get down there?
20    Q.  Did you take a company vehicle or did you take
21  your own vehicle?
22    A.  Yeah, right.  Took our own vehicle.
23    Q.  In fact, that was always how you got to work,
24  correct?

---

29

1    A.  Until we got to Westchester.  We had a truck, I
2  had a truck like all the rest of the foremen.
3    Q.  Well, you said you were previously a foreman
4  for cable TV work and you didn't have a truck then, did
5  you?
6    A.  They didn't give trucks then, because you were
7  doing cable TV.  They had a van.  There was vans.
8  Whatever job sites you were in, because most of the time
9  you were working out of town, you would drive that van to
10  that shop and get in your car and go home or to the
11  motel.
12    Q.  How did you get the truck in Westchester?
13    A.  Oh, what's his name?  I don't remember the
14  supervisor's name.  Billy Grover, I think it is.  Bill
15  Grover.
16    Q.  Did he assign you the vehicle for work
17  purposes?
18    A.  I had a brand new truck, it was Jason's truck
19  that he was using during the day, he told us we could run
20  back and forth with the old one.  Everybody else had a
21  truck, why shouldn't we have a truck is what he told us.
22    Q.  When did he make that statement?
23    A.  I don't know.  Sometime during the time we were
24  working up there.

---

8 (Pages 26 to 29)

# MCLEAN EXHIBIT 13

McLean and Coleman v. Communications Construction Group, LLC
Jason McLean

---

**30**

1    A.  In Westchester.
2    Q.  Was the work that you were doing in Angola
3  different than the work that you were doing in New
4  Castle?
5    A.  Same work.
6    Q.  Was the work different that you were doing in
7  Westchester?  Was the work in Westchester that you were
8  doing for CCG different than the work in New Castle or
9  Angola?
10    A.  Same work.
11    Q.  Employees of the company are paid based on a
12  rate schedule that varies by the contract that you're
13  working on, correct?
14    A.  Yes.
15    Q.  And that rate schedule was different for New
16  Castle and Angola, correct?
17    A.  No.
18    Q.  Was that rate schedule different for New Castle
19  and Westchester?
20    A.  Yes.
21    Q.  Why was that rate schedule different?
22    A.  I don't know.
23    Q.  Were you given copies of that rate schedule?
24    A.  Not to my -- no.  No.

---

**31**

1    Q.  Do you recall seeing the rate schedules?
2    A.  Yes.
3       (McLean Exhibits 3 and 4 marked)
4  BY MR. HUGGETT:
5    Q.  I've marked as Exhibit 3 the rate schedule for
6  Delaware FIOS work.  Is that the rate schedule that you
7  have previously seen?
8    A.  No.  Never seen this piece of paper before.
9    Q.  Okay.  Can you describe what you've seen?
10    A.  I seen a copy of just a brief rundown on the
11  back of my paycheck of what you get paid per foot.
12    Q.  Is that this document?
13    A.  It might be.  It looks like a copy.  I don't
14  remember seeing anything like this, but it was similar.
15    Q.  Exhibit 4 is marked the southeast PA FIOS drops
16  for Pennsylvania rate schedule.  Have you ever seen that
17  rate schedule?
18    A.  No.  They never provided us anything like this.
19    Q.  Did you ever ask for a copy of the rate
20  schedule?
21    A.  No.
22    Q.  When were you promoted to the position of
23  foreman?
24    A.  I don't recall the exact date.  Take a stab,

---

**32**

1  maybe a month before I was laid off.
2    Q.  And that was while you were working in
3  Westchester?
4    A.  No.  We were actually transferred up to Oaks,
5  Pennsylvania, at that time.
6    Q.  Why did you go up to Oaks, Pennsylvania?
7    A.  Because I was told to.
8    Q.  Why did the company go up there?
9    A.  I don't know.
10    Q.  What kind of work was being done in Oaks,
11  Pennsylvania?
12    A.  Same work.
13    Q.  And just so we're clear, can you describe, when
14  you say same work, what was the work that was being done?
15    A.  Underground utilities.
16    Q.  When you were working in Angola, how did you
17  get to Angola?
18    A.  Drove my car.
19    Q.  Prior to working in Angola, had you always
20  driven your car to get to work?
21    A.  Yes.
22    Q.  And did you drive your car to get to work in
23  Westchester?
24    A.  Partially.

---

**33**

1    Q.  When you started work in Westchester, were you
2  driving your car?
3    A.  No.
4    Q.  How did you get to Westchester the first day
5  you went there?
6    A.  Company truck.
7    Q.  From where?
8    A.  From the company.
9    Q.  From New Castle?
10    A.  Yeah.
11    Q.  To Westchester?
12    A.  No.  From Angola to Westchester.
13    Q.  Oh, you went all the way from Angola up to
14  Westchester?
15    A.  Went from Angola home -- well, no.  Went from
16  home that day to Angola to Westchester.
17    Q.  Okay.  And how did you get home that evening?
18    A.  I don't recall that evening.  Eventually, we
19  had a truck, they provided us a truck to drive.
20    Q.  Who provided you with a truck?
21    A.  Oh, what's his name?  Bill Grover.
22    Q.  Did he provide that to you?
23    A.  Brian and I.  He knew that both of us were
24  riding in it.

---

9  (Pages 30 to 33)

# MCLEAN EXHIBIT 14

McLean and Coleman v. Communications Construction Group, LLC
Brian Coleman

26

1    Q. And the police told you that you needed to file
2 a further report?
3    A. They told me I needed to?
4    Q. Is that --
5    A. No.
6    Q. Okay. What did they do?
7    A. They told me it was up to me what I wanted to
8 do. But they had two or more people who heard him say
9 this, and I could -- they was going to give me the card
10 where I can go down to the court and have him arrested if
11 I wanted to, and I chose to.
12    Q. Did anyone tell you that you couldn't do that?
13    A. Not that I know of.
14    Q. And that document that we've looked at as
15 Exhibit Number 1 was dated June 17th. Was that as soon
16 as you got back from vacation, or --
17    A. I don't remember.
18    Q. Okay.
19       MR. POLIQUIN: Can we take a quick
20 break for a second?
21       (Brief recess held)
22 BY MR. HUGGETT:
23    Q. What happened when you returned from your
24 vacation?

27

1    A. A whole bunch. I don't -- we got transferred,
2 they had told us they didn't know what they was going to
3 do with us. They had me laying pipe for a little bit up
4 in -- I believe it was Hockessin, Delaware, up by the
5 beach, for like three days. Snatched us off that, and
6 that's when we went to Westchester.
7    Q. When you came back, were you on Brad Dodson's
8 crew?
9    A. No.
10    Q. Whose crew were you on?
11    A. I guess you could call it my own for three
12 days.
13    Q. And when you say your own, you would have been
14 a foreman for that crew?
15    A. Yeah.
16    Q. Who else was on the crew?
17    A. I believe it was Jason McLean, and Harry Ortiz.
18    Q. Previously, that crew, Mark Lynch was the
19 foreman, correct?
20    A. Mark Lynch.
21    Q. Worked with Harry Ortiz?
22    A. I don't remember. I don't even remember a Mark
23 Lynch.
24    Q. Did you do any work down in Angola?

28

1    A. That was the place. Angola, Delaware.
2    Q. So, not Hockessin or --
3    A. Not Hockessin.
4    Q. Or in addition to Hockessin?
5    A. No. It was Angola.
6    Q. How long did you work in Angola?
7    A. That was that three days I told you.
8    Q. And you went straight from Angola to
9 Westchester?
10    A. Yeah. Westchester and Oaks, Pennsylvania,
11 which is even farther than Westchester.
12    Q. So you don't recall being in Angola for several
13 weeks?
14    A. No. I don't remember. It seemed like it was
15 only like three days, four days. Not even a week. Not
16 no several weeks. I don't know. Could have been, I
17 don't remember.
18    Q. How did you get down to Angola?
19    A. What did you mean how did I get down there?
20    Q. Did you take a company vehicle or did you take
21 your own vehicle?
22    A. Yeah, right. Took our own vehicle.
23    Q. In fact, that was always how you got to work,
24 correct?

29

1    A. Until we got to Westchester. We had a truck, I
2 had a truck like all the rest of the foremen.
3    Q. Well, you said you were previously a foreman
4 for cable TV work and you didn't have a truck then, did
5 you?
6    A. They didn't give trucks then, because you were
7 doing cable TV. They had a van. There was vans.
8 Whatever job sites you were in, because most of the time
9 you were working out of town, you would drive that van to
10 that shop and get in your car and go home or to the
11 motel.
12    Q. How did you get the truck in Westchester?
13    A. Oh, what's his name? I don't remember the
14 supervisor's name. Billy Grover, I think it is. Bill
15 Grover.
16    Q. Did he assign you the vehicle for work
17 purposes?
18    A. I had a brand new truck, it was Jason's truck
19 that he was using during the day, he told us we could run
20 back and forth with the old one. Everybody else had a
21 truck, why shouldn't we have a truck is what he told us.
22    Q. When did he make that statement?
23    A. I don't know. Sometime during the time we were
24 working up there.

8 (Pages 26 to 29)

# MCLEAN EXHIBIT 15

McLean and Coleman v. Communications Construction Group, LLC
Brian Coleman

|  | 30 |
|---|---|
| 1 | Q. But it wasn't right when you started working up |
| 2 | there? |
| 3 | A. I don't remember that. I really don't. |
| 4 | Q. And what happened with regard to that? |
| 5 | A. The truck got taken away from us. |
| 6 | Q. How did that happen? |
| 7 | A. Well, allegedly, John Gates told him we didn't |
| 8 | need a truck. |
| 9 | Q. And when you say allegedly, what do you mean? |
| 10 | A. Well, I mean that's what Billy Grover said. |
| 11 | But you don't know what to believe. I didn't hear it |
| 12 | from his mouth, so I don't know if he said it or not. |
| 13 | Q. You heard that from Mr. Grover? |
| 14 | A. Correct. |
| 15 | MR. POLIQUIN: Brian, if I could |
| 16 | just -- off the record. |
| 17 | (Brief discussion off the record) |
| 18 | BY MR. HUGGETT: |
| 19 | Q. Did you know why you went from Angola up to |
| 20 | Westchester? |
| 21 | A. Sure don't. |
| 22 | Q. No one ever told you anything? |
| 23 | A. (Witness shakes head). |
| 24 | Q. Did you understand that the Verizon contract |

|  | 31 |
|---|---|
| 1 | was being closed? |
| 2 | A. Nobody ever told me. I don't know. |
| 3 | Q. But you did say it was the nature of the work |
| 4 | that employees went and did the work -- |
| 5 | A. Traveled, yeah. |
| 6 | Q. -- wherever it was? What was the work that was |
| 7 | being done in Westchester? |
| 8 | A. When we got transferred? |
| 9 | Q. Yeah. |
| 10 | A. Drop work. Underground drops. Instead of |
| 11 | doing big pipe, you do little small drops. Got to run |
| 12 | from here to there, there to there. There to there. It |
| 13 | was just crazy. Monotonous. Versus the main line, you |
| 14 | go to a neighborhood and sit in that neighborhood and |
| 15 | just work, work, work, work. |
| 16 | Q. So the drops can be in various neighborhoods in |
| 17 | a given day? |
| 18 | A. Absolutely. |
| 19 | Q. Is it easier work? |
| 20 | A. I'm not going to say it's easier. I mean it's |
| 21 | all back-busting work. I mean it's hard labor work. |
| 22 | That's all it is. |
| 23 | Q. It's different than what you were doing down in |
| 24 | New Castle? |

|  | 32 |
|---|---|
| 1 | A. I mean it's the same type thing, but different |
| 2 | a little bit, yeah. You could say. |
| 3 | Q. Has different rates associated with payments? |
| 4 | A. A lot different. I think I was getting about |
| 5 | 1.20 a foot for doing that underground drops. That one |
| 6 | was like 3.65 a foot we were getting. I think. Don't |
| 7 | quote me but -- the big pipe, I don't know exactly what |
| 8 | it was. |
| 9 | Q. When you're doing drops, you don't have to |
| 10 | spend extra time setting vaults though, correct? |
| 11 | A. You still got to dig into the vault. |
| 12 | Q. But when you're setting vaults you don't get |
| 13 | paid for setting a vault per se. There's not a rate for |
| 14 | that, is there? |
| 15 | A. No. There's not. But the price makes up for |
| 16 | not getting paid to set vaults. 3.65 is a lot different |
| 17 | than 1.20. |
| 18 | Q. So the 3.65 includes payment for setting the |
| 19 | vault, right? That's part of that. And the 1.20 doesn't |
| 20 | require that. You have to dig into it, but you don't |
| 21 | have to set it, which is a lot of work. |
| 22 | A. No, you don't have to set it. |
| 23 | Q. Were you working more hours directly when you |
| 24 | came up to Westchester? |

|  | 33 |
|---|---|
| 1 | A. It varied. Could go back and forth -- I mean |
| 2 | any day with underground utilities, you can have a bad |
| 3 | day, something can go wrong. |
| 4 | Q. Does the weather interfere with being able to |
| 5 | do the work? |
| 6 | A. Unexpected. I mean Brad had us working in the |
| 7 | rain. Didn't matter. The rain, to me, didn't have |
| 8 | nothing to do with it, no. Wintertime when the ground |
| 9 | got frozen, that would be a different story. |
| 10 | Q. And it's correct, isn't it, that in fact, after |
| 11 | you came up to Westchester, you were taking home more, on |
| 12 | average in pay, per week, than you were in New Castle? |
| 13 | A. I don't -- I don't remember, but if I did, I |
| 14 | had to work a lot harder to get it. |
| 15 | Q. How is that? |
| 16 | A. Because I had to wake up two hours earlier to |
| 17 | get to work on time, then, versus like I said, sitting in |
| 18 | one development, one neighborhood, working up this street |
| 19 | all day long, I had to run 20 miles this way, 20 miles |
| 20 | this way, 15 miles that way, ten miles that way, to knock |
| 21 | out four or five jobs in a day to make any money at all. |
| 22 | Then you still got to split that 1.20 with Ortiz or |
| 23 | whoever your helper was. It's not like you are taking |
| 24 | home a whole 1.20. |

9 (Pages 30 to 33)

# MCLEAN EXHIBIT 16

Case 1:06-cv-00617-SLR    Document 45-17    Filed 12/17/2007    Page 2 of 2
McLean and Coleman v. Communications Construction Group, LLC
Jason McLean

34

1    Q.  Do you recall when that happened?

2    A.  The same week that we started working up there,

3    probably the second, maybe third day.

4    Q.  And how did you get up there on the second day?

5    A.  I said the second, maybe the third day we took

6    the truck. So, one of us drove, and the other one drove

7    the truck back.

8    Q.  And how did you come to get this truck?

9    A.  We asked him, and he gave it to us.

10    Q.  And did you tell him at that point in time that

11    you needed it for the purposes of driving back and forth

12    between Dover and Westchester?

13    A.  No. That's just how the company was. All the

14    foremen had company trucks.

15    Q.  In fact, did you know that Mark Lynch didn't

16    have a company truck?

17    A.  He did.

18    Q.  Were you present at the time that any of those

19    foremen were assigned a truck?

20    A.  No.

21    Q.  Did you ever see a policy that said all foremen

22    have a truck?

23    A.  No.

24    Q.  Did you review the Complaint in this action

35

1    before it was filed?

2    A.  Yes.

3    Q.  Did you sign a verification that it was

4    accurate?

5    A.  I believe so.

6    MR. HUGGETT: I would make a request

7    for a copy of that if it exists. I don't have any

8    such -- I have a verification from Mr. Coleman,

9    but --

10    Q.  In the Complaint, paragraph 28, it says "The

11    plaintiffs made $1.20 per square foot, compared to $2.80

12    per foot at the New Castle plant." Do you recall that

13    allegation?

14    A.  Yeah.

15    Q.  Okay. Upon what do you base the allegation

16    that you were paid $1.20 per square foot?

17    A.  Should have been $1.20 per foot.

18    Q.  Rates are based on linear feet of installation?

19    A.  Whatever linear means. What do you mean by

20    linear?

21    Q.  Distance from one point to another in a

22    straight line.

23    A.  Okay. Yeah.

24    Q.  And in fact, the rates that you were paid for

36

1    out of New Castle, it wasn't just one $1.20 rate, was

2    there?

3    A.  No.

4    Q.  There were multiple rates depending on what

5    work you were doing?

6    A.  Yes.

7    Q.  So when you referred to the $1.20, what are you

8    referring to?

9    A.  The main course of action. Just the burying of

10    the pipe.

11    Q.  When you were working in New Castle, you were

12    burying the main trunk line through the neighborhood,

13    correct?

14    A.  Yes.

15    Q.  When you were working out of Westchester, you

16    were burying lines from that main trunk directly to a

17    house, a drop?

18    A.  Yes.

19    Q.  And that's different work with different rates?

20    A.  Same principle, different rates.

21    Q.  At paragraph 27, it says, "The transfer

22    resulted in a substantial reduction in salary." Do you

23    recall that allegation?

24    A.  Yes.

37

1    Q.  Upon what is that based?

2    A.  Deductions at the end of the day.

3    Q.  And what are deductions?

4    A.  Gas, food, room and board.

5    Q.  Well, you were traveling back and forth daily

6    between home, so you didn't have room and board, did you?

7    A.  Depending on what time we got off work. If we

8    got off work at 9:00 at night, we would just get a hotel.

9    No point in driving home.

10    Q.  Why would food costs increase because you were

11    in Westchester as opposed to anywhere else? You have to

12    eat all the time, right?

13    A.  We worked longer hours, so you ended up in the

14    field longer, so you got to spend more money on food.

15    Q.  And if you're driving the company truck, who

16    pays for gas?

17    A.  The company.

18    Q.  In fact, in direct salary from the company, you

19    made more working at Westchester than you did in New

20    Castle?

21    A.  In direct salary, yes.

22    Q.  And you and Mr. Coleman weren't the only

23    employees transferred from New Castle to Westchester,

24    were you?

10  (Pages 34 to 37)

# MCLEAN EXHIBIT 17

McLean and Coleman v. Communications Construction Group, LLC

Brian Coleman

---

30

1  Q. But it wasn't right when you started working up

2  there?

3      A. I don't remember that. I really don't.

4      Q. And what happened with regard to that?

5      A. The truck got taken away from us.

6      Q. How did that happen?

7      A. Well, allegedly, John Gates told him we didn't

8  need a truck.

9      Q. And when you say allegedly, what do you mean?

10     A. Well, I mean that's what Billy Grover said.

11  But you don't know what to believe. I didn't hear it

12  from his mouth, so I don't know if he said it or not.

13     Q. You heard that from Mr. Grover?

14     A. Correct.

15        MR. POLIQUIN: Brian, if I could

16  just -- off the record.

17        (Brief discussion off the record)

18  BY MR. HUGGETT:

19     Q. Did you know why you went from Angola up to

20  Westchester?

21     A. Sure don't.

22     Q. No one ever told you anything?

23     A. (Witness shakes head).

24     Q. Did you understand that the Verizon contract

---

31

1  was being closed?

2      A. Nobody ever told me. I don't know.

3      Q. But you did say it was the nature of the work

4  that employees went and did the work --

5      A. Traveled, yeah.

6      Q. -- wherever it was? What was the work that was

7  being done in Westchester?

8      A. When we got transferred?

9      Q. Yeah.

10     A. Drop work. Underground drops. Instead of

11  doing big pipe, you do little small drops. Got to run

12  from here to there, there to there. There to there. It

13  was just crazy. Monotonous. Versus the main line, you

14  go to a neighborhood and sit in that neighborhood and

15  just work, work, work, work.

16     Q. So the drops can be in various neighborhoods in

17  a given day?

18     A. Absolutely.

19     Q. Is it easier work?

20     A. I'm not going to say it's easier. I mean it's

21  all back-busting work. I mean it's hard labor work.

22  That's all it is.

23     Q. It's different than what you were doing down in

24  New Castle?

---

32

1      A. I mean it's the same type thing, but different

2  a little bit, yeah. You could say.

3      Q. Has different rates associated with payments?

4      A. A lot different. I think I was getting about

5  1.20 a foot for doing that underground drops. That one

6  was like 3.65 a foot we were getting. I think. Don't

7  quote me but -- the big pipe, I don't know exactly what

8  it was.

9      Q. When you're doing drops, you don't have to

10  spend extra time setting vaults though, correct?

11     A. You still got to dig into the vault.

12     Q. But when you're setting vaults you don't get

13  paid for setting a vault per se. There's not a rate for

14  that, is there?

15     A. No. There's not. But the price makes up for

16  not getting paid to set vaults. 3.65 is a lot different

17  than 1.20.

18     Q. So the 3.65 includes payment for setting the

19  vault, right? That's part of that. And the 1.20 doesn't

20  require that. You have to dig into it, but you don't

21  have to set it, which is a lot of work.

22     A. No, you don't have to set it.

23     Q. Were you working more hours directly when you

24  came up to Westchester?

---

33

1      A. It varied. Could go back and forth -- I mean

2  any day with underground utilities, you can have a bad

3  day, something can go wrong.

4      Q. Does the weather interfere with being able to

5  do the work?

6      A. Unexpected. I mean Brad had us working in the

7  rain. Didn't matter. The rain, to me, didn't have

8  nothing to do with it, no. Wintertime when the ground

9  got frozen, that would be a different story.

10     Q. And it's correct, isn't it, that in fact, after

11  you came up to Westchester, you were taking home more, on

12  average in pay, per week, than you were in New Castle?

13     A. I don't -- I don't remember, but if I did, I

14  had to work a lot harder to get it.

15     Q. How is that?

16     A. Because I had to wake up two hours earlier to

17  get to work on time, then, versus like I said, sitting in

18  one development, one neighborhood, working up this street

19  all day long, I had to run 20 miles this way, 20 miles

20  this way, 15 miles that way, ten miles that way, to knock

21  out four or five jobs in a day to make any money at all.

22  Then you still got to split that 1.20 with Ortiz or

23  whoever your helper was. It's not like you are taking

24  home a whole 1.20.

---

9 (Pages 30 to 33)

# MCLEAN EXHIBIT 18

McLean and Coleman v. Communications Construction Group, LLC
Jason McLean

---

**34**

1    Q.  Do you recall when that happened?

2    A.  The same week that we started working up there,

3    probably the second, maybe third day.

4    Q.  And how did you get up there on the second day?

5    A.  I said the second, maybe the third day we took

6    the truck.  So, one of us drove, and the other one drove

7    the truck back.

8    Q.  And how did you come to get this truck?

9    A.  We asked him, and he gave it to us.

10    Q.  And did you tell him at that point in time that

11    you needed it for the purposes of driving back and forth

12    between Dover and Westchester?

13    A.  No.  That's just how the company was.  All the

14    foremen had company trucks.

15    Q.  In fact, did you know that Mark Lynch didn't

16    have a company truck?

17    A.  He did.

18    Q.  Were you present at the time that any of those

19    foremen were assigned a truck?

20    A.  No.

21    Q.  Did you ever see a policy that said all foremen

22    have a truck?

23    A.  No.

24    Q.  Did you review the Complaint in this action

**35**

1    before it was filed?

2    A.  Yes.

3    Q.  Did you sign a verification that it was

4    accurate?

5    A.  I believe so.

6        MR. HUGGETT:  I would make a request

7    for a copy of that if it exists.  I don't have any

8    such -- I have a verification from Mr. Coleman,

9    but --

10    Q.  In the Complaint, paragraph 28, it says "The

11    plaintiffs made $1.20 per square foot, compared to $2.80

12    per foot at the New Castle plant."  Do you recall that

13    allegation?

14    A.  Yeah.

15    Q.  Okay.  Upon what do you base the allegation

16    that you were paid $1.20 per square foot?

17    A.  Should have been $1.20 per foot.

18    Q.  Rates are based on linear feet of installation?

19    A.  Whatever linear means.  What do you mean by

20    linear?

21    Q.  Distance from one point to another in a

22    straight line.

23    A.  Okay.  Yeah.

24    Q.  And in fact, the rates that you were paid for

**36**

1    out of New Castle, it wasn't just one $1.20 rate, was

2    there?

3    A.  No.

4    Q.  There were multiple rates depending on what

5    work you were doing?

6    A.  Yes.

7    Q.  So when you referred to the $1.20, what are you

8    referring to?

9    A.  The main course of action.  Just the burying of

10    the pipe.

11    Q.  When you were working in New Castle, you were

12    burying the main trunk line through the neighborhood,

13    correct?

14    A.  Yes.

15    Q.  When you were working out of Westchester, you

16    were burying lines from that main trunk directly to a

17    house, a drop?

18    A.  Yes.

19    Q.  And that's different work with different rates?

20    A.  Same principle, different rates.

21    Q.  At paragraph 27, it says, "The transfer

22    resulted in a substantial reduction in salary."  Do you

23    recall that allegation?

24    A.  Yes.

**37**

1    Q.  Upon what is that based?

2    A.  Deductions at the end of the day.

3    Q.  And what are deductions?

4    A.  Gas, food, room and board.

5    Q.  Well, you were traveling back and forth daily

6    between home, so you didn't have room and board, did you?

7    A.  Depending on what time we got off work.  If we

8    got off work at 9:00 at night, we would just get a hotel.

9    No point in driving home.

10    Q.  Why would food costs increase because you were

11    in Westchester as opposed to anywhere else?  You have to

12    eat all the time, right?

13    A.  We worked longer hours, so you ended up in the

14    field longer, so you got to spend more money on food.

15    Q.  And if you're driving the company truck, who

16    pays for gas?

17    A.  The company.

18    Q.  In fact, in direct salary from the company, you

19    made more working at Westchester than you did in New

20    Castle?

21    A.  In direct salary, yes.

22    Q.  And you and Mr. Coleman weren't the only

23    employees transferred from New Castle to Westchester,

24    were you?

10 (Pages 34 to 37)

# MCLEAN EXHIBIT 19

McLean and Coleman v. Communications Construction Group, LLC
Jason McLean

|  | 62 |
|---|---|
| 1 | A. All the time. |
| 2 | MR. HUGGETT: Objection. |
| 3 | Q. And when do you think about that? |
| 4 | A. Whenever I think about what life would have |
| 5 | been like if he had never made that statement. |
| 6 | Q. Do you know if Brad Dodson continued to work |
| 7 | after you were laid off from CCG? |
| 8 | A. Yeah. Because the day I was laid off, that was |
| 9 | the day they transferred him and another guy named Chris |
| 10 | to an aerial construction team up in New York, I believe. |
| 11 | Q. Do you know, did Brad Dodson make any |
| 12 | statements concerning his relationship with, the fact |
| 13 | that he was related to David Dodson, during the |
| 14 | confrontation with Brian Coleman? |
| 15 | A. Yeah. He did spout off a couple times that, |
| 16 | you know -- just pretty much they were arguing. Nobody |
| 17 | knew where the situation was going to go at that time. |
| 18 | So he did make a couple of statements about his brother, |
| 19 | yeah. |
| 20 | Q. What statements were those? |
| 21 | A. I can't remember exactly the exact statements. |
| 22 | Q. Can you recall in general what type of |
| 23 | statements they were? |
| 24 | A. When he was poking him in his chest, he was |

|  | 63 |
|---|---|
| 1 | saying, "What do you think you're doing here?" He's like |
| 2 | "My brother is the supervisor." Or something to that |
| 3 | nature. Just pretty much trying to make it like there |
| 4 | was nothing we could do. He was going to win, if we |
| 5 | tried to do anything, pretty much. |
| 6 | Q. Does the Dodson name mean anything within the |
| 7 | CCG company? |
| 8 | A. It means a lot, just like the Millers. The |
| 9 | Dodsons are some of the -- I believe they were some of |
| 10 | the founders of the company. His dad, their dad works |
| 11 | there, the brother works there, cousins work there. And |
| 12 | like I said, I met a cousin of the Dodsons in Ocean City |
| 13 | this year. It's a big family company, pretty much. |
| 14 | Q. After you were transferred from the New Castle |
| 15 | site, do you know how much you were making per square |
| 16 | foot when you were transferred? |
| 17 | A. We were making $2.60 per foot in New Castle and |
| 18 | Angola. In Westchester, we made $1.20 per foot. Pretty |
| 19 | much the same -- same work. You bury the pipe in the |
| 20 | ground, takes the exact same time to do it. Same labor |
| 21 | involved. Shoot missiles under driveways, it's the same |
| 22 | thing as shooting missiles under driveways from main |
| 23 | line. You actually shoot the missile right next to the |
| 24 | main line lines. It's the same work. |

|  | 64 |
|---|---|
| 1 | Q. Now, you heard the question referenced by |
| 2 | defense counsel that you were actually making more after |
| 3 | you were transferred? |
| 4 | A. You make more on the books, but I mean at the |
| 5 | end of the week, after you deduct everything you have to |
| 6 | spend to make the money, you don't make more, working two |
| 7 | hours away from home, than you do when you work 30 |
| 8 | minutes from home. Working for half the -- less than |
| 9 | half the pay, doing more work on a daily basis, just to |
| 10 | make that dollar. |
| 11 | Q. So, do you know if you were working more days |
| 12 | after your transfer? |
| 13 | A. Yeah. We worked four-day weeks in Angola and |
| 14 | New Castle, and in Westchester, we worked up to six days, |
| 15 | sometimes come in on the weekends and even work just to |
| 16 | make enough money. |
| 17 | Q. And who decided how many days a week you were |
| 18 | to work? How was that decided? |
| 19 | A. You were mandatory to work five days, but I |
| 20 | mean if you didn't make it, they had no problem with you |
| 21 | working more days, as much overtime as you want, because |
| 22 | the company made a lot more than we did, so they wouldn't |
| 23 | have a problem with it. There's always an abundance of |
| 24 | work, so -- |

|  | 65 |
|---|---|
| 1 | Q. Do you know if anyone informed Lisa Clemens |
| 2 | that Brad Dodson, in fact, did not call you two dumb |
| 3 | niggers? |
| 4 | A. If anybody informed her that he didn't? |
| 5 | Q. Yes. |
| 6 | A. I don't know. I don't think so. |
| 7 | Q. And when Robert Koch had told you about the |
| 8 | conversation, it was in the context of how much money |
| 9 | they were making? |
| 10 | A. Yeah. |
| 11 | Q. And Robert Koch informed you of this statement |
| 12 | that Brad Dodson made, was it a reference that you two |
| 13 | were the reason that they were not making as much money? |
| 14 | A. Exactly, yes. |
| 15 | Q. And how do you know that? |
| 16 | A. Because he tried to make it as though if he had |
| 17 | somebody else -- |
| 18 | MR. HUGGETT: I'm going to object to |
| 19 | the question. He wasn't present for any of that. |
| 20 | MR. POLIQUIN: That's fine. |
| 21 | A. He was trying to make it seem as though if it |
| 22 | wasn't for us, he would be making more money, and that we |
| 23 | were the downfall of the crew. |
| 24 | MR. POLIQUIN: I have no further |

17 (Pages 62 to 65)

# MCLEAN EXHIBIT 20

Case 1:06-cv-00617-SLR    Document 45-21    Filed 12/17/2007    Page 2 of 2
McLean and Coleman v. Communications Construction Group, LLC
Jason McLean

34

1    Q.  Do you recall when that happened?
2    A.  The same week that we started working up there,
3    probably the second, maybe third day.
4    Q.  And how did you get up there on the second day?
5    A.  I said the second, maybe the third day we took
6    the truck. So, one of us drove, and the other one drove
7    the truck back.
8    Q.  And how did you come to get this truck?
9    A.  We asked him, and he gave it to us.
10   Q.  And did you tell him at that point in time that
11   you needed it for the purposes of driving back and forth
12   between Dover and Westchester?
13   A.  No. That's just how the company was. All the
14   foremen had company trucks.
15   Q.  In fact, did you know that Mark Lynch didn't
16   have a company truck?
17   A.  He did.
18   Q.  Were you present at the time that any of those
19   foremen were assigned a truck?
20   A.  No.
21   Q.  Did you ever see a policy that said all foremen
22   have a truck?
23   A.  No.
24   Q.  Did you review the Complaint in this action

35

1    before it was filed?
2    A.  Yes.
3    Q.  Did you sign a verification that it was
4    accurate?
5    A.  I believe so.
6        MR. HUGGETT:  I would make a request
7    for a copy of that if it exists. I don't have any
8    such -- I have a verification from Mr. Coleman,
9    but --
10   Q.  In the Complaint, paragraph 28, it says "The
11   plaintiffs made $1.20 per square foot, compared to $2.80
12   per foot at the New Castle plant." Do you recall that
13   allegation?
14   A.  Yeah.
15   Q.  Okay. Upon what do you base the allegation
16   that you were paid $1.20 per square foot?
17   A.  Should have been $1.20 per foot.
18   Q.  Rates are based on linear feet of installation?
19   A.  Whatever linear means. What do you mean by
20   linear?
21   Q.  Distance from one point to another in a
22   straight line.
23   A.  Okay. Yeah.
24   Q.  And in fact, the rates that you were paid for

36

1    out of New Castle, it wasn't just one $1.20 rate, was
2    there?
3    A.  No.
4    Q.  There were multiple rates depending on what
5    work you were doing?
6    A.  Yes.
7    Q.  So when you referred to the $1.20, what are you
8    referring to?
9    A.  The main course of action. Just the burying of
10   the pipe.
11   Q.  When you were working in New Castle, you were
12   burying the main trunk line through the neighborhood,
13   correct?
14   A.  Yes.
15   Q.  When you were working out of Westchester, you
16   were burying lines from that main trunk directly to a
17   house, a drop?
18   A.  Yes.
19   Q.  And that's different work with different rates?
20   A.  Same principle, different rates.
21   Q.  At paragraph 27, it says, "The transfer
22   resulted in a substantial reduction in salary." Do you
23   recall that allegation?
24   A.  Yes.

37

1    Q.  Upon what is that based?
2    A.  Deductions at the end of the day.
3    Q.  And what are deductions?
4    A.  Gas, food, room and board.
5    Q.  Well, you were traveling back and forth daily
6    between home, so you didn't have room and board, did you?
7    A.  Depending on what time we got off work. If we
8    got off work at 9:00 at night, we would just get a hotel.
9    No point in driving home.
10   Q.  Why would food costs increase because you were
11   in Westchester as opposed to anywhere else? You have to
12   eat all the time, right?
13   A.  We worked longer hours, so you ended up in the
14   field longer, so you got to spend more money on food.
15   Q.  And if you're driving the company truck, who
16   pays for gas?
17   A.  The company.
18   Q.  In fact, in direct salary from the company, you
19   made more working at Westchester than you did in New
20   Castle?
21   A.  In direct salary, yes.
22   Q.  And you and Mr. Coleman weren't the only
23   employees transferred from New Castle to Westchester,
24   were you?

# MCLEAN EXHIBIT 21

McLean and Coleman v. Communications Construction Group, LLC
Jason McLean

---

**62**

1  A. All the time.

2  MR. HUGGETT: Objection.

3  Q. And when do you think about that?

4  A. Whenever I think about what life would have

5  been like if he had never made that statement.

6  Q. Do you know if Brad Dodson continued to work

7  after you were laid off from CCG?

8  A. Yeah. Because the day I was laid off, that was

9  the day they transferred him and another guy named Chris

10  to an aerial construction team up in New York, I believe.

11  Q. Do you know, did Brad Dodson make any

12  statements concerning his relationship with, the fact

13  that he was related to David Dodson, during the

14  confrontation with Brian Coleman?

15  A. Yeah. He did spout off a couple times that,

16  you know -- just pretty much they were arguing. Nobody

17  knew where the situation was going to go at that time.

18  So he did make a couple of statements about his brother,

19  yeah.

20  Q. What statements were those?

21  A. I can't remember exactly the exact statements.

22  Q. Can you recall in general what type of

23  statements they were?

24  A. When he was poking him in his chest, he was

---

**63**

1  saying, "What do you think you're doing here?" He's like

2  "My brother is the supervisor." Or something to that

3  nature. Just pretty much trying to make it like there

4  was nothing we could do. He was going to win, if we

5  tried to do anything, pretty much.

6  Q. Does the Dodson name mean anything within the

7  CCG company?

8  A. It means a lot, just like the Millers. The

9  Dodsons are some of the -- I believe they were some of

10  the founders of the company. His dad, their dad works

11  there, the brother works there, cousins work there. And

12  like I said, I met a cousin of the Dodsons in Ocean City

13  this year. It's a big family company, pretty much.

14  Q. After you were transferred from the New Castle

15  site, do you know how much you were making per square

16  foot when you were transferred?

17  A. We were making $2.60 per foot in New Castle and

18  Angola. In Westchester, we made $1.20 per foot. Pretty

19  much the same -- same work. You bury the pipe in the

20  ground, takes the exact same time to do it. Same labor

21  involved. Shoot missiles under driveways, it's the same

22  thing as shooting missiles under driveways from main

23  line. You actually shoot the missile right next to the

24  main line lines. It's the same work.

---

**64**

1  Q. Now, you heard the question referenced by

2  defense counsel that you were actually making more after

3  you were transferred.

4  A. You make more on the books, but I mean at the

5  end of the week, after you deduct everything you have to

6  spend to make the money, you don't make more, working two

7  hours away from home, than you do when you work 30

8  minutes from home. Working for half the -- less than

9  half the pay, doing more work on a daily basis, just to

10  make that dollar.

11  Q. So, do you know if you were working more days

12  after your transfer?

13  A. Yeah. We worked four-day weeks in Angola and

14  New Castle, and in Westchester, we worked up to six days,

15  sometimes come in on the weekends and even work just to

16  make enough money.

17  Q. And who decided how many days a week you were

18  to work? How was that decided?

19  A. You were mandatory to work five days, but I

20  mean if you didn't make it, they had no problem with you

21  working more days, as much overtime as you want, because

22  the company made a lot more than we did, so they wouldn't

23  have a problem with it. There's always an abundance of

24  work, so --

---

**65**

1  Q. Do you know if anyone informed Lisa Clemens

2  that Brad Dodson, in fact, did not call you two dumb

3  niggers?

4  A. If anybody informed her that he didn't?

5  Q. Yes.

6  A. I don't know. I don't think so.

7  Q. And when Robert Koch had told you about the

8  conversation, it was in the context of how much money

9  they were making?

10  A. Yeah.

11  Q. And Robert Koch informed you of this statement

12  that Brad Dodson made, was it a reference that you two

13  were the reason that they were not making as much money?

14  A. Exactly, yes.

15  Q. And how do you know that?

16  A. Because he tried to make it as though if he had

17  somebody else --

18  MR. HUGGETT: I'm going to object to

19  the question. He wasn't present for any of that.

20  MR. POLIQUIN: That's fine.

21  A. He was trying to make it seem as though if it

22  wasn't for us, he would be making more money, and that we

23  were the downfall of the crew.

24  MR. POLIQUIN: I have no further

---

17 (Pages 62 to 65)

# MCLEAN EXHIBIT 22

McLean and Coleman v. Communications Construction Group, LLC
Jason McLean

---

**58**

1     Q. Did you ask anyone else?

2     A. No.

3     Q. And did you ever get an explanation why you

4 were transferred from the New Castle site?

5     A. Never an explanation, no.

6     Q. Did you ask for a written statement on why you

7 were transferred from the New Castle site?

8     A. Yes.

9     Q. And did you ever get a written statement?

10     A. No.

11     Q. After Lisa Clemens conducted her investigation,

12 were you informed of the results of the investigation?

13     A. Yes.

14     Q. And what were you informed?

15     A. I was informed that we apparently did not

16 follow company policy, by we should have -- I should have

17 contacted the supervisor. But I had no supervisor's

18 phone number to contact. The only person I had to

19 contact was Brad, and that I was apparently out of area

20 by contacting my foreman, which is the same person I

21 contact every day, all day, for anything. So --

22     Q. And was there any other supervisors on the site

23 at that time?

24     A. No.

---

**59**

1     Q. You have made a statement that all foremen have

2 trucks that they used?

3     A. Uh-huh.

4     Q. How do you know that?

5     A. Every foreman that I've ever met in CCG had an

6 F350 pickup truck, and drove it from the work site home,

7 or from the work site to the hotel, and then on weekends

8 they drove it home. Every single one I've met. Other

9 than myself.

10     Q. And you know that from firsthand experience?

11     A. Yeah.

12     Q. Now, did you have a chance to review the police

13 report that was connected with the incident that took

14 place on May 31, 2005?

15     A. The only police report that I reviewed was the

16 one that the cop actually handed to us. I got to review

17 the second one today, briefly.

18     Q. And did it confirm, did any witnesses confirm

19 the fact that Brad Dodson made the statement calling you

20 two dumb niggers?

21     A. Yeah. In the police report that I originally

22 had, yeah. It had the statements from both of the guys,

23 that they both said in the police report what they heard.

24     Q. And do you remember if in Brad Dodson's

---

**60**

1 statement to the police, if, in fact, he denied calling

2 you and Brian, calling you two dumb niggers?

3     A. I don't recall his statement, if he denied it

4 or -- I believe he probably did deny it.

5     Q. Can I show you a copy of the police report to

6 refresh your recollection?

7     A. Yeah.

8       MR. POLIQUIN: I am showing him a

9 police report that's connected to the -- listed as

10 an exhibit to the Complaint.

11     A. "He did not admit or deny making the statement

12 at this time." Yeah.

13     Q. So based on reading that police report, did

14 Brad Dodson deny making the statement at all to the

15 police officer?

16       MR. HUGGETT: Objection. Go ahead and

17 answer, but --

18     A. He didn't deny it or say that he did, so --

19     Q. Did anyone else get physical -- excuse me, did

20 you or Brian Coleman get physical with Brad Dodson on May

21 31, 2005?

22     A. No.

23     Q. And this was even after Brad Dodson had started

24 poking Mr. Coleman in the chest?

---

**61**

1     A. Yes.

2     Q. Has the incident with Brad Dodson changed you

3 at all, in how you work?

4     A. Absolutely.

5     Q. And how has it?

6     A. Well, for one, from the day I got laid off,

7 started having problems at home, being able to provide

8 for the girl that I was going to end up marrying and my

9 daughter. We ended up breaking up due to the fact that I

10 didn't have enough money to provide for the both of them,

11 and I'm not having any insurance, so I ended up -- I have

12 a tonsilitis condition, where I was supposed to have my

13 tonsils out. I lost my insurance, two years went by

14 without having to get my tonsils out. Ended up getting

15 four or five throat infections every year. I actually

16 got one right now, I was in the hospital for it

17 yesterday.

18       And the career that I have, I mean

19 everybody knows everybody. Everybody that I work with

20 now knows Brad Dodson. I work with three people that

21 used to work at CCG. I mean it's -- you just can't

22 escape it. I mean it's an everyday thing.

23     Q. Do you ever think about the day that Brad

24 Dodson had called you and Brian Coleman two dumb niggers?

---

16 (Pages 58 to 61)

# MCLEAN EXHIBIT 23

McLean and Coleman v. Communications Construction Group, LLC
Brian Coleman

30

1    Q.  But it wasn't right when you started working up
2    there?
3        A.  I don't remember that. I really don't.
4        Q.  And what happened with regard to that?
5        A.  The truck got taken away from us.
6        Q.  How did that happen?
7        A.  Well, allegedly, John Gates told him we didn't
8    need a truck.
9        Q.  And when you say allegedly, what do you mean?
10       A.  Well, I mean that's what Billy Grover said.
11   But you don't know what to believe. I didn't hear it
12   from his mouth, so I don't know if he said it or not.
13       Q.  You heard that from Mr. Grover?
14       A.  Correct.
15           MR. POLIQUIN:  Brian, if I could
16   just -- off the record.
17           (Brief discussion off the record)
18   BY MR. HUGGETT:
19       Q.  Did you know why you went from Angola up to
20   Westchester?
21       A.  Sure don't.
22       Q.  No one ever told you anything?
23       A.  (Witness shakes head).
24       Q.  Did you understand that the Verizon contract

31

1    was being closed?
2        A.  Nobody ever told me. I don't know.
3        Q.  But you did say it was the nature of the work
4    that employees went and did the work --
5        A.  Traveled, yeah.
6        Q.  -- wherever it was?  What was the work that was
7    being done in Westchester?
8        A.  When we got transferred?
9        Q.  Yeah.
10       A.  Drop work. Underground drops. Instead of
11   doing big pipe, you do little small drops. Got to run
12   from here to there, there to there. There to there. It
13   was just crazy. Monotonous. Versus the main line, you
14   go to a neighborhood and sit in that neighborhood and
15   just work, work, work, work.
16       Q.  So the drops can be in various neighborhoods in
17   a given day?
18       A.  Absolutely.
19       Q.  Is it easier work?
20       A.  I'm not going to say it's easier. I mean it's
21   all back-busting work. I mean it's hard labor work.
22   That's all it is.
23       Q.  It's different than what you were doing down in
24   New Castle?

32

1        A.  I mean it's the same type thing, but different
2    a little bit, yeah. You could say.
3        Q.  Has different rates associated with payments?
4        A.  A lot different. I think I was getting about
5    1.20 a foot for doing that underground drops. That one
6    was like 3.65 a foot we were getting. I think. Don't
7    quote me but -- the big pipe, I don't know exactly what
8    it was.
9        Q.  When you're doing drops, you don't have to
10   spend extra time setting vaults though, correct?
11       A.  You still got to dig into the vault.
12       Q.  But when you're setting vaults you don't get
13   paid for setting a vault per se. There's not a rate for
14   that, is there?
15       A.  No. There's not. But the price makes up for
16   not getting paid to set vaults. 3.65 is a lot different
17   than 1.20.
18       Q.  So the 3.65 includes payment for setting the
19   vault, right? That's part of that. And the 1.20 doesn't
20   require that. You have to dig into it, but you don't
21   have to set it, which is a lot of work.
22       A.  No, you don't have to set it.
23       Q.  Were you working more hours directly when you
24   came up to Westchester?

33

1        A.  It varied. Could go back and forth -- I mean
2    any day with underground utilities, you can have a bad
3    day, something can go wrong.
4        Q.  Does the weather interfere with being able to
5    do the work?
6        A.  Unexpected. I mean Brad had us working in the
7    rain. Didn't matter. The rain, to me, didn't have
8    nothing to do with it, no. Wintertime when the ground
9    got frozen, that would be a different story.
10       Q.  And it's correct, isn't it, that in fact, after
11   you came up to Westchester, you were taking home more, on
12   average in pay, per week, than you were in New Castle?
13       A.  I don't -- I don't remember, but if I did, I
14   had to work a lot harder to get it.
15       Q.  How is that?
16       A.  Because I had to wake up two hours earlier to
17   get to work on time, then, versus like I said, sitting in
18   one development, one neighborhood, working up this street
19   all day long, I had to run 20 miles this way, 20 miles
20   this way, 15 miles that way, ten miles that way, to knock
21   out four or five jobs in a day to make any money at all.
22   Then you still got to split that 1.20 with Ortiz or
23   whoever your helper was. It's not like you are taking
24   home a whole 1.20.

9  (Pages 30 to 33)

# MCLEAN EXHIBIT 24

Case 1:06-cv-00617-SLR   Document 45-25   Filed 12/17/2007   Page 2 of 2
McLean and Coleman v. Communications Construction Group, LLC
Brian Coleman

30

```
 1      Q.  But it wasn't right when you started working up
 2   there?
 3      A.  I don't remember that. I really don't.
 4      Q.  And what happened with regard to that?
 5      A.  The truck got taken away from us.
 6      Q.  How did that happen?
 7      A.  Well, allegedly, John Gates told him we didn't
 8   need a truck.
 9      Q.  And when you say allegedly, what do you mean?
10      A.  Well, I mean that's what Billy Grover said.
11   But you don't know what to believe. I didn't hear it
12   from his mouth, so I don't know if he said it or not.
13      Q.  You heard that from Mr. Grover?
14      A.  Correct.
15         MR. POLIQUIN: Brian, if I could
16   just -- off the record.
17         (Brief discussion off the record)
18   BY MR. HUGGETT:
19      Q.  Did you know why you went from Angola up to
20   Westchester?
21      A.  Sure don't.
22      Q.  No one ever told you anything?
23      A.  (Witness shakes head).
24      Q.  Did you understand that the Verizon contract
```

31

```
 1   was being closed?
 2      A.  Nobody ever told me. I don't know.
 3      Q.  But you did say it was the nature of the work
 4   that employees went and did the work --
 5      A.  Traveled, yeah.
 6      Q.  -- wherever it was? What was the work that was
 7   being done in Westchester?
 8      A.  When we got transferred?
 9      Q.  Yeah.
10      A.  Drop work. Underground drops. Instead of
11   doing big pipe, you do little small drops. Got to run
12   from here to there, there to there. There to there. It
13   was just crazy. Monotonous. Versus the main line, you
14   go to a neighborhood and sit in that neighborhood and
15   just work, work, work, work.
16      Q.  So the drops can be in various neighborhoods in
17   a given day?
18      A.  Absolutely.
19      Q.  Is it easier work?
20      A.  I'm not going to say it's easier. I mean it's
21   all back-busting work. I mean it's hard labor work.
22   That's all it is.
23      Q.  It's different than what you were doing down in
24   New Castle?
```

32

```
 1      A.  I mean it's the same type thing, but different
 2   a little bit, yeah. You could say.
 3      Q.  Has different rates associated with payments?
 4      A.  A lot different. I think I was getting about
 5   1.20 a foot for doing that underground drops. That one
 6   was like 3.65 a foot we were getting. I think. Don't
 7   quote me but -- the big pipe, I don't know exactly what
 8   it was.
 9      Q.  When you're doing drops, you don't have to
10   spend extra time setting vaults though, correct?
11      A.  You still got to dig into the vault.
12      Q.  But when you're setting vaults you don't get
13   paid for setting a vault per se. There's not a rate for
14   that, is there?
15      A.  No. There's not. But the price makes up for
16   not getting paid to set vaults. 3.65 is a lot different
17   than 1.20.
18      Q.  So the 3.65 includes payment for setting the
19   vault, right? That's part of that. And the 1.20 doesn't
20   require that. You have to dig into it, but you don't
21   have to set it, which is a lot of work.
22      A.  No, you don't have to set it.
23      Q.  Were you working more hours directly when you
24   came up to Westchester?
```

33

```
 1      A.  It varied. Could go back and forth -- I mean
 2   any day with underground utilities, you can have a bad
 3   day, something can go wrong.
 4      Q.  Does the weather interfere with being able to
 5   do the work?
 6      A.  Unexpected. I mean Brad had us working in the
 7   rain. Didn't matter. The rain, to me, didn't have
 8   nothing to do with it, no. Wintertime when the ground
 9   got frozen, that would be a different story.
10      Q.  And it's correct, isn't it, that in fact, after
11   you came up to Westchester, you were taking home more, on
12   average in pay, per week, than you were in New Castle?
13      A.  I don't -- I don't remember, but if I did, I
14   had to work a lot harder to get it.
15      Q.  How is that?
16      A.  Because I had to wake up two hours earlier to
17   get to work on time, then, versus like I said, sitting in
18   one development, one neighborhood, working up this street
19   all day long, I had to run 20 miles this way, 20 miles
20   this way, 15 miles that way, ten miles that way, to knock
21   out four or five jobs in a day to make any money at all.
22   Then you still got to split that 1.20 with Ortiz or
23   whoever your helper was. It's not like you are taking
24   home a whole 1.20.
```

# MCLEAN EXHIBIT 25

Case 1:06-cv-00617-SLR    Document 45-26    Filed 12/17/2007    Page 2 of 2
McLean and Coleman v. Communications Construction Group, LLC
Brian Coleman

34

1    Q.  And that split is what's referred to as
2    percentages?
3    A.  Absolutely.
4    Q.  And to your knowledge, was there any work still
5    being performed in Delaware?
6    A.  I don't know. I mean I was just a worker. I
7    don't know.
8    Q.  Where did you reside at that point in time?
9    A.  In Delaware. In Delaware.
10    Q.  All right. Why did you provide the police with
11    a Willingboro, New Jersey address?
12    A.  When did I provide the police with a New Jersey
13    address?
14    Q.  Well, actually, this one has, what we've marked
15    as Exhibit 1 has a Puzzleton Road, Dunkinsville, PA
16    address. Is that your address?
17    A.  No, it's not.
18    Q.  Is that an address you've ever lived at?
19    A.  No.
20    MR. POLIQUIN: I believe, just for
21    confusion's sake, I think that's Bradley Dodson
22    they're referring to as the defendant there, not
23    Mr. Coleman.
24    Q.  Okay. Here is actually where I was looking.

35

1    I, Brian T. Coleman of 20 Tarpon Court, Willingboro, New
2    Jersey.
3    A.  Yes, I did. That's my mother and father's
4    address. I was living with a woman and if that woman
5    puts me out, where am I going to get my mail? This is
6    important business, that's why I put that address.
7    Q.  So you did give them that address?
8    A.  Yeah, I did.
9    Q.  But you weren't living at that address at that
10    point in I am?
11    A.  Staying there sometimes on the weekends, but
12    no, I wasn't living there. Not permanently. We had a
13    job site when I was doing cable up in New Jersey,
14    Trenton, New Jersey. I stayed right up there. John
15    Gates was the supervisor. So I stayed at my mother and
16    father's house, where I could sleep. I mean if I don't
17    have money to pay at a motel, why should I stay at a
18    motel? My mother and father's house was right there.
19    Q.  What work did you do in Oaks, Pennsylvania?
20    A.  The underground drops, 1.20 a foot.
21    Q.  Same kind of work as in Westchester?
22    A.  Pretty much.
23    Q.  After the incident on May 31, did you ever
24    speak to anyone from human resources?

36

1    A.  Did I? Yeah.
2    Q.  Who did you speak to?
3    A.  We had -- we all had a meeting, they had a
4    meeting with us.
5    Q.  Who had a meeting?
6    A.  It was Lisa Clemens, Gates.
7    Q.  And do you recall -- Gates? John Gates?
8    A.  Yeah. And I think it was separate. I don't
9    remember. I think we all went in there separately. But
10    basically, there's a -- they gave us all a written
11    warning.
12    Q.  You say "all," to whom are you referring to?
13    A.  Me, Jason McLean, I know, and Bradley Dodson,
14    Frank and Bobby Koch all got written warnings.
15    Q.  Okay. Do you know whether they were all for
16    the same thing?
17    A.  Pretty much, I believe so.
18    (Coleman Exhibit 4 marked)
19    BY MR. HUGGETT:
20    Q.  I'll give you a document we've marked as
21    Exhibit 4 to your deposition, the employee warning
22    report. Is that the document to which you were
23    referring?
24    A.  Yes.

37

1    Q.  And is that your signature on the document?
2    A.  Yes, it is.
3    Q.  Okay. And there is a part there on that first
4    page in the middle that says "I agree or I disagree."
5    There's nothing checked there, is there?
6    A.  Nope.
7    Q.  You didn't write down that you had a
8    disagreement with any of this?
9    A.  No. I mean I felt my job was threatened, the
10    reason why I didn't. I was just cooperating with them,
11    because -- because of the situation. That's why I didn't
12    check the boxes. I didn't agree with it, and I knew I
13    was going to get worse, because I knew --
14    Q.  Did anyone threaten your job at that point in
15    time?
16    A.  I mean you're making accusations, "I don't
17    know, when you come back from vacation, I don't know
18    where you're going to go." That's like threatening my
19    job. I been there for five years. How you going to tell
20    me you're not going to know where I'm going to go or what
21    I'm going to do when you got job sites all over. Send me
22    from one to another one where Brad Dodson was not
23    supposed to be around me, but it's still the same job
24    site. You going to tell me you can't find a job site to

10 (Pages 34 to 37)

# MCLEAN EXHIBIT 26

McLean and Coleman v. Communications Construction Group, LLC
Brian Coleman

---

**34**

1    Q.   And that split is what's referred to as
2    percentages?
3    A.   Absolutely.
4    Q.   And to your knowledge, was there any work still
5    being performed in Delaware?
6    A.   I don't know.  I mean I was just a worker.  I
7    don't know.
8    Q.   Where did you reside at that point in time?
9    A.   In Delaware.  In Delaware.
10   Q.   All right.  Why did you provide the police with
11   a Willingboro, New Jersey address?
12   A.   When did I provide the police with a New Jersey
13   address?
14   Q.   Well, actually, this one has, what we've marked
15   as Exhibit 1 has a Puzzleton Road, Dunkinsville, PA
16   address.  Is that your address?
17   A.   No, it's not.
18   Q.   Is that an address you've ever lived at?
19   A.   No.
20        MR. POLIQUIN:  I believe, just for
21   confusion's sake, I think that's Bradley Dodson
22   they're referring to as the defendant there, not
23   Mr. Coleman.
24   Q.   Okay.  Here is actually where I was looking.

---

**35**

1    I, Brian T. Coleman of 20 Tarpon Court, Willingboro, New
2    Jersey.
3    A.   Yes, I did.  That's my mother and father's
4    address.  I was living with a woman and if that woman
5    puts me out, where am I going to get my mail?  This is
6    important business, that's why I put that address.
7    Q.   So you did give them that address?
8    A.   Yeah, I did.
9    Q.   But you weren't living at that address at that
10   point in I am?
11   A.   Staying there sometimes on the weekends, but
12   no, I wasn't living there.  Not permanently.  We had a
13   job site when I was doing cable up in New Jersey,
14   Trenton, New Jersey.  I stayed right up there.  John
15   Gates was the supervisor.  So I stayed at my mother and
16   father's house, where I could sleep.  I mean if I don't
17   have money to pay at a motel, why should I stay at a
18   motel?  My mother and father's house was right there.
19   Q.   What work did you do in Oaks, Pennsylvania?
20   A.   The underground drops, 1.20 a foot.
21   Q.   Same kind of work as in Westchester?
22   A.   Pretty much.
23   Q.   After the incident on May 31, did you ever
24   speak to anyone from human resources?

---

**36**

1    A.   Did I?  Yeah.
2    Q.   Who did you speak to?
3    A.   We had -- we all had a meeting, they had a
4    meeting with us.
5    Q.   Who had a meeting?
6    A.   It was Lisa Clemens, Gates.
7    Q.   And do you recall -- Gates?  John Gates?
8    A.   Yeah.  And I think it was separate.  I don't
9    remember.  I think we all went in there separately.  But
10   basically, there's a -- they gave us all a written
11   warning.
12   Q.   You say "all," to whom are you referring?
13   A.   Me, Jason McLean, I know, and Bradley Dodson,
14   Frank and Bobby Koch all got written warnings.
15   Q.   Okay.  Do you know whether they were all for
16   the same thing?
17   A.   Pretty much, I believe so.
18        (Coleman Exhibit 4 marked)
19   BY MR. HUGGETT:
20   Q.   I'll give you a document we've marked as
21   Exhibit 4 to your deposition, the employee warning
22   report.  Is that the document to which you were
23   referring?
24   A.   Yes.

---

**37**

1    Q.   And is that your signature on the document?
2    A.   Yes, it is.
3    Q.   Okay.  And there is a part there on that first
4    page in the middle that says "I agree or I disagree."
5    There's nothing checked there, is there?
6    A.   Nope.
7    Q.   You didn't write down that you had a
8    disagreement with any of this?
9    A.   No.  I mean I felt my job was threatened, the
10   reason why I didn't.  I was just cooperating with them,
11   because -- because of the situation.  That's why I didn't
12   check the boxes.  I didn't agree with it, and I knew I
13   was going to get worse, because I knew --
14   Q.   Did anyone threaten your job at that point in
15   time?
16   A.   I mean you're making accusations, "I don't
17   know, when you come back from vacation, I don't know
18   where you're going to go."  That's like threatening my
19   job.  I been there for five years.  How you going to tell
20   me you're not going to know where I'm going to go or what
21   I'm going to do when you got job sites all over.  Send me
22   from one to another one where Brad Dodson was not
23   supposed to be around me, but it's still the same job
24   site.  You going to tell me you can't find a job site to

---

10  (Pages 34 to 37)

# MCLEAN EXHIBIT 27

McLean and Coleman v. Communications Construction Group, LLC
Brian Coleman

46

1    A.  Lisa Clemens.

2    Q.  On the date of the incident?

3    A.  On the date of the incident.

4    Q.  You talked about a team concept.  What did you

5  exactly mean by it, when you explained -- when you said

6  team concept and working with a group of individuals at

7  CCG?

8    A.  Because, I mean everybody is there to make

9  money.  We're used to making good money.  That's what we

10  do, try to make good money.  Everybody has a place and a

11  role, a position to play.  Me and Jason's role was at the

12  bottom of the totem pole.  Bottom of the food chain.  We

13  had to dig holes.  But we still made good money.

14    So, if we didn't go dig those holes,

15  Bradley Dodson and Frank couldn't sit there and run that

16  drill, the rest of the machine so we could all make

17  money.  There's a process.

18    Q.  How did it make you feel when someone told you

19  that Bradley Dodson had called you two dumb niggers?

20    A.  I felt humiliated.  I was pissed off, because I

21  know that's not the case.  And just for him to call me

22  that, I mean -- it was just -- it wasn't -- I don't know.

23  I mean I'm sweating my butt off every day for the man,

24  and for our team.  And for him to say something like

47

1  that, it wasn't right.  If I wouldn't have had so much

2  time invested in the company, and if it had been a couple

3  years ago and I was younger and I didn't think, I

4  probably would have had a real bad problem out there.

5    Q.  Did you make --

6    A.  But the reason I didn't do all that was because

7  I was trying to keep my job.  I tried to play everything

8  by the book.

9    Q.  Did it make you feel any better that Bradley

10  Dodson didn't say it directly to you, but said it to

11  other employees when you weren't around?

12    A.  No.  I would rather have him say it directly to

13  my face.

14    Q.  And why is that?

15    A.  At least he is not a coward then.  If he had

16  said it to my face, I would have said well, why do you

17  feel like this.  We could have corrected the problem

18  before it got blown out of proportion.  When you go say

19  something behind somebody's back, that's devious.  You

20  have to watch that person.  Sneaky.

21    Q.  Now, who is Mike Fender?

22    A.  He was a supervisor.  I don't know where he

23  came from or how they got him, but he was a supervisor.

24    Q.  And he was present on March 31, 2005?

48

1    A.  Yes.

2    Q.  And you had said he had actually given you some

3  instructions not to talk to the police or report it to

4  human resources?

5    A.  He didn't want me to call the police.  He kept

6  trying to pull me and Brad aside, make us shake hands,

7  and basically go back to work.

8    Q.  Did he say anything about calling human

9  resources?

10    A.  No.  Jason did that on his own.

11    Q.  Did Mike Fender instruct you to call human

12  resources?

13    A.  No.

14    Q.  Do you know if he wanted you to call human

15  resources?

16    A.  It sure didn't seem like it, the way he was

17  acting.  He kept saying, "We'll take care of this.  We'll

18  take care of this."

19    Q.  And what did you take it, when you said "We'll

20  take care of this"?

21    A.  Like nothing was going to be done.

22    Q.  You also had a couple questions concerning

23  whether you felt, whether anyone had told you if your job

24  was threatened after you reported this incident.  You

49

1  stated someone said I don't know where you're going to go

2  after you come back from vacation.  Who said that to you?

3    A.  That was John Gates.

4    Q.  How long had you worked for Communications

5  Construction Group?

6    A.  About four or five years.

7    Q.  And during that time, have you had employment

8  reviews?

9    A.  Yeah.

10    Q.  And for the most part, were those positive

11  reviews?

12    A.  Absolutely.  The only thing they said bad about

13  me, and I'm not trying to say -- the only thing they said

14  about me, period, was that my knowledge of other cable TV

15  work was limited.  But that was because they stuck me

16  pounding ground rods and that was it.  They never tried

17  to train me to do anything else.  So how am I going to

18  know anything else?  They said my cable TV experience was

19  limited, so I only good quarter every time I got a raise.

20    Q.  The majority of the reviews, were they

21  positive?

22    A.  Oh, yeah, yeah, yes, sir.

23    Q.  Did anyone else ever call you dumb, or refer to

24  you as dumb?

13  (Pages 46 to 49)

# MCLEAN EXHIBIT 28

McLean and Coleman v. Communications Construction Group, LLC
Jason McLean

**6**

1    Q.  Did it file tax returns?
2    A.  Yes.
3    Q.  And how did you come to start McLean
4    Enterprises?
5    A.  With my own knowledge of the job, and a little
6    help from the parents with a little start-up money, and
7    help of another friend who had already started the exact
8    same business.
9    Q.  Okay.  Who started the same kind of a business?
10   A.  A buddy of mine named Josh.
11   Q.  Did McLean Enterprises have any employees,
12   besides yourself?
13   A.  No.
14   Q.  And why did you make the decision to go from
15   operating your own business to working for CableNet
16   Services?
17   A.  Money.
18   Q.  And when you say money, what do you mean by
19   that?
20   A.  Increase of pay, easier work.
21   Q.  How much were you making when you worked for
22   yourself at McLean Enterprises?
23   A.  Anywhere from 500 to $1500 per week.
24   Q.  And presently what are you making?

**7**

1    A.  Anywhere from about 700 to $2,000 a week.
2    Q.  Prior to McLean Enterprises, where did you
3    work?
4    A.  CCG.
5    Q.  And what was your position with CCG at the time
6    you left there?
7    A.  Foreman.
8    Q.  And do you recall how much you made when you
9    were working at CCG as a foreman?
10   A.  Not the exact number.  Guess, anywhere from 400
11   to $1,000 a week.
12   Q.  So you were actually making more money when you
13   started working for yourself?
14   A.  Yeah.
15   Q.  When did you start working for CCG?
16   A.  December, I believe it was, 2004, was it?
17   Q.  If I told you it was January 10th of 2005,
18   would you have any reason to say that was incorrect?
19   A.  No.  About the same time.
20   Q.  Why did you start working for CCG?
21   A.  I was looking for better employment.
22   Q.  Where had you been prior to CCG?
23   A.  EPB Associates.
24   Q.  And what do they do?

**8**

1    A.  Construction.  Roads.
2    Q.  How long were you with EPB?
3    A.  I can't recall.  Maybe six, seven months.
4    Q.  Where did you work prior to that?
5    A.  Carmike Cinemas.
6    Q.  Is that a movie theater?
7    A.  Yeah.
8    Q.  How long did you work there?
9    A.  About six years.
10   Q.  Is that while you were in school?
11   A.  Yes.
12   Q.  Were you still in school at the time that you
13   worked for EPB?
14   A.  No.
15   Q.  What were you doing when you were first hired
16   by CCG?
17   A.  Laborer, digging holes.
18   Q.  And how long did you work as a laborer?
19   A.  Maybe four months.
20   Q.  What did you do after you worked as a laborer
21   for CCG?
22   A.  Operator.
23   Q.  And how long were you an operator for CCG?
24   A.  Maybe two, three months.

**9**

1    Q.  Did you hold any position after you were an
2    operator?
3    A.  Foreman position.
4    Q.  And how long did you hold that position?
5    A.  The remainder of the time.
6    Q.  That would be about five months?
7    A.  Sure, yeah.
8    Q.  Do you recall specifically when you were
9    promoted to foreman?
10   A.  Not the exact date, no.
11   Q.  Do you recall if that was after you made the
12   complaint of discrimination that's at issue in this case?
13   A.  Yes.
14   Q.  Is it correct that the issues that you're
15   bringing in this case begin on May 31 of 2005, when Brad
16   Koch told you about a comment supposedly made by Brad
17   Dodson -- or I'm sorry.  Robert Koch told you about a
18   comment supposedly made by a Brad Dodson?
19   A.  Can you repeat the whole question one more
20   time?
21       (Question read)
22   A.  Yes.
23   Q.  And that comment was allegedly a racial
24   comment?

3 (Pages 6 to 9)

# MCLEAN EXHIBIT 29

McLean and Coleman v. Communications Construction Group, LLC
Jason McLean

---

**46**

1    Q. Did you review the answers to the
2 Interrogatories that were given to you?
3    A. Yes.
4    Q. The first Interrogatory asks for the
5 identification of anyone with knowledge, and the answer
6 to that says Joseph Tatsch informed plaintiffs that Brad
7 Dodson told the entire crew of approximately six men.
8 You've identified Mr. Tatsch, Mr. Miller, Mr. Koch, and
9 an unnamed person as the four people in that crew.
10    A. Uh-huh.
11    Q. Are there two other members of that crew?
12    A. There might have been. The crews are always
13 switching up. As you can see how many crews I jumped
14 from. So, those are the main characters of that crew
15 that stood firm, so there's only people getting thrown in
16 day to day, thrown out day to day. Possibly could have
17 been six. Definitely two.
18    Q. Can you provide any other names --
19    A. No.
20    Q. -- related to these six? Did you sign a
21 verification of these Interrogatory answers?
22    A. I don't remember.
23    Q. The last sentence of that Interrogatory answer
24 says, "Any CCG employee working in Ocean City in February

**47**

1 of 2007." To what does that refer?
2    A. I think that's referring to when I had a run-in
3 with Brad Dodson's cousin, who still works for CCG, who
4 pretty much knew the entire situation. So, after we
5 introduced each other, we just parted.
6    Q. And that was after you no longer worked for
7 CCG?
8    A. Yes.
9    Q. And what's this cousin's name?
10    A. I don't know.
11    Q. And upon what do you base the statement that he
12 knew the entire situation?
13    A. Because he knew who I was. He knew who Brian
14 was, he knew the situation. He said -- in our short
15 conversation, he said, "I heard about that."
16    Q. How did that come up?
17    A. We were talking about CCG.
18    Q. He didn't elaborate more than "I heard about
19 that"?
20    A. Neither of us did.
21    Q. Was Joseph Tatsch present on May 31?
22    A. Yes.
23    Q. When we went through it before, you identified
24 that Mr. Koch came up riding on a piece of equipment and

**48**

1 talked to you.
2    A. Uh-huh.
3    Q. And you both then went over to where Frank and
4 Brad were working.
5    A. Uh-huh.
6    Q. Where was Mr. Tatsch?
7    A. Working somewhere in the same area.
8    Q. But he wasn't there at that point in time?
9    A. What point in time are you referring to? When
10 we went over there?
11    Q. When you spoke with Mr. Koch.
12    A. No. He was not right directly with us, no.
13    Q. And he wasn't directly with you when you spoke
14 to Brad Dodson?
15    A. No.
16    Q. And it's correct that you haven't seen any
17 doctor or psychiatrist as a result of any of the events
18 we've discussed today?
19    A. No. Can't afford it.
20    Q. Why do you say that?
21    A. If you get laid off, you don't get insurance.
22    Q. But you said that you went into business for
23 yourself, and indeed, made more money, correct?
24    A. Yeah. Cash money, but -- after you do your

**49**

1 taxes and everything, you don't end up making that much
2 money.
3    Q. Do you get benefits with your present employer?
4    A. Yes.
5    Q. Have you given any written statements about the
6 events in this matter since May 31 of 2005?
7    A. To whom?
8    Q. To anyone.
9    A. Written statements? Other than to my lawyer,
10 no.
11    Q. Did you give a written statement to your
12 lawyer?
13    MR. POLIQUIN: Objection. You don't
14 have to answer the question. It's attorney/client
15 of privilege.
16    MR. HUGGETT: Well, I don't think the
17 existence of the statement is subject to the
18 attorney/client privilege. The content of the
19 statement would be.
20    MR. POLIQUIN: You can answer the
21 question, if you can answer it, I guess.
22 BY MR. HUGGETT:
23    Q. Did you ever give your lawyer a written
24 statement?

13 (Pages 46 to 49)

# MCLEAN EXHIBIT 30

**Page 46**

1    Q. Did you review the answers to the
2 Interrogatories that were given to you?
3    A. Yes.
4    Q. The first Interrogatory asks for the
5 identification of anyone with knowledge, and the answer
6 to that says Joseph Tatsch informed plaintiffs that Brad
7 Dodson told the entire crew of approximately six men.
8 You've identified Mr. Tatsch, Mr. Miller, Mr. Koch, and
9 an unnamed person as the four people in that crew.
10    A. Uh-huh.
11    Q. Are there two other members of that crew?
12    A. There might have been. The crews are always
13 switching up. As you can see how many crews I jumped
14 from. So, those are the main characters of that crew
15 that stood firm, so there's only people getting thrown in
16 day to day, thrown out day to day. Possibly could have
17 been six. Definitely two.
18    Q. Can you provide any other names --
19    A. No.
20    Q. -- related to these six? Did you sign a
21 verification of these Interrogatory answers?
22    A. I don't remember.
23    Q. The last sentence of that Interrogatory answer
24 says, "Any CCG employee working in Ocean City in February

**Page 47**

1 of 2007." To what does that refer?
2    A. I think that's referring to when I had a run-in
3 with Brad Dodson's cousin, who still works for CCG, who
4 pretty much knew the entire situation. So, after we
5 introduced each other, we just parted.
6    Q. And that was after you no longer worked for
7 CCG?
8    A. Yes.
9    Q. And what's this cousin's name?
10    A. I don't know.
11    Q. And upon what do you base the statement that he
12 knew the entire situation?
13    A. Because he knew who I was. He knew who Brian
14 was, he knew the situation. He said -- in our short
15 conversation, he said, "I heard about that."
16    Q. How did that come up?
17    A. We were talking about CCG.
18    Q. He didn't elaborate more than "I heard about
19 that"?
20    A. Neither of us did.
21    Q. Was Joseph Tatsch present on May 31?
22    A. Yes.
23    Q. When we went through it before, you identified
24 that Mr. Koch came up riding on a piece of equipment and

**Page 48**

1 talked to you.
2    A. Uh-huh.
3    Q. And you both then went over to where Frank and
4 Brad were working.
5    A. Uh-huh.
6    Q. Where was Mr. Tatsch?
7    A. Working somewhere in the same area.
8    Q. But he wasn't there at that point in time?
9    A. What point in time are you referring to? When
10 we went over there?
11    Q. When you spoke with Mr. Koch.
12    A. No. He was not right directly with us, no.
13    Q. And he wasn't directly with you when you spoke
14 to Brad Dodson?
15    A. No.
16    Q. And it's correct that you haven't seen any
17 doctor or psychiatrist as a result of any of the events
18 we've discussed today?
19    A. No. Can't afford it.
20    Q. Why do you say that?
21    A. If you get laid off, you don't get insurance.
22    Q. But you said that you went into business for
23 yourself, and indeed, made more money, correct?
24    A. Yeah. Cash money, but -- after you do your

**Page 49**

1 taxes and everything, you don't end up making that much
2 money.
3    Q. Do you get benefits with your present employer?
4    A. Yes.
5    Q. Have you given any written statements about the
6 events in this matter since May 31 of 2005?
7    A. To whom?
8    Q. To anyone.
9    A. Written statements? Other than to my lawyer,
10 no.
11    Q. Did you give a written statement to your
12 lawyer?
13        MR. POLIQUIN: Objection. You don't
14 have to answer the question. It's attorney/client
15 of privilege.
16        MR. HUGGETT: Well, I don't think the
17 existence of the statement is subject to the
18 attorney/client privilege. The content of the
19 statement would be.
20        MR. POLIQUIN: You can answer the
21 question, if you can answer it, I guess.
22 BY MR. HUGGETT:
23    Q. Did you ever give your lawyer a written
24 statement?

13  (Pages 46 to 49)

# MCLEAN EXHIBIT 31

McLean and Coleman v. Communications Construction Group, LLC
Brian Coleman

---

**50**

1    A.   No.

2    Q.   Prior to this incident, did Bradley Dodson ever

3    refer to you or Jason McLean by a certain -- by any other

4    names?

5    A.   Yeah.   He used to call us yahoos.

6    Q.   And did he call anyone else yayhoos, or yahoos?

7    A.   I never heard him say that to anyone else.

8    Q.   And in what context did he tell you yayhoos or

9    yahoos?

10   A.   "You yayhoos, come on.   You can't get that

11   right."   I never heard the word or expression before.   I

12   didn't know what it meant.

13   Q.   Who else was on your team at that time?

14   A.   Bradley and Frank.

15   Q.   Did he ever refer to Frank as a yayhoo?

16   A.   Huh-uh.

17   Q.   You had worked for this company for four or

18   five years?

19   A.   Yes, sir.

20   Q.   And were you ever laid off during that period

21   of time?

22   A.   No, sir.   Not that I remember.

23   Q.   And do you know what discipline Bradley Dodson

24   received has a result of the Lisa Clemens investigation?

---

**51**

1    A.   None.   A warning like we did.   Which I don't

2    see how --

3    Q.   And do you know if Bradley Dodson continued to

4    work after you were laid off?

5    A.   Yes, he did.

6    Q.   Now, whatever happened to Bradley Dodson's

7    criminal charges that were filed against him?

8    A.   He pled out.   Probation before judgment.

9    MR. POLIQUIN:   I have no further

10   questions.

11   REDIRECT EXAMINATION

12   BY MR. HUGGETT:

13   Q.   Brad Dodson's title was foreman?

14   A.   Yes.

15   Q.   Okay.   And in Exhibit 2, the policies you

16   looked at, nowhere in there did it use the word foreman

17   in terms of making a complaint, did it?

18   A.   I correct you, foreman or supervisor.

19   Foreman/supervisor.   He had the power to fire me.   He

20   told me what I did, he had control over me, so yeah.

21   Foreman, supervisor.   He was my supervisor.   You try and

22   reword it, but I mean that's -- that's what he was, my

23   supervisor.

24   Q.   That's what you believe he was.   Jason McLean

---

**52**

1    called human resources after the confrontation between

2    you and Mr. Dodson, correct?

3    A.   Correct.

4    Q.   Did you ever complain to anyone that Brad

5    Dodson referred to you as a yahoo?

6    A.   I didn't pay it no mind, until after that other

7    comment was said.   But I heard him say that directly to

8    me.

9    MR. HUGGETT:   That's all.

10   MR. POLIQUIN:   I have nothing else.

11   you can either waive signature or you can review it

12   before you sign it.   What would you want to do?

13   THE WITNESS:   I want to review it.

14   (Deposition concluded at 2:22 p.m.)

---

**53**

INDEX

DEPONENT: BRIAN COLEMAN          PAGE

Examination by Mr. Huggett        2

Examination by Mr. Poliquin      42

Examination by Mr. Huggett       51

EXHIBITS

DEFENDANT'S DEPOSITION EXHIBITS        MARKED

1.  Complaint and Warrant        16

2.  Employee Policy Manual       22

3.  Employee vacation form, 5/10/05   25

4.  Employee warning report, 6/20/06   36

ERRATA SHEET/DEPONENT'S SIGNATURE       54

CERTIFICATE OF REPORTER          55

---

14 (Pages 50 to 53)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| JASON MCLEAN and | ) | |
| BRIAN COLEMAN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No.: 06-617-SLR |
| | ) | |
| COMMUNICATIONS | ) | JURY TRIAL DEMANDED |
| CONSTRUCTION GROUP, LLC., | ) | |
| | ) | |
| Defendant. | ) | |

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on this 17th day of December 2007, I served electronically the

attached Plaintiffs' Answering Memorandum in Support of Denying Defendant's Motion

for Summary Judgment on the following parties:

> Michael B. Kelly, Esquire
> Daniel M. Silver, Esquire
> McCarter & English, LLP
> Renaissance Centre
> 405 N. King Street, 8[th] Floor
> Wilmington, DE 19801
>
> Thomas Benjamin Huggett, Esquire
> Courtney A. Wirth, Esquire
> Morgan, Lewis & Bockius, LLP
> 1701 Market Street
> Philadelphia, PA 19103

**YOUNG, MALMBERG & HOWARD, P.A.**

/s/ Ronald G. Poliquin
Ronald G. Poliquin, Esquire
I.D. No. 4447
30 The Green
Dover, DE 19901
(302) 672-5600
*Attorney for Plaintiffs*