IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JASON MCLEAN and
BRIAN COLEMAN,

                        **Plaintiffs,**

v.

COMMUNICATIONS CONSTRUCTION
GROUP, LLC,

                        **Defendant.**

CIVIL ACTION NO. 06-617 (SLR)

---

**DEFENDANT COMMUNICATIONS CONSTRUCTION GROUP, LLC'S
RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**

MCCARTER & ENGLISH LLP
Michael P. Kelly (DE Bar ID # 2295)
Daniel M. Silver (DE Bar ID # 4758)
Renaissance Centre
405 N. King St., 8th Floor
Wilmington, DE 19801
302.984.6301
302.984.2493 (fax)
mkelly@mccarter.com
dsilver@mccarter.com

Thomas Benjamin Huggett *(admitted pro hac vice)*
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
215.963.5191
215.963.5001 (fax)

*Attorneys for Defendant Communication
Construction Group, Inc.*

Date: December 17, 2007

## TABLE OF CONTENTS

I.    NATURE AND STAGE OF THE PROCEEDING..................................................... 1

II.   SUMMARY OF ARGUMENT ............................................................................... 1

III.  STATEMENT OF FACTS ...................................................................................... 2

      A.    CCG's Operations ...................................................................................... 2

      B.    The Alleged Racial Statement .................................................................... 2

      C.    The Investigation ....................................................................................... 4

      D.    The End of Plaintiffs' Employment With CCG........................................... 4

IV.   ARGUMENT .......................................................................................................... 5

      A.    Standard Of Review.................................................................................... 5

      B.    This Court Should Deny Plaintiffs' Motion for Partial Summary Judgment ........ 5

            1.    Plaintiffs Have Not Established Harassment That Was Pervasive
                  Or Regular.................................................................................... 6

            2.    A Material Issue of Fact Exists Regarding Whether CCG Can Be
                  Held Vicariously Liable For Brad Dodson's Conduct............................ 10

V.    CONCLUSION....................................................................................................... 14

## TABLE OF AUTHORITIES

Anderson v. Liberty Lobby, Inc.,
   477 U.S. 242 (1986)................................................................5

Andrews v. City of Phila.,
   895 F.2d 1469 (3d Cir. 1990).....................................................6

Bell v. Waste Management, Inc.,
   Civ. A. No. 03-992, 2004 WL 2451416 (D. Del. Oct. 29, 2004) .............8

Bolden v. PRC Inc.,
   43 F.3d 545 (10th Cir. 1994) ...................................................10

Brown v. Middaugh,
   41 F. Supp. 2d 172 (N.D.N.Y. 1999)............................................9

Burlington Industries, Inc. v. Ellerth,
   524 U.S. 742 (1998)..............................................................13

Burlington N. & Santa Fe Ry. Co. v. White,
   126 S.Ct. 2405 (2006).............................................................7

Celotex Corp. v. Catrett,
   477 U.S. 317 (1986)................................................................5

Charlton v. Paramus Bd. of Educ.,
   25 F.3d 194 (3d Cir. 1994).........................................................5

Daso v. Grafton Sch.,
   181 F. Supp. 2d 485 (D. Md. 2002) ............................................9

Faragher v. City of Boca Raton,
   524 U.S. 775 (1998)..............................................................12

Hall v. Bodine Electric Co.,
   276 F.3d 345 (7th Cir. 2002) ...................................................11

Harris v. Forklift System, Inc.,
   510 U.S. 17 (1993)...........................................................6, 7, 8

Hartwell v. Lifetime Doors, Inc.,
   Civ. A. No. 05-2155, 2006 WL 381685 (E.D. Pa. Feb. 16, 2006) ............8

Hotchkins v. Fleet Delivery Service,
   25 F. Supp. 2d 1141 (D. Ore. 1998)............................................9

Joens v. John Morrell & Co.,
  354 F.3d 938 (8th Cir. 2004) ................................................................................11

King v. City of Philadelphia,
  66 F. App'x 300 (3d Cir. 2003) ...............................................................................8

Kunin v. Sears Roebuck and Co.,
  175 F.3d 289 (3d Cir. 1999) .................................................................................13

Mack v. Otis Elevator Co.,
  326 F.3d 116 (2d Cir. 2003) .................................................................................11

McCray v. DPC Industries, Inc.,
  942 F. Supp. 288 (E.D. Tex. 1996) ...................................................................9, 10

Moore v. City of Philadelphia,
  461 F.3d 331 (3d Cir. 2006) ...................................................................................7

Sofia v. McWilliams,
  Civ. A. No. 01-5394, 2003 WL 1818414 (E.D. Pa. March 31, 2003) .....................11

Walker v. Pepsi-Cola Bottling Co.,
  Civ. A. No. 99-748, 2000 WL 1251906 (D. Del. Aug. 10, 2000) .............................8

**RULES**

Fed.R.Civ.P. 56 .........................................................................................................5

**STATUTES**

42 U.S.C. §§ 2000e .....................................................................................................1

## I.    NATURE AND STAGE OF THE PROCEEDING

On October 3, 2006, Plaintiff Jason McLean ("Mr. McLean") and Plaintiff Brian

Coleman ("Mr. Coleman") (collectively "Plaintiffs") filed the instant Complaint against

Defendants Communications Construction Group, LLC ("CCG"), Brad Dodson, Jonathan Gates,

and Mike Fender (the "Individual Defendants"), asserting racial harassment and discrimination

in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII")

("Count I"), retaliation in violation of Title VII ("Count II"), as well as an Equal Protection

Clause claim ("Count III"), a breach implied covenant of good faith and fair dealing claim

("Count IV"), and an assault and battery claim ("Count V"). After the filing of a joint motion for

dismissal of Counts III-V of the Complaint, as well as all claims against the Individual

Defendants, all that remains in this action is a racial harassment and discrimination claim. On

November 28, 2007, CCG moved for summary judgment on all remaining claims. On the same

date, Plaintiffs moved for partial summary judgment with respect to the racial harassment claim.

CCG now files its response in opposition to Plaintiff's motion for partial summary judgment.

## II.    SUMMARY OF ARGUMENT

1.    Plaintiffs are not entitled to summary judgment on their racial harassment claim.

2.    Plaintiffs have not produced sufficient evidence to support a prima facie case of

racial harassment that was pervasive or regular.

3.    A genuine issue of material fact exists only as to Plaintiffs' assertion that CCG

can be held liable for Brad Dodson's alleged conduct as an alleged supervisor.

### III.    STATEMENT OF FACTS

#### A.    CCG's Operations

CCG is a construction services company that provides services to the cable television and telephone industries. In May 2005, Plaintiffs worked for CCG at the New Castle, Delaware site. Mr. McLean and Mr. Coleman both worked on a crew with Brad Dodson, who was the crew foreman. (Exhibit 1 [Dodson Dep.] at 40:19-22). The crew foreman essentially runs the crew, deciding where to start the work assigned by his supervisor and giving daily feedback to his supervisor regarding production and how members of the crew are doing. (Exhibit 1 [Dodson Dep.] at 13:4-14). A crew foreman is also responsible for maintaining CCG's safety guidelines and equipment at the worksite. (Exhibit 2 [Fender Dep.] at 32:17-33:8). However, a foreman does not make the same types of decisions as a supervisor. (Exhibit 3 [Clements Dep.] at 30:5-20). For example, a foreman does not prepare evaluations for employees. [Exhibit 1 [Dodson Dep.] at 17:18-19:2). Plaintiffs' crew reported to Mike Fender ("Mr. Fender"), who had the job title Field Supervisor. (Exhibit 1 [Dodson Dep.] at 24:1-6). Mr. Fender reported to Dave Dodson, who worked as the Job Supervisor for the New Castle Delaware jobsite. (Exhibit 1 [Dodson Dep.] at 23:17-24:2).

#### B.    The Alleged Racial Statement

On May 31, 2005, Mr. McLean and Mr. Coleman were working for CCG out of its New Castle, Delaware site, digging holes to put in underground vaults and running for conduit lines between the vaults. (D.I. 1 ¶¶10 and 11; Exhibit 4 [McLean Dep.] at 11:20-23). Another CCG employee, Robert Koch ("Mr. Koch"), began a conversation with Plaintiffs about making money. (Exhibit 4 [McLean Dep.] at 10:6-14; Exhibit 5 [Coleman Dep.] at 11:11-17). At that time, Mr. Koch told Plaintiffs that during the prior week, he heard Brad Dodson make a comment allegedly referring to Mr. McLean and Mr. Coleman as "niggers." (D.I. 3 ¶14; Exhibit

2

4 [McLean Dep.] at 10:8-19; Exhibit 5 [Coleman Dep.] at 11:14-23; Exhibit 6 [Koch Dep.] at 10:18-11:22, 13:2-7). Joseph Tatsch ("Mr. Tatsch"), another CCG employee, was walking by Brad Dodson and Mr. Koch and he also allegedly heard Brad Dodson make the remark. (Exhibit 6 [Koch Dep.] at 10:23-11:22, Exhibit 7 [Tatsch Dep.] at 14:19-15:14). It is undisputed that Mr. McLean and Mr. Coleman were not present during this conversation and neither Plaintiff actually heard Brad Dodson make the alleged statement. (Exhibit 4 [McLean Dep.] at 13:17-19; Exhibit 5 [Coleman Dep.] at 11:24-12:3, 17:1-14). Rather, Mr. McLean and Mr. Coleman only heard the statement second hand from Mr. Koch who repeated it to them.

After Mr. Koch told Plaintiffs about the racial slur, Mr. McLean and Mr. Coleman left the spot where they were working and went to confront Brad Dodson. (Exhibit 4 [McLean Dep.] at 10:8-11:5). Brad Dodson, at that time, was working around the corner from where Plaintiffs were located and was drilling underneath the street. (Exhibit 4 [McLean Dep.] at 10:20-11:2). After being physically confronted by Plaintiffs, Brad Dodson got into an altercation with Mr. Coleman and apparently poked Mr. Coleman in the chest with a single finger, but he did not make any racial statements to Plaintiffs. (D.I. 3 ¶16; Exhibit 4 [McLean Dep.] at 10:20-11:5; Exhibit 5 [Coleman Dep.] at 13:3-18; 23:1-24:2). Only at that time, did Mr. McLean call Lisa Clements ("Ms. Clements"), CCG's Human Resources Manager and Mr. Coleman called the police. (Exhibit 4 [McLean Dep.] at 11:6-13). Brad Dodson called Dave Dodson to report the incident and Dave Dodson called Mr. Fender and told him to get to the jobsite. (Exhibit 1 [Dodson Dep.] at 23:10-13, 24:7-12). Mr. Fender arrived at the scene and tried to defuse the situation.

It is undisputed that aside from the May 31, 2005, neither Mr. McLean nor Mr. Coleman has identified any other instances of racial slurs made by CCG employees. (Exhibit 4 [McLean

Dep.] at 10:2-5; Exhibit 5 [Coleman Dep.] at 11:1-10; 39:8-21). Moreover, both Mr. McLean

and Mr. Coleman were promoted to foreman after the incident on May 31, 2005 and after their

complaints about the discriminatory statement. (Exhibit 4 [McLean Dep.] at 9:8-13, 31:22-32:1;

Exhibit 5 [Coleman Dep.] at 9:4-23).

**C.    The Investigation**

Ms. Clements, on behalf of CCG, promptly investigated the incident. (Exhibit 3

[Clements Dep.] at 21:2-8). In conducting her investigation, Ms. Clements interviewed all of the

individuals involved. (Exhibit 3 [Clements Dep.] at 23:22-24:1). Brad Dodson denied making

the racial statement. (Exhibit 3 [Clements Dep.] at 33:11-20). As a result of Ms. Clements'

investigation, Ms. Clements gave written warnings to Brad Dodson, Mr. Koch, Mr. McLean and

Mr. Coleman. (Exhibit 3 [Clements Dep.] at 28:3-11). Brad Dodson received a warning for

engaging in a physical altercation, Mr. Koch was written up for failing to report the alleged racial

statement per company policy and for inciting other employees by repeating the statement, and

Mr. McLean and Mr. Coleman each received a warning for failing to use CCG's Complaint

Procedure as stated in CCG's Harassment Policy and for leaving their work area to engage in a

physical confrontation with Brad Dodson. (Exhibit 8 [D0491, 486, 476, 481]). Plaintiffs were

immediately removed from Brad Dodson's crew and did not work on the same crew as him for

the remainder of their employment with CCG. (Exhibit 1 [Dodson Dep.] at 42:2-6; Exhibit 4

[McLean Dep.] at 23:12-23; Exhibit 5 [Coleman Dep.] at 27:7-9).

**D.    The End of Plaintiffs' Employment With CCG**

On July 6, 2005 – more than a month after the confrontation incident – Mr. McLean and

Mr. Coleman, along with other CCG employees, were transferred to a job site in West Chester,

Pennsylvania because the work for Verizon in New Castle was being cut and more work was

available in West Chester for another Verizon contract. (Exhibit 4 [McLean Dep.] at 37:22-38:5;

4

Exhibit 9 [Clements Decl.] at ¶ 2). The only individuals who participated in the decision to transfer Mr. McLean and Mr. Coleman to West Chester, PA for additional work were John Gates, Regional Manager, and Dave Dodson, Project Supervisor. (Exhibit 3 [Clements Dep.] at 41:24-42:7). Mr. McLean and Mr. Coleman were eventually laid off due to lack of work, along with five other CCG employees. (Exhibit 9 [Clements Decl.] at ¶ 3). This occurred on October 6, 2005, more than four months after the incident with Brad Dodson.

## IV.    ARGUMENT

### A.    Standard Of Review

The entry of judgment against a party is proper only when, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. See also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 327 (1986). Importantly, the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). Rather, a dispute must exist over a material fact. Id.; Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 197 (3d Cir. 1994). Applying this standard, the undisputed facts establish that Plaintiffs' are not entitled to summary judgment as a matter of law on their racial harassment claim.

### B.    This Court Should Deny Plaintiffs' Motion for Partial Summary Judgment

This Court should deny Plaintiffs' partial motion for summary judgment. First and foremost, Plaintiffs have failed to establish a prima facie case of racial harassment under Title VII as they have failed to adduce evidence of conduct which is pervasive or regular. They

5

instead present only evidence of a single statement which they themselves did not hear. Secondarily, assuming *arguendo* there were some legal support for their single utterance claim (which there is not), a material issue of fact exists as to whether Brad Dodson was a supervisor and consequently whether CCG can be held accountable on summary judgment for his alleged actions under the theory of respondeat superior liability.

1.    **Plaintiffs Have Not Established Harassment That Was Pervasive Or Regular**

Plaintiffs are not entitled to summary judgment as a matter of law with respect to their racial harassment claim because Plaintiffs have not produced sufficient evidence to support their initial burden of establishing a prima facie case of harassment under Title VII. As noted in CCG's Motion for Summary Judgment, to bring an actionable claim for harassment based on a hostile work environment, Plaintiffs must first establish, under the totality of the circumstances, that: (1) they suffered intentional discrimination because of their race; (2) the discrimination was pervasive or regular; (3) the discrimination detrimentally affected them; (4) the discrimination would have detrimentally affected a reasonable person of the same race in the same position; and (5) that respondeat superior liability exists. See Andrews v. City of Phila., 895 F.2d 1469, 1482 (3d Cir. 1990). Thus, to prevail on their claim for racial harassment, Plaintiffs must show that the workplace was "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [their] employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citations and quotations omitted).

Surprisingly, Plaintiffs make no mention of their prima facie burden in their brief in support of summary judgment. Instead, Plaintiffs simply make the bald legal assertion that "Bradley Dodson calling the plaintiffs 'two dumb lazy niggers' to two other co-workers and then

6

physically attacking Jason McLean qualifies as racial harassment under Title VII. See *Moore*."

D.I. 39, p.9. Interestingly, the only case referenced by Plaintiffs in support of their proposition,

Moore v. City of Philadelphia, 461 F.3d 331 (3d Cir. 2006), does not even involve a Title VII

hostile work environment claim. Rather, the issue in Moore was whether the defendants had

violated Title VII's anti-retaliation provisions by *inter alia* harassing plaintiffs in retaliation for

their involvement in a protected activity. Id. at 342. In Moore, the Third Circuit explicitly stated

that in considering workplace harassment in the context of a retaliation claim, the Court would

not consider whether such conduct was "severe or pervasive" enough to create a hostile work

environment, but instead would consider the conduct under a different standard, i.e., whether the

retaliatory harassment was "materially adverse" in that it "well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination." Id. at 341 (citing

Burlington N. & Santa Fe Ry. Co. v. White, 126 S.Ct. 2405 (2006)). As such, Plaintiffs citation

to Moore has no legal significance as to whether Plaintiffs suffered conduct that would qualify as

actionable "pervasive or regular" racial harassment under a Title VII hostile work environment

claim.

    In fact, Plaintiff's unsupported legal conclusion is **diametrically opposed** to well

established law regarding racial harassment claims. In analyzing hostile work environment

claims, federal courts will look to the totality of the circumstances including the "frequency of

the discriminatory conduct; its severity; whether it is physically threatening or humiliating, *or a*

*mere offensive utterance*; and whether it unreasonably interferes with an employee's work

performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993) (emphasis added). In

explaining a plaintiff's burden with respect to the second element of a prima facie case of

harassment (i.e., whether the conduct was pervasive or regular), the Supreme Court has held that

7

the "mere utterance of an . . . epithet which engenders offensive feelings in an employee does not

sufficiently affect the conditions of employment to implicate Title VII." Id. at 21. Indeed, the

principle that the mere utterance of the racial epithet "nigger" is insufficient to support a prima

facie Title VII harassment claim because such conduct is not "pervasive or regular" has been

widely accepted among courts of the Third Circuit. See King v. City of Philadelphia, 66 F.

App'x 300, 305 (3d Cir. 2003) (affirming summary judgment in favor of defendant and finding

that where plaintiff was called a "nigger" on one occasion and subject to one physically push and

one threat of sabotage to plaintiff's work record, these incidents were isolated and sporadic

incidents that did not demonstrate a pervasive atmosphere of harassment); Hartwell v. Lifetime

Doors, Inc., Civ. A. No. 05-2155, 2006 WL 381685, *11 (E.D. Pa. Feb. 16, 2006) (explaining

that "while the word nigger is morally repulsive, when it is used a single time it is not

sufficiently severe to show the existence of a hostile work environment"); Bell v. Waste

Management, Inc., Civ. A. No. 03-992, 2004 WL 2451416, * 7 (D. Del. Oct. 29, 2004) (granting

summary judgment for a defendant where plaintiff could only point to a single circumstance

where he was subjected to the word "nigger"); Walker v. Pepsi-Cola Bottling Co., Civ. A. No.

99-748, 2000 WL 1251906, *16 (D. Del. Aug. 10, 2000) (granting summary judgment for

defendant where plaintiff was called a "fucking nigger" because "[o]ne-time utterances of racial

epithets simply do not rise to the level of racial harassment). The principle that a single use of

the word "nigger" in the workforce is insufficient to support a hostile work environment claim is

also well established in courts outside of the Third Circuit. See Bolden v. PRC Inc., 43 F.3d 545,

551 (10th Cir. 1994) (affirming summary judgment for the employer on a Title VII harassment

claim where employee was called a "nigger" and was subject to a Ku Klux Klan comment

because such comments were "not pervasive" enough to be actionable); Daso v. Grafton Sch.,

8

181 F. Supp. 2d 485, 493 (D. Md. 2002) (granting summary judgment for the employer because a single incident in which supervisor yelled at the plaintiff, "Next time you all niggers lock the door, I'm going to write you up," was insufficient to create hostile work environment under Title VII); Walls v. Turano Baking Co., No. 01 C 3577, 2002 WL 31236406, at *3 (N.D. Ill. Oct. 1, 2002) (granting summary judgment for the employer because a supervisor's reference to plaintiff as "nigger" to a third-party which was overheard by plaintiff was insufficient to sustain a hostile work environment under Title VII); Brown v. Middaugh, 41 F. Supp. 2d 172, 187-88 (N.D.N.Y. 1999) (holding that were an employee was called at work "a nigger, lazy nigger, piece of shit nigger and good for nothing nigger" that the comments did not constitute behavior "sufficiently severe or pervasive such that plaintiff's hostile work environment claim can survive summary judgment"); Hotchkins v. Fleet Delivery Service, 25 F. Supp. 2d 1141, 1149 (D. Ore. 1998) (granting summary judgment for the employer on Title VII harassment claim where employees only evidence was that he was called a "nigger" by co-worker); McCray v. DPC Industries, Inc., 942 F. Supp. 288, 293 (E.D. Tex. 1996) (granting summary judgment for the employer where employee was called a "nigger" and was involved in a physical altercation with his foreman because such evidence does not constitute a hostile working environment)

The record evidence in this case is limited. Mr. Koch told Plaintiffs that on one occasion he heard Brad Dodson make a comment allegedly[1] referring to Mr. McLean and Mr. Coleman as "niggers." (Exhibit 4 [McLean Dep.] at 10: 8-19; Exhibit 4 [Coleman Dep.] at 11:14-23; Exhibit 6 [Koch Dep.] at 10:23-11:22, 13:2-7). It is undisputed that Mr. McLean and Mr. Coleman were

---

[1]    None of the testimony adduced during discovery stated that Brad Dodson identified Plaintiffs' by name and called them "niggers." Brad Dodson denied making the statement during CCG's contemporaneous internal investigation and was not deposed in this action. For purposes of its Motion for Summary Judgment - only, CCG assumed that Brad Dodson made the remark. CCG does not make such an assumption for Plaintiffs' Motion, rather it is their burden to prove the remark was made and that it was made in reference to Plaintiffs.

MEI 6993039v.1

not present during this conversation and neither Plaintiff actually heard Brad Dodson make the alleged statement. (Exhibit 4 [McLean Dep.] at 13:17-19; Exhibit 5 [Coleman Dep.] at 11:24-12:3, 17:1-14). It is also undisputed that aside from the incident on May 31, 2005, neither Mr. McLean nor Mr. Coleman have identified any other instances of alleged racial discrimination, nor did they report any other such incident to CCG during their employment. (Exhibit 4 [McLean Dep.] at 10:2-5; Exhibit 5 [Coleman Dep.] at 11:1-10; 23:1-22). This one incident – if it happened – is simply insufficient to prove that Plaintiffs were subject to harassment which was pervasive or regular. Moreover, the alleged "physical attack" consisted of nothing more than Brad Dodson poking a single finger in Mr. Coleman's chest after being physically confronted by Plaintiffs – and involved no racial statements by Brad Dodson whatsoever. (Exhibit 4 [McLean Dep.] at 10:20-11:5; Exhibit 5 [Coleman Dep.] at 13:3-18). Furthermore, a single racial comment and one physical altercation are simply insufficient to support a claim for hostile work environment. See McCray, 942 F. Supp. at 293 (granting summary judgment for the employer where employee was called a "nigger" and was involved in a physical altercation with his foreman because such evidence does not constitute a hostile working environment). For these reasons, Plaintiffs are not entitled to judgment as a matter of law with respect to their racial harassment claim. Thus, on this basis alone, Plaintiffs' Motion for Partial Summary Judgment should be denied and CCG's Motion for Summary Judgment granted.

## 2.    A Material Issue of Fact Exists Regarding Whether CCG Can Be Held Vicariously Liable For Brad Dodson's Conduct

Even assuming *arguendo* Plaintiffs have established that they were subject to harassment that was pervasive or regular, which they have not, the Court should still deny Plaintiffs motion for partial summary judgment because there is a genuine issue of material fact as to whether CCG can be held liable for Brad Dodson's alleged conduct under the theory of respondeat

superior liability.[2]  Plaintiffs claim in their brief that the test for employer liability for harassment

caused by a supervisor is as follows:

> "When the alleged harasser is a supervisor, Defendant employer is presumed to be
> absolutely liable for harassment under Title VII.  See *Faragher*.  An employer is
> subject to vicarious liability to a victimized employee for an actionable hostile
> environment created by a supervisor with immediate (or successively higher)
> authority over the employee.  See *Burlington Industries, Inc.*"

D.I. 39, p.11.  Neither the United States Supreme Court nor the Court of Appeals for the Third

Circuit has explicitly defined the term "supervisor" as it is used in the context of Title VII.

However, distinguishing between whether an individual is a co-employee or a supervisor is a

"fact-intensive inquiry in which the fact-finder must analyze the defendant employee's power

over the plaintiff's work situation." Sofia v. McWilliams, Civ. A. No. 01-5394, 2003 WL

1818414, *7 (E.D. Pa. March 31, 2003) (holding that the question of whether an employee was a

supervisor where he could directly recommend adverse job consequences and direct daily work

activity of plaintiff was a genuine issue of material fact for the jury).  Other Circuit Courts

considering the issue of who qualifies as a "supervisor" in the context of a Title VII hostile work

environment claim have found that to be considered a supervisor, "the alleged harasser must

have had the power (not necessarily exercised) to take tangible employment action against the

victim, such as the authority to hire, fire, promote, or reassign to significantly different duties."

Joens v. John Morrell & Co., 354 F.3d 938, 940 (8th Cir. 2004).  See also Hall v. Bodine Elec.

Co., 276 F.3d 345, 355 (7th Cir. 2002) (holding that a co-worker was not a supervisor where he

had the power to direct the employee's work operations, provide input into her evaluations, and

participate in her training).  But cf. Mack v. Otis Elevator Co., 326 F.3d 116, 127 (2d Cir. 2003)

---

[2]    CCG, in its opening motion for summary judgment, did not address the issue of respondeat
       superior liability because the record evidence of alleged harassment is so deficient that it
       does not even come close to establishing conduct that is "pervasive or regular" and thus no
       prima facie case has been made.  Thus, the instant dispute of fact regarding Brad Dodson's
       supervisory status in no way affects CCG's Motion for Summary Judgment.

(explaining the inquiry for whether an individual qualifies as a supervisor under Title VII as "whether the authority given by the employer to the employee enabled or materially augmented the ability of the latter to create a hostile work environment").

Here, Brad Dodson was the foreman of Plaintiffs' crew. (Exhibit 1 [Dodson Dep.] at 40:19-22). A crew foreman works directly with the crew performing the work assigned by his superior and giving daily feedback to his superior regarding production and how members of the crew are doing. (Exhibit 1 [Dodson Dep.] at 13:4-14). A crew foreman is also responsible for maintaining CCG's safety guidelines and equipment at the worksite. (Exhibit 2 [Fender Dep.] at 32:17-33:8). However, foremen do not make the same decisions as a supervisor would make. (Exhibit 3 [Clements Dep.] at 30:5-20). For example, a foreman does not prepare evaluations for employees. [Exhibit 1 [Dodson Dep.] at 17:18-19:2). Indeed, the exact extent of Brad Dodson's actual authority and control over Plaintiffs was not identified by Plaintiffs and has not been developed elsewhere in the record. Accordingly, a disputed issue of material fact exists as to whether Brad Dodson was Plaintiffs' supervisor.

Moreover, assuming *arguendo* Brad Dodson was Plaintiffs' supervisor, Plaintiffs have not presented sufficient evidence to prove that Brad Dodson's alleged harassment was causally connected to a "tangible employment action." Plaintiffs have conveniently failed to mention that an employer may raise an affirmative defense to liability where "no tangible employment action is taken." Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998). To establish the affirmative defense, an employer must prove: "(a) that the employer exercised reasonable care to prevent and correct promptly any [racially] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Id. The affirmative defense is not

available to the employer only when the supervisor's harassment causes a tangible employment action, such as discharge or demotion. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 762-63 (1998). With regard to harassment inflicted by a co-worker who is not a supervisor, an employer is only liable for such conduct if the plaintiff proves that the employer knew, or should have known, of the harassment and failed to take reasonable corrective action. See Kunin v. Sears Roebuck and Co., 175 F.3d 289, 293-94 (3d Cir. 1999).

It is undisputed that Brad Dodson did not participate in any tangible employment action as Plaintiffs were immediately removed from his crew following the incident and did not work on the same crew as him for the remainder of their employment with CCG. (Exhibit 1 [Dodson Dep.] at 42:2-6; Exhibit 4 [McLean Dep.] at 23:12-23; Exhibit 5 [Coleman Dep.] at 27:7-9). Indeed, the only individuals who participated in the decision to transfer Mr. McLean and Mr. Coleman to West Chester, PA for additional work were John Gates and Dave Dodson. (Exhibit 3 [Clements Dep.] at 41:24-42:7). Moreover, Plaintiffs have not shown as a matter of law that CCG failed to take reasonable corrective action. Upon learning of the incident, Ms. Clements, on behalf of CCG, promptly investigated the incident. (Exhibit 3 [Clements Dep.] at 21:2-8). In conducting her investigation, Ms. Clements interviewed all of the individuals involved in the incident and issued written warnings to several of the parties involved. (Exhibit 3 [Clements Dep.] at 23:22-24:1; Exhibit 8 [D0491, 486, 476, 481]). The record evidence clearly establishes that Brad Dodson took no adverse action against Plaintiffs, that Plaintiffs were promptly reassigned so that the did not have to work for him any further, and that he was give a written warning on following CCG's harassment policy with an express notation that future incidents could result in termination. These actions constitute a reasonable corrective action. Any dispute regarding that conclusion is a dispute regarding a material fact critical to whether CCG can be

held liable for Brad Dodson's alleged conduct and precluding summary judgment for Plaintiffs on the issue of respondeat superior liability.

## V.    <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs partial motion for summary judgment should be denied and CCG's Motion for Summary Judgment should be granted.

Respectfully submitted,

/s/ Daniel M. Silver .
Michael P. Kelly (DE Bar ID # 2295)
Daniel M. Silver (DE Bar ID # 4758)
McCarter & English LLP
Renaissance Centre
405 N. King St., 8th Floor
Wilmington, DE  19801
302.984.6301
302.984.2493 (fax)
mkelly@mccarter.com
dsilver@mccartre.com

Thomas Benjamin Huggett *(admitted pro hac vice)*
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103-2921
215.963.5191
215.963.5001 (fax)
tbhuggett@morganlewis.com

Attorneys for Defendant
Communications Construction Group, LLC

Date: December 17, 2007

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


JASON McLEAN and BRIAN COLEMAN,    )
                                  )
        Plaintiffs,      )
                                  )   Civil Action
v.                             )   No. 06-617-SLR
                                  )
COMMUNICATIONS CONSTRUCTION GROUP,)
LLC.,                             )
                                  )
        Defendant.      )


        Deposition of DAVID E. DODSON taken
pursuant to notice at the law offices of Young &
Malmberg, P.A., 30 The Green, Dover, Delaware,
beginning at 1:00 p.m. on Friday, September 14, 2007,
before Christina M. Vitale, Certified Shorthand
Reporter and Notary Public.

APPEARANCES:

      RONALD G. POLIQUIN, ESQUIRE
      YOUNG MALMBERG & HOWARD, P.A.
        30 The Green
        Dover, Delaware  19901
        For the Plaintiffs

      THOMAS BENJAMIN HUGGETT, ESQUIRE
      MORGAN LEWIS & BOCKIUS LLP
        1701 Market Street
        Philadelphia, Pennsylvania   19103-2921
        for the Defendant


              WILCOX & FETZER

1330 King Street -  Wilmington, Delaware 19801

             (302) 655-0477

             www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters



David E. Dodson

2

1          DAVID E. DODSON, the deponent herein,

2    having first been duly sworn on oath, was examined and

3    testified as follows:

4    BY MR. POLIQUIN:

5     Q.    Good morning, Mr. Dodson, my name is Ron

6    Poliquin and I'll be taking your deposition today.

7    Have you ever had a deposition taken previous to this

8    deposition?

9     A.    No.

10     Q.    Do you understand the procedures for taking

11    your deposition?

12     A.    Not really.

13     Q.    Do you understand that you have been placed

14    under oath and you have an obligation to testify

15    truthfully?

16     A.    Yes.

17     Q.    Do you understand that even though we are in an

18    informal conference room your testimony here has the

19    same effect as if you were testifying in front of a

20    judge or a jury?

21     A.    Yes.

22     Q.    Do you understand that the court reporter will

23    take down everything that is said during the

24    deposition and that testimony will be transcribed into

David E. Dodson

13

1   they normally do.  I don't know his exact job duties,

2   but it would be running a crew of I don't know how

3   many guys right now.  Easy three to six guys.

4      Q.   You say "running a crew," is that usually what

5   a foreman does is run a crew?

6      A.   Correct.

7      Q.   What other job duties generally does a foreman

8   have?

9      A.   They basically decide -- like I would give them

10  the work and they decide where they're starting and

11  what they're going to do on that day, stuff like that.

12     Q.   Would they give you feedback as to --

13     A.   They give us a daily as to what they completed

14  that day.

15     Q.   And would they give you feedback on members of

16  their crew and how they were doing?

17     A.   Yes.

18     Q.   And would they tell you if a crew member was

19  not working out or was doing well?

20     A.   Usually, yeah, they would.

21     Q.   What does David Dodson, Senior do?

22     A.   Mechanic.

23     Q.   How is he related to you?

24     A.   Father.



David E. Dodson

17

1    A.    Bachelor of science.

2    Q.    Where did you work after obtaining your degree?

3    A.    Blair County sheriff's department.

4    Q.    How long did you work there for?

5    A.    Approximately two years.

6    Q.    Why did you leave?

7    A.    Better opportunities with CCG I thought.

8    Q.    Why did you think you had a better opportunity

9    with CCG?

10    A.    Most of the guys working for CCG were running

11    around in new vehicles, I guess, making lots of money

12    I think for our area.

13    Q.    Who did you know that worked at CCG at the

14    time?

15    A.    My father worked at CCG.  My brother worked at

16    CCG.  Rob Dodson worked at CCG.  Mike Shoop I think

17    worked there then.  I'm not sure, I can't remember.

18    Q.    Have you ever participated in evaluating an

19    employee at CCG?

20    A.    Yes.

21    Q.    And how does that process work?

22    A.    They send -- human resources sends paperwork

23    out and gives you a list of stuff and it's a number

24    system between one and I think five to that extent.

David E. Dodson

18

1    You just evaluate different areas on where they're at

2    on the scale and there is a place for comments and

3    stuff like that.

4        Q.    And in what capacity did you participate in

5    evaluations, at your current position or previous

6    position?

7        A.    No, my current position.

8        Q.    How would you go ahead and evaluate a member of

9    a crew?

10       A.    As far as?

11       Q.    How would you decide how to put which numbers

12   to it?

13       A.    Just go by what they were asked and like -- and

14   just use the knowledge I had.  If it's vague, like

15   another supervisor knew more about them, I might

16   consult them and see what their thoughts were on it.

17       Q.    Would you consult with a supervisor that had

18   the most direct contact with that employee usually?

19       A.    Correct, correct.

20       Q.    And did you ever consult with a foreman?

21       A.    Yes, if it was a ground hand or somebody below

22   the foreman that I was evaluating.

23       Q.    And that would be something that you would talk

24   to a foreman about about how this crew member was

David E. Dodson

19

1   doing?

2   A.   Correct.

3   Q.   And after the evaluation would there be a

4   recommendation for a raise or promotion perhaps?   What

5   was the purpose of that evaluation?

6   A.   What is that?

7   Q.   What was the purpose of that?

8   A.   It's usually they're yearly evaluations.   It's

9   just to gauge where they're at and it would be -- you

10  could suggest if they should be increased, stay the

11  same, as far as wages.   Yeah, you didn't have final

12  decision or anything on that, but basically yearly

13  evaluation to gauge where they're at.

14  Q.   Sometimes would there be a recommendation that

15  this person, individual, get a raise?

16  A.   Yes.

17  Q.   Can you describe was Brad Dodson a good

18  employee with CCG?

19  A.   Yes.

20  Q.   And what is your basis for that statement?

21  A.   As far as workload and stuff like that he

22  carried a good workload and was able to get things

23  done in a timely basis with minimal supervision.

24  Basically dependable as far as being on time to work,

David E. Dodson

23

1   Dodson?

2          MR. HUGGETT:   Objection.   Just to clarify

3   you are asking him what he was involved in?

4   BY MR. POLIQUIN:

5     Q.    I'm asking if you can describe the events that

6   happened that day.

7     A.    That was the first day, that was the day that

8   the allegations took place?

9     Q.    Correct.

10    A.    The first I heard about it Brad called me, told

11  me that Brian, Brian and Jason, came up to him -- up

12  to Frank and was yelling and screaming and he told me

13  I needed to get out there right away.

14    Q.    And he called you on -- what did he call you

15  on?

16    A.    I believe it was Nextel, which is a two-way.

17    Q.    On that date what was your position with the

18  company?

19    A.    Job supervisor.

20    Q.    And were you the supervisor for that particular

21  job?

22    A.    For?

23    Q.    The job that Bradley Dodson, Jason McLean and

24  Brian Coleman were doing.

David E. Dodson

24

1    A.    With my duties I'm the supervisor over all the

2    jobs.    I do have a field supervisor, which is under

3    me.

4    Q.    Who is the field supervisor?

5    A.    The one that would have been with those -- in

6    charge of those guys would have been Mike Fender.

7    Q.    And did Bradley Dodson say anything else to you

8    over the telephone?

9    A.    Not that I can recall.

10    Q.    Did you ask him any questions?

11    A.    No.    I got off the phone and I called Mike

12    Fender to go out there.

13    Q.    And how long between the phone call that you

14    received from Bradley Dodson and the time that you

15    eventually came to the incident that happened?

16    A.    I don't recall 100 percent, but I would say it

17    was within an hour.

18    Q.    Where were you at the time you received the

19    phone call?

20    A.    At our field office.

21    Q.    Where is the field office at?

22    A.    It was in New Castle, Delaware.

23    Q.    And where was Bradley Dodson at?

24    A.    I don't recall the address.    I would have to --

David E. Dodson

40

1    (Dodson Deposition Exhibit No. 5 was marked

2  for identification.)

3  BY MR. POLIQUIN:

4    Q.   This is an investigation form after an

5  interview with Brad Dodson concerning an incident that

6  took place May 31st, '05.  On Page Two it states, "A

7  while back, Dave wrote Brian and Jason up for poor

8  work quality and Jason for not showing up to work one

9  day."

10    A.   I don't remember it.  I don't remember that.

11    Q.   That could be confirmed or verified easily?

12    A.   Yeah, there would be documents, correct.

13    Q.   Since Brad Dodson was the foreman of Brian

14  Coleman and Jason McLean that day was it appropriate

15  for Brian Coleman to report an incident of harassment

16  to Bradley Dodson as the foreman?

17    A.   Will you repeat that question one time for me,

18  please.

19    Q.   Bradley Dodson was Jason McLean and Brian

20  Coleman's foreman at the time on May 31st, 2005, is

21  that correct?

22    A.   His foreman, correct.

23    Q.   So, was it appropriate for Brian Coleman to

24  approach Bradley Dodson concerning this alleged

David E. Dodson

42

1    guess.  He took a job back home.

2    Q.    After this incident, Bradley Dodson, was he

3    transferred to another job site?

4    A.    Yes.

5    Q.    Where was he transferred to?

6    A.    He was transferred to a Pennsylvania job.

7    Q.    Was that in West Chester?

8    A.    I believe so, yes.

9    Q.    And do you know how long he was there for?

10   A.    I think he was there for the duration of that

11   job.  I'm not 100 percent sure how long that was,

12   though.

13   Q.    Do you know where he was transferred after that

14   Pennsylvania job?

15   A.    He was transferred to New York.

16   Q.    What type of job was that?

17   A.    That was a Cable TV job.  Still pulling the

18   same thing, underground cable.

19   Q.    And do you know how long he was there for?

20   A.    I think three to four months.  I'm not 100

21   percent sure, though.

22   Q.    And did he resign after the job in New York or

23   was he transferred?

24   A.    During the -- no, he resigned at that point.

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


JASON McCLEAN and BRIAN COLEMAN,    )
                                    )
          Plaintiffs,               )
                                    )    Civil Action
v.                                  )    No. 06-617-SLR
                                    )
COMMUNICATIONS CONTRUCTION GROUP,   )
LLC,                                )
                                    )
          Defendant.                )


          Deposition of MICHAEL B. FENDER taken
pursuant to notice at the law offices of Morgan, Lewis
& Bockius, LLP, 1701 Market Street, Philadelphia,
Pennsylvania,  beginning at 9:30 a.m. on Wednesday,
September 19, 2007, before Christina M. Vitale,
Certified Shorthand Reporter and Notary Public.

APPEARANCES:

        RONALD G. POLIQUIN, ESQUIRE
        YOUNG MALMBERG & HOWARD, P.A.
          30 The Green
          Dover, Delaware  19901
          For the Plaintiffs

        COURTNEY A. WIRTH, ESQUIRE
        MORGAN LEWIS & BOCKIUS, LLP
          1701 Market Street
          Philadelphia, Pennsylvania  19103
          For the Defendant



              WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801

            (302) 655-0477

            www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters



2

1           MICHAEL B. FENDER, the deponent herein,

2   having first been duly sworn on oath, was examined and

3   testified as follows:

4   BY MR. POLIQUIN:

5     Q.    Good morning, Mr. Fender, my name is Rob

6   Poliquin.  I will be taking your deposition today.  Do

7   you know what a deposition is?

8     A.    Yes.

9     Q.    And do you understand that you have been placed

10  under oath and that you have on obligation to testify

11  truthfully?

12    A.    Yes.

13    Q.    Do you understand even though we are in a

14  conference room here your testimony has the same force

15  and effect as if you were testifying in a court of law

16  before a judge or a jury?

17    A.    Yes.

18    Q.    Do you understand that the court reporter will

19  be taking down everything that is said during the

20  deposition and that that testimony will be transcribed

21  into booklet form and read like a script?

22    A.    Yes.

23    Q.    And since she is transcribing your words please

24  do not give inaudible responses such as nods or if you

Michael B. Fender

32

1    A.    Project supervisor.

2    Q.    And what is his relation to Brad Dodson?

3    A.    What is his relation?

4    Q.    Yes.

5    A.    You mean as far as work or as far as personal

6    life?

7    Q.    Work.

8    A.    I guess technically he would be Brad's boss.

9    Q.    Would he be pretty much everybody's boss on a

10   job site?

11   A.    By "he" you mean Dave Dodson?

12   Q.    Dave Dodson, yes.

13   A.    Yes.

14   Q.    Would he be Brian Coleman's and Jason McLean's

15   boss?

16   A.    Not directly.

17   Q.    Who would be their direct boss?

18   A.    The direct boss would be Brad Dodson.

19   Q.    As direct boss what were his duties and

20   responsibilities?

21   A.    As "he" being Brad Dodson's duties?

22   Q.    Yes.

23   A.    To maintain a proper and safe work site.

24   Q.    Anything else?



**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

Michael B. Fender

33

1    A.    Maintain our safety guidelines, maintain our

2    production guidelines, to make sure responsibilities

3    go out right for maintaining equipment, trucks, to be

4    in charge of gathering information for payroll

5    information, for work site detail.

6    Q.    And he held the position of a foreman on May

7    31st, 2005?

8    A.    That's correct.

9    Q.    And essentially he was the boss of a crew of

10   men?

11   A.    That's correct.

12   Q.    So, he in essence was in charge of these men?

13   A.    Yes.

14   Q.    Have you ever participated in evaluations of

15   employees?

16   A.    Of employees in general?

17   Q.    Yes.

18   A.    Yes.

19   Q.    And can you describe how the evaluation process

20   works.

21   A.    The physical evaluation or the mental

22   evaluation?  It's two parts.

23   Q.    When I say "evaluation," is there an evaluation

24   done on how an employee is doing essentially?

# EXHIBIT 3

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


JASON McCLEAN and BRIAN COLEMAN,    )
                                    )
          Plaintiffs,               )
                                    )    Civil Action
    v.                              )    No. 06-617-SLR
                                    )
COMMUNICATIONS CONTRUCTION GROUP,   )
LLC,                                )
                                    )
          Defendant.                )


          Deposition of LISA CLEMENTS taken
pursuant to notice at the law offices of Morgan, Lewis
& Bockius, LLP, 1701 Market Street, Philadelphia,
Pennsylvania,  beginning at 1:06 P.m. on Wednesday,
September 19, 2007, before Christina M. Vitale,
Certified Shorthand Reporter and Notary Public.

APPEARANCES:

          RONALD G. POLIQUIN, ESQUIRE
          YOUNG MALMBERG & HOWARD, P.A.
            30 The Green
            Dover, Delaware  19901
            For the Plaintiffs

          COURTNEY A. WIRTH, ESQUIRE
          MORGAN LEWIS & BOCKIUS, LLP
            1701 Market Street
            Philadelphia, Pennsylvania  19103
            For the Defendant



          WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801

          (302) 655-0477

          www.wilfet.com



**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters



Lisa Clements

2

1            LISA CLEMENTS, the deponent herein, having

2      first been duly sworn on oath, was examined and

3      testified as follows:

4      BY MR. POLIQUIN:

5        Q.   Ms. Clements, have you spoken with your

6      attorney regarding the procedures for a deposition?

7        A.   Yes.

8        Q.   Do you understand you are under oath and you

9      are obligated to testify truthfully?

10       A.   Yes.

11       Q.   Even though we are sitting here in a conference

12     room your testimony has the same force and effect as

13     if you were testifying in a court of law.

14       A.   Yes.

15       Q.   Do you understand that the court reporter will

16     take down everything you say during the deposition and

17     that that testimony will be transcribed into a booklet

18     form?

19       A.   Yes.

20       Q.   And please understand that because everything

21     is verbal answer all your questions verbally meaning

22     no nods with the head, no shaking, everything has to

23     be communicated verbally.

24       A.   Yes.



Lisa Clements

21

1  McLean had actually contacted me first.

2     Q.    Can you describe what your investigation --

3  what the findings of your investigation were

4  concerning what happened on May 31st, 2005?

5     A.    The findings of my investigation or what Jason

6  had told me?

7     Q.    You conducted an investigation?

8     A.    I did conduct an investigation, yes.

9     Q.    Let me start over.  Jason McLean had

10  represented to you that Brad Dodson had referred to

11  himself and Brian Coleman as two dumb niggers?

12     A.    That is correct.

13     Q.    In your investigation when you interviewed Bob

14  Koch concerning that investigation, he confirmed that

15  statement, is that correct?

16     A.    Yes, he admitted that he had heard, overheard,

17  that statement made by Brad Dodson.

18     Q.    Did you find any reason during your

19  investigation that Mr. Koch would be lying about that?

20     A.    I can't say that it was true or not true

21  because I didn't hear the comment myself.  That was

22  based on what Mr. Koch --

23     Q.    That wasn't my question.  Did you find any

24  reasons why Mr. Koch would be lying about that?

Lisa Clements

23

1 incident happened?

2    A.    No, I believe it was just Jason.

3    Q.    Were you told anything about how you should go

4 about conducting the investigation into this complaint

5 of racial harassment?

6    A.    No.

7    Q.    Were there any restrictions placed on your

8 investigation?

9    A.    No.

10    Q.    And you could have interviewed anyone you

11 wanted to in connection with the investigation, is

12 that correct?

13    A.    Yes.

14    Q.    And you could look at any documents you wanted

15 to in connection with the investigation, is that

16 correct?

17    A.    Yes.

18    Q.    Were there any time limits placed on your

19 investigation?

20    A.    Just my own to make sure that it was done

21 sooner than later.

22    Q.    What steps did you take, if any, prior to

23 meeting with Jason McLean and Brian Coleman?

24    A.    I conducted phone interviews with all

Lisa Clements

24

1    individuals involved.

2      Q.    Did you review Brian Coleman's personnel file?

3      A.    No, that was not done until after my

4    investigation face-to-face with the plaintiffs.

5      Q.    Did you review Jason McLean's personnel file?

6      A.    Again, it was done after the investigation

7    on-site.

8      Q.    You had became aware that Brad Dodson was

9    arrested concerning events that happened on May 31st,

10   2005?

11     A.    I was aware of that, yes.

12     Q.    Are you aware that Brad Dodson did not

13   represent to the police that he didn't make the

14   statement that Brian Coleman and Jason McLean were two

15   dumb niggers?

16     A.    I'm not aware of anything regarding that.

17     Q.    Did you follow-up with the police, what the

18   result of the police arrest of Brad Dodson was?

19     A.    No.

20     Q.    Why not?

21     A.    Because it was regarding Brad individually.  It

22   wasn't against the company.

23     Q.    But it involved the incident that we are

24   talking about that is the basis of this lawsuit, is

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Lisa Clements

28

1  Dodson?

2  A.   I don't believe that's correct.

3  Q.   What punishment did Brad Dodson receive after

4  your investigation?

5  A.   He received a written warning.

6  Q.   What punishment did Brian Coleman receive after

7  your investigation?

8  A.   A written warning.

9  Q.   What punishment did Jason McLean receive after

10  your investigation?

11  A.   A written warning.

12  Q.   So, they received the same type of punishment,

13  a written warning?

14  A.   They received -- they all receive written

15  warnings, however, the individual that was on the

16  written warning is different.  They were written up

17  for different things.

18  Q.   Other than the actual way the warning was

19  written was there any other punishment to Brad Dodson?

20  A.   No.

21       MR. POLIQUIN:  If I could have this marked.

22       (Clements Deposition Exhibit No. 2 was

23  marked for identification.)

24



Lisa Clements

30

1    employees, being in supervision"?

2        A.    Just because I use that term as --

3        Q.    But he does supervise employees?

4        A.    -- as a vague term.  I'm sorry?

5        Q.    He does supervise employees?

6        A.    He is in charge of a crew.  He is a foreman of

7    a crew.

8        Q.    And he is a supervisor for that crew?

9        A.    No, he is a foreman.

10       Q.    Does he supervise that crew?

11       A.    Not in the meaning that a supervisor -- not in

12   the same meaning as a supervisor.  He doesn't make

13   decisions.

14       Q.    When you say being in supervision, what do you

15   mean by that?

16       A.    Just being in charge of a group of people.

17       Q.    Your testimony here today is that a foreman

18   never makes any decisions?

19       A.    The foreman does not make the same decisions as

20   a supervisor would make.

21       Q.    When you say "supervisor," what exactly are you

22   referring to?

23       A.    Field supervisor, project supervisor.

24       Q.    You are referring to in the sense that they

Lisa Clements

33

1  Q.   At the end of the day when you came up with

2  your conclusions did you not believe Bob Koch and

3  Joseph Tatsch?

4  A.   I still didn't -- can you rephrase that

5  question?

6  Q.   Did you not believe Joseph Tatsch and Bob Koch

7  when they told you they heard Brad Dodson refer to

8  Jason McLean and Brian Coleman as two dumb niggers?

9  A.   I did and I didn't because of -- I did and I

10 didn't believe them.

11 Q.   What was the purpose of your investigation?

12 A.   The purpose of my investigation was to find out

13 what actually had happened.

14 Q.   And would that include finding out whether, in

15 fact, Brad Dodson made the statement?

16 A.   Yes.

17 Q.   And your conclusion was that he did not make

18 the statement?

19 A.   My conclusion was that according to Brad he did

20 not make the statement.

21 Q.   And that was after listening to both Bob Koch

22 and Joseph Tatsch?

23 A.   Correct.

24 Q.   What was your basis for giving Jason McLean and

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Lisa Clements

41

1    A.    I don't remember.

2    Q.    Would that be something in your investigative

3    report?

4    A.    Yes.

5    Q.    So, if it's not in your investigative report,

6    you probably didn't attempt to call the officer, is

7    that correct?

8    A.    Yes, it may be.

9    Q.    Let me show you what was attached as Exhibit 3

10   in plaintiffs' complaint.

11                MR. POLIQUIN:  Would you mark that, please.

12                (Clements Deposition Exhibit No. 4 was

13   marked for identification.)

14   BY MR. POLIQUIN:

15   Q.    I'm looking at page two of the police report

16   concerning the incident of May 31, 2005.  If you could

17   look under statement of suspect, Brad Dodson, I

18   believe it's the third sentence in parentheses.

19   A.    (Witness complies.)

20   Q.    Does that represent that Brad Dodson did not

21   deny making the statement dumb fucking niggers when he

22   was interviewed by the police officer?

23   A.    It says he did not admit or deny.

24   Q.    After May 31st, 2005 were you involved in any

Lisa Clements

42

1    decision-making to transfer Brad Dodson, Brian Coleman

2    or Jason McLean?

3      A.    No, I was not.

4      Q.    Who decided where those employees would be

5    transferred?

6      A.    The regional manager, John Gates, and the

7    project supervisor, Dave Dodson, Junior.

8      Q.    Dave Dodson is brothers with Brad Dodson, is

9    that correct?

10     A.    That is correct.

11     Q.    And you didn't feel it was inappropriate for

12   Dave Dodson to be part of those decisions since he was

13   closely related to Brad Dodson?

14     A.    No, because Dave Dodson is our project

15   supervisor and he maintains that position whether it's

16   his brother or not.

17     Q.    As somebody with a degree in HR management you

18   don't see any conflict of interest in having Dave

19   Dodson participate in this decision?

20     A.    I didn't even know the decision was being made.

21     Q.    So, no one asked you?

22     A.    No.

23     Q.    Do you think you should have been consulted on

24   a decision like this?

# EXHIBIT 4

```
        IN THE UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF DELAWARE


JASON McLEAN and              )
BRIAN COLEMAN,                )
                             )   C.A. No. 06-617 SLR
                Plaintiffs,  )
                             )
 -vs-                        )
                             )
COMMUNICATIONS CONSTRUCTION  )
GROUP, LLC,                  )
                             )
                Defendant.   )



            Deposition of JASON McLEAN taken pursuant
to notice at the law offices of Young, Malmlberg &
Howard, 30 The Green, Dover, Delaware, beginning at 9:13
a.m. on September 13, 2007, before Julianne LaBadia,
Registered Diplomate Reporter and Notary Public.


APPEARANCES:

            RONALD POLIQUIN, ESQ.
            YOUNG, MALMBERG & HOWARD
              30 The Green
              Dover, Delaware  19901
              For the Plaintiff


            THOMAS BENJAMIN HUGGETT, ESQ.
            MORGAN, LEWIS & BROCKIUS, LLP
              1701 Market Street
              Philadelphia, Pennsylvania  19103
              For the Defendant

              WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
              (302) 655-0477
              www.wilfet.com
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

## ORIGINAL

Jason McLean

2

1                  JASON MCLEAN

2          The deponent herein, having first been

3          duly sworn on oath, was examined and

4          testified as follows:

5                  DIRECT EXAMINATION

6   BY MR. HUGGETT:

7       Q.    Would you state your name for the record,

8   please.

9       A.    Jason A. McLean.

10      Q.    And where do you reside, Mr. McLean?

11      A.    In Dover.

12      Q.    And what address?

13      A.    324 East Broad Stairs, Dover, Delaware 19904.

14      Q.    How long have you lived at that address?

15      A.    About six months.

16      Q.    Where did you reside prior to that?

17      A.    1266 South Farmview Drive, Dover, Delaware

18  19904.

19      Q.    And how long did you reside there?

20      A.    22 years.

21      Q.    I would take that it's your parents' house?

22      A.    Exactly.

23      Q.    We are here today to take your deposition.

24  Have you ever been deposed before?

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

Jason McLean

9

1     Q.    Did you hold any position after you were an

2   operator?

3     A.    Foreman position.

4     Q.    And how long did you hold that position?

5     A.    The remainder of the time.

6     Q.    That would be about five months?

7     A.    Sure, yeah.

8     Q.    Do you recall specifically when you were

9   promoted to foreman?

10    A.    Not the exact date, no.

11    Q.    Do you recall if that was after you made the

12  complaint of discrimination that's at issue in this case?

13    A.    Yes.

14    Q.    Is it correct that the issues that you're

15  bringing in this case begin on May 31 of 2005, when Brad

16  Koch told you about a comment supposedly made by Brad

17  Dodson -- or I'm sorry.  Robert Koch told you about a

18  comment supposedly made by a Brad Dodson?

19    A.    Can you repeat the whole question one more

20  time?

21          (Question read)

22    A.    Yes.

23    Q.    And that comment was allegedly a racial

24  comment?



Jason McLean

10

1     A.    Yes.

2     Q.    Had anything occurred prior to May 31 of 2005,

3     in your employment with CCG, that you think is of any

4     significance to this matter?

5     A.    No.

6     Q.    All right.  In your own words, if you would,

7     can you tell me what happened on May 31 of 2005.

8     A.    I was digging a hole in the neighborhood that

9     we were working in, and Robert Koch rode by on a -- on a

10    machine, and he stopped.  We had a conversation.

11              The conversation consisted of we were

12    talking about how nobody was making any money.  He stated

13    that, "You wouldn't believe what Brad said about you last

14    week."

15              Then I asked him what he said.  He said --

16    "We were talking that -- we were having the same

17    conversation.  At that time, he said, 'yeah, nobody is

18    making any money, but at least you don't have to work

19    with two dumb niggers,'" quote, unquote.

20              At that time we approached Mr. Dodson.  He

21    was drilling --

22    Q.    When you said "we," who are you referring to?

23    A.    Brian Coleman and I approached Mr. Dodson, who

24    was drilling underneath the street, around the corner

Jason McLean

11

1  from where we were.  We asked him if he made the

2  statement.  He jumped off his machine, furious, started

3  waving his finger in my face, and then Brian's face, and

4  then him and Brian got into a verbal altercation, and he

5  started poking Brian in his chest.

6         At that time, I called Lisa Clemens, the HR

7  representative, the only phone number of anybody I had

8  from the company, other than Brad.  I explained to her

9  what was going on at the present time.  After that

10 confrontation, Brian called the police.  After I got off

11 the phone with Lisa, Brad's brother Dave, the site

12 supervisor, and Mike Fender arrived on scene.  That was

13 my first time meeting Mike Fender.

14        They tried to resolve the situation by

15 having us shake hands and go back to work.  I stated that

16 that wouldn't work, because there's been some wrong

17 doings done.  The police then arrived and took statements

18 from everybody involved, and then the day was over and we

19 went home.

20    Q.   Okay.  Let me go back through, get a little

21 more detail on some of that.  You said you were digging a

22 hole.  What were you digging a hole for?

23    A.   Put in an underground vault.

24    Q.   And is that the normal work that you were doing

Jason McLean

13

1      Q.    So, depending on the type of work that's being

2   done by the company, different amounts of money can be

3   made by employees?

4      A.    Yes.

5      Q.    Can you tell me to the best of your

6   recollection exactly what Mr. Koch said, after that,

7   about Mr. Dodson?

8      A.    Exactly what I said.

9      Q.    How did he make the transition from talking

10   about not making money to repeating this alleged

11   statement?

12      A.    There was no transition.  He just came right

13   out and said it.

14      Q.    Why did he do that?

15      A.    He's one of our friends.  I would consider him

16   a friend.

17      Q.    You weren't present for this comment allegedly

18   made by Brad Dodson?

19      A.    No.

20      Q.    This was the first time that you had heard

21   about it?

22      A.    Yes.

23      Q.    You didn't know whether, in fact, Mr. Dodson

24   had said this?



WILCOX & FETZER LTD.
Registered Professional Reporters

Jason McLean

23

1      Q.    If you were to be asked by the police your

2    race, would you say White?

3      A.    And Black.

4      Q.    So you would agree this report is not entirely

5    accurate?

6      A.    I would agree.

7      Q.    You said that after the police took statements,

8    everyone went home for the day?

9      A.    In my recollection, yes.

10     Q.    And that was at the direction of Mr. Fender?

11     A.    Yeah.

12     Q.    What happened after May 31?

13     A.    Continued to work.

14     Q.    Did you work on that same crew?

15     A.    No.

16     Q.    To whose crew did you go?

17     A.    That day after, nobody's.

18     Q.    And why not?

19     A.    I don't know.

20     Q.    Did you want to go back to Mr. Dodson's crew?

21     A.    I wouldn't have had a problem with it.

22     Q.    Who told you not to go back to that crew?

23     A.    Mike Fender.

24     Q.    And what did you do the day after?

Jason McLean

31

1       Q.    Do you recall seeing the rate schedules?

2       A.    Yes.

3             (McLean Exhibits 3 and 4 marked)

4    BY MR. HUGGETT:

5       Q.    I've marked as Exhibit 3 the rate schedule for

6    Delaware FIOS work.  Is that the rate schedule that you

7    have previously seen?

8       A.    No.  Never seen this piece of paper before.

9       Q.    Okay.  Can you describe what you've seen?

10      A.    I seen a copy of just a brief rundown on the

11   back of my paycheck of what you get paid per foot.

12      Q.    Is that this document?

13      A.    It might be.  It looks like a copy.  I don't

14   remember seeing anything like this, but it was similar.

15      Q.    Exhibit 4 is marked the southeast PA FIOS drops

16   for Pennsylvania rate schedule.  Have you ever seen that

17   rate schedule?

18      A.    No.  They never provided us anything like this.

19      Q.    Did you ever ask for a copy of the rate

20   schedule?

21      A.    No.

22      Q.    When were you promoted to the position of

23   foreman?

24      A.    I don't recall the exact date.  Take a stab,

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Jason McLean

32

1    maybe a month before I was laid off.

2        Q.    And that was while you were working in

3    Westchester?

4        A.    No.  We were actually transferred up to Oaks,

5    Pennsylvania, at that time.

6        Q.    Why did you go up to Oaks, Pennsylvania?

7        A.    Because I was told to.

8        Q.    Why did the company go up there?

9        A.    I don't know.

10        Q.    What kind of work was being done in Oaks,

11    Pennsylvania?

12        A.    Same work.

13        Q.    And just so we're clear, can you describe, when

14    you say same work, what was the work that was being done?

15        A.    Underground utilities.

16        Q.    When you were working in Angola, how did you

17    get to Angola?

18        A.    Drove my car.

19        Q.    Prior to working in Angola, had you always

20    driven your car to get to work?

21        A.    Yes.

22        Q.    And did you drive your car to get to work in

23    Westchester?

24        A.    Partially.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Jason McLean

37

1    Q.    Upon what is that based?

2    A.    Deductions at the end of the day.

3    Q.    And what are deductions?

4    A.    Gas, food, room and board.

5    Q.    Well, you were traveling back and forth daily

6    between home, so you didn't have room and board, did you?

7    A.    Depending on what time we got off work.  If we

8    got off work at 9:00 at night, we would just get a hotel.

9    No point in driving home.

10   Q.    Why would food costs increase because you were

11   in Westchester as opposed to anywhere else?  You have to

12   eat all the time, right?

13   A.    We worked longer hours, so you ended up in the

14   field longer, so you got to spend more money on food.

15   Q.    And if you're driving the company truck, who

16   pays for gas?

17   A.    The company.

18   Q.    In fact, in direct salary from the company, you

19   made more working at Westchester than you did in New

20   Castle?

21   A.    In direct salary, yes.

22   Q.    And you and Mr. Coleman weren't the only

23   employees transferred from New Castle to Westchester,

24   were you?



Jason McLean

38

1     A.   Yes, that day -- well, that week.

2     Q.   Over time, all the employees were transferred

3 to Westchester, weren't they?

4     A.   Just Brad and Frank, afterwards.  I think they

5 were the only ones left.

6     Q.   The rest were, in fact, laid off?

7     A.   Quit.

8     Q.   Didn't work for the company at all anymore?

9     A.   Exactly.

10    Q.   You were ultimately laid off of work from CCG?

11    A.   Yes.

12    Q.   Along with seven other employees?

13    A.   I don't know how many.

14    Q.   You weren't the only one laid off?

15    A.   No.

16    Q.   Mr. Coleman wasn't the only one laid off?

17    A.   No.

18    Q.   There were more than the two of you?

19    A.   To my understanding.

20    Q.   And you understood that you were being laid off

21 because the work had come to an end?

22    A.   I didn't know why I was being laid off.  There

23 was still work.

24    Q.   No one told you why you were being laid off?

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


JASON McLEAN and              )
BRIAN COLEMAN,                )
                             )  C.A. No. 06-617 SLR
               Plaintiffs,   )
                             )
  -vs-                        )
                             )
COMMUNICATIONS CONSTRUCTION   )
GROUP, LLC,                   )
                             )
               Defendant.    )


             Deposition of BRIAN COLEMAN taken pursuant
to notice at the law offices of Young, Malmlberg &
Howard, 30 The Green, Dover, Delaware, beginning at 1:00
p.m. on September 13, 2007, before Julianne LaBadia,
Registered Diplomate Reporter and Notary Public.

APPEARANCES:

          RONALD POLIQUIN, ESQ.
          YOUNG, MALMBERG & HOWARD
            30 The Green
            Dover, Delaware  19901
            For the Plaintiff


          THOMAS BENJAMIN HUGGETT, ESQ.
          MORGAN, LEWIS & BROCKIUS, LLP
            1701 Market Street
            Philadelphia, Pennsylvania  19103
            For the Defendant

            WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
              (302) 655-0477
              www.wilfet.com



W&F
WILCOX & FETZER LTD.
Registered Professional Reporters
COPY

Brian Coleman

2

1           BRIAN COLEMAN

2       The deponent herein, having first been

3       duly sworn on oath, was examined and

4       testified as follows:

5               DIRECT EXAMINATION

6   BY MR. HUGGETT:

7       Q.   Would you state your name for the record?

8       A.   Brian T. Coleman.

9       Q.   Mr. Coleman, by whom are you presently

10  employed?

11      A.   Myself.

12      Q.   And what do you do?

13      A.   The same thing that I used to do there.

14      Q.   When you say "there," you're referring to

15  Communication Construction Group?

16      A.   Yes, sir.

17      Q.   Have you worked for any other company since you

18  worked for CCG?

19      A.   Yeah.  I mean I work for myself, but I still

20  sub work out.  I get it from somebody else.

21      Q.   Who do you get work for?

22      A.   JT Enterprises, now it's S&M, out of Richmond,

23  Virginia, or Ashland, Virginia.

24      Q.   And do you get a paycheck from them?  Or how

Brian Coleman

9

1      Q.   And that's in the nature of the contracts and

2  work that they do?

3      A.   Yeah.

4      Q.   What was the last position that you held with

5  CCG?

6      A.   I was a foreman.

7      Q.   When did you become a foreman?

8      A.   Well, I was a foreman when I was doing the

9  underground FIOS work, before that Verizon work started.

10  After that incident happened with Mr. Dodson, Mr. Gates,

11  I asked him if I could run my own crew, he told me he

12  didn't know if I was capable of doing that, and that's

13  when he tried -- gave me a crew and gave me a truck and

14  took the truck away.  After that incident happened, after

15  I got back off vacation from California.

16      Q.   The incident that you're referring to is the

17  May 31 conversation, Mr. Robert Koch told you about a

18  comment that was allegedly made by Brad Dodson; is that

19  correct?

20      A.   I guess that was May 31st.  Yeah.  I mean if

21  that was the right day.  That was a long time ago.  But

22  it wasn't just Robert Koch.  It was a couple other guys,

23  as well.

24      Q.   We'll get back to that.  And it was after that

Brian Coleman

11

1    Q.    2005.  Now, you had worked for CCG for a number

2  of years prior to May 31st, 2005?

3    A.    Yes.

4    Q.    Were there any events that occurred prior to

5  that date, in your employment --

6    A.    With me?

7    Q.    With you.

8    A.    No, sir.

9    Q.    Didn't have any problems --

10    A.    No problem at all.

11    Q.    -- with the company or working?  Okay.  In your

12  own words, if you would, tell me what happened on May

13  31st, what the conversation was with Mr. Koch.

14    A.    Well, it was me and Jason McLean, saw Mr. Koch,

15  I guess, and asked him if they were making any money.  It

16  was like -- some weeks you do good and some weeks you do

17  bad.  This was one of those bad spells.  And he had told

18  us what Mr. Dodson said, about "We weren't making any

19  money, but at least you don't have to work with two dumb

20  niggers."

21    Q.    And when you said Mr. Dodson, you're referring

22  to Brad Dodson?

23    A.    Brad Dodson.  He was my foreman.

24    Q.    You weren't present for this conversation

Brian Coleman

12

1    between Mr. Dodson when he allegedly made this statement

2    to Mr. Koch?

3        A.    No.  I wasn't.

4        Q.    Do you know when that happened?

5        A.    It was a Friday before that weekend, or -- we

6    had a weekend off or something, a holiday or something.

7    A couple days that went past, and that Monday, I think,

8    they told us.

9        Q.    What did you say to Mr. Koch after he gave you

10   this alleged statement?

11       A.    Well, you keep saying Mr. Koch.  It wasn't just

12   Mr. Koch who was telling me.

13       Q.    Okay.  Who else -- where did that conversation

14   take place?

15       A.    Right in the neighborhood where we were working

16   at.

17       Q.    Okay.  And was Mr. Koch working with you?

18       A.    No.  Mr. Koch wasn't working with us.

19       Q.    Okay.

20       A.    We all worked -- there was a street here, a

21   street here.  Everybody -- the neighborhood was broken up

22   into sections.  This crew had this section, this crew had

23   this section.  We had to go around the corner on the

24   backhoe to get stone.  We were getting boxes.  And we

Brian Coleman

13

1   always stopped and just shoot the shit with the guys, you

2   know what I mean?  We all worked together.  Same company.

3              So when we stopped, he told us what was

4   said.  Davey Miller told us what was said.  There was a

5   couple of them told us what was said.  So when he told us

6   what was said, I mean I go -- I bust my butt for this

7   guy, Dave Dodson -- I mean, yeah, Brad Dodson.  If I

8   don't dig my holes, he can't use that machine to shoot

9   that footage there where he is taking the biggest chunk

10  of the money.  So I went around there, and I confronted

11  him.  I asked him --

12      Q.   Okay.

13      A.   -- why would you say something like that, you

14  know what I mean?

15      Q.   And what was his response?

16      A.   He got in my face.  "I'm a Dodson."  I said I

17  don't care who you are.  I'm a man just like you are.

18  From there, that's when the confrontation started.

19      Q.   Okay.  You and Jason were going to get stone,

20  you said, when this conversation took place.

21      A.   Yeah.

22      Q.   Who was present at that point in time?

23      A.   When we were going to get stone?

24      Q.   Yeah.

Brian Coleman

17

1       A.    It says me, the big boss -- he called me a dumb

2   nigger before the police came.

3       Q.    Okay.  You didn't tell the police that he

4   called you a dumb nigger at that point in time?

5       A.    Yes, I did.  Yes, I did.

6       Q.    Did he call you that, on May 31st?

7       A.    He called me that before May 31st.

8       Q.    You heard that he called you that?

9       A.    Yeah.

10      Q.    You never heard that directly from him, did

11  you?

12      A.    From a couple guys.

13      Q.    You never heard that --

14      A.    No.  I didn't hear that directly from him.

15      Q.    Okay.

16      A.    Okay.

17      Q.    So, did you mean to tell the police that you

18  heard it directly from him?

19      A.    I never told the police that I heard it

20  directly from him.

21      Q.    If you look at the --

22      A.    When the police came there, they took my

23  statement.  They said that there was more than one party

24  who heard him say it, so that was admissible in court, it

Brian Coleman

23

1    Q.    How did you approach him?

2    A.    I didn't go up there yelling at him.  He jumps

3  off the machine yelling at me, getting in my face.

4  Talking about "I don't know what you're trying to do.  I

5  don't know what you're trying to prove.  I'm a Dodson."

6  That's when he was poking me in my chest.

7    Q.    You said you didn't yell at him.

8    A.    No, I didn't yell at him.

9    Q.    What was the first thing that you said to him?

10   A.    I said, "Man, what's going on?  I'm over here

11 busting my rump for you, how you going to call me a dumb

12 nigger?"  Or something to that effect.

13   Q.    What was his first response?

14   A.    I don't exactly remember what his first

15 response was.  He was on the machine.  I don't think he

16 even quite heard me when I first said that.  So he jumped

17 off the machine, you know what I mean, and I was like,

18 "Yo, what's up?"  You know what I mean.  And I asked him

19 about the dumb nigger incident or remark.  And that's

20 what he said, "I don't know what you trying to start.  I

21 don't know what you're trying to prove or whatever."  And

22 that's when the poking started.

23              And that I should get the hell away from

24 there.  Never once did I put my hands back on him, so I

Brian Coleman

24

1 | don't know what you're trying to get at, or what you're

2 | trying to ask me.

3 |     Q.   I'm just trying to figure out exactly what

4 | happened. So it's your testimony you did not touch him?

5 |     A.   No. I did not touch him.

6 |     Q.   Didn't poke him in the chest with your finger

7 | back?

8 |     A.   No, I did not. If I would have poked him in

9 | the chest I would have been arrested, too, right? Let me

10 | ask you a question.

11 |     MR. POLIQUIN: You're only supposed to

12 | answer questions.

13 |     Q.   You called the police.

14 |     A.   Yes, I did.

15 |     Q.   And they came out?

16 |     A.   I don't think it was that day. I think it was

17 | when I got back off of my vacation.

18 |     Q.   You don't recall them being there on May 31st?

19 |     A.   If May 31st was when I got back from my

20 | vacation, that's when they was there. If the incident

21 | happened before May 31st -- they didn't come that first

22 | day when the incident happened. They came out there

23 | after. Well, as a matter of fact, they did come out

24 | there the 31st, and what happened was, they told me I had

Brian Coleman

27

1     A.   A whole bunch.  I don't -- we got transferred,

2  they had told us they didn't know what they was going to

3  do with us.  They had me laying pipe for a little bit up

4  in -- I believe it was Hockessin, Delaware, up by the

5  beach, for like three days.  Snatched us off that, and

6  that's when we went to Westchester.

7     Q.   When you came back, were you on Brad Dodson's

8  crew?

9     A.   No.

10     Q.   Whose crew were you on?

11     A.   I guess you could call it my own for three

12  days.

13     Q.   And when you say your own, you would have been

14  a foreman for that crew?

15     A.   Yeah.

16     Q.   Who else was on the crew?

17     A.   I believe it was Jason McLean, and Harry Ortiz.

18     Q.   Previously, that crew, Mark Lynch was the

19  foreman, correct?

20     A.   Mark Lynch.

21     Q.   Worked with Harry Ortiz?

22     A.   I don't remember.  I don't even remember a Mark

23  Lynch.

24     Q.   Did you do any work down in Angola?

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Brian Coleman

39

1     Q.    And the safety meeting was simply a meeting

2  where everybody is present?  All the employees of the

3  company, correct?

4     A.    Correct.

5     Q.    You weren't required to speak with him?  He

6  wasn't your supervisor, correct?

7     A.    Correct.

8     Q.    Any further incident involving any racial

9  allegation, after the May 31st?

10     A.    I don't know.  I don't know.  Not directly to

11  me, I guess.  I don't know.  I'm not going to say yes,

12  I'm not going to say no.

13     Q.    Nothing was said directly to you?

14     A.    No.

15     Q.    No one --

16     A.    Not --

17     Q.    No one reported that something else had been

18  said?

19     A.    Oh.  No.  That, I know, sir, after that.

20     Q.    So it was just the one time?

21     A.    (Witness nods head).

22     Q.    What happened when the work ended in Oaks,

23  Pennsylvania?

24     A.    At what time?  When we got laid off?

# EXHIBIT 6

1

1            IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3                          - - -

4   McLEAN, et al.,                    )
                                       )
5            Plaintiffs,               )
                                       ) Action
6         vs.                          ) No. 06-617-SLR
                                       )
7   COMMUNICATIONS CONSTRUCTION        )
    GROUP, LLC,                        )
8                                      )
             Defendant.                )
9                          - - -

10                 Deposition of ROBERT KOCH

11                 Monday, November 5, 2007

12                          - - -

13       The deposition of ROBERT KOCH, called as a

14   witness by the Defendant, pursuant to notice and the
     Federal Rules of Civil Procedure pertaining to the

15   taking of depositions, taken before me, the
     undersigned, Melissa L. Fenster, a Notary Public in

16   and for the Commonwealth of Pennsylvania, at the
     offices of Morgan, Lewis & Bockius, LLP, One Oxford

17   Centre, 32nd Floor, Pittsburgh, Pennsylvania  15219,
     commencing at 9:00 o'clock a.m., the day and date

18   above set forth.

19                          - - -

20          COMPUTER-AIDED TRANSCRIPTION BY
            MORSE, GANTVERG & HODGE, INC.

21            PITTSBURGH, PENNSYLVANIA
                   412-281-0189

22

23   ORIGINAL            - - -

24

25

2

```
 1  APPEARANCES:

 2      On behalf of the Plaintiffs:

 3          (No appearance.)

 4      On behalf of the Defendant:

 5          Morgan, Lewis & Bockius, LLP:
            Thomas B. Huggett, Esquire
 6          1701 Market Street
            Philadelphia, Pennsylvania  19103-2921
 7
                       - - -
 8                     INDEX

 9  EXAMINATION:                                    PAGE:

10  BY MR. HUGGETT                                      3

11  KOCH DEPOSITION EXHIBITS:                      PAGE:

12  1    Letter with subpoena                         22

13  2    Harassment policy acknowledgment             22

14  3    Incident Investigation Form                  22

15  4    Disciplinary notice                          27

16                       - - -

17

18

19

20

21

22

23

24

25
```

3

```
 1                          ROBERT KOCH
 2  called as a witness by the Defendant, having been
 3  first duly sworn, as hereinafter certified, was
 4  deposed and said as follows:
 5                    DIRECT EXAMINATION
 6  BY MR. HUGGETT:
 7      Q      Mr. Koch, would you state your full name
 8  for the record.
 9      A      Robert James Koch, Jr.
10      Q      What is your present home address?
11      A      RR 2 Box 361, Portage, Pennsylvania, 15946.
12      Q      What's your phone number?
13      A      814-695-9020.
14      Q      Have you ever been deposed before,
15  Mr. Koch?
16      A      No.
17      Q      A deposition is the process during the
18  course of a lawsuit in which the parties to the
19  lawsuit are entitled to ask questions of witnesses.
20  And the purpose of that is for the parties to learn
21  the facts about the case before proceeding to a
22  trial.
23             So the purpose here today is to ask
24  questions of you related to a lawsuit brought by
25  Brian Coleman and Jason McLean against Communications
```

1                   It would have been in July.

2        Q        You're looking at something.

3                 What is that?

4        A        Reference from New Enterprise.

5        Q        Do you mind if I --

6                 So this is your certification of road test

7    for your new company?

8        A        Yeah.

9        Q        New Enterprise?

10       A        Correct.

11       Q        And it states that the road test was

12   14 July 2005?

13       A        Correct, so it was in July whenever I left

14   CCG.

15       Q        We were talking earlier about the issues

16   that brought about this lawsuit.  You identified a

17   statement.

18                Can you in your own description tell me

19   what you remember about that event when it first

20   occurred, when you first heard such a statement?

21       A        I don't know when it occurred.

22       Q        Okay.

23                This was a conversation that you had with

24   Brad Dodson, correct?

25       A        Yeah, it was Brad Dodson.

1     Q     Who is Brad Dodson?

2     A     He was an employee.

3     Q     Where was the conversation that you had

4     with him?

5     A     On one of the job sites.

6     Q     It was out on a job site?

7     A     Yeah.

8     Q     Was there anyone else present for this

9     conversation?

10     A     When he said it, yeah.

11     Q     Who else was present?

12     A     Joe Tatsch.

13     Q     And what was the -- how did this

14     conversation come about?

15     A     We were -- I think it was on a Friday,

16     Thursday, Friday.  I think it was a Friday because we

17     were leaving, and we parked equipment up past him.

18     And we were walking on down by, and he said to us it

19     because we were leaving.

20          He said, it must be nice to leave.  I said,

21     well, you get work done -- that what he said, he said,

22     you don't have the two dumb niggers working with you.

23     Q     So you were just going past him at that

24     point.  It wasn't an ongoing conversation about

25     anything?

13

```
1      A      No.

2      Q      Did he identify by name who he was

3   referring to?

4      A      No.  He didn't say no names, no.

5      Q      Did you know who he was referring to?

6      A      He said you don't have two working for you,

7   and he only had those other two guys working for him.

8      Q      When you say "working for him," what do you

9   mean?

10     A      He was more or less the boss of the crew,

11  and he had three guys working under him.

12     Q      What is the boss of the crew?  Is that

13  referred to as the foreman?

14     A      Right.

15     Q      And is that a management employee or just

16  the head of the particular crew?

17     A      It's just more or less the head of the crew.

18     Q      How many employees are generally in a crew

19  working on the underground work?

20     A      They ranged anywhere from four to six.

21  Some had more.  It all depended on what they were

22  doing and how many guys they had to have.

23     Q      Whose crew were you working on at that

24  point in time?

25     A      I was working with Bob Miller and
```

# EXHIBIT 7

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 3                         -  -  -

 4   McLEAN, et al.,                    )
                                        )
 5            Plaintiffs,               )
                                        ) Action
 6        vs.                           ) No. 06-617-SLR
                                        )
 7   COMMUNICATIONS CONSTRUCTION        )
     GROUP, LLC,                        )
 8            Defendant.                )
                                        )
 9                         -  -  -

10              Deposition of JOSEPH TATSCH

11            Monday, November 5, 2007

12                         -  -  -

13        The deposition of JOSEPH TATSCH, called as a
14   witness by the Defendant, pursuant to notice and the
     Federal Rules of Civil Procedure pertaining to the
15   taking of depositions, taken before me, the
     undersigned, Melissa L. Fenster, a Notary Public in
16   and for the Commonwealth of Pennsylvania, at the
     offices of Morgan, Lewis & Bockius, LLP, One Oxford
17   Centre, 32nd Floor, Pittsburgh, Pennsylvania  15219,
     commencing at 11:51 o'clock a.m., the day and date
18   above set forth.

19                         -  -  -

20          COMPUTER-AIDED TRANSCRIPTION BY
             MORSE, GANTVERG & HODGE, INC.
21             PITTSBURGH, PENNSYLVANIA
                   412-281-0189
22
                           -  -  -
23   ORIGINAL

24

25
```

2

```
 1  APPEARANCES:

 2       On behalf of the Plaintiffs:

 3          (No appearance.)

 4       On behalf of the Defendant:

 5          Morgan, Lewis & Bockius, LLP:
            Thomas B. Huggett, Esquire
 6          1701 Market Street
            Philadelphia, Pennsylvania  19103-2921
 7
                      - - -
 8                    INDEX

 9  EXAMINATION:                              PAGE:

10  BY MR. HUGGETT                              3

11  TATSCH DEPOSITION EXHIBITS:               PAGE:

12  1    Letter with subpoena                  4

13  2    Harassment policy acknowledgment     20

14  3    Incident Investigation Form          21

15                    - - -

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                         JOSEPH TATSCH
 2   called as a witness by the Defendant, having been
 3   first duly sworn, as hereinafter certified, was
 4   deposed and said as follows:
 5                         DIRECT EXAMINATION
 6   BY MR. HUGGETT:
 7        Q      Would you state your full name for the
 8   record.
 9        A      Joseph G. Tatsch.
10        Q      Would you state your address?
11        A      It's used to be HC 1 Box 70A, Madera,
12   Pennsylvania, but I think it's 348, something like
13   that now.  They switched addresses up there for
14   emergency things.
15               My wife has it.  I didn't even bother
16   looking at.  I ain't much on paperwork.  I stay away
17   from it.
18        Q      You are here today pursuant to a subpoena
19   that my office sent to you, correct?
20        A      Yes.
21               MR. HUGGETT:  We'll mark that as Exhibit 1.
22               (Thereupon, Tatsch Deposition Exhibit No. 1
23        was marked for identification.)
24        Q      I've given you a document that we've marked
25   as Exhibit 1.
```

14

1      A      Like I said, I was walking down the road,

2  and he called Bobby Koch over.

3      Q      Do you know what month or what day that

4  was?

5      A      I couldn't tell you.  I don't remember

6  dates too good.  I go from day to day and I don't even

7  bother looking at a calendar.

8      Q      Do you remember anything about what day of

9  the week it was?

10      A      The only thing I can tell you is it might

11  have been a Wednesday or a Thursday or something like

12  that.

13      Q      If I told you it was from the information

14  we have either May 26th or May 27th of 2005, would you

15  have any reason to disagree with that?

16      A      No, because like I said I don't follow

17  along with dates.  I just go from day to day.  I don't

18  even pay attention to a calendar.

19      Q      As I understand it, you and Bobby Koch were

20  walking down the road?

21      A      Yeah.

22      Q      From where?

23      A      From up the road.  We was getting pipe.  We

24  was getting pipe or something.  I forget what it was,

25  but we were walking down.

1          He called Bobby Koch down, and I still kept

2  walking.  As I kept walking, I ended up I heard him

3  say to Bobby Koch or that -- because I guess them two

4  that you're talking about, that whatever his name is,

5  the two black guys --

6      Q     Mr. Coleman and Mr. McLean?

7      A     Yeah.  He ended up I guess they were having

8  a dispute or something like that, and then he ended up

9  telling Bobby Koch -- like I said, he called them dumb

10  Fing niggers.  That's all I can tell you.

11          I kept walking by.  I didn't say nothing to

12  nobody because I know what it causes, so I stayed away

13  from it.  I walked up onto the area where I was

14  working.

15          And, apparently -- I don't know if it was

16  Bobby Koch ended up talking to them two and saying

17  what Brad Dodson said or somehow they found out about

18  it some other way, but then there was a big dispute.

19          I guess they called the cops or that, and

20  they had the cops there to take testimony, and then

21  the next thing I know I got drug down into it.

22      Q     When Brad Dodson was speaking to

23  Bobby Koch, there was no one else present?

24      A     No, no one else.

25      Q     And you were walking down the road?

# EXHIBIT 8

# Communications Construction Group, LLC.
## *Employee Warning Report*

Employee's Name   Brad Dodson          Date of Warning   6/20/05      Job #   5007

## Type of Violation

☐ Attendance        ☐ Safety Violation      ☐ Work Quality      ✳ Insubordination

☐ Lateness/Leave Early   ✳ Violation of Policy   ☐ Other _____

## Warning Information

Violation Date   5/31/05       Violation Time   Mid-Day   Location of Violation   New Castle, DE

| Company Explanation of Incident | Employee Statement |
|---|---|
| An allegation was made that Brad used a racially derogatory remark. Brad denies making the statement he was accused of making. Additionally, during a heated conversation with Brian Coleman, Brad used physical contact in an inappropriate manner. | ☒ I agree with the company's statement<br><br>☐ I disagree with the company's statement; <u>Explanation</u> |

★*If necessary, use the back of the form to complete your explanation* ★

## Action Taken As Result Of Warning

Brad violated CCG's Harassment policy by engaging in inappropriate physical contact with an employee. To the extent any statement Brad made was either racially derogatory or racially insensitive, that would constitue a further violation of CCG Policy. A copy of CCG's Harassment Policy is being reissued. If he should violate any CCG policy again, he will be subject to further discipline, up to and including termination.

### *MUST BE COMPLETED*

I have read and understand this warning and decision, and have had the opportunity to express my viewpoint.

Employee's Signature: _~Brad Dodson~_          Date: 6/21/05

Signature of Person Preparing Warning _~Lisa Clemente~_   Date 6/17/05

Supervisor's Signature (if different): _~John Aiala~_   Date: 6-21-05

# Communications Construction Group, LLC.
## *Employee Warning Report*

Employee's Name **Bob Koch**    Date of Warning **6/20/05**    Job # **5007**

## Type of Violation

☐ Attendance    ☐ Safety Violation    ☐ Work Quality    ☐ Insubordination

☐ Lateness/Leave Early    ✵ Violation of Policy    ☐ Other _____

## Warning Information

Violation Date **5/31/05**    Violation Time _____ Morning    Location of Violation **New Castle, DE**

| Company Explanation of Incident | Employee Statement |
|---|---|
| During a conversation between Bob Koch and Brad Dodson which took place on 5/27/05, Bob has made<br><br>a claim that he heard Brad Dodson make a racially derogative comment about two other employees from #5007. Rather than following the Company procedure and reporting the alleged racially derogatory remark to the Project Supervisor and/or HR, on 5/31/05, Bob told Jason McLean and Brian Coleman about the comment and that it<br><br>was said by Brad Dodson. | ☐ I agree with the company's statement<br><br>☐ I disagree with the company's statement;<br>Explanation |

*★If necessary, use the back of the form to complete your explanation ★*

## Action Taken As Result Of Warning

Bob violated CCG's Harassment Policy by not following the Complaint Procedure and by spreading rumors at work. A copy of CCG's Harassment Policy and Complaint Procedure are being reissued. If any company violation should occur again, Bob will be subject to further disciplinary action, up to and including termination.

### *MUST BE COMPLETED*

I have read and understand this warning and decision, and have had the opportunity to express my viewpoint.

Employee's Signature: _____    Date: 6-21-05

Signature of Person Preparing Warning: *Lisa Clements*    Date: 6/17/05

Supervisor's Signature (if different): *John Bates*    Date: 6-21-05

D0486

# Communications Construction Group, LLC.
## Employee Warning Report

Employee's Name   Jason McLean          Date of Warning   6/20/05      Job #   5007

## Type of Violation

☐ Attendance      ☐ Safety Violation      ☐ Work Quality      ☐ Insubordination

☐ Lateness/Leave Early      ✸ Violation of Policy      ☐ Other _____

## Warning Information

Violation Date   5/31/05      Violation Time   Mid-Day      Location of Violation   New Castle, DE

| Company Explanation of Incident | Employee Statement |
|---|---|
| Jason was involved in a conversation with Brian Coleman and Bob Koch during which he claims to have been told by Bob Koch that a racially derogative comment about Jason McLean and Brian Coleman was made by Brad Dodson. Rather than following company procedure and reporting the issue to the Project Supervisor and/or HR, Jason left his job site during work hours and approached Brad Dodson to confront him about the comment. | ☐ I agree with the company's statement<br><br>☑ I disagree with the company's statement; Explanation<br>I never left my job site. We all were working in the same area. |

★If necessary, use the back of the form to complete your explanation ★

## Action Taken As Result Of Warning

Jason violated CCG's Harassment Policy by not following the Complaint Procedures. He also violated Company policy by leaving his job site during work hours. A copy of the Company's Harassment Policy and Complaint Procedures are being reissued. If this type of violation occurs again, Jason will be subject to further disciplinary action.

### MUST BE COMPLETED

I have read and understand this warning and decision, and have had the opportunity to express my viewpoint.

Employee's Signature: _Jason McLean_          Date: 6·21·05

Signature of Person Preparing Warning: _Lisa Clements_          Date: 10/17/05

Supervisor's Signature (if different): _John Slota_          Date: 6-21-05

D0476

# Communications Construction Group, LLC.
## Employee Warning Report

Employee's Name __Brian Coleman__    Date of Warning __6/20/05__    Job # __5007__

## Type of Violation

☐ Attendance          ☐ Safety Violation          ☐ Work Quality          ✖ Insubordination

☐ Lateness/Leave Early    ✖ Violation of Policy    ☐ Other _____

## Warning Information

Violation Date __5/31/05__    Violation Time __Mid-Day__    Location of Violation __New Castle, DE__

| Company Explanation of Incident | Employee Statement |
|---|---|
| Brian was told by Bob Koch that Brad Dodson had made a racially derogative remark and it was directed towards Jason McLean and Brian Coleman. Upon hearing this, rather than following company policy and raising the issue with the Project Supervisor and/or HR, Brian left his job site and confronted Brad to question him about the comment.<br><br>While doing so, Brian waved his finger at Brad's face in a menacing manner. | ☐ I agree with the company's statement<br><br>☐ I disagree with the company's statement; <u>Explanation</u> |

★ *If necessary, use the back of the form to complete your explanation* ★

## Action Taken As Result Of Warning

Brian violated CCG's Harassment Policy by not following the Complaint Procedure and by engaging in inappropriate physical interaction with another employee. A copy of CCG's Harassment Policy and Complaint Procedure are being reissued. Brian also violated CCG's policy by leaving his job site during working hours. If this type of violation occurs again, Brian will be subject to further discipline, up to and including termination.

### MUST BE COMPLETED

I have read and understand this warning and decision, and have had the opportunity to express my viewpoint.

Employee's Signature: _____    Date: _6/21/05_

Signature of Person Preparing Warning: _____    Date: _6/17/05_

Supervisor's Signature (if different): _____    Date: _6-21-05_

D0481

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JASON MCLEAN and
BRIAN COLEMAN,

                    **Plaintiffs,**

v.

COMMUNICATIONS CONSTRUCTION
GROUP, LLC,

                    **Defendant.**

CIVIL ACTION NO. 06-617 (SLR)

## DECLARATION OF LISA CLEMENTS

I, Lisa Clements, depose and state as follows:

    1.    I am a currently employed as the Human Resources Manager for Communications Construction Group, LLC ("CCG"). I have held this position since approximately August of 2005. Prior to August of 2005 I was employed as the Human Resource/Benefits Administrator.

    2.    On or about July 6, 2005 Brian McLean and Jason Coleman were transferred from CCG's Newcastle Delaware, worksite to its West Chester, Pennsylvania worksite. They were transferred because work on the Verizon contract in Delaware was ending and other work was available in Pennsylvania. After they were notified of the transfer by their supervisor, and before the transfer occurred, pursuant to a request from Mr. Coleman on or about July 5 I prepared a letter explaining the basis for the transfer for Mr. Coleman. A true and accurate copy of the letter is attached as Exhibit 1 hereto.

    3.    On October 6, 2005 several CCG employees who were working on Job No. 5008 were laid off due to lack of work. The names and races of these employees are as follows:

        a.  Marco Blancas (Hispanic)

    b.  Alberto Carmona (Hispanic)

    c.  Brian Coleman (African-American)

    d.  Joel Diaz Guaddarama (Hispanic)

    e.  Jason McLean (African-American)

    f.  John Morris (African-American)

    g.  Harry Ortiz (Hispanic)

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing information is true and correct, based upon my knowledge, information and belief.

DATED: November 27, 2007

LISA CLEMENTS

Exhibit
1

July 5, 2005


Mr. Brian Coleman
20 Tarpon Court
Willingboro, NJ 08046

Re: Employee Transfer

Attn: Brian

Due to the recent cut back in the amount of work given to Communications Construction Group, LLC in New Castle, DE (Job #5007) we will need to transfer you to Devault, PA (Job #5008). John Gates - Regional Manager – received notification from Job #5007 customer that the work was being cut in half. At the same time the work on Job #5008 is being increased.

Jason McLean, Harry Ortiz and you are all being transferred to the Devault, PA job. A 120 man Sub Crew is also being transferred to Devault, PA. Currently there are two underground crews working in New Castle, DE. The other crew uses a drill that is too large to be used on the Devault, PA job and the New Castle, DE job must have a drill on site; therefore this crew must stay at the New Castle, DE job.

As a reminder, I have enclosed a copy of the signed *Receipt & Acknowledgement* form. As stated in the company's <u>Employee Policy Manual</u>, "All employees should be advised that CCG may require that you transfer to another job site, which could be in a different location or state."

If you have any questions, please feel free to call me at (610) 696-1800 x588.

Thank you,



Lisa Clements
Human Resource/Benefits Administrator



*encl*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

JASON MCLEAN and
BRIAN COLEMAN,

                **Plaintiffs,**

v.

COMMUNICATIONS CONSTRUCTION
GROUP, LLC,

                **Defendant.**

**CIVIL ACTION NO. 06-617 (SLR)**

## ORDER

Now, this _____ day of _____, 200__, having considered Plaintiffs' Motion for Partial Summary Judgment and Defendant's opposition thereto, it is hereby **ORDERED** that the Motion is **DENIED**. Further, having considered Defendant Communication Construction Group, LLC's Motion for Summary Judgment and any opposition thereto, it is hereby **ORDERED** that the Motion is **GRANTED**. It is further **ORDERED** that Plaintiffs' Complaint is **DISMISSED WITH PREJUDICE**.

                **SO ORDERED BY**
                **THE**
                **COURT:**

_____
                **Robinson, U.S.D.J.**

## CERTIFICATE OF SERVICE

I, Daniel J. Brown, hereby certify that a true and correct copy of the foregoing Defendant Communications Construction Group, LLC's Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment, and all Exhibits thereto has been served via CM/ECF this 17th day of December, 2007 upon the following:

> Ronald G. Poliquin
> Young, Malmberg & Howard, P.A.
> 30 The Green
> Dover, DE 19901
> (302) 672-5600
> Delaware Bar I.D. No. 4447
>
> Attorney for Plaintiffs

/s/ Daniel J. Brown
Daniel J. Brown (DE Bar ID # 4688)