IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JASON MCLEAN and BRIAN COLEMAN, | |
| Plaintiffs, | CIVIL ACTION NO. 06-617 (SLR) |
| v. | |
| COMMUNICATIONS CONSTRUCTION GROUP, LLC, | |
| Defendant. | |

---

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
COMMUNICATIONS CONSTRUCTION GROUP, LLC'S
MOTION FOR SUMMARY JUDGMENT**

---

Michael P. Kelly (DE Bar ID # 2295)
Daniel M. Silver (DE Bar ID # 4758)
McCarter & English LLP
Renaissance Centre
405 N. King St., 8th Floor
Wilmington, DE  19801
302.984.6301
302.984.2493 (fax)
mkelly@mccarter.com
dsilver@mccarter.com

Thomas Benjamin Huggett (admitted pro hac vice)
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103-2921
215.963.5191
215.963.5001 (fax)
tbhuggett@morganlewis.com

Dated:  January 2, 2008        Attorneys for Defendant
                              Communications Construction Group, LLC

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ............................................................................................... 1

II.   ARGUMENT ..................................................................................................... 2

    A.   This Court Should Grant CCG Summary Judgment With Respect to
        Plaintiffs' Racial Discrimination Claim........................................................ 2

        1.   Plaintiffs Have Failed to Establish a *Prima Facie Case* of
              Discrimination........................................................................................ 2

        2.   Plaintiffs Have Not Shown CCG's Stated Reasons Are Pretextual........... 4

    B.   This Court Should Grant CCG Summary Judgment With Respect to
        Plaintiffs' Racial Harassment Claim............................................................ 6

        1.   Plaintiffs Have Failed to Establish a *Prima Facie Case* of
              Harassment............................................................................................ 6

    C.   This Court Should Grant CCG Summary Judgment With Respect to
        Plaintiffs' Retaliation Claim ....................................................................... 8

        1.   Plaintiffs Failed To Establish a *Prima Facie Case* of Retaliation ............ 8

        2.   Plaintiffs Have Not Shown CCG's Stated Reasons are Pretextual............ 9

III.  CONCLUSION................................................................................................. 10

## <u>TABLE OF AUTHORITIES</u>

Andrews v. City of Phila.,
895 F.2d 1469 (3d Cir. 1990)...........................................................................7

Calloway v. E.I. DuPont De Nemours and Co.,
Civ. A. No. 98-669, 2000 WL 1251909 (D. Del. Aug. 8, 2000) .....................3

Celotex Corp. v. Catrett,
477 U.S. 317 (1986).........................................................................................1

Fuentes v. Perskie,
32 F.3d 759, 804 (3d Cir. 1994 ................................................................4, 5, 6

Goosby v. Johnson & Johnson Med., Inc.,
228 F.3d 313 (3d Cir. 2000).............................................................................2

Hartwell v. Lifetime Doors, Inc.,
Civ. A. No. 05-2115, 2006 WL 381685 (E.D. Pa. Feb. 16, 2006) ..................3

Jiminez v. All American Rathskeller, Inc.,
503 F.3d 247, 254 (3d Cir. 2007).....................................................................4

Kautz v. Met-Pro Corp.,
412 F.3d 463 (3d Cir. 2005)..............................................................................5

King v. City of Philadelphia,
66 F. App'x 300, 305 (3d Cir. 2003) .................................................................7

McCray v. DPC Indus., Inc.,
942 F. Supp. 288 (E.D. Tex. 1996)...................................................................7

Mroczek v. Bethlehem Steel Corp.,
126 F. Supp. 2d 379 (E.D. Pa. 2001) ..............................................................10

Oncale v. Sundowner Offshore Servs., Inc.,
523 U.S. 75 (1998)............................................................................................3

Sarullo v. U.S. Postal Serv.,
352 F.3d 789 (3d Cir. 2003)..............................................................................2

Smith v. Univ. of Pa.,
Civ. A. No. 05-525, 2006 WL 2645143 (E.D. Pa. Sept. 15, 2006) .................2

Valenti v. Brownlee,
No. 04-5369, 2005 WL 1655887 (E.D. Pa. July 13, 2005) .............................4

v.

Case 1:06-cv-00617-SLR    Document 48    Filed 01/02/2008    Page 4 of 15

<u>Weston v. Pennsylvania</u>,
251 F.3d 420 (3d Cir. 2001)........................................................................................8

<u>Zappan v. Pa. Bd. of Probation and Parole</u>,
Civ. A. No. 00-1049, 2002 WL 32174230 (E.D. Pa. Nov. 25, 2002)...........................9

## **<u>STATUTES</u>**

42 U.S.C. § 2000e-3(a) ...............................................................................................8

## I.    INTRODUCTION

In their unsupported Opposition to Defendant Communications Construction Group, LLC's ("CCG") Motion for Summary Judgment, Plaintiffs Jason McLean ("Mr. McLean") and Brian Coleman ("Mr. Coleman") (collectively "Plaintiffs") have utterly failed to meet their burden under Rule 56 of the Federal Rules of Civil Procedure to set forth "specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Plaintiffs cannot survive summary judgment because they have "failed to make a sufficient showing" on essential elements for which they have the burden of proof. Id. at 323. As an initial matter, while Plaintiffs' brief sets out the *prima facie* elements for their discrimination claim, it fails to separately address their claims for harassment and retaliation, both of which require Plaintiffs to prove separate and distinct *prima facie cases*. In fact, Plaintiffs only mention their harassment and retaliation claims in the heading and summary of the argument section – they make no attempt to apply any case law or facts to these claims. Even giving Plaintiffs every benefit of the doubt with respect to their factual allegations, Plaintiffs have failed to establish a *prima facie case* of discrimination, harassment, and retaliation and have not produced any evidence to suggest that CCG's stated reasons for its decisions were pretextual. As Plaintiffs have not established any disputes of material fact, this Court should grant CCG summary judgment on Plaintiffs discrimination, harassment, and retaliation claims.

v.

## II.     ARGUMENT

### A.     This Court Should Grant CCG Summary Judgment With Respect to Plaintiffs' Racial Discrimination Claim

#### 1.     Plaintiffs Have Failed to Establish a *Prima Facie Case* of Discrimination

As stated in CCG's opening brief, Plaintiffs cannot survive summary judgment on their race discrimination claim unless they can first establish a *prima facie case* that: (1) they belong to a protected class; (2) they were qualified for the position; (3) they were subject to an adverse employment action; and (4) employees outside of the protected class were treated more favorably or the circumstances of the adverse employment action otherwise give rise to an inference of unlawful discrimination. See Smith v. Univ. of Pa., Civ. A. No. 05-525, 2006 WL 2645143, *7 (E.D. Pa. Sept. 15, 2006) (citing Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 318-19 (3d Cir. 2000)). As the Third Circuit has explained, "[t]he central focus of the *prima facie case* is always whether the employer is treating some people less favorably than others because of their race." Sarullo v. U.S. Postal Serv., 352 F.3d 789, 798 (3d Cir. 2003) (second emphasis added). Further, to establish the fourth prong of a *prima facie case* of discrimination, Plaintiffs "must establish some causal nexus between [their] membership in a protected class" and an adverse employment action. Id. Simply put, Plaintiffs' evidence on this crucial issue in their burden is vastly deficient.

In this case there is no dispute that Plaintiffs were African American or that they were qualified for their positions. With respect to the third element of the *prima facie case* there is a dispute as to whether Plaintiffs' transfer three weeks after a single isolated comment or whether their layoff for lack of work five months later was an adverse action within the meaning of Title VII. This Court, however, is not being asked to decide the third element of the *prima facie case*. Rather, the sole issue advanced by CCG is whether Plaintiffs have established the fourth element

of their *prima facie case* –whether Plaintiffs have shown any causal link between their transfer and termination and any racial animus on the part of CCG.  Plaintiffs have not showed any such nexus.

Plaintiffs only evidence of racial animus is one racial comment allegedly made about Plaintiffs by Brad Dodson, which Plaintiffs did not hear themselves.  (Exhibit 1 [McLean Dep.] at 10:8-19, 13:17-19; Exhibit 2 [Coleman Dep.] at 11:14-12:3, 17:1-14).  Plaintiffs' reliance on Brad Dodson's single statement is misplaced and unactionable.  As many courts have noted, Title VII is not a general civility code.  See, e.g., Calloway v. E.I. DuPont De Nemours and Co., Civ. A. No. 98-669, 2000 WL 1251909, at *5 (D. Del. Aug. 8, 2000) (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)).  Brad Dodson played no part whatsoever in any adverse action as CCG immediately removed Plaintiffs from Brad Dodson's crew following the incident and they did not work on the same crew as him for the remainder of their employment with CCG.  (Exhibit 1 [McLean Dep.] at 23:12-23; Exhibit 2 [Coleman Dep.] at 27:7-9).  It is well established that discriminatory remarks made by a non-decision maker are inadequate to support an inference of racial discrimination.  See, e.g., Hartwell v. Lifetime Doors, Inc., Civ. A. No. 05-2115, 2006 WL 381685, at * 7 (E.D. Pa. Feb. 16, 2006) (holding that plaintiff's evidence that a co-worker made two racial comments including calling plaintiff a nigger was inadequate to support an inference of discrimination where the co-worker was a non-decision maker).  It is also undisputed that the only CCG employees who took part in the decision to transfer Plaintiffs were Regional Manager John Gates and Project Supervisor Dave Dodson.  (Exhibit 3 [Clements Dep.] at 41:24-42:7).  Plaintiffs have not cited to any evidence to suggest that either John Gates or Dave Dodson (the decision makers) were somehow motivated by racial animus.  Plaintiffs' only evidence on this issue is their own subjective belief that they

have been discriminated against.

In a desperate attempt to establish the fourth element of their *prima facie case*, Plaintiffs claim that one similarly situated employee -- Brad Dodson -- was treated more favorably because he continued to work for CCG after Plaintiffs were laid off.  D.I. 45 at 6.  However, Plaintiffs present not a shred of record evidence to establish that Brad Dodson was in fact a "similarly situated" employee.  They offer no evidence as to qualifications, experience, or any other comparison factor.  Indeed, Plaintiffs expend a considerable amount of time and effort in their filings trying to establish that Brad Dodson is a supervisor – distinct and different from them.  Plaintiffs cannot create a material issue of fact with themselves in order to defeat summary judgment.  See, e.g., Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 254 (3d Cir. 2007) (explaining that a plaintiff cannot create a material dispute of fact by his own contradictory testimony without a "satisfactory explanation" for the conflicting evidence).  Simply put, Plaintiffs have failed to identify any evidence to show they suffered an adverse action that occurred under circumstances giving rise to an inference of discrimination and thus summary judgment should be granted.

2.    Plaintiffs Have Not Shown CCG's Stated Reasons Are Pretextual

Moreover, even assuming *arguendo* that Plaintiffs have established a *prima facie case* of discrimination, Plaintiffs have not demonstrated that CCG's non-discriminatory reasons for its employment decisions are pretextual.  If Plaintiffs establish their *prima facie* burden, CCG must only meet its "relatively light burden" of providing a legitimate, nondiscriminatory reason for its employment actions.  See Valenti v. Brownlee, No. 04-5369, 2005 WL 1655887, at *3 (E.D. Pa. July 13, 2005) (granting summary judgment) (quoting Fuentes v. Perskie, 32 F.3d 759, 804 (3d Cir. 1994)).

Here, CCG has met this "relatively light burden" as it has shown that Plaintiffs were

transferred by John Gates and Dave Dodson because the work Plaintiffs were performing for Verizon in New Castle, DE was ending and more work was available in West Chester, PA on another Verizon contract. (Exhibit 3 [Clements Dep.] at 41:24-42:7; Exhibit 4 [Clements Decl.] at ¶ 2). Mr. Coleman has admitted that it is the nature of the work at CCG that employees are transferred from one job site to another. (Exhibit 2 [Coleman Dep.] at 8:13-9:3). He also admitted that after his transfer, he did not know whether CCG was still performing work at the Delaware site. (Exhibit 2 [Coleman Dep.] at 34:4-7). Mr. McLean has admitted that in direct payment from CCG, he made more money after the transfer to West Chester, which refutes the assertion that Plaintiffs' transfer resulted in "inferior" work. (Exhibit 1 [McLean Dep.] at 37:18-21). Moreover, John Gates has explained that while Plaintiffs were permitted to use a company truck to travel from the warehouse to job sites, they were not allowed to drive a company truck home, while other supervisory employees could, because only specifically approved supervisory personnel who had been grandfathered in under an old policy were authorized to take company vehicles home. (Exhibit 5 [Gates Decl.] at ¶ 3-6). Finally, CCG has explained that Plaintiffs were terminated, along with five other employees at their jobsite (four of whom were outside of Plaintiffs' protected class), due to lack of work. (Exhibit 4 [Clements Decl.] at ¶ 3; Exhibit 6 [D0574-D780]).

Because CCG has met its minimal burden of production, the burden shifts back to Plaintiffs to meet their "difficult burden" of demonstrating that CCG's stated reasons are mere pretext for discrimination. Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005) (quoting Fuentes, 32 F.3d at 765). Plaintiffs have offered no evidence in response. There is absolutely no evidence that any of the alleged adverse actions or the decision makers in those actions, John Gates and Dave Dodson, were somehow motivated by anti-African American animus. Plaintiffs

offer only the unsupported assertion that Mr. Gates made "veiled threats" about Mr. Coleman's future with CCG after the incident with Brad Dodson.  D.I. 45 at 9.  Mr. Coleman identified the "threat" as the comment by Mr. Gates:  "I don't' know, when you come back from vacation, I don't know where you're going to go." (Exhibit 2 [Coleman Dep.] at 37:16-19).  This alleged statement is not objectively a threat – it was a statement of fact after the incident – and regardless did not involve any racial comments.  As Mr. Coleman admitted, it was the nature of the work at CCG that employees moved from one job site to another.  (Exhibit 2 [Coleman Dep.] at 8:13-9:3).

To establish pretext, Plaintiffs must do more than simply argue that a fact finder should not believe the employer's reason for taking the adverse actions.  Fuentes, 32 F.3d at 765.  Plaintiffs must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for the asserted non-discriminatory reasons.'" Id.  (citations omitted).  In sum, the fact that Plaintiffs may subjectively believe that their transfer, inability to drive the company truck home, and subsequent termination were wrong or unfair is irrelevant in a discrimination case and legally insufficient to defeat CCG's properly supported motion for summary judgment.

**B.      This Court Should Grant CCG Summary Judgment With Respect to Plaintiffs' Racial Harassment Claim**

1.      Plaintiffs Have Failed to Establish a *Prima Facie Case* of Harassment

As explained by CCG in its opening brief, to survive summary judgment on a racial harassment claim based on hostile work environment, Plaintiffs must establish that: (1) they suffered intentional discrimination because of their race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected them; (4) the discrimination would

have detrimentally affected a reasonable person of the same race in the same position; and (5) that respondeat superior liability exists.  See Andrews v. City of Phila., 895 F.2d 1469, 1482 (3d Cir. 1990).  Plaintiffs have not even mentioned their *prima facie* burden nor attempted to apply the facts of the case to that burden in their answering brief.  Applying the limited evidence that Plaintiffs produced to support a racial harassment claim shows it is inadequate to prove they suffered discrimination that was "pervasive and regular."

Here, Plaintiffs were told by another CCG employee, Robert Koch, that on one occasion Mr. Koch heard Brad Dodson make a comment allegedly referring to Mr. McLean and Mr. Coleman as "niggers."  (Exhibit 1 [McLean Dep.] at 10:8-19; Exhibit 2 [Coleman Dep.] at 11:14-23).  It is undisputed that neither Mr. McLean nor Mr. Coleman was present during this conversation and neither Plaintiff actually heard Brad Dodson make the alleged statement. (Exhibit 1 [McLean Dep.] at 13:17-19; Exhibit 2 [Coleman Dep.] at 11:24-12:3, 17:1-14).  The alleged "physical harassment" consisted of nothing more than Brad Dodson poking a single finger in Mr. Coleman's chest after being physically confronted by Plaintiffs – and involved no racial statements by Brad Dodson whatsoever.  (Exhibit 2 [McLean Dep.] at 10:20-11:5; Exhibit 2 [Coleman Dep.] at 13:3-18).  A single indirect racial comment and a finger poking altercation are simply insufficient to support a claim for hostile work environment.  See King v. City of Philadelphia, 66 F. App'x 300, 305 (3d Cir. 2003) (affirming summary judgment in favor of defendant and finding that where plaintiff was called a "nigger" on one occasion and subject to one physically push and one threat of sabotage to plaintiff's work record, these incidents were isolated and sporadic incidents that did not demonstrate a pervasive atmosphere of harassment); McCray v. DPC Indus., Inc., 942 F. Supp. 288, 293 (E.D. Tex. 1996) (granting summary judgment for the employer where employee was called a "nigger" and was involved in a physical

altercation with his foreman because such evidence does not constitute a hostile working

environment).

Plaintiffs claim in their brief that Brad Dodson referred to them as "yahoos." D.I. 45 at 7.

Plaintiffs have not, however, produced any evidence that this was a racial statement. Indeed, Mr.

Coleman testified that:

> Q. Prior to this incident, did Bradley Dodson ever refer to you or Jason McLean
> by a certain -- by any other names?
> A. Yeah. He used to call us yahoos.
> Q. And did he call anyone else yayhoos or yahoos?
> A. I never heard him say that to anyone else.
> Q. And in what context did he tell you yayhoos or yahoos?
> A. "You yayhoos, come one. You can't get that right." I never heard the word or
> expression before. **I didn't know what it meant.**

(Exhibit 2 [Coleman Dep.] at 50:2-12) (emphasis added). Further, Mr. Coleman admitted that he

did not complain to anyone at CCG that Brad Dodson called him a yahoo. (Exhibit 2 [Coleman

Dep.] at 52:4-8). This evidence is simply insufficient to carry Plaintiffs' burden of proof that

they were subject to harassment which was pervasive and regular. For these reasons, Plaintiffs

have not established a *prima facie case* of racial harassment and CCG is entitled to summary

judgment on this claim.

**C.    This Court Should Grant CCG Summary Judgment With Respect to
        Plaintiffs' Retaliation Claim**

1.    Plaintiffs Failed To Establish a *Prima Facie Case* of Retaliation

To survive summary judgment on their retaliation claim, Plaintiffs must establish a *prima*

*facie case* by showing: (1) they participated in a protected activity known to the defendant; (2)

they suffered an adverse employment action; and (3) there is a causal connection between the

protected activity and the adverse employment action. Weston v. Pennsylvania, 251 F.3d 420,

430 (3d Cir. 2001); 42 U.S.C. § 2000e-3(a). Inexplicitly, Plaintiffs have all but abandoned this

claim making only a vague reference to it in a heading and a statement about "temporal

proximity" in their summary of the argument.

A generous reading of Plaintiffs' brief suggests that they are claiming that their transfer, inability to drive a company truck home, and termination constitute retaliatory adverse employment actions. However, even accepting this proposition to be true, Plaintiffs have failed to establish the requisite causal connection between these actions and their complaints about discrimination. Plaintiffs' transfer, which occurred more than a month after the incident, was due to lack of work. (Exhibit 4 [Clements Decl.] at ¶ 2). Far from an adverse action, this was continuation of their employment. Indeed, Mr. McLean has admitted that in direct payment from CCG, he made more money after the transfer to West Chester, which refutes Plaintiffs assertion that the transfer resulted in "inferior" work. (Exhibit 1 [McLean Dep.] at 37:18-21). Further, describing the work in the two locations, Mr. Coleman stated, "it's the same type of thing, but different a little bit, yeah." (Exhibit 2 [Coleman Dep.] at 31:23-32:2).

To prove causation by temporal proximity, the retaliatory conduct must occur within a relatively short time period of the protected conduct. See, e.g., Zappan v. Pa. Bd. of Probation and Parole, Civ. A. No. 00-1049, 2002 WL 32174230, *10 (E.D. Pa. Nov. 25, 2002) (finding that a two month separation between the protected activity and the adverse employment action is "not unusually suggestive enough to establish causation"). Here, Plaintiffs were laid off for lack of work in October 2005, more than four months after the incident. (Exhibit 4 [Clements Decl.] at ¶ 3). The allegation that there was still work at CCG after Plaintiffs were laid off does not establish a "causal" connection. Moreover, it bears repeating that Plaintiffs have not presented a single piece of evidence to suggest that the decision makers in the alleged adverse actions, John Gates and Dave Dodson, were motivated by racial animus.

       2.    Plaintiffs Have Not Shown CCG's Stated Reasons are Pretextual

As with Plaintiffs discrimination claim, even assuming that Plaintiffs have established a

*prima facie case* of retaliation, their claim cannot survive summary judgment because Plaintiffs

point to no evidence that CCG's stated reasons for its employment decisions were pretextual.

See <u>Mroczek v. Bethlehem Steel Corp.</u>, 126 F. Supp. 2d 379, 389 (E.D. Pa. 2001).

Plaintiffs were transferred to continue their employment and were ultimately laid off for lack of

work along with a number of other employees.  For the same reasons stated in Section II.A.2

above, there is simply no evidence from which a fact finder could reasonably infer that CCG's

legitimate reasons for its employment actions were pretext for unlawful retaliation.

## III.    CONCLUSION

For the reasons set forth above, there are no genuine disputes of material fact and the

Court should grant CCG's motion for summary judgment.

Respectfully submitted,

/s/ Daniel M. Silver
Michael P. Kelly (DE Bar ID # 2295)
Daniel M. Silver (DE Bar ID # 4758)
McCarter & English LLP
Renaissance Centre
405 N. King St., 8th Floor
Wilmington, DE  19801
302.984.6301
302.984.2493 (fax)
mkelly@mccarter.com
dsilver@mccarter.com


Thomas Benjamin Huggett (admitted pro hac vice)
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103-2921
215.963.5191
215.963.5001 (fax)
tbhuggett@morganlewis.com

Dated:  January 2, 2008                    Attorneys for Defendant
                                           Communications Construction Group, LLC

## CERTIFICATE OF SERVICE

I, Daniel M. Silver, hereby certify that a true and correct copy of the foregoing Reply

Memorandum of Law in Support of Defendant Communications Construction Group, LLC's

Motion for Summary Judgment, and all Exhibits thereto has been served via CM/ECF this 2nd

day of January, 2008 upon the following:

Ronald G. Poliquin
Young, Malmberg & Howard, P.A.
30 The Green
Dover, DE 19901
(302) 672-5600
Delaware Bar I.D. No. 4447

Attorney for Plaintiffs

/s/ Daniel M. Silver
Daniel M. Silver (DE Bar ID # 4758)

v.

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


JASON McLEAN and                    )
BRIAN COLEMAN,                      )
                                    )   C.A. No. 06-617 SLR
                    Plaintiffs,)
                                    )
  -vs-                              )
                                    )
COMMUNICATIONS CONSTRUCTION         )
GROUP, LLC,                         )
                                    )
                    Defendant. )



          Deposition of JASON McLEAN taken pursuant
to notice at the law offices of Young, Malmlberg &
Howard, 30 The Green, Dover, Delaware, beginning at 9:13
a.m. on September 13, 2007, before Julianne LaBadia,
Registered Diplomate Reporter and Notary Public.


APPEARANCES:

          RONALD POLIQUIN, ESQ.
          YOUNG, MALMBERG & HOWARD
            30 The Green
            Dover, Delaware  19901
            For the Plaintiff


          THOMAS BENJAMIN HUGGETT, ESQ.
          MORGAN, LEWIS & BROCKIUS, LLP
            1701 Market Street
            Philadelphia, Pennsylvania  19103
            For the Defendant

          WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
              (302) 655-0477
              www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters

# ORIGINAL

Jason McLean

2

1                          JASON MCLEAN

2              The deponent herein, having first been

3              duly sworn on oath, was examined and

4              testified as follows:

5                     DIRECT EXAMINATION

6     BY MR. HUGGETT:

7          Q.    Would you state your name for the record,

8     please.

9          A.    Jason A. McLean.

10         Q.    And where do you reside, Mr. McLean?

11         A.    In Dover.

12         Q.    And what address?

13         A.    324 East Broad Stairs, Dover, Delaware 19904.

14         Q.    How long have you lived at that address?

15         A.    About six months.

16         Q.    Where did you reside prior to that?

17         A.    1266 South Farmview Drive, Dover, Delaware

18    19904.

19         Q.    And how long did you reside there?

20         A.    22 years.

21         Q.    I would take that it's your parents' house?

22         A.    Exactly.

23         Q.    We are here today to take your deposition.

24    Have you ever been deposed before?

Jason McLean

10

1    A.    Yes.

2    Q.    Had anything occurred prior to May 31 of 2005,

3    in your employment with CCG, that you think is of any

4    significance to this matter?

5    A.    No.

6    Q.    All right.  In your own words, if you would,

7    can you tell me what happened on May 31 of 2005.

8    A.    I was digging a hole in the neighborhood that

9    we were working in, and Robert Koch rode by on a -- on a

10   machine, and he stopped.  We had a conversation.

11            The conversation consisted of we were

12   talking about how nobody was making any money.  He stated

13   that, "You wouldn't believe what Brad said about you last

14   week."

15            Then I asked him what he said.  He said --

16   "We were talking that -- we were having the same

17   conversation.  At that time, he said, 'yeah, nobody is

18   making any money, but at least you don't have to work

19   with two dumb niggers,'" quote, unquote.

20            At that time we approached Mr. Dodson.  He

21   was drilling --

22   Q.    When you said "we," who are you referring to?

23   A.    Brian Coleman and I approached Mr. Dodson, who

24   was drilling underneath the street, around the corner

Jason McLean

11

1    from where we were.  We asked him if he made the

2    statement.  He jumped off his machine, furious, started

3    waving his finger in my face, and then Brian's face, and

4    then him and Brian got into a verbal altercation, and he

5    started poking Brian in his chest.

6              At that time, I called Lisa Clemens, the HR

7    representative, the only phone number of anybody I had

8    from the company, other than Brad.  I explained to her

9    what was going on at the present time.  After that

10   confrontation, Brian called the police.  After I got off

11   the phone with Lisa, Brad's brother Dave, the site

12   supervisor, and Mike Fender arrived on scene.  That was

13   my first time meeting Mike Fender.

14             They tried to resolve the situation by

15   having us shake hands and go back to work.  I stated that

16   that wouldn't work, because there's been some wrong

17   doings done.  The police then arrived and took statements

18   from everybody involved, and then the day was over and we

19   went home.

20        Q.    Okay.  Let me go back through, get a little

21   more detail on some of that.  You said you were digging a

22   hole.  What were you digging a hole for?

23        A.    Put in an underground vault.

24        Q.    And is that the normal work that you were doing

Jason McLean

13

1      Q.    So, depending on the type of work that's being

2  done by the company, different amounts of money can be

3  made by employees?

4      A.    Yes.

5      Q.    Can you tell me to the best of your

6  recollection exactly what Mr. Koch said, after that,

7  about Mr. Dodson?

8      A.    Exactly what I said.

9      Q.    How did he make the transition from talking

10 about not making money to repeating this alleged

11 statement?

12     A.    There was no transition.  He just came right

13 out and said it.

14     Q.    Why did he do that?

15     A.    He's one of our friends.  I would consider him

16 a friend.

17     Q.    You weren't present for this comment allegedly

18 made by Brad Dodson?

19     A.    No.

20     Q.    This was the first time that you had heard

21 about it?

22     A.    Yes.

23     Q.    You didn't know whether, in fact, Mr. Dodson

24 had said this?



Jason McLean

23

1        Q.    If you were to be asked by the police your

2    race, would you say White?

3        A.    And Black.

4        Q.    So you would agree this report is not entirely

5    accurate?

6        A.    I would agree.

7        Q.    You said that after the police took statements,

8    everyone went home for the day?

9        A.    In my recollection, yes.

10       Q.    And that was at the direction of Mr. Fender?

11       A.    Yeah.

12       Q.    What happened after May 31?

13       A.    Continued to work.

14       Q.    Did you work on that same crew?

15       A.    No.

16       Q.    To whose crew did you go?

17       A.    That day after, nobody's.

18       Q.    And why not?

19       A.    I don't know.

20       Q.    Did you want to go back to Mr. Dodson's crew?

21       A.    I wouldn't have had a problem with it.

22       Q.    Who told you not to go back to that crew?

23       A.    Mike Fender.

24       Q.    And what did you do the day after?

Jason McLean

37

1       Q.    Upon what is that based?

2       A.    Deductions at the end of the day.

3       Q.    And what are deductions?

4       A.    Gas, food, room and board.

5       Q.    Well, you were traveling back and forth daily

6    between home, so you didn't have room and board, did you?

7       A.    Depending on what time we got off work.  If we

8    got off work at 9:00 at night, we would just get a hotel.

9    No point in driving home.

10      Q.    Why would food costs increase because you were

11   in Westchester as opposed to anywhere else?  You have to

12   eat all the time, right?

13      A.    We worked longer hours, so you ended up in the

14   field longer, so you got to spend more money on food.

15      Q.    And if you're driving the company truck, who

16   pays for gas?

17      A.    The company.

18      Q.    In fact, in direct salary from the company, you

19   made more working at Westchester than you did in New

20   Castle?

21      A.    In direct salary, yes.

22      Q.    And you and Mr. Coleman weren't the only

23   employees transferred from New Castle to Westchester,

24   were you?

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


JASON McLEAN and                    )
BRIAN COLEMAN,                      )
                                    )    C.A. No. 06-617 SLR
                    Plaintiffs,)
                                    )
    -vs-                            )
                                    )
COMMUNICATIONS CONSTRUCTION         )
GROUP, LLC,                         )
                                    )
                    Defendant. )



        Deposition of BRIAN COLEMAN taken pursuant
to notice at the law offices of Young, Malmlberg &
Howard, 30 The Green, Dover, Delaware, beginning at 1:00
p.m. on September 13, 2007, before Julianne LaBadia,
Registered Diplomate Reporter and Notary Public.


APPEARANCES:

        RONALD POLIQUIN, ESQ.
        YOUNG, MALMBERG & HOWARD
          30 The Green
          Dover, Delaware  19901
          For the Plaintiff


        THOMAS BENJAMIN HUGGETT, ESQ.
        MORGAN, LEWIS & BROCKIUS, LLP
          1701 Market Street
          Philadelphia, Pennsylvania  19103
          For the Defendant

        WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
            (302) 655-0477
            www.wilfet.com



Brian Coleman

2

1              BRIAN COLEMAN

2         The deponent herein, having first been

3         duly sworn on oath, was examined and

4         testified as follows:

5              DIRECT EXAMINATION

6    BY MR. HUGGETT:

7         Q.    Would you state your name for the record?

8         A.    Brian T. Coleman.

9         Q.    Mr. Coleman, by whom are you presently

10   employed?

11        A.    Myself.

12        Q.    And what do you do?

13        A.    The same thing that I used to do there.

14        Q.    When you say "there," you're referring to

15   Communication Construction Group?

16        A.    Yes, sir.

17        Q.    Have you worked for any other company since you

18   worked for CCG?

19        A.    Yeah.  I mean I work for myself, but I still

20   sub work out.  I get it from somebody else.

21        Q.    Who do you get work for?

22        A.    JT Enterprises, now it's S&M, out of Richmond,

23   Virginia, or Ashland, Virginia.

24        Q.    And do you get a paycheck from them?  Or how

Brian Coleman

8

1       A.    I'm not sure.

2       Q.    And when did that move to New Castle?

3       A.    I have no idea.  You asking me stuff that was

4    like a couple years back.  I can't remember.  CCG should

5    have that information.

6       Q.    Okay.  Well, at this point, I am just exploring

7    what you recall, and, yeah, we'll -- your attorney has

8    the right to ask questions of our employees, as well.

9       A.    That's fine.

10      Q.    And we can go through all that.  Do you know

11   why the work moved from Westchester down to New Castle?

12      A.    No.

13      Q.    And at some point, the work moved back from New

14   Castle back up to Westchester, correct?

15      A.    From where?

16      Q.    From New Castle, Delaware, back up to

17   Westchester?

18      A.    Yeah.

19      Q.    Did it go back and forth over a period of

20   years, or just --

21      A.    I mean it was a traveling company.  That's what

22   the company did.  They had job sites all across the

23   United States.  Wherever they want to send you, that's

24   where you have to go, if you want the job.

Brian Coleman

9

1    Q.    And that's in the nature of the contracts and

2   work that they do?

3    A.    Yeah.

4    Q.    What was the last position that you held with

5   CCG?

6    A.    I was a foreman.

7    Q.    When did you become a foreman?

8    A.    Well, I was a foreman when I was doing the

9   underground FIOS work, before that Verizon work started.

10  After that incident happened with Mr. Dodson, Mr. Gates,

11  I asked him if I could run my own crew, he told me he

12  didn't know if I was capable of doing that, and that's

13  when he tried -- gave me a crew and gave me a truck and

14  took the truck away.  After that incident happened, after

15  I got back off vacation from California.

16   Q.    The incident that you're referring to is the

17  May 31 conversation, Mr. Robert Koch told you about a

18  comment that was allegedly made by Brad Dodson; is that

19  correct?

20   A.    I guess that was May 31st.  Yeah.  I mean if

21  that was the right day.  That was a long time ago.  But

22  it wasn't just Robert Koch.  It was a couple other guys,

23  as well.

24   Q.    We'll get back to that.  And it was after that

Brian Coleman

11

1     Q.   2005.  Now, you had worked for CCG for a number

2  of years prior to May 31st, 2005?

3     A.   Yes.

4     Q.   Were there any events that occurred prior to

5  that date, in your employment --

6     A.   With me?

7     Q.   With you.

8     A.   No, sir.

9     Q.   Didn't have any problems --

10    A.   No problem at all.

11    Q.   -- with the company or working?  Okay.  In your

12  own words, if you would, tell me what happened on May

13  31st, what the conversation was with Mr. Koch.

14    A.   Well, it was me and Jason McLean, saw Mr. Koch,

15  I guess, and asked him if they were making any money.  It

16  was like -- some weeks you do good and some weeks you do

17  bad.  This was one of those bad spells.  And he had told

18  us what Mr. Dodson said, about "We weren't making any

19  money, but at least you don't have to work with two dumb

20  niggers."

21    Q.   And when you said Mr. Dodson, you're referring

22  to Brad Dodson?

23    A.   Brad Dodson.  He was my foreman.

24    Q.   You weren't present for this conversation

Brian Coleman

12

1   between Mr. Dodson when he allegedly made this statement

2   to Mr. Koch?

3       A.   No.  I wasn't.

4       Q.   Do you know when that happened?

5       A.   It was a Friday before that weekend, or -- we

6   had a weekend off or something, a holiday or something.

7   A couple days that went past, and that Monday, I think,

8   they told us.

9       Q.   What did you say to Mr. Koch after he gave you

10  this alleged statement?

11      A.   Well, you keep saying Mr. Koch.  It wasn't just

12  Mr. Koch who was telling me.

13      Q.   Okay.  Who else -- where did that conversation

14  take place?

15      A.   Right in the neighborhood where we were working

16  at.

17      Q.   Okay.  And was Mr. Koch working with you?

18      A.   No.  Mr. Koch wasn't working with us.

19      Q.   Okay.

20      A.   We all worked -- there was a street here, a

21  street here.  Everybody -- the neighborhood was broken up

22  into sections.  This crew had this section, this crew had

23  this section.  We had to go around the corner on the

24  backhoe to get stone.  We were getting boxes.  And we

Brian Coleman

13

1    always stopped and just shoot the shit with the guys, you

2    know what I mean?  We all worked together.  Same company.

3                    So when we stopped, he told us what was

4    said.  Davey Miller told us what was said.  There was a

5    couple of them told us what was said.  So when he told us

6    what was said, I mean I go -- I bust my butt for this

7    guy, Dave Dodson -- I mean, yeah, Brad Dodson.  If I

8    don't dig my holes, he can't use that machine to shoot

9    that footage there where he is taking the biggest chunk

10   of the money.  So I went around there, and I confronted

11   him.  I asked him --

12       Q.    Okay.

13       A.    -- why would you say something like that, you

14   know what I mean?

15       Q.    And what was his response?

16       A.    He got in my face.  "I'm a Dodson."  I said I

17   don't care who you are.  I'm a man just like you are.

18   From there, that's when the confrontation started.

19       Q.    Okay.  You and Jason were going to get stone,

20   you said, when this conversation took place.

21       A.    Yeah.

22       Q.    Who was present at that point in time?

23       A.    When we were going to get stone?

24       Q.    Yeah.



Brian Coleman

17

1      A.   It says me, the big boss -- he called me a dumb

2 nigger before the police came.

3      Q.   Okay.  You didn't tell the police that he

4 called you a dumb nigger at that point in time?

5      A.   Yes, I did.  Yes, I did.

6      Q.   Did he call you that, on May 31st?

7      A.   He called me that before May 31st.

8      Q.   You heard that he called you that?

9      A.   Yeah.

10     Q.   You never heard that directly from him, did

11 you?

12     A.   From a couple guys.

13     Q.   You never heard that --

14     A.   No.  I didn't hear that directly from him.

15     Q.   Okay.

16     A.   Okay.

17     Q.   So, did you mean to tell the police that you

18 heard it directly from him?

19     A.   I never told the police that I heard it

20 directly from him.

21     Q.   If you look at the --

22     A.   When the police came there, they took my

23 statement.  They said that there was more than one party

24 who heard him say it, so that was admissible in court, it

Brian Coleman

27

1   A.   A whole bunch.  I don't -- we got transferred,

2   they had told us they didn't know what they was going to

3   do with us.  They had me laying pipe for a little bit up

4   in -- I believe it was Hockessin, Delaware, up by the

5   beach, for like three days.  Snatched us off that, and

6   that's when we went to Westchester.

7   Q.   When you came back, were you on Brad Dodson's

8   crew?

9   A.   No.

10  Q.   Whose crew were you on?

11  A.   I guess you could call it my own for three

12  days.

13  Q.   And when you say your own, you would have been

14  a foreman for that crew?

15  A.   Yeah.

16  Q.   Who else was on the crew?

17  A.   I believe it was Jason McLean, and Harry Ortiz.

18  Q.   Previously, that crew, Mark Lynch was the

19  foreman, correct?

20  A.   Mark Lynch.

21  Q.   Worked with Harry Ortiz?

22  A.   I don't remember.  I don't even remember a Mark

23  Lynch.

24  Q.   Did you do any work down in Angola?

Brian Coleman

31

1   was being closed?

2       A.    Nobody ever told me.  I don't know.

3       Q.    But you did say it was the nature of the work

4   that employees went and did the work --

5       A.    Traveled, yeah.

6       Q.    -- wherever it was?  What was the work that was

7   being done in Westchester?

8       A.    When we got transferred?

9       Q.    Yeah.

10      A.    Drop work.  Underground drops.  Instead of

11  doing big pipe, you do little small drops.  Got to run

12  from here to there, there to there.  There to there.  It

13  was just crazy.  Monotonous.  Versus the main line, you

14  go to a neighborhood and sit in that neighborhood and

15  just work, work, work, work.

16      Q.    So the drops can be in various neighborhoods in

17  a given day?

18      A.    Absolutely.

19      Q.    Is it easier work?

20      A.    I'm not going to say it's easier.  I mean it's

21  all back-busting work.  I mean it's hard labor work.

22  That's all it is.

23      Q.    It's different than what you were doing down in

24  New Castle?

Brian Coleman

32

1     A.    I mean it's the same type thing, but different

2  a little bit, yeah.   You could say.

3     Q.    Has different rates associated with payments?

4     A.    A lot different.   I think I was getting about

5  1.20 a foot for doing that underground drops.   That one

6  was like 3.65 a foot we were getting.   I think.   Don't

7  quote me but -- the big pipe, I don't know exactly what

8  it was.

9     Q.    When you're doing drops, you don't have to

10 spend extra time setting vaults though, correct?

11    A.    You still got to dig into the vault.

12    Q.    But when you're setting vaults you don't get

13 paid for setting a vault per se.   There's not a rate for

14 that, is there?

15    A.    No.   There's not.   But the price makes up for

16 not getting paid to set vaults.   3.65 is a lot different

17 than 1.20.

18    Q.    So the 3.65 includes payment for setting the

19 vault, right?   That's part of that.   And the 1.20 doesn't

20 require that.   You have to dig into it, but you don't

21 have to set it, which is a lot of work.

22    A.    No, you don't have to set it.

23    Q.    Were you working more hours directly when you

24 came up to Westchester?

Brian Coleman

34

1      Q.    And that split is what's referred to as

2  percentages?

3      A.    Absolutely.

4      Q.    And to your knowledge, was there any work still

5  being performed in Delaware?

6      A.    I don't know.  I mean I was just a worker.  I

7  don't know.

8      Q.    Where did you reside at that point in time?

9      A.    In Delaware.  In Delaware.

10      Q.    All right.  Why did you provide the police with

11  a Willingboro, New Jersey address?

12      A.    When did I provide the police with a New Jersey

13  address?

14      Q.    Well, actually, this one has, what we've marked

15  as Exhibit 1 has a Puzzleton Road, Dunkinsville, PA

16  address.  Is that your address?

17      A.    No, it's not.

18      Q.    Is that an address you've ever lived at?

19      A.    No.

20          MR. POLIQUIN:  I believe, just for

21  confusion's sake, I think that's Bradley Dodson

22  they're referring to as the defendant there, not

23  Mr. Coleman.

24      Q.    Okay.  Here is actually where I was looking.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Brian Coleman

37

1      Q.    And is that your signature on the document?

2      A.    Yes, it is.

3      Q.    Okay.  And there is a part there on that first

4   page in the middle that says "I agree or I disagree."

5   There's nothing checked there, is there?

6      A.    Nope.

7      Q.    You didn't write down that you had a

8   disagreement with any of this?

9      A.    No.  I mean I felt my job was threatened, the

10  reason why I didn't.  I was just cooperating with them,

11  because -- because of the situation.  That's why I didn't

12  check the boxes.  I didn't agree with it, and I knew I

13  was going to get worse, because I knew --

14     Q.    Did anyone threaten your job at that point in

15  time?

16     A.    I mean you're making accusations, "I don't

17  know, when you come back from vacation, I don't know

18  where you're going to go."  That's like threatening my

19  job.  I been there for five years.  How you going to tell

20  me you're not going to know where I'm going to go or what

21  I'm going to do when you got job sites all over.  Send me

22  from one to another one where Brad Dodson was not

23  supposed to be around me, but it's still the same job

24  site.  You going to tell me you can't find a job site to

Brian Coleman

50

1      A.    No.

2      Q.    Prior to this incident, did Bradley Dodson ever

3    refer to you or Jason McLean by a certain -- by any other

4    names?

5      A.    Yeah.  He used to call us yahoos.

6      Q.    And did he call anyone else yayhoos, or yahoos?

7      A.    I never heard him say that to anyone else.

8      Q.    And in what context did he tell you yayhoos or

9    yahoos?

10     A.    "You yayhoos, come on.  You can't get that

11   right."  I never heard the word or expression before.  I

12   didn't know what it meant.

13     Q.    Who else was on your team at that time?

14     A.    Bradley and Frank.

15     Q.    Did he ever refer to Frank as a yayhoo?

16     A.    Huh-uh.

17     Q.    You had worked for this company for four or

18   five years?

19     A.    Yes, sir.

20     Q.    And were you ever laid off during that period

21   of time?

22     A.    No, sir.  Not that I remember.

23     Q.    And do you know what discipline Bradley Dodson

24   received has a result of the Lisa Clemens investigation?

Brian Coleman

52

1   called human resources after the confrontation between

2   you and Mr. Dodson, correct?

3        A.    Correct.

4        Q.    Did you ever complain to anyone that Brad

5   Dodson referred to you as a yahoo?

6        A.    I didn't pay it no mind, until after that other

7   comment was said.  But I heard him say that directly to

8   me.

9             MR. HUGGETT:  That's all.

10             MR. POLIQUIN:  I have nothing else.

11   you can either waive signature or you can review it

12   before you sign it.  What would you want to do?

13             THE WITNESS:  I want to review it.

14             (Deposition concluded at 2:22 p.m.)

15

16

17

18

19

20

21

22

23

24

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


JASON McCLEAN and BRIAN COLEMAN,    )
                                    )
          Plaintiffs,               )
                                    )    Civil Action
v.                                  )    No. 06-617-SLR
                                    )
COMMUNICATIONS CONTRUCTION GROUP,   )
LLC,                                )
                                    )
          Defendant.                )


          Deposition of LISA CLEMENTS taken
pursuant to notice at the law offices of Morgan, Lewis
& Bockius, LLP, 1701 Market Street, Philadelphia,
Pennsylvania,  beginning at 1:06 P.m. on Wednesday,
September 19, 2007, before Christina M. Vitale,
Certified Shorthand Reporter and Notary Public.

APPEARANCES:

        RONALD G. POLIQUIN, ESQUIRE
        YOUNG MALMBERG & HOWARD, P.A.
          30 The Green
          Dover, Delaware  19901
          For the Plaintiffs

        COURTNEY A. WIRTH, ESQUIRE
        MORGAN LEWIS & BOCKIUS, LLP
          1701 Market Street
          Philadelphia, Pennsylvania  19103
          For the Defendant



                WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801

                (302) 655-0477

              www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters



Lisa Clements

2

1          LISA CLEMENTS, the deponent herein, having

2     first been duly sworn on oath, was examined and

3     testified as follows:

4     BY MR. POLIQUIN:

5       Q.    Ms. Clements, have you spoken with your

6     attorney regarding the procedures for a deposition?

7       A.    Yes.

8       Q.    Do you understand you are under oath and you

9     are obligated to testify truthfully?

10      A.    Yes.

11      Q.    Even though we are sitting here in a conference

12    room your testimony has the same force and effect as

13    if you were testifying in a court of law.

14      A.    Yes.

15      Q.    Do you understand that the court reporter will

16    take down everything you say during the deposition and

17    that that testimony will be transcribed into a booklet

18    form?

19      A.    Yes.

20      Q.    And please understand that because everything

21    is verbal answer all your questions verbally meaning

22    no nods with the head, no shaking, everything has to

23    be communicated verbally.

24      A.    Yes.



Lisa Clements

41

1    A.    I don't remember.

2    Q.    Would that be something in your investigative

3    report?

4    A.    Yes.

5    Q.    So, if it's not in your investigative report,

6    you probably didn't attempt to call the officer, is

7    that correct?

8    A.    Yes, it may be.

9    Q.    Let me show you what was attached as Exhibit 3

10   in plaintiffs' complaint.

11           MR. POLIQUIN:  Would you mark that, please.

12           (Clements Deposition Exhibit No. 4 was

13   marked for identification.)

14   BY MR. POLIQUIN:

15   Q.    I'm looking at page two of the police report

16   concerning the incident of May 31, 2005.  If you could

17   look under statement of suspect, Brad Dodson, I

18   believe it's the third sentence in parentheses.

19   A.    (Witness complies.)

20   Q.    Does that represent that Brad Dodson did not

21   deny making the statement dumb fucking niggers when he

22   was interviewed by the police officer?

23   A.    It says he did not admit or deny.

24   Q.    After May 31st, 2005 were you involved in any

Lisa Clements

42

1   decision-making to transfer Brad Dodson, Brian Coleman

2   or Jason McLean?

3       A.    No, I was not.

4       Q.    Who decided where those employees would be

5   transferred?

6       A.    The regional manager, John Gates, and the

7   project supervisor, Dave Dodson, Junior.

8       Q.    Dave Dodson is brothers with Brad Dodson, is

9   that correct?

10      A.    That is correct.

11      Q.    And you didn't feel it was inappropriate for

12  Dave Dodson to be part of those decisions since he was

13  closely related to Brad Dodson?

14      A.    No, because Dave Dodson is our project

15  supervisor and he maintains that position whether it's

16  his brother or not.

17      Q.    As somebody with a degree in HR management you

18  don't see any conflict of interest in having Dave

19  Dodson participate in this decision?

20      A.    I didn't even know the decision was being made.

21      Q.    So, no one asked you?

22      A.    No.

23      Q.    Do you think you should have been consulted on

24  a decision like this?

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JASON MCLEAN and
BRIAN COLEMAN,

               **Plaintiffs,**

v.

COMMUNICATIONS CONSTRUCTION
GROUP, LLC,

               **Defendant.**

CIVIL ACTION NO. 06-617 (SLR)

## DECLARATION OF LISA CLEMENTS

I, Lisa Clements, depose and state as follows:

    1.     I am a currently employed as the Human Resources Manager for Communications Construction Group, LLC ("CCG"). I have held this position since approximately August of 2005. Prior to August of 2005 I was employed as the Human Resource/Benefits Administrator.

    2.     On or about July 6, 2005 Brian McLean and Jason Coleman were transferred from CCG's Newcastle Delaware, worksite to its West Chester, Pennsylvania worksite. They were transferred because work on the Verizon contract in Delaware was ending and other work was available in Pennsylvania. After they were notified of the transfer by their supervisor, and before the transfer occurred, pursuant to a request from Mr. Coleman on or about July 5 I prepared a letter explaining the basis for the transfer for Mr. Coleman. A true and accurate copy of the letter is attached as Exhibit 1 hereto.

    3.     On October 6, 2005 several CCG employees who were working on Job No. 5008 were laid off due to lack of work. The names and races of these employees are as follows:

       a.  Marco Blancas (Hispanic)

  b. Alberto Carmona (Hispanic)

  c. Brian Coleman (African-American)

  d. Joel Diaz Guaddarama (Hispanic)

  e. Jason McLean (African-American)

  f. John Morris (African-American)

  g. Harry Ortiz (Hispanic)


   I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing information is true and correct, based upon my knowledge, information and belief.

DATED:  November 27, 2007

LISA CLEMENTS

Exhibit
1

July 5, 2005


Mr. Brian Coleman
20 Tarpon Court
Willingboro, NJ 08046

Re: Employee Transfer

Attn: Brian

Due to the recent cut back in the amount of work given to Communications Construction Group, LLC in New Castle, DE (Job #5007) we will need to transfer you to Devault, PA (Job #5008). John Gates - Regional Manager – received notification from Job #5007 customer that the work was being cut in half. At the same time the work on Job #5008 is being increased.

Jason McLean, Harry Ortiz and you are all being transferred to the Devault, PA job. A 120 man Sub Crew is also being transferred to Devault, PA. Currently there are two underground crews working in New Castle, DE. The other crew uses a drill that is too large to be used on the Devault, PA job and the New Castle, DE job must have a drill on site; therefore this crew must stay at the New Castle, DE job.

As a reminder, I have enclosed a copy of the signed *Receipt & Acknowledgement* form. As stated in the company's Employee Policy Manual, "All employees should be advised that CCG may require that you transfer to another job site, which could be in a different location or state."

If you have any questions, please feel free to call me at (610) 696-1800 x588.

Thank you,


Lisa Clements
Human Resource/Benefits Administrator


*encl*

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **JASON MCLEAN and BRIAN COLEMAN,** | |
| Plaintiffs, | CIVIL ACTION NO. 06-617 (SLR) |
| v. | |
| **COMMUNICATIONS CONSTRUCTION GROUP, LLC,** | |
| Defendant. | |

## DECLARATION OF JOHN GATES

I, John Gates, depose and state as follows:

1.    I am a currently employed as the Regional Supervisor for Communications Construction Group, LLC ("CCG"). I have held this position since 2000.

2.    In my capacity as Regional Supervisor, I have personal knowledge of CCG policies and procedures, including use of company provided vehicles.

3.    In 2005, it was brought to my attention by Bill Grover that Brian Coleman and Jason McLean were driving a company truck home from work.

4.    According to CCG policy at that time, only specifically approved supervisory personnel were authorized to take company vehicles home.

5.    The only foremen who were authorized to take company vehicles to and from their homes had been grandfathered in under an old policy where they had been personally assigned a company truck for their company and individual use. Those foremen who had previously worked on aerial installation of fiber optic cable across the state of Pennsylvania. At that time, CCG provided company trucks to foreman and allowed their use for travel home on

weekends because the job sites were extremely remote. Aerial cable installation work by CCG

ended in late 2004 and early 2005 and company trucks were not provided to any foremen after

that time. This practice was discontinued in part as a cost savings measure for the company.

     6.     Because neither Mr. Coleman nor Mr. McLean had ever performed aerial

installation, and because neither had been personally assigned a company truck, it was against

company policy for them to use a company truck to get to and from the company warehouse.

Therefore, I instructed Mr. Grover to tell Mr. McLean and Mr. Coleman to stop driving the

company truck home. Mr. Coleman and Mr. McLean were still permitted to use the truck for

travel from the warehouse to the job site.

     I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing

information is true and correct, based upon my knowledge, information and belief.


DATED: November 27, 2007     JOHN GATES

# EXHIBIT 6

P.02

RECEIVED FROM:12152697568

06-10-05    15:08

*1-800-822-3345*

# Communications Construction Group, LLC.
## Record of Employment Separation

| | | | |
|---|---|---|---|
| **Employee's Name** | Marco Blancas | **Employee #** | I1993 |
| | (print name) | | |
| **Last Day Worked** | 10-6-05 | **Job #** | 5008 |

### Reason For Separation (check one)

| Voluntary Resignation | | Discharge | |
|---|---|---|---|
| Job Abandonment | ☐ | | Absenteeism |
| Job Relocation Refused | ☐ | | Lateness |
| Dissatisfied with Job | ☐ | | Not Qualified |
| Other Employment | ☐ | Violation of Company Policy | |
| Personal or Domestic | X | | Lack of Work |
| Continuing Education | ☐ | | Gross Insubordination |
| Other _____ | ☐ | Other _____ | |

### Items Returned to CCG (check all that apply)

☐ Cell Phone   ☐ Computer/Laptop   ☒ Company Truck/ Keys   ☐ Building Keys   ☐ CCG ID Cards   ☐ Other _____

### Explanation of Final Incident
Include all relevant dates and previous infractions. Continue on back of page if necessary.

_____

_____

---

**MUST BE COMPLETED**

**Employee's Signature** Marco Antonio Blancas    **Date** 10/06/05

**Supervisor (signature)** William Grove Jr    **Date** 10-6-05

**Supervisor (print name)** William J Grove Jr

**Witness Signature** _____    **Date** _____

---

**Office Use Only**    Pd W/CK 10-13-05 km

☐ If checked, the company chooses not to challenge claimant's eligibility to receive benefits.

| | | |
|---|---|---|
| Health Insurance _NA_ | Stock _NA_ | Tool amount owed _____ |
| H.I. Reimbursement _NA_ | Garnishment _____ | Vacation _3 1/2 days PC_ |
| 401(k) _NA_ | Direct Deposit _____ | Computer/Network Access _See attached_ |
| ING _NA_ | Vehicle Allowance _____ | Advances _NA_ |
| Pre-Paid Legal _NA_ | Cell Phone _NA_ | |

PC10/5 ✓ Human Resources
10-10-05  Payroll km

CCG. Emp separation frm(4-05)

610-380-3569  Call Back #

D0574

RECEIVED FROM:12152697568    P.03
06-10-05    15:09

*1-800-822-3-45*

# Communications Construction Group, LLC.
## *Record of Employment Separation*

| | | | |
|---|---|---|---|
| Employee's Name | Alberto Carmona | Employee # | 11976 |
| | (print name) | | |
| Last Day Worked | 10-6-05 | Job # | 5008 |

### Reason For Separation (check one)

| Voluntary Resignation | | Discharge | |
|---|---|---|---|
| ☐ | Job Abandonment | ☐ | Absenteeism |
| ☐ | Job Relocation Refused | ☐ | Lateness |
| ☐ | Dissatisfied with Job | ☐ | Not Qualified |
| ☐ | Other Employment | ☐ | Violation of Company Policy |
| ☐ | Personal or Domestic | X | Lack of Work |
| ☐ | Continuing Education | ☐ | Gross Insubordination |
| ☐ | Other _____ | ☐ | Other _____ |

### Items Returned to CCG (check all that apply)
☐ Cell Phone   ☐ Computer/Laptop   ☒ Company Truck/ Keys   ☐ Building Keys   ☐ CCG ID Cards   ☐ Other ___

### Explanation of Final Incident
Include all relevant dates and previous infractions. Continue on back of page if necessary.

---

**MUST BE COMPLETED**

| | | | |
|---|---|---|---|
| Employee's Signature | *Alberto Carmona* | Date | 10-6-06 |
| Supervisor (signature) | *Will J.G.* | Date | 10-6-05 |
| Supervisor (print name) | William J Grover Jr | | |
| Witness Signature | _____ | Date | _____ |

### Office Use Only
Pd w/ck 10-13-05 KHW

__ If checked, the company chooses not to challenge claimant's eligibility to receive benefits.

| | | |
|---|---|---|
| Health Insurance NA | Stock NA | Tool amount owed |
| H.I. Reimbursement NA | Garnishment | Vacation 3 1/2 days PC |
| 401(k) NA | Direct Deposit | Computer/Network Access See attached |
| ING NA | Vehicle Allowance | Advances NA |
| Pre-Paid Legal NA | Cell Phone NA | |

PC 10/5 ✓ Human Resources
10-10-05 Payroll KHW

CCG Emp separation form(4-05)

D0575

P. 05                    RECEIVED FROM:12152697568                    15:09    06-10-05

*1 - 800 - 822 - 3345*

# Communications Construction Group, LLC.
## *Record of Employment Separation*

**Employee's Name**   Brian Coleman                              **Employee #**   11563
                        (print name)

**Last Day Worked**   10 - 6 - 05                                **Job #**   5008

### Reason For Separation (check one)

| Voluntary Resignation | | Discharge | |
|---|---|---|---|
| ☐ | Job Abandonment | ☐ | Absenteeism |
| ☐ | Job Relocation Refused | ☐ | Lateness |
| ☐ | Dissatisfied with Job | ☐ | Not Qualified |
| ☐ | Other Employment | ☐ | Violation of Company Policy |
| ☐ | Personal or Domestic | X | Lack of Work |
| ☐ | Continuing Education | ☐ | Gross Insubordination |
| ☐ | Other _____ | ☐ | Other _____ |

### Items Returned to CCG (check all that apply)

☒ Cell Phone   ☐ Computer/Laptop   ☒ Company Truck/ Keys   ☐ Building Keys   ☐ CCG ID Cards   ☐ Other _____

### Explanation of Final Incident
Include all relevant dates and previous infractions. Continue on back of page if necessary.

_____

_____

| MUST BE COMPLETED | |
|---|---|
| **Employee's Signature** B____ C____ | **Date** 10-6 05 |
| **Supervisor (signature)** Will §.J. | **Date** 10 - 6 - 05 |
| **Supervisor (print name)** William J Grover Jr | |
| **Witness Signature** _____ | **Date** _____ |

### Office Use Only

__ **If checked, the company chooses not to challenge claimant's eligibility to receive benefits.**

Pd w/cc  10·13·05 KM

Health Insurance  *term Ŧᶜ*          Stock  *NA*              Tool amount owed _____

H.I. Reimbursement  *term Ŧᶜ*        Garnishment _____    Vacation  1/2 day ᶻᶜ

401(k)  *N̸A  , ᶻᶜ*                   Direct Deposit  *Off*    Computer/Network Access  *see attached*

ING  *NA*                            Vehicle Allowance _____   Advances  *NA*

Pre-Paid Legal  *NA*                 Cell Phone  *returned*

                                     ᵭc 10/5 ✓ Human Resources
                                     10·13·05 Payroll KM.

→7 Medical KM
   Dental KM

CCG  Emp.separation frm (4-05)

Call Back # 302-241-1139                                      D0576

RECEIVED FROM:12152697568                                13:16   06-10-05

# Communications Construction Group, LLC.
## *Record of Employment Separation*

**Employee's Name**   Joel Diaz Guaddarama         **Employee #**   12036
(print name)

**Last Day Worked**   10-6-05                      **Job #**   5008

### Reason For Separation (check one)

**Voluntary Resignation** | **Discharge**
--- | ---
☐ Job Abandonment | ☐ Absenteeism
☐ Job Relocation Refused | ☐ Lateness
☐ Dissatisfied with Job | ☐ Not Qualified
☐ Other Employment | ☐ Violation of Company Policy
☐ Personal or Domestic | X Lack of Work
☐ Continuing Education | ☐ Gross Insubordination
☐ Other ___ | ☐ Other ___

### Items Returned to CCG (check all that apply)
☐ Cell Phone  ☐ Computer/Laptop  ☒ Company Truck/ Keys  ☐ Building Keys  ☐ CCG ID Cards  ☐ Other ___

### Explanation of Final Incident
Include all relevant dates and previous infractions. Continue on back of page if necessary.

___

**MUST BE COMPLETED**

Employee's Signature  Joel Diaz leal Guadarama   Date 10-6-05

Supervisor (signature)  Will DA L     Date 10-6-05

Supervisor (print name)  William J Grogen Jr

Witness Signature ___   Date ___

### Office Use Only   Pd w/ck 10.13.05

☐ If checked, the company chooses not to challenge claimant's eligibility to receive benefits.

Health Insurance  NA      Stock  NA        Tool amount owed ___
H.I. Reimbursement  NA    Garnishment ___  Vacation  2 days LC
401(k)  NA               Direct Deposit  N/A  Computer/Network Access  See Attached
ING  NA                  Vehicle Allowance ___  Advances  NA
Pre-Paid Legal  NA       Cell Phone ___

LC 10/5  Human Resources
10-7-05  Payroll  Km.

CCG Emp separation frm/(4-05)

D0577

# Communications Construction Group, LLC.
## *Record of Employment Separation*

**Employee's Name**   Jason McLean          **Employee #**   11951
                      **(print name)**

**Last Day Worked**   10-6-05               **Job #**   5008

## Reason For Separation (check one)

| Voluntary Resignation | | Discharge | |
|---|---|---|---|
| ☐ | Job Abandonment | ☐ | Absenteeism |
| ☐ | Job Relocation Refused | ☐ | Lateness |
| ☐ | Dissatisfied with Job | ☐ | Not Qualified |
| ☐ | Other Employment | ☐ | Violation of Company Policy |
| ☐ | Personal or Domestic | X | Lack of Work |
| ☐ | Continuing Education | ☐ | Gross Insubordination |
| ☐ | Other _____ | ☐ | Other _____ |

## Items Returned to CCG (check all that apply)

X Cell Phone   ☐ Computer/Laptop   X Company Truck/ Keys   ☐ Building Keys   ☐ CCG ID Cards   ☐ Other

## Explanation of Final Incident
Include all relevant dates and previous infractions. Continue on back of page if necessary.

_____

_____

_____

### MUST BE COMPLETED

**Employee's Signature**   *Jason McLean*          Date   10-6-05

**Supervisor (signature)**   *Will Hf*             Date   10-6-05

**Supervisor (print name)**   William J Grover Jr

**Witness Signature**   *Rhyle*                    Date   10/6/05

### Office Use Only

Pd w/CK 10.13.05 KM

☐ If checked, the company chooses not to challenge claimant's eligibility to receive benefits.

Health Insurance   term &C        Stock   NA              Tool amount owed _____

H.I. Reimbursement   NA           Garnishment _____     Vacation   2 days &C

401(k)   NA                       Direct Deposit   off    Computer/Network Access   see attached

NG   NA                           Vehicle Allowance _____  Advances   NA

Pre-Paid Legal   NA               Cell Phone   returned

| | Human Resources |
|---|---|
| &C 10/5 | |
| 10-7-05 | Payroll KM |

medical KM
Dental KM
Vision CK.

CCG Emp separation frm (1-05)

D0578

Call back # 3026785725

RECEIVED FROM:12152697568                    06-10-05    15:09

*1-800-822-33 5*

# Communications Construction Group, LLC.
## *Record of Employment Separation*

| | | | |
|---|---|---|---|
| **Employee's Name** | John Morris | **Employee #** | 12001 |
| | (print name) | | |
| **Last Day Worked** | 10-6-05 | **Job #** | 5008 |

### Reason For Separation (check one)

| Voluntary Resignation | | Discharge | |
|---|---|---|---|
| ☐ | Job Abandonment | ☐ | Absenteeism |
| ☐ | Job Relocation Refused | ☐ | Lateness |
| ☐ | Dissatisfied with Job | ☐ | Not Qualified |
| ☐ | Other Employment | ☐ | Violation of Company Policy |
| ☐ | Personal or Domestic | X | Lack of Work |
| ☐ | Continuing Education | ☐ | Gross Insubordination |
| ☐ | Other _____ | ☐ | Other _____ |

### Items Returned to CCG (check all that apply)
X Cell Phone  ☐ Computer/Laptop  ☐ Company Truck/ Keys  ☐ Building Keys  ☐ CCG ID Cards  ☐ Other _____

### Explanation of Final Incident
Include all relevant dates and previous infractions. Continue on back of page if necessary.

_____

_____

**MUST BE COMPLETED**

| | | | |
|---|---|---|---|
| **Employee's Signature** | _Tom_ | Date | 10-6-05 |
| **Supervisor (signature)** | _Will f.kr_ | Date | 10-6-05 |
| **Supervisor (print name)** | William J Grover Jr | | |
| **Witness Signature** | _____ | Date | _____ |

### Office Use Only
Pd w/ck 10-13-05 kw

☐ If checked, the company chooses not to challenge claimant's eligibility to receive benefits.

| | | | | | |
|---|---|---|---|---|---|
| Health Insurance | term RV | Stock | NA | Tool amount owed | |
| H.I. Reimbursement | NA | Garnishment | | Vacation | 3 days LC |
| 401(k) | NA | Direct Deposit | Off | Computer/Network Access | See attached |
| ING | NA | Vehicle Allowance | | Advances | NA |
| Pre-Paid Legal | NA | Cell Phone | returned | | |

→ medical kw
   Dental kw

| | |
|---|---|
| LC 10/5 | Human Resources |
| 10/13/05 | Payroll kw |

CCG Emp separation frm/(4-05)

215-535-2355                                           D0579

06-18-05    13:17    RECEIVED FROM:12152697568    P.03

# Communications Construction Group, LLC.
## *Record of Employment Separation*

| | | | |
|---|---|---|---|
| **Employee's Name** | Harry Ortiz | **Employee #** | 11959 |
| | (print name) | | |
| **Last Day Worked** | 10-6-05 | **Job #** | 5008 |

### Reason For Separation (check one)

| Voluntary Resignation | | Discharge | |
|---|---|---|---|
| ☐ | Job Abandonment | ☐ | Absenteeism |
| ☐ | Job Relocation Refused | ☐ | Lateness |
| ☐ | Dissatisfied with Job | ☐ | Not Qualified |
| ☐ | Other Employment | ☐ | Violation of Company Policy |
| ☐ | Personal or Domestic | X | Lack of Work |
| ☐ | Continuing Education | ☐ | Gross Insubordination |
| ☐ | Other | ☐ | Other |

### Items Returned to CCG (check all that apply)

X Cell Phone   ☐ Computer/Laptop   ☑ Company Truck/ Keys   ☐ Building Keys   ☐ CCG ID Cards   ☐ Other _____

### Explanation of Final Incident
Include all relevant dates and previous infractions. Continue on back of page if necessary.

---

**MUST BE COMPLETED**

| | | | |
|---|---|---|---|
| **Employee's Signature** | _____ | **Date** | _____ |
| **Supervisor (signature)** | _____ | **Date** | 10-6-05 |
| **Supervisor (print name)** | William J Grover JR | | |
| **Witness Signature** | _____ | **Date** | 10/6/-05 |

### Office Use Only

pd w/ck 10·13·05  Km.

☐ If checked, the company chooses not to challenge claimant's eligibility to receive benefits.

| | | |
|---|---|---|
| Health Insurance term FC | Stock NA | Tool amount owed _____ |
| H.I. Reimbursement NA | Garnishment _____ | Vacation 3½ days ot |
| 401(k) NA | Direct Deposit Off | Computer/Network Access See Attached |
| ING NA | Vehicle Allowance _____ | Advances NA |
| Pre-Paid Legal NA | Cell Phone Returned | |

medical
Dental
vision

PC 10/5  Human Resources
10·7·05  Payroll Km.

CCG: Emp. separation form (4-05)

610-563-8474

D0580