IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JASON MCLEAN and<br>BRIAN COLEMAN,<br><br>        Plaintiffs,<br><br>        v.<br><br>COMMUNICATIONS CONSTRUCTION<br>GROUP, LLC.,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) Civ. No. 06-617-SLR<br>)<br>)<br>)<br>)<br>)<br>) |

Ronald G. Poliquin of Young, Malmberg & Howard, P.A., Dover, Delaware. Counsel for Plaintiffs.

Michael P. Kelley & Daniel M. Silver of McCarter & English, LLP, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Thomas Benjamin Huggett of Morgan, Lewis & Bockius, LLP, Philadelphia, Pennsylvania.

**MEMORANDUM OPINION**

Dated: March 7, 2008
Wilmington, Delaware

*[signature]*
**ROBINSON, District Judge**

## I. INTRODUCTION

Plaintiffs Jason McLean ("McLean") and Brian Coleman ("Coleman") (collectively "plaintiffs"), African American men, brought suit against their former employer, Communications Construction Group, LLC ("CCG" or "defendant") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"). More specifically, plaintiffs assert three claims under Title VII against defendant: hostile work environment due to racial harassment; racial discrimination; and retaliation. Both plaintiffs and defendant have moved for summary judgment. The court has jurisdiction over these matters pursuant to 28 U.S.C. § 1331.

## II. FACTS

For purposes of this motion practice, the material facts are undisputed.

CCG is a construction services company that provides services to the cable television and telephone industries. As CCG contracts with different cable and telephone providers to perform work at many different locations, CCG employees generally work at multiple job sites to which they must travel. Once CCG employees complete the work at one job site, it is typical for them to relocate to the next job site. The general work done by CCG crews involves digging trenches for the installation of underground cable. A crew is paid by the linear foot. There are different rates of pay for different job sites. For example, when a crew is installing a main trunk line underground, the rate of pay is higher than when a crew is installing lines from the main trunk to a home (a "drop line"). The faster the crew with its digging, the more money they make. (D.I. 41, ex. 1; D.I. 45, exs. 13, 15, 16, 27)

In May 2005, CCG was performing work for Verizon in New Castle, Delaware. The work involved the underground installation of a main trunk line at a rate of $2.80 a linear foot. At the time, both McLean and Coleman were working on a crew with Brad Dodson ("Dodson"), who was the crew foreman.[1] Plaintiffs' crew reported to Mike Fender, who had the job title of field supervisor. Mike Fender, in turn, reported to Dave Dodson, who worked as the job supervisor for the New Castle job site. Brad and Dave Dodson are brothers. John Gates was the regional supervisor. (D.I. 39, exs. 7, 8, 10, 39)

On May 31, 2005, while McLean and Coleman were working at the New Castle job site, they were informed by a co-worker that Dodson had referred to them as "dumb niggers."[2] Plaintiffs immediately confronted Dodson at the job site.[3] Coleman and

---

[1] By May 2005, Coleman had been working for CCG for four or five years; McLean had only started his employment with CCG in January 2005. Dodson had been an employee with CCG on and off since at least 1990. Although Dodson had a less-than-stellar employment record, there is no history of record relating to racial harassment, discrimination or retaliation. Nor had either plaintiff complained of any such conduct prior to May 2005. (D.I. 39, exs. 21, 22; D.I. 45, exs. 1, 27; D.I. 47, exs. B-E)

[2] Brad Dodson has denied making any such derogatory statement; nevertheless, CCG has assumed that plaintiffs' allegations are true in this regard for purposes of the instant motion practice. The record includes evidence that two CCG employees confirm that the statement was made, Robert Koch (who passed the statement along to plaintiffs) and Joseph Tatsch. (D.I. 39, exs. 1, 2, 24, 31, 33; D.I. 41, ex. 1; D.I. 46, ex. 3)

[3] Plaintiffs did not leave the job site to confront Dodson; however, they did leave their work area and walked approximately 150 feet to where Dodson was working. (D.I. 45, exs. 4, 7)

3

Dodson got into a verbal altercation and Dodson physically contacted Coleman.[4] McLean thereafter contacted Lisa Clements, CCG's Human Resources Manager; Coleman called the police; Dodson called Dave Dodson to report the incident; Dave Dodson called Mike Fender. Mike Fender arrived at the scene and tried to defuse the situation. The police also arrived and took statements from everyone involved. (D.I. 45, exs. 4, 5, 8; D.I. 47, ex. G)

Ms. Clements, on behalf of CCG, investigated the incident. At the conclusion of her investigation, she gave written warnings to Dodson,[5] Robert Koch,[6] and plaintiffs.[7] Plaintiffs were immediately removed from Dodson's crew and never again worked under his supervision for the remainder of their employment with CCG.

Subsequent to the May 31, 2005 incident, both plaintiffs were transferred to other job sites and promoted to foremen. Dave Dodson and Jonathan Gates made these employment decisions. On July 6, 2005, plaintiffs' crew was transferred to a job site in West Chester, Pennsylvania. Although the crew was "dropping line" at a lesser

---

[4]There is no dispute that Dodson contacted Coleman's chest with his fingers. Although this physical contact was described in plaintiffs' papers as "striking" Coleman in the chest, the record evidence describes this contact as "poking" Coleman in the chest. (D.I. 39, ex. 33; D.I. 45, ex. 10; D.I. 47, ex. G)

[5]For engaging in the physical altercation. (D.I. 41, ex. 7)

[6]For failing to report the alleged racial statement as required by company policy and for inciting other employees by repeating the statement. (D.I. 41, ex. 8)

[7]Both plaintiffs received warnings for failing to use CCG's complaint procedure provided for in the company's "Harassment Policy" and for leaving their job site to engage in a physical confrontation with Dodson. With respect to the former, plaintiffs had received CCG's Employee Manual and had signed verifications that they had read and understood all of CCG's policies prior to the incident. (D.I. 41, exs. 9 - 12; D.I. 45, exs. 4, 8)

4

rate of pay than under the New Castle contract ($1.20 per foot), plaintiffs' direct pay was comparable.

As a foreman, Coleman was assigned the use of a company truck for taking equipment from the warehouse to the job site. When it was discovered that Coleman was also using the truck to drive home to Delaware, he was directed by John Gates to stop such personal use of company equipment.[8] (D.I. 39, ex. 39; D.I. 41, ex. 13; D.I. 45, exs. 11, 13, 15, 16, 19, 25, 28; D.I. 46, ex. 3)

On October 6, 2005, seven CCG employees (including plaintiffs) were laid off due to lack of work. Of the seven, three were African American men (including plaintiffs) and four were Hispanic. The supervisor signing the separation papers for these employees was William J. Grover, Jr. (D.I. 41, exs. 13, 15; D.I. 48, ex. 6)

### III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden

---

[8]Plaintiffs assert that every foreman they had met were permitted to use a company truck for commuting. According to CCG, any foremen who were permitted to take company vehicles home had been grandfathered in under an old policy, which did not apply to Coleman.

of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." Revis v. Slocomb Indus., 814 F. Supp. 1209, 1215 (D. Del. 1993) (quoting Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir. 1987)).

## IV. ANALYSIS

Plaintiffs rely on the same set of facts to prove all of their claims, that is: (1) Dodson's racial statement and the related May 31, 2005 altercation; and (2) subsequent

to May 2005, (a) plaintiffs were transferred to different job sites; (b) as foremen, they were not allowed to use a company truck for personal transportation; and (c) they were laid off in October 2005.

### A. Hostile Work Environment

The determination of whether the quantity and quality of racial harassment has created a hostile work environment is made on a case-by-case basis after considering the totality of the circumstances. See Andrews v. City of Philadelphia, 895 F.2d 1469, 1482-84 (3d Cir. 1990); see also 29 C.F.R. § 1604.11(b). To state a Title VII claim premised on a hostile work environment, plaintiffs must demonstrate the following: (1) they suffered intentional harassment because of their race; (2) the harassment was severe or pervasive;[9] (3) the harassment detrimentally affected plaintiffs; (4) the harassment would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability. See Andrews, 895 F.2d at 1482. A prima facie showing, therefore, contains both a subjective standard (that plaintiffs were in fact affected) and an objective standard (that a reasonable, similarly situated individual would have been affected). See id. at 1483.

Having reviewed the record, the court concludes that plaintiffs have failed to carry their burden of proving a prima facie case for a hostile work environment, which requires

---

[9]While the Andrews court stated that the discrimination in question must have been "pervasive and regular," the United States Supreme Court has employed a "severe or pervasive" standard, see Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001), which the Third Circuit recently adopted, noting that "[t]he difference is meaningful, and the Supreme Court's word controls," Jensen v. Potter, 435 F.3d 444, 449 n.3 (3d Cir. 2006), overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).

them to demonstrate that they were subject to harassment which was pervasive or severe. There simply is no evidence of record that plaintiffs were exposed to the kind of racially charged conduct that must be present to satisfy their burden of proof in this regard. Aside from Dodson's one racial statement, plaintiffs have not identified any other instances of racial harassment; nor is there evidence of record of complaints made by plaintiffs or any other employee regarding any other instances of racial harassment, discrimination or retaliation.[10] A single racially derogatory comment[11] is insufficient to withstand defendant's summary judgment challenge.[12]

### B. Racial Discrimination

Claims of racial discrimination brought pursuant to Title VII are analyzed under a burden-shifting framework. Under this framework, plaintiffs must first establish a prima facie case of race discrimination by proving that: (1) they are members of a protected class; (2) they suffered some form of adverse employment action; and (3) this action occurred under circumstances that give rise to an inference of unlawful discrimination such as might occur when a similarly situated person not of the protected class is treated

---

[10] Indeed, Coleman admitted in his deposition that there was no similar conduct prior to the one racial statement leading to the May 31, 2005 altercation. (D.I. 39, exs. 21, 22; D.I. 45, ex. 1)

[11] Plaintiffs assert that more than just two other employees were aware of Dodson's racial statement. However, there is no evidence of such in the record aside from plaintiffs' conclusory statements. At this stage of the proceedings, with the record closed, plaintiffs have failed to identify any genuine issues of material fact in this regard.

[12] Because Dodson's racial statement is the only conduct that relates to plaintiffs' race, the court will not take into consideration any of the other conduct upon which plaintiffs rely for their claims for purposes of establishing a hostile work environment based on racial harassment.

differently. See Boykins v. Lucent Techs., Inc., 78 F. Supp. 2d 402, 409 (E.D. Pa. 2000) (citing Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir.1999)).  The Third Circuit recognizes, however, that the elements of a prima facie case may vary depending on the facts and context of the particular situation.  See Pivirotto v. Innovative Sys. Inc., 191 F.3d 344, 352 (3d Cir. 1999).  If plaintiff succeeds in establishing his prima facie case, the burden shifts to defendant employer to proffer "legitimate non-discriminatory" reason for its actions.  See Woodson v. Scott Paper Co., 109 F.3d 913, 920 n.2 (3d Cir. 1997). If defendant meets this burden, the burden again shifts to plaintiff to demonstrate, by a preponderance of the evidence, that the employer's rationale is pretextual.  Id. at 804. To do this, plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).  If a defendant carries this burden, the presumption of discrimination drops from the case, and plaintiff must "cast sufficient doubt" upon defendant's proffered reasons to permit a reasonable fact finder to conclude that the reasons are fabricated.  See Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1072 (3d Cir. 1996) (en banc).

Plaintiffs have failed to carry their burden of demonstrating a prima facie case of racial discrimination.  There is no evidence that plaintiffs' subsequent employment history was other than "business as usual," i.e., that white employees were not transferred to different job sites working at different pay rates.  Plaintiffs were both moved from Dodson's crew to other crews and were promoted to foremen subsequent to the May 31,

2005 incident. Plaintiffs were transferred to new job sites along with their crews. Each job site involved different work[13] and different pay. The record does not contain any evidence that there were jobs in Delaware or jobs with better pay at the time. John Gates, Regional Manager, made the decision to transfer plaintiffs. There is no evidence that he acted with any racial motivation in his decision-making capacity. Plaintiffs were among seven employees who were terminated due to lack of work. Again, aside from Dodson's racial statement in May 2005, there is no evidence of racial motivation in CCG's decision. Reviewing the summary judgment record as a whole, said record does not give rise to an inference of unlawful racial discrimination.

### C. Retaliation

Plaintiffs claiming retaliation must first establish a prima facie case under Title VII. To establish a prima facie case, plaintiffs must demonstrate that: (1) they engaged in a protected activity; (2) the defendant took adverse employment action against them; and (3) a causal link exists between the protected activity and the adverse action. See Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997).

There is no question but that plaintiffs engaged in a protected activity when they complained about Dodson's racial statement on May 31, 2005. Given the nature of plaintiffs' employment with CCG, however, the record does not demonstrate the existence of genuine issues of material fact as to whether their subsequent employment history with CCG was retaliatory in any way. More specifically, as a matter of course, the composition of CCG crews was always changing, with the crews being transferred to

---

[13]Plaintiffs always dug holes, regardless of whether the "work" was installing a main trunk line or drop lines. (D.I. 45, ex. 13)

different job sites at different rates of pay.  Plaintiffs were promoted to foremen subsequent to May 2005.  Although plaintiffs argue that the decisions to deny Coleman the personal use of a company truck and to terminate their employment were retaliatory, aside from the fact that both happened after May 31, 2005, there is not one shred of evidence linking these events to the complaint about Dodson's conduct.  See id. at 178 ("It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn.").  Without any evidence of a causal link, no reasonable jury could find for plaintiffs in this regard.

## V. CONCLUSION

For the reasons stated, plaintiffs' motion for partial summary judgment is denied; defendant's motion for summary judgment is granted.  An order shall issue.